**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF MICHIGAN**

In re:

BARFLY VENTURES, LLC, *et al,*[1]

            Debtors.

Chapter 11
Case No. 20-01947-jwb
Hon. James W. Boyd

*Joint Administration Pending*

_____/

**DECLARATION OF MARK A. SELLERS, III**
**IN SUPPORT OF FIRST DAY MOTIONS**

      I, Mark A. Sellers, III, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

      1.      I am the Founder of Barfly Ventures, LLC ("Barfly Ventures") and each of its affiliated debtors in the above captioned chapter 11 cases (collectively, the "Debtors"). I founded what would become Barfly Ventures organization in 2008 after moving back to my hometown of Grand Rapids from Chicago, where I had a career in finance at GE Capital, Morningstar, and my investment fund Sellers Capital. I attended Berklee School of Music in

---

[1] The Debtors are: Barfly Ventures, LLC (8379), Barfly Management, LLC (6274), 9 Volt, LLC (d/b/a HopCat)(1129), 50 Amp Fuse, LLC (d/b/a Stella's Lounge)(3684), GRBC Holdings, LLC (d/b/a Grand Rapids Brewing Company)(2130), E L Brewpub, LLC (d/b/a HopCat East Lansing)(5334), HopCat-Ann Arbor, LLC (5229), HopCat-Chicago, LLC (7552), HopCat-Concessions, LLC (2597), HopCat-Detroit, LLC (8519), HopCat-GR Beltline, LLC (9149), HopCat-Holland, LLC (7132), HopCat-Indianapolis, LLC (d/b/a HopCat-Broad Ripple)(7970), HopCat-Kalamazoo, LLC (8992), HopCat-Kansas City, LLC (d/b/a HopCat,-KC, LLC and Tikicat)(6242), HopCat-Lexington, LLC (6748), HopCat-Lincoln, LLC (2999), HopCat-Louisville, LLC (0252), HopCat-Madison, LLC (9108), HopCat-Minneapolis, LLC (8622), HopCat-Port St. Lucie, LLC (0616), HopCat-Royal Oak, LLC (1935), HopCat-St. Louis, LLC (6994), Luck of the Irish, LLC (d/b/a The Waldron Public House, LLC and McFadden's Restaurant Saloon)(4255).

Boston, have a B.A. in accounting from Michigan State University, and an M.B.A. in finance from Northwestern University's Kellogg School of Management.

2. I am familiar with the Debtors' books and records, day-to-day operations, business affairs, and financial condition. I am also familiar with the facts and circumstances surrounding the First Day Motions and the commencement of these Chapter 11 Cases, and the recent key operational and strategic decisions made by the Debtors' senior management. However, no one individual has personal knowledge of all the facts in this Declaration. The facts set forth herein are based upon (a) my personal knowledge of and familiarity with the Debtors' operations and finances, (b) information learned from my review of the relevant documents, and information supplied to me by other members of the Debtors' management, the Debtors' professionals and employees of the Debtors working under my supervision, and (c) my opinions based upon experience, knowledge and information concerning the Debtors and the industry in which the Debtors operate. If called upon to testify, I would and could testify competently to the facts set forth herein.

3. I submit this Declaration in support of the First Day Motions. Part I of this Declaration describes the Debtors' business and the circumstances surrounding the commencement of these Chapter 11 Cases. Part II sets forth the relevant facts in support of the First Day Motions filed concurrently herewith.

## PART I

## BACKGROUND

4.      On the date hereof (the "Petition Date"), the Debtors commenced the above-captioned chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Chapter 11 Cases were filed to preserve the value of the Debtors' business and maintain continued operations pending the Debtors' implementation of a financial and operational restructuring. To minimize the adverse effects of commencing these Chapter 11 Cases, the Debtors have filed a number of pleadings requesting "first day" relief (collectively, the "First Day Motions"), which are described in greater detail in Part II below.

**B.**      **The Company's Business**

5.      The business was founded in 2008 with the opening of HopCat in Grand Rapids, Michigan, a specialty casual food and bar concept with craft beer and made-from-scratch kitchen cooking. Today, the Debtors have seventeen (17) HopCat locations across eight states (including Michigan, Minnesota, Wisconsin, Nebraska, Indiana, and Kentucky) as well as Grand Rapids Brewing Co. ("GRBC") and Stella's Lounge ("Stella's"), both located in downtown Grand Rapids.

### *HopCat*

6.      Despite having over a dozen locations, HopCat is *not* an average cookie-cutter chain.  Each HopCat location has its own design and specially-commissioned artwork, giving each restaurant its own unique atmosphere.  What each HopCat location has in common, though, is over 80 local, domestic, and international beers on tap, delicious food, outstanding service, and a dedication to environmental sustainability.  HopCat is a nationally-acclaimed concept, having been ranked as the #3 Beer Bar in the World by Beer Advocate



Magazine, the #2 Beer Bar in the United States by CraftBeer.com, and HopCat's Grand Rapids location was named the #1 Brewpub in the United States by RateBeer.com from 2012 to 2016.

### *Grand Rapids Brewing Co.*

7.      On January 1, 1893, six local breweries joined forces and opened GRBC at the corner of Michigan Street and Ionia Avenue in Grand Rapids.  After Prohibition, GRBC left town.  Over a century later, in 2012, the Company acquired GRBC and brought it back to downtown Grand Rapids, just six blocks away from its original location.  Today, GRBC brews eighteen different award-winning beers, including Silver Foam, a new take on the classic lager GRBC started brewing in 1893.

### *Stella's Lounge*

8.      Opened in 2010, Stella's is a whiskey bar (offering over 250 varieties) with vintage arcade games located in downtown Grand Rapids.   Stella's offers high-quality bar food, including several vegan options, and in 2012, GQ named Stella's stuffed burger the Best in America.



9.      As of the Petition Date, the Debtors employ approximately 83 people, of whom nineteen (19) are employed at the Debtors' corporate offices in Grand Rapids. However, prior to governmental shelter-in-place orders, the Debtors employed 1,145 people, of whom 41 were employed at the corporate offices in Grand Rapids.  As a result of the shelter-in-place orders, the Debtors furloughed approximately 1,135 employees whose services were no longer necessary while the Debtors paused their operations.  During this time, the Debtors have been using a skeleton staff to maintain and preserve their business so that their locations can be reopened when the governments' shelter-in-place orders are relaxed and it is safe to resume catering to the Debtors' loyal customers.  None of the Debtors' employees are covered by a collective bargaining agreement.

## C.      **Corporate and Capital Structure**

10.      Barfly Ventures was incorporated on February 1, 2010.  BarFly Ventures is owned by approximately 55 individuals and entities, including some employees and former employees.  An entity that I wholly own, BarFly Management, LLC ("BarFly Management"), is the largest equityholder of Barfly Ventures, holding approximately 28% of BarFly Ventures'

equity.  BarFly Management is a Debtor and each of the other Debtors are single-member LLCs wholly-owned by Barfly Ventures.  A corporate organizational chart is attached hereto as Exhibit A.

   11.  The Debtors[2] are borrowers under the *Credit Agreement*, dated August 31, 2015 (as amended, the "Credit Agreement") with Congruent Credit Opportunities Fund III, LP, Main Street Capital Corporation, and HMC Income Fund, Inc. (collectively, the "Prepetition Lenders"), and CIP Administrative, LLC as administrative agent.  The Debtors' obligations under the Credit Agreement are guaranteed by BarFly Management.  The Debtors' obligations under the Credit Agreement are secured by (i) liens on substantially all of the Debtors' assets and (ii) liens on all of BarFly Management's assets, except its membership interests in BarFly Ventures. As of the Petition Date, there is approximately $29.5 million outstanding under the Credit Agreement, which includes accrued but unpaid interest, and no further availability under the lending facility.

   12.  On April 8, 2020, and with the consent of the Prepetition Lenders, the Debtors submitted to First Savings Bank ("FSB") an application to borrow funds made available under the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), which added a new product titled the Paycheck Protection Program (the "PPP") to the U.S. Small Business Administration's Loan Program.  On April 29, 2020, FSB approved and funded the Debtors' PPP loan application in the approximate amount of $6.6 million.

---

[2] One Debtor, HopCat-Concessions, LLC, is not listed as a borrower under the Credit Agreement.

13.     As of June 2, 2020, the Company estimates that it owes various vendors, suppliers, and other unsecured trade creditors approximately $5.6 million.

**D.     Events Leading to the Commencement of the Chapter 11 Cases**

14.     The Debtors' restaurant chain operates during a time when nearly all casual dining concepts in the country are struggling as a result of macro- and microeconomic factors, such as rising wages, increased competition, and online third-party food delivery platforms.  The Debtors have accordingly struggled in servicing their long-term debt obligations and maintaining sufficient liquidity that enable them to endure some of the unpredictable peaks and valleys of foot traffic in their core locations and the other states in which they operate.

15.     Over the past several years, the Debtors took on an overly-aggressive expansion process by building new HopCat locations that were both too large and geographically diverse, including locations in Florida, Illinois, and Minnesota.  Given their respective locations, they were more difficult and expensive to manage from Grand Rapids, in addition to other expenses that were over-market, including rent.  The "craft beer craze" has also slowed down along with the uneven casual dining interest in a nationally struggling retail market. The reduced foot traffic coupled with increasing G&A has adversely affected the Debtors' cash flow and their ability to maintain business operation has been impacted. In the end, the Debtors' business is not sustainable without further operational and long-term financial changes.

16.     This lack of liquidity materially reduced the Debtors' ability to fund necessary capital expenditures and investment in their restaurants that would allow the business to grow more organically.  At the same time, the challenging casual dining industry made it

difficult to remain profitable. In particular, the costs of rent due under the Debtors' long-term real property leases, which is one of the Debtors' largest monthly expenditures, along with other market pressures such as higher wages and other costs, further strained the Debtors' liquidity and hampered their ability to fund the necessary cash to sustain their operations.

17.     In March 2020, in order to ease liquidity constraints and rebuild its core brand in the regions with a loyal customer base, the Debtors closed down two locations in Port St. Lucie, Florida and St. Louis, Missouri because they were underperforming, showed no tangible signs of recovering, and drained the Debtors' liquidity on account of over-market leases. The Debtors have also instituted certain corporate initiatives that focus on improving the brand and delivering a unique concept to customers. The Debtors have worked to revitalize their core operations by other means, including a successful launch of an online ordering program through DoorDash, Postmates, and ODO, implementation of cost reduction and asset monetization strategies, and the rejuvenation of their lunch and happy hour programs. Plus, the Debtors have instituted various enterprise and operational mechanisms that streamlined operations and cut costs.

18.     While implementing the above-described turnaround efforts, the Debtors have been working with their existing corporate and litigation counsel, Warner Norcross + Judd, Rock Creek Advisors ("Rock Creek") (engaged in November 2019) as their financial advisor, Pachulski Stang Ziehl & Jones LLP ("PSZJ") as restructuring counsel (engaged in January 2020), and Mastodon Ventures, Inc. ("Mastodon") as its investment banker (January 2020). The

Debtors have worked with each and they all have been working together in various capacities to address the financial and operational issues the Debtors are facing.

19.    Initially, it was the Debtors' goal to work with their professionals and other key counterparties on agreeable terms of an out-of-court transaction. The Debtors, certain equity holders, and the Prepetition Lenders explored various operational and financial restructurings that, if successful, would have prevented the filing of these Chapter 11 Cases.  At the same time, the Debtors and their advisors reached out to certain landlords regarding the restructuring of their various real estate leases on either a short-term or long-term basis so they align with market terms and financial wherewithal of each location.

20.    Despite management's best effort, their strong brands, and loyal customer base, the Debtors' efforts have not been enough to address their overleveraged capital structure, certain underperforming locations, and over-market leases.  During this already difficult time for the Debtors, their operations were shut down, like all restaurants and bars across the country, by the COVID-19 pandemic.  All of the Debtors' locations were closed as of March 20, 2020. Immediately prior to the complete closures of the Debtor's operations, certain locations remained open for take-out and delivery but the Debtors eventually closed those locations because the costs exceeded the benefits of operation given that same store sales were down as much as 52% at certain locations and 36% on a consolidated basis.  In short, COVID-19 has had an unprecedentedly deleterious effect on the Debtors' operations and necessitated the filing of these bankruptcy cases for the purpose of preserving the Debtors' brand so that it can be re-opened and restructured after current governmental restrictions are relaxed and eventually lifted.

21.     The Debtors have been in the process of taking the necessary steps to restart their business with their turnaround strategy and are well-positioned to move forward in a positive direction as and when the region, along with the rest of the country, are ready to restart catering to consumer needs.

22.     First, the Debtors' applied for and received an unsecured loan in the approximate amount of $6.6 million under the CARES Act, which they intend to use to stabilize their operations until restrictions imposed as a result of COVID-19 are fully lifted.   The PPP Loan may be used for, among other things: (i) payroll costs; (ii) costs related to the continuation of group health care benefits during periods of paid sick, medical, or family leave and insurance premiums; (iii) salaries, commissions, or other similar compensation; and (iv) rent and utility payments.   The Debtors intend to use the PPP Loan for precisely those purposes and other expenditures to administer these cases to the extent necessary.   The PPP Loan is an unsecured loan that is not collateral of the Prepetition Lenders under the Credit Agreement.

23.     Second, and with the PPP funds, the Debtors are readying the streamlined operation to reopen in phases. Initially, the Debtors will open locations in the Grand Rapids area and the rest of Michigan. As and when shelter-in-place restrictions are relaxed and consumer traffic picks up, the Debtors will continue to open other locations on a rolling basis and hire back furloughed employees as and when necessary. The Debtors are committed to providing their patrons with a safe and healthy environment in which to enjoy a delicious meal and refreshing drinks.  The Debtors recognize the importance cautiously opening the restaurants in light of the e COVID-19 pandemic. As the responses to the health risks have evolved, the health and safety of

our team members and the communities we serve has been and will continue to be our top priority. As our restaurants reopen, we remain committed to providing the same exceptional guest experiences you are used to, with increased cleaning and sanitization protocols in place to ensure your safety and peace of mind in response to the COVID-19 pandemic. We will continue to monitor the COVID-19 situation closely and stay in accordance with local and federal government mandates and CDC guidelines, which will include the creation of a new Safety Manager at each location to train all employees and enforce all recommended health guidelines.

E.    **Goals of the Chapter 11 Cases**

24.    The Company commenced these Chapter 11 Cases to preserve value for their stakeholders, including their employees and creditors. Prior to the Petition Date, the Debtors engaged Mastodon as their investment banker. After its engagement, Mastodon prepared a marketing teaser and confidential information memorandum that it used, and will continue to use, to market the sale of the Debtors' assets.

25.    However, before embarking on a full-blown sale process, the Debtors will first look to the Prepetition Lenders to determine if they have any interest sponsoring a debt for equity plan or acting as a stalking horse bidder for the purpose of submitting a credit bid to purchase the Debtors' assets or setting the floor for third parties to submit competing offers that would come together in an auction yielding the highest and best offer.

26.    In the event the Prepetition Lender are not interested acting as a plan sponsor or stalking horse buyer, the Debtors and Mastodon will continue to market the Debtors' assets with a goal of entering into an asset purchase agreement with a third-party buyer, which

will be subject to higher and better offers and an auction in the event the Debtors receive competing bids.  In the near term, the Debtors will file a sale procedure motion for purpose of establishing a formal sale timeline, which will include bidding procedures and an auction in the event the Debtors receive additional competing offers.

27.     I believe that a marketing and sale process through these Chapter 11 Cases is in the best interests of the Company and all stakeholder because it is the best way to right-size it capital structure while focusing on the Debtors' core locations.

28.     The goals of these Chapter 11 Cases are the best way to maintain the Debtors' customer base, which has been earned by providing their patrons with perfectly-crafted experiences in unique and highly differentiated restaurants that are not available at many of their competitors.  The Debtors' efforts to date have been aimed to enhance the quality and selection of food, added new menus, launched an improved guest service platform, and re-aligned their operating management teams to meet and exceed guest expectations.  These factors plus other locally-branded concepts drive high customer satisfaction and repeat business.

29.     I believe that a sale of the Debtors' assets will achieve these goals thereby preserving the going concern, maintaining jobs and relationships with trade vendors and service providers that are all an important part of what makes the Debtors' restaurants what they are known for.

## PART II

## FIRST DAY MOTIONS

30.     In an effort to minimize the adverse effects of the commencement of the Chapter 11 Cases, the Debtors have requested various types of relief in the First Day Motions filed simultaneously with this Declaration.  A summary of the relief sought in each First Day Motion is set forth below.

31.     I have reviewed each of the First Day Motions.  The facts stated therein are true and correct to the best of my knowledge, information, and belief.  I believe that the type of relief sought in each of the First Day Motions (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption and (b) is essential to maximizing the value of the Debtors' assets for the benefit of their estates and creditors.

32.     With respect to each First Day Motion which seeks authority to pay all or part of a claim that arose before the Petition Date within the first 21 days of the Petition Date, for the reasons stated herein and in such First Day Motion, such relief is necessary to avoid immediate and irreparable harm.

**A.      Motion of Debtors for Entry of an Order (I) Directing
Joint Administration of Chapter 11 Cases and (II) Granting
Related Relief (the "Joint Administration Motion")**

33.     In order to optimally and economically administer the Debtors' chapter 11 cases, such cases should be jointly administered, for procedural purposes only, under the case number assigned to Barfly Ventures, LLC.

34.     The Debtors in these bankruptcy cases are "affiliates" as that term is defined in §101(2) of the Bankruptcy Code; accordingly, both the Bankruptcy Code and the Bankruptcy Rules authorize a grant of the relief requested herein.

35.     Many of the motions, hearings, and orders that will arise in these chapter 11 cases will jointly affect each Debtor. By jointly administering these chapter 11 cases, the Debtors will be able to reduce fees and costs resulting from the administration of these cases and ease the administrative burden of having to file multiple and duplicative documents.

36.     Further, the rights of the Debtors' respective creditors will not be adversely affected by the joint administration of these chapter 11 cases because this Motion requests only administrative, not substantive, consolidation of the estates. Any creditor may still file a claim against a particular Debtor or its estate, or Debtors and their respective estates.

37.     This Court will be relieved of the burden of entering duplicative orders and maintaining duplicative files.

38.     Finally, supervision of the administrative aspects of these chapter 11 cases by the Office of the United States Trustee will be simplified by virtue hereof. Thus, all parties in interest should benefit from the reduced costs as a result of joint administration.

38.     Based on the foregoing, the joint administration of these chapter 11 cases is in the best interests of the Debtors, their creditors, and all parties in interest.

**B.     Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor and (B) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, and (II) Granting Related Relief (the "Consolidated Matrix Motion")**

39.     Through the Consolidated Matrix Motion, the Debtors seek the entry of an order authorizing the Debtors to file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor and authorizing the Debtors to file a single, consolidated list of their thirty largest unsecured creditors, as opposed to separate lists for each Debtor.

40.     The Debtors presently maintain various computerized lists of the names and addresses of their respective creditors that are entitled to receive the obligatory notices and other documents in these chapter 11 cases.  The Debtors believe that the information, as maintained in computer files (or those of their agents), may be consolidated and utilized efficiently to provide interested parties with the Notices and other similar documents.  Requiring the Debtors to segregate and convert their computerized records to an entity-specific creditor matrix format would be an unnecessarily burdensome task and would result in duplicate mailings.  Accordingly, by the Consolidated Matrix Motion, the Debtors seek authority to file the lists on a consolidated basis, identifying their creditors in the format or formats currently maintained in the ordinary course of the Debtors' businesses.  In addition, filing a consolidated list of the largest thirty unsecured creditors will help alleviate administrative burdens, unnecessary costs, and the possibility of duplicate service.

41.     I believe that such relief is not only appropriate under the circumstances, but necessary for the efficient and orderly administration of these chapter 11 cases.

**C.    Motion for Order Allowing Extension of Time for the Filing of
Schedules and Related Documents (the "Schedules Extension Motion")**

42.    Pursuant to the Schedules Extension Motion, the Debtors seek entry of an
order extending the deadline by which the Debtors must file their schedules of assets and
liabilities, schedules of current income and expenditures, schedules of executory contracts and
unexpired leases, and statements of financial affairs (collectively, the "Schedules and
Statements") to July 7, 2020, without prejudice to the Debtors' ability to request additional
extensions.

43.    Given the size and complexity of the Debtors' business and financial
affairs, and the critical matters that the Debtors' management and professionals were required to
address prior to the commencement of these chapter 11 cases, the Debtors were not in a position
to complete the Schedules and Statements as of the Petition Date. Accordingly, the relief
requested in the Schedules Extension Motion is warranted under the circumstances.

**D.    Debtors' Motion for Order Under Sections 105, 345, 363, 503, 1107 and 1108 of the
Bankruptcy Code Authorizing (I) Maintenance of Existing Bank Accounts; (II)
Continuance of Existing Cash Management System, Bank Accounts, Checks and
Related Forms; (III) Limited Waiver of Section 345(b) Deposit and Investment
Requirements; and (IV) Granting Related Relief (the "Cash Management Motion")**

44.    The Company's Cash Management System facilitates the timely and
efficient collection, management, and disbursement of funds used in the Debtors' business. The
Cash Management System primarily consists of, as more fully outlined below, (i) a primary
operating bank account, (ii) 19 linked sub-accounts, and (iii) a money market account, all located
at Mercantile Bank.[3]  The Company also maintains (i) a checking account at Chemical Bank, (ii)

---

[3]    The Company is in the process of closing certain restaurant locations. To the extent sub-accounts relating to
these restaurants are no longer required, the Debtors request authority to close such sub-accounts without
further order of the Court.

a money market account at Chemical Bank that contains the Company's Paycheck Protection Payment ("PPP") loan proceeds, and (iii) four closed loop bank accounts with various banks that support local business operations. A list of the Company's bank accounts (collectively, the "Bank Accounts") is set forth on Exhibit A annexed to the Cash Management Motion. The Debtors make their payroll disbursements directly from the PPP Checking Account. To meet their bi-weekly payroll obligations, the Debtors utilize the services of ADP, a third party payroll processor. Payments to fund payroll disbursements are made to ADP from the PPP Checking Account every other Friday and subsequently disbursed to employees the following Monday.

45.     The Cash Management System is designed to effectuate the collection of revenue from customers, pay operating expenses, and maintain payroll obligations. Any disruption to the Cash Management System would jeopardize the Company's ability to timely satisfy postpetition obligations.

46.     The Debtors use a variety of checks and business forms in the ordinary course of business. To minimize expenses to their estates and avoid confusion during the pendency of the Chapter 11 Cases, the Debtors request that the Court authorize the Debtors' continued use of all existing preprinted correspondence and business forms (including, without limitation, letterhead, checks and other business forms) (collectively, the "Business Forms") as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new Business Forms. That said, in the event that the Debtors generate new Business Forms during the pendency of these Chapter 11 Cases other than from

their existing stock, the Debtors will include a legend referring to the Debtors as "Debtors-In-Possession" on such newly created business forms.

**E.**   **Debtors' Motion for Entry of an Order Authorizing the Debtors to (I) Pay and/or Honor Prepetition Wages, Salaries, And Employee Benefits; (II) Remit Withholding Obligations and Deductions; (III) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (IV) Have Applicable Banks and Other Financial Institutions Receive, Process, Honor, and Pay Certain Checks Presented for Payment and Honor Certain Fund Transfer Requests (the "Wage Motion")**

47.   By the Wage Motion, the Debtors seek to minimize the personal hardship to their employees (collectively, the "Employees") as a result of the filing of these chapter 11 cases and to minimize the disruption to the Debtors' operations. To accomplish this, the Debtors request, in their sole discretion, the authority (a) to pay and honor, *inter alia*, certain prepetition claims of their Employees for wages, salaries, and compensation (the "Wages"), (b) pay and honor employee benefits and expense reimbursements and honor and pay ordinary course bonuses owed to certain non-insider Employees (collectively, the "Benefits" and, together with Wages, the "Wages and Benefits"); (c) remit withholding obligations and employee deductions and withholdings, and (d) to continue to pay and honor such Wages and Benefits as they become due postpetition in the ordinary course of the Debtors' business.

**i.**   **General Employee Overview**

48.   Historically, the Debtors have employed approximately 1,350 employees (collectively, the "Employees"), which includes approximately 1,200 part-time hourly employees, 100 full-time restaurant managers, and 35 corporate employees. The Employees are generally classified in two groups: (a) approximately 1,337 non-partner employees (collectively, the "Non-Partner Employees") and (b) 13 partner employees that have a partnership interest in debtor BarFly Ventures, LLC (collectively, the "Partner Employees"). The Partner Employees

have employment agreements with the Debtors and are generally treated like Non-Partner Employees, except they are paid on a different payroll cycle, as described further below.

49.     As discussed above, in light of recent events surrounding the coronavirus, the Debtors were forced to mothball their operations and are now in the process of gradually resuming operations.  As a result, as of the Petition Date, the Debtors only have 76 Non-Partner Employees and 7 Partner Employees, for a total of 83 Employees.

50.     The Employees are not unionized and, except as otherwise noted, the employee benefits described herein are generally applicable to all Employees.

51.     I believe that we will have sufficient funds available postpetition, through the use of cash collateral and postpetition financing, to pay or honor all Wages and Benefits and other amounts detailed in the Wage Motion in the ordinary course of business.

**ii.        Payroll**

52.     Non-Partner Employees are paid bi-weekly on Mondays (each payroll date, a "Bi-Weekly Pay Date").  Partner Employees are paid bi-monthly on the 15th and the last day of the month (each payroll date, a "Bi-Monthly Pay Date" and, together with the Bi-Weekly Pay Date, the "Payroll Dates").  The Debtors use a third party to process payroll and fund payroll prior to the Payroll Dates.  All payroll-related automatic deposits and checks are drawn against third party accounts (*i.e.*, Automatic Data Processing, Inc., the Company's third party payroll processor).

53.     The next Bi-Weekly Pay Date will occur on June 22, 2020, which relates to wages earned during the period of June 1, 2020 through and including June 14, 2020 – only two days of which relate to the prepetition period.[4]  As of the Petition Date, I estimate the

---

[4]    The Debtors funded their June 8, 2020 payroll, which relates to the period from May 18, 2020 to May 31, 2020, prior to the Petition Date.

Debtors owe approximately $15,000 on account of prepetition accrued, but unpaid, wages for all Non-Partner Employees being paid on June 22, 2020 (the "Non-Partner Employee Unpaid Wages").

54.    The next Bi-Monthly Pay Date will occur on June 15, 2020, which relates to wages earned during the period of June 1, 2020 through and including June 15, 2020.  As of the Petition Date, the Debtors estimate they owe approximately $4,250 on account of prepetition accrued, but unpaid, wages for all Partner Employees, which is scheduled to be paid on June 15, 2020 (the "Partner Employee Unpaid Wages" and, together with the Non-Partner Employee Unpaid Wages, the "Unpaid Wages").

55.    The Debtors use Automatic Data Processing, Inc. ("ADP") to process the Company's payroll obligations in the ordinary course of business.  On each Payroll Date, the Debtors pay ADP fees to process their payroll.  The fees vary depending upon the number of employees and the timing of the payroll processing.  In light of the Company's recent reduction in force, the fee for each Bi-Weekly Pay Date is approximately $550 and the fee for each Bi-Monthly Pay date is approximately $500.  I believe that the Debtors are current in fees owing to ADP but will owe ADP processing fees for the postpetition Payroll Dates related to prepetition Unpaid Wages.

**iii.    Gross Pay Deductions and Payroll Taxes**

56.    For each applicable Payroll Date, the Debtors routinely deduct certain amounts from each Employee's gross payroll, including, without limitation, garnishments, child support, spousal support, and similar deductions and other pre-tax and post-tax deductions payable pursuant the employee benefit plans discussed herein (including, for example, the Non-Executive Employee's share of health care benefits) (collectively, the "Deductions").

57.     In addition to the Deductions, federal and state laws require the Debtors to withhold amounts related to federal, state, and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authorities (collectively, the "Withholding Obligations").   The Debtors must also pay, from their own funds, for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively the "Employer Payroll Taxes," and, together with the Withholding Obligations, the "Payroll Taxes").  On average, the Payroll Taxes for each Bi-Weekly Pay Date, including both the Non-Partner Employee and employer portions, total approximately $2,000.

### iv.     Reimbursable Expenses

58.     Employees customarily incur business expenses in the ordinary course of performing their duties on behalf of the Debtors.  Such expenses may include, but are not limited to, cell phone expenses, office supply purchases, and business-related travel expenses, including air travel, car rental, lodging, meal charges, ground transportation, and miscellaneous other approved travel expenses (collectively, the "Reimbursable Expenses").

59.     Generally, Employees pay for the Reimbursable Expenses personally and submit expense report forms to the Debtors for reimbursement.  In some cases, Employees may not have submitted reimbursement requests in time to have been processed prior to the Petition Date.   In addition, certain Employees have corporate-issued credit cards upon which Reimbursable Expenses are charged and for which the Employees are personally responsible, but which invoices are paid by the Debtors to the extent the charges are authorized.[5]   In the aggregate, the Employees incur, on average, approximately $2,500 per month in Reimbursable

---

[5]     The Company's obligations with respect to charges on the corporate credit card are secured by a $30,000 certificate of deposit at the Mercantile Bank of Michigan.

Expenses, including corporate credit card expenses, although these amounts can vary from month to month depending on the amount of expenses incurred at any given time.

### v.  Employee Bonus Payments

60.     The Debtors administer two bonus programs: (1) a quarterly store-level bonus program available to store managers and regional directors (the "Store-Level Bonus") and (2) an annual bonus available to senior executives (the "Corporate Bonus").  The Store-Level Bonus is paid quarterly, approximately two months after the close of the quarter (*e.g.*, the Q4 2019 bonus was paid in February 2020).  The Store-Level Bonus is a performance-based incentive award that incorporates various metrics (*e.g.*, same store sales growth).  In order to be eligible to receive the Store-Level Bonus, eligible Employees must be employed on the day the payment is made.  The Store-Level Bonus is discretionary and I do not anticipate the Debtors declaring a Store-level Bonus for Q1 2020 and, by the Wage Motion, do not seek authority to pay any such bonus.

61.     The Corporate Bonus is paid annually and is available to the Debtors' chief executive officer, chief financial officer, director of information technology, vice president of food and beverage, director of culinary systems, vice president of constructions, and vice president of human resources.  The Corporate Bonus is a performance-based incentive award. The Corporate Bonus pool for 2019 was approximately $155,000 and was paid in February 2020. I do not anticipate the Debtors declaring a Corporate Bonus in 2020 and do not seek authority for any such bonus.

### vi.  Health Benefits

62.     The Debtors provide health insurance to all active salaried Employees and eligible hourly Employees.  An hourly Employee is eligible to receive health insurance if the

Employee has (i) been employed for 12 continuous months at an average of 30 or more hours per week or (ii) has been designated a full-time employee by the Debtors for health benefit purposes. Approximately 19 Employees are eligible to receive health insurance. The Company's health benefits include, *inter alia*, medical, dental, vision, disability, health savings accounts, and dependent care benefits (collectively, the "Health Plans"), as described in more detail below. Each pay period, Employees make contributions toward the Health Plan premiums for medical, dental, and vision coverage, and the Debtors deduct an Employee's portions of the premiums, if applicable, owing under the Health Plans from the Employee's Wages as Deductions.

      vii.       **Medical Plans**

      63.     The Debtors offer all regular full-time Employees and legal dependents subsidized medical insurance. The Debtors are self-insured for their medical insurance and use ASR Health Benefits (the "Administrator").

      64.     Under the Company's medical plan, the Debtors have a specific stop-loss program whereby the portion of any medical claim exceeding $70,000 is fully covered by the insurance carrier. To administer their plan, the Debtors pay Administrator monthly premiums at the end of each month for that month plus actual claims incurred in the prior month, subject to any applicable stop-loss cap. For example, in June 2020, the Company will pay Administrator the monthly premium for June 2020 and the actual claims incurred in May 2020.

      65.     The premiums payable to Administrator for June 2020 were paid as of the Petition Date. However, the claims associated with May 2020 are not yet known and remain unpaid. Accordingly, by this Motion, the Debtors seek authority to pay Administrator the valid claims as and when they come due. While no two months are the same, the aggregate claims for April 2020 were approximately $10,000.

**viii.**        **Dental Plan**

66.    The Debtors offer all eligible Employees and legal dependents dental insurance (the "Dental Plan"), which is 100% funded by Employees through withholdings from payroll, and averages approximately $450 per month for all current Employees. The Debtors are current with the Dental Plan and seek authorization to continue making payments in the ordinary course of business.

**ix.**        **Vision Plan**

67.    The Debtors also provide eligible Employees with vision insurance through a premium-based policy issued by VSP Insurance Co. (the "Vision Plan"). The Vision Plan provides several types of services, including eyeglass lenses, frames, and contact lenses. The Vision Plan provides both in-network and out-of-network services. The Vision Plan is 100% funded by Employees through withholdings from payroll, and averages approximately $150 per month for all current Employees. The Debtors seek authority to pay the $150 prepetition premium and continue to offer the Vision Plan, administer Employee withholdings, and pay VSP Insurance Co. amounts owed under the Vision Plan postpetition in the ordinary course of business.

**x.**        **Life Insurance, Accidental**

**Death & Dismemberment, and Disability Plans**

68.    The Debtors provide basic life and accidental death and dismemberment coverage to all salaried Employees and any other benefit eligible employees (the "Basic Life and AD&D Insurance Plan") through Mutual of Omaha at no cost to such Employees. The Debtors pay all premiums and administrative fees in connection with the Basic Life and AD&D

Insurance Plan. The Debtors estimate that they remit approximately $1,000 per month on account of premiums and administrative fees under the Basic Life and AD&D Insurance Plan.

69.    The Company also provides a voluntary short-term disability plan to all salaried Employees and benefit eligible employees, which the Company self-funds and administers through their weekly payroll runs.

70.    The Debtors also offer all salaried Employees and benefit eligible employees (a) voluntary supplemental life and accidental, death and dismemberment insurance (the "Voluntary Life and AD&D Plan") and (b) voluntary long-term disability insurance (the "Voluntary Long-Term Disability Plan" and together with the Voluntary Life and AD&D Plan, the "Voluntary Plans"). Eligible Employees pay 100% of the premiums under the Voluntary Plans out of payroll deductions. The Debtors estimate that they remit approximately $740 per month on account of premiums and administrative fees under the Voluntary Life and AD&D Plan. The Debtors estimate that they remit approximately $370 per month on account of premiums and administrative fees under the Voluntary Long-Term Disability Plan.

71.    The Debtors also offer additional benefits to Employees on a voluntary basis, which include, Identity Theft Protection and Legal, each through ID Watchdog, a health savings account through an institution of their choosing, and a flexible spending account through Infinisource Benefit Services (collectively, the "Voluntary Benefits"). As voluntary benefits, the Debtors remit Employee funds that are withheld from paychecks. The Debtors are requesting authority to remit all funds withheld from Employees for Voluntary Benefits.

**xi.    Vacation and Sick Time**

72.    The Debtors provide vacation pay for salaried Employees upon hire. Sick leave is also provided in states that require this benefit (together with vacation time, "PTO").

Designated hourly employees are eligible for up to 40 hours of PTO in a calendar year.  Vacation time may not be rolled over from year to year.

    **xii.**       **401(k) Plan**

    73.    The Debtors provide Employees with a 401(k) retirement plan (the "401(k) Plan").  The Debtors' obligation to match Employee contributions is in the sole discretion of the Debtors.  Currently, the Debtors do not match Employee contributions and do not seek authority to make any matching contributions.  Employee contributions are withheld from paychecks as Deductions and transferred to the 401(k) account approximately one week after each Payroll Date.  The Debtors estimate that as of the Petition Date that approximately $1,200 will need to be transferred to Employees' 401(k) accounts and seeking authority to complete such transfers as and when they become due.

    **xiii.**      **Workers' Compensation Insurance**

    74.    Under the laws of various states, the Debtors are required to maintain workers' compensation insurance to provide Employees with coverage for injury claims arising from or related to their employment with the Debtors (the "WC Claims").  The Company's workers' compensation program is fully insured ("WC Program") with Accident Fund for all locations.

    75.    For the current coverage year, the Debtors pay an initial premium and equal monthly premiums to its broker for the benefit of Accident Fund ("WC Broker") in the amounts of $10,164 each.  The initial premium of $10,164 was paid prior to the Petition Date and the Debtors are seeking authorization to continue paying premiums as they become due in the ordinary course of business.

**F.**      **Motion for the Entry of an Order Authorizing the Debtors to (A) Reject Certain Unexpired Leases Pursuant To 11 U.S.C. § 365, (B) Abandon Any Remaining Personal Property Located at the Leased Premises Pursuant To 11 U.S.C. § 554; and (C) Fix a Bar Date for Claims of Counterparties (the "Lease Rejection Motion")**

76.      By the Lease Rejection Motion, the Debtors seek the entry of an order, pursuant to section 365 of the Bankruptcy Code and Bankruptcy Rule 6006, (a) authorizing and approving the Debtors' rejection of the Rejected Leases, effective as of the Rejection Effective Date indicated on Exhibit A to the motion, (b) authorizing the Debtors to abandon any personal property located at the Leased Premises on the Rejection Effective Date, and (c) fixing a bar date for claims, if any, of the Counterparties to each and Rejected Lease.  As set forth in detail below, the relief requested herein is in the best interest of the Debtors' estates and creditors because the Debtors have ceased or will cease operations at the Leased Premises, have no further use for the Leased Premises, have vacated or will vacate each of the Leased Premises by the Rejection Effective Date, and the Debtors, in the exercise of their business judgment, do not believe that that the Rejected Leases have any net value to the Debtors' estates.

47.      The Debtors seek to reject the Rejected Leases, in accordance with principles of sound business judgment, based on the belief that the Rejected Leases are, and will continue to be, a burden to the Debtors' estates.  The Debtors have terminated their operations at the particular locations subject to the Rejected Leases, have no further use for and have vacated the Leased Premises, and the Rejected Leases no longer provide any economic benefit to the Debtors in connection with their operations at such locations.  Additionally, the Debtors have determined, in their reasonable business judgment, that there is no net value that can be realized from an attempt to market and assign the Rejected Leases.  As a result, the Debtors have

determined that the cost to the Debtors of continuing to occupy the Leased Premises under the

Rejected Leases, and of performing their obligations under the Rejected Leases and incurring

unnecessary administrative expenses, will exceed any realistic sales price, and that rejection of

the Rejected Leases is thus in the best interests of the Debtors' estates and creditors.  Finally, the

Debtors do not believe that the value of any Rejected Lease will increase in the immediate

future.  For all of the above reasons, the Debtors submit that rejection of the Rejected Leases is

in the best interests of the Debtors' estates and creditors, and other parties in interest.

<u>Abandonment of Remaining Personal Property</u>

48.    The Debtors have ceased operations at the locations subject to the

Rejected Leases.  The Debtors believe that they removed all of their owned personal property

assets (the "<u>Remaining Personal Property</u>") currently located at the Leased Premises that has a

value that would benefit the estates.  However, out of an abundance of caution and solely to the

extent that they retained any ownership interest in any Remaining Personal Property, the Debtors

seek authority to abandon any Remaining Personal Property assets that remain at the Leased

Premises subject to the Rejected Leases as of the Rejection Effective Date.

49.    The Debtors seek to abandon any Remaining Personal Property assets

described above as is, where is, and in accordance with section 554(a) of the Bankruptcy Code.

Section 554(a) provides that "[a]fter notice and a hearing, the trustee may abandon any property

of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the

estate."  11 U.S.C. § 554(a).  The Debtors believe that the costs associated with liquidating any

Remaining Personal Property at the Leased Premises on the Rejection Effective Date will likely approach or exceed the value of such assets. Accordingly, the Debtors believe that the Remaining Personal Property at the Leased Premises, if any, have inconsequential value to the Debtors' estates and should be abandoned as of the Rejection Effective Date.

<u>Claims Bar Date</u>

50.    The Counterparties may seek to assert a rejection damage claim under section 502 of the Bankruptcy Code or other claims in connection with the Rejected Leases. As a result, the Debtors further request by this Motion that the Court fix a claims bar date with respect to the Rejected Leases of the later of (a) twenty-eight (28) days after entry of an order granting the Motion, or (b) the general claims bar date to be established by subsequent order of the Court, failing which such claim or claims by the Counterparty shall be forever barred.

51.    Rule 3003(c)(3) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") provides: "[t]he court shall fix . . . the time within which proofs of claim may be filed." Bankruptcy Rule 2002(a)(7) requires at least twenty-one days' notice by mail of the time fixed for filing proofs of claim and interest pursuant to Bankruptcy Rule 3003(c)(3).

52.    The Debtors request that the Court, in accordance with Bankruptcy Rule 3003(c)(3), establish a bar date that is the later of (a) twenty-eight (28) days after entry of an order granting the Motion, or (b) the general claims bar date to be established by subsequent order of the Court, failing which such claim or claims by the Counterparty shall be forever barred.

53.     The Debtors will give notice of such bar date to the Counterparties by service of the Order approving this Motion and fixing such bar date.  The Debtors will serve such order within three (3) business days of its entry, thereby satisfying the requirements of Bankruptcy Rule 2002(a)(7).  The Debtors reserve any and all rights to object to any rejection damage claims or other claims filed by any Counterparty..

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 3rd day of June 2020.

_____

Mark Sellers

**EXHIBIT A**

**(CORPORATE ORGANIZATIONAL CHART)**

Organizational chart of Barfly Ventures, LLC and its subsidiaries:

- Barfly Ventures, LLC
  - E L Brewpub, LLC (d/b/a HopCat East Lansing)
  - GRBC Holdings, LLC
  - 50 Amp Fuse, LLC (d/b/a Stella's Lounge)
  - 9 Volt, LLC
  - HopCat-Lexington, LLC
  - HopCat-Detroit, LLC
  - HopCat-Concessions, LLC
  - HopCat-GR Beltline, LLC
  - HopCat-Lincoln, LLC
  - HopCat-Holland, LLC
  - Luck of the Irish, LLC (d/b/a The Waldron)
  - HopCat-Madison, LLC
  - HopCat-Louisville, LLC
  - HopCat-Indianapolis, LLC
  - HopCat-Royal Oak, LLC
  - HopCat-Ann Arbor, LLC
  - HopCat-Kalamazoo, LLC
  - HopCat-St. Louis, LLC
  - HopCat-Chicago, LLC
  - HopCat-Port St. Lucie, LLC
  - HopCat-Kansas City, LLC
  - HopCat-Minneapolis, LLC