## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

BARFLY VENTURES, LLC, *et al.*

Debtors. [1]

Chapter 11

Case No. 20-01947-jwb

Jointly Administered

**MOTION OF DEBTORS FOR ENTRY OF (I) AN ORDER (A) APPROVING BIDDING PROCEDURES AND SCHEDULING SALE HEARING, (B) APPROVING THE FORM OF THE ASSET PURCHASE AGREEMENT, INCLUDING THE BID PROTECTIONS, AND (C) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

hereby file this *Motion of Debtors for Entry of (I) an Order (A) Approving Bidding Procedures*

*and Scheduling Sale Hearing, (B) Approving the Form of the Asset Purchase Agreement,*

*Including the Bid Protections, and (C) Granting Related Relief; and (II) an Order (A)*

*Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens,*

*Claims, Encumbrances, and Other Interests, (B) Authorizing the Assumption and Assignment of*

---

[1] The Debtors and the last four digits of their federal employment identification number are: Barfly Ventures, LLC (8379); 9 Volt, LLC (d/b/a HopCat) (1129); 50 Amp Fuse, LLC (d/b/a Stella's Lounge) (3684); GRBC Holdings, LLC (d/b/a Grand Rapids Brewing Company) (2130); E L Brewpub, LLC (d/b/a HopCat East Lansing) (5334); HopCat-Ann Arbor, LLC (5229); HopCat-Chicago, LLC (7552); HopCat-Concessions, LLC (2597); HopCat-Detroit, LLC (8519); HopCat-GR Beltline, LLC (9149); HopCat-Holland, LLC (7132); HopCat-Indianapolis, LLC (d/b/a HopCat-Broad Ripple) (7970); HopCat-Kalamazoo, LLC (8992); HopCat-Kansas City, LLC (d/b/a HopCat,-KC, LLC and Tikicat) (6242); HopCat-Lexington, LLC (6748); HopCat-Lincoln, LLC (2999); HopCat-Louisville, LLC (0252); HopCat-Madison, LLC (9108); HopCat-Minneapolis, LLC (8622); HopCat-Port St. Lucie, LLC (0616); HopCat-Royal Oak, LLC (1935); HopCat-St. Louis, LLC (6994); Luck of the Irish, LLC (d/b/a The Waldron Public House, LLC and McFadden's Restaurant Saloon) (4255).

*Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (the "Motion").

Pursuant to the Motion, the Debtors seek, among other things, approval of bidding and sale procedures to be followed by the sale of substantially all of the Debtors' assets to Project BarFly LLC (the "Stalking Horse Bidder"),[2] subject to higher or otherwise better bids as determined by the Debtors at an auction (the "Auction").  The Debtors have determined that an auction sale of substantially all of their assets is in the best interests of their estates and creditors and will maximize the value of Debtors' assets for the benefit of all creditors.  In support of the Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.     The statutory predicates for the relief requested herein are sections 105(a), 363, and, 365 of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

A.     **Case Background**

3.     On June 3, 2020 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate and

---

[2] The Stalking Horse Bidder is an affiliate of the Prepetition Lender (defined below).

manage their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these chapter 11 cases.

4.        On June 23, 2020, the Office of the United States Trustee for Region 3 and Region 9, pursuant to section 1102(a)(1) of the Bankruptcy Code, appointed the Official Committee of Unsecured Creditors (the "Committee").

**B.        Company Background**

5.        The Debtors' business was founded in 2008 with the opening of HopCat in Grand Rapids, Michigan, a specialty casual food and bar concept with craft beer and made-from-scratch kitchen cooking. As of the Petition Date, the Debtors had seventeen (17) HopCat locations across eight states (including Michigan, Minnesota, Wisconsin, Nebraska, Indiana, and Kentucky) as well as Grand Rapids Brewing Co. ("GRBC") and Stella's Lounge ("Stella's"), both located in downtown Grand Rapids.

6.        The factual background regarding the Debtors, including their current and historical business operations and the events precipitating their chapter 11 filings, is set forth in detail in the *Declaration of Mark Sellers in Support of First Day Pleadings* [Docket No. 4] and incorporated herein by reference.

**C.        Capital Structure**

7.        The Debtors are borrowers under that certain *Credit Agreement*, dated August 31, 2015 (as amended, the "Credit Agreement") with Congruent Credit Opportunities Fund III, LP, Main Street Capital Corporation, and HMS Income Fund, Inc. (collectively, the "Prepetition Secured Lender"), and CIP Administrative, LLC, as administrative agent (in its capacity as such,

the "Administrative Agent").[3]  The Debtors' obligations under the Credit Agreement are secured by liens on substantially all of the Debtors' assets.  As of the Petition Date, there is approximately $29.5 million outstanding under the Credit Agreement, which includes accrued but unpaid interest (the "Prepetition Obligations"), and no further availability under the lending facility.

**D.    The Sale Process**

8.    As discussed above, the Debtors' business was founded in 2008 with the opening of HopCat in Grand Rapids, Michigan, a specialty casual food and bar concept with craft beer and made-from-scratch kitchen cooking.  As of the Petition Date, the Debtors had seventeen (17) HopCat locations across eight states as well as GRBC and Stella's.  The Debtors' rights, title, and interests in and related to their restaurants and the assets relating thereto are referred to herein, collectively, as the "Assets."

9.    As noted in the First Day Declaration, the Debtors filed these chapter 11 cases with the goal of pursuing a going concern sale of their assets to maximize the value of their assets for the benefit of creditors.  The primary value of the Assets is in their continued operations. Based on the foregoing and the facts referenced in the First Day Declaration, the Debtors believe that the best available means of maximizing the value of the Assets is to conduct the sale process described herein and attempt to increase recoveries through a competitive auction process for the Assets on the proposed timeline.

10.    In furtherance thereof, the Debtors have engaged Mastodon Ventures, Inc. ("Mastodon"), an investment banker with extensive experience in selling restaurant assets in a

---

[3] HopCat-Concessions, LLC is not listed as a borrower under the Credit Agreement.

restructuring, to assist with soliciting bidders and potential parties in interest to create a competitive auction process as contemplated by the Bidding Procedures.

**E.**     **The Stalking Horse APA**

11.     Prior to the filing of this Motion, the Debtors and their professionals, including Mastodon, engaged in extensive arm's length negotiations with the Stalking Horse Bidder.  As a result of those negotiations, the Debtors have agreed to sell substantially all of their Assets to the Stalking Horse Purchaser, subject to higher and better offers, pursuant to section 363 of the Bankruptcy Code.  The Debtors and Stalking Horse Bidder have entered into that certain *Asset Purchase Agreement* dated July 9, 2020 (the "Stalking Horse Agreement").  A true and correct copy of the Stalking Horse APA is attached hereto as Exhibit A.

12.     The following is a summary of the material terms contained in the Stalking Horse Agreement.  This summary is not intended to be a comprehensive discussion of all of the provisions of the Stalking Horse Agreement and is qualified in all respect by the terms of the Stalking Horse Agreement.

| MATERIAL TERMS OF STALKING HORSE AGREEMENT | |
|---|---|
| **Term** | **Description** |
| **Purchased Assets (§ 2.1)** | The assets to be sold will consist of substantially all of the Debtors' assets, including their leasehold interests in designated leases, accounts receivable, certain bank accounts, inventory, equipment, intellectual property, liquor licenses, and recipes.<br><br>Pursuant to Section 2.1(a), the Stalking Horse Bidder is also purchasing certain of the Debtors' cash, including:<br><br>(a)     all Cash and Cash equivalents of Sellers, including Restaurant Petty Cash, except for (i) PPP Cash, (ii) cash that has otherwise been reserved or designated by Decree of the Bankruptcy Court entered prior to the date hereof for utility |

| MATERIAL TERMS OF STALKING HORSE AGREEMENT | |
|---|---|
| **Term** | **Description** |
| | deposits (collectively, "Existing Escrows") to the extent actually applied for such designated purpose (it being expressly agreed that notwithstanding anything to the contrary in Section 2.2, any cash that reverts to the Sellers from any Existing Escrow shall constitute a Purchased Asset), and (iii) in an aggregate amount needed to fund the wind-down budget set forth on Schedule 2.1(a) (as the same may hereafter be amended from time to time with the prior written consent of Buyer, the "Wind-Down Budget" and, the aggregate amount of such Cash and Cash Equivalents in the foregoing the "Excluded Cash"); provided, that to the extent that Excluded Cash described herein (after taking into account any Backstop Amount (as defined in Section 5.9 below) actually funded to Sellers by Buyer that has not been used or applied for the purposes required by Section 5.9 prior to (and is not used or applied at) the Closing) is insufficient to fund the entire Wind-Down Budget (the "Excluded Cash Deficiency Amount"), Buyer shall fund the Excluded Cash Deficiency Amount to the Sellers at the Closing in accordance with Sections 2.5, 2.8(b)(ii), and 5.9 (including, for the avoidance of doubt, the limitations set forth therein) hereof |
| **Purchase Price (§ 2.5)** | A credit bid of the Prepetition Obligations in the initial amount of $17,500,000, but not to exceed $20,000,000, plus the amount of the Assumed Liabilities identified in Section 2.3 of the Stalking Horse Agreement. |
| **Assumed Liabilities (§ 2.3)** | Pursuant to Section 2.3 of the Stalking Horse Agreement, the Assumed Liabilities include: <br><br> (a)   Liabilities (i) for all Cure Amounts to the extent that the Sellers' Cash and Cash Equivalents are not sufficient to pay such amounts, and (ii) under the Assumed Contracts and Assumed Permits arising from and after the Closing Date as well as any Liabilities to the extent arising out of the Purchased Assets or the operation of the Business solely in respect of the Continuing Restaurants, in each case under clause (ii) of this Subpart (a), arising from and after the Closing Date; <br><br> (b)   All Accounts Payable arising from the normal operation of Business that is accrued but not yet due as of the Closing and as set forth on Schedule 2.3(b) (as such Schedule may be updated and amended (i) by Sellers with Buyer's consent (such consent not to be unreasonably withheld) between the date of |

| MATERIAL TERMS OF STALKING HORSE AGREEMENT | |
|---|---|
| **Term** | **Description** |
| | the Stalking Horse Agreement and August 21, 2020, and (ii) as otherwise agreed upon by Sellers and Buyer up to the Closing); |
| | (c)   all obligations of Sellers to honor gift cards in the Ordinary Course of Business at a Business restaurant (i.e., accepting such gift cards in exchange for goods or services delivered), whether relating to a Continuing Restaurant or an Excluded Restaurant, but excluding any escheatment claims related to such gift card obligations and excluding any claims for cash refunds to the extent not otherwise required by applicable Law in any jurisdiction in which a Continuing Restaurant is located; and |
| | (d)   all accrued payroll, accrued and unused vacation, or other accrued paid time-off, and accrued payroll Taxes, in each case, that is earned or accrued by, but not yet payable, as of the Closing Date (and not paid by Sellers prior thereto) to any Transferred Employee. |
| **Assumed Contracts (§ 2.6)** | Pursuant to Section 2.6 of the Stalking Horse Agreement: |
| | (a)   Schedule 2.6(a) sets forth a list of all Contracts and Leases to which a Seller is a party (other than such Contracts and Leases that have been rejected by Decree of the Bankruptcy Court or are the subject of a pending motion to reject as of the date of this Agreement), together with estimated Cure Amounts for each Assumed Contract. |
| | (b)   Until the Closing, Buyer may, in its sole discretion, (i) designate a Contract or Lease listed on Schedule 2.6(a) for assumption and assignment to Buyer, effective on and as of the Closing (such Contracts and Leases, the "Assumed Contracts"), or (ii) without in any manner reducing or otherwise affecting the Purchase Price, designate any Contract or Lease listed on Schedule 2.6(a) for rejection; for the avoidance of doubt, the Sellers will not object to any such designation made by Buyer pursuant to this Section 2.6(b).  Except as so designated by Buyer, the Sellers shall not designate any Contract or Lease listed on Schedule 2.6(a) for assumption and assignment or for rejection on or after the date of the Stalking Horse Agreement. The Assumed Contracts set forth on Schedule 2.6(b), will be supplemented in writing by Buyer as additional Leases and Contracts are designated for assumption and assignment or rejection prior to the Closing as set forth in Section 2.6(b). |

| MATERIAL TERMS OF STALKING HORSE AGREEMENT ||
|---|---|
| **Term** | **Description** |
|  | (c)      In connection with the assumption by and assignment to Buyer of any Assumed Contracts pursuant to Section 2.6, (i) the amounts, if any, necessary to cure all defaults, if any, and to pay all actual pecuniary losses, if any, that have resulted from such defaults under the Assumed Contracts (collectively, such amounts, the "Cure Amounts"), in each case as of the Petition Date and to the extent required by Section 365(b)(1)(A) and (B) of the Bankruptcy Code and any Decree of the Bankruptcy Court, shall be paid by Sellers at the Closing, and (ii) Buyer shall provide such adequate assurance of future performance as of the Sale Hearing as the Bankruptcy Court deems necessary to satisfy the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to Assumed Contracts. |
|  | (d)      Subject to Buyer's reasonable cooperation therewith, Sellers shall use their respective commercially reasonable efforts to obtain a Decree of the Bankruptcy Court to assign the Assumed Contracts to Buyer on the terms set forth in this Section 2.6. In the event Sellers are unable to assign any such Assumed Contract to Buyer pursuant to a Decree of the Bankruptcy Court, then the Parties shall use their respective commercially reasonable efforts to obtain, and to cooperate (at no material cost or expense to Sellers) in obtaining, all Consents from Governmental Entities and third parties necessary to assume and assign such Assumed Contracts to Buyer, including, in the case of Buyer, paying any applicable Cure Amounts. |
|  | (e)      Notwithstanding the foregoing, but subject to Section 5.1, a Contract shall not be an Assumed Contract and shall not be assigned to, or assumed by, Buyer to the extent that such Contract (i) is rejected by a Seller or terminated by a Seller in accordance with the terms hereof or by the other party thereto, or terminates or expires by its terms, on or prior to the Closing and is not continued or otherwise extended upon assumption, (ii) was not listed on Schedule 2.6(a) and not provided to Buyer by Sellers at least five (5) Business Days prior to the Closing and requires a Consent of any Governmental Entity or other third party (except as permitted by the Bankruptcy Code) in order to permit the sale or transfer to Buyer of Sellers' rights under such Contract, and no such Consent has been obtained prior to the Closing, or (iii) relates solely to Excluded Assets. In addition, a Permit (including any Liquor License) shall not |

| MATERIAL TERMS OF STALKING HORSE AGREEMENT | |
|---|---|
| **Term** | **Description** |
| | be assigned to, or assumed by, Buyer to the extent that such Permit requires a Consent of any Governmental Entity or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer of Sellers' rights under such Permit, and no such Consent has been obtained prior to the Closing. |
| **Stalking Horse Protections (§ 8.3)** | Break-Up Fee: $525,000.<br><br>Expense Reimbursement: the Stalking Horse Bidder's reasonable costs and expenses related to pursuing, negotiating, and documenting the Sale.<br><br>The Stalking Horse Protections, subject to Bankruptcy Court approval, constitute a superpriority administrative expense of the Sellers' estates under Sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code. |
| **Backstop Amount (§ 5.9)** | Pursuant to Section 5.9 of the Stalking Horse Agreement:<br><br>To the extent that the performance of Sellers' obligations under the Stalking Horse Agreement prior to or at the Closing require the use or payment of money, Sellers shall utilize the from time to time Cash and Cash Equivalents (other than any Excluded Cash) on hand and available for use in the Business ("Available Cash") to perform and satisfy such obligations. If, at any time prior to or at the Closing, there is not sufficient Available Cash for Sellers to perform any such obligations (an "Available Cash Deficiency"), Buyer shall fund to Sellers (within two (2) Business Days following Buyer's receipt from time to time of written notification from Sellers of the amount of such Cash Deficiency and reasonable support therefor (each, a "Shortfall Notice") cash in the amount of the then Available Cash Deficiency (a "Backstop Amount"), which Backstop Amount shall be used by Sellers only to satisfy Sellers' obligations under this Agreement specifically identified in the Shortfall Notice as obligations Sellers had insufficient Available Cash to satisfy; provided, however, and notwithstanding anything to the contrary set forth herein, Buyer's aggregate payments with respect to Backstop Amounts and the Excluded Cash Deficiency Amount shall not exceed $613,708 and Buyer shall have no further obligation for the payment of any Backstop Amounts or the Excluded Cash Deficiency Amount in excess of such aggregate amount, provided further, however, in lieu of |

| MATERIAL TERMS OF STALKING HORSE AGREEMENT ||
| --- | --- |
| **Term** | **Description** |
|  | funding the Backstop Amount to Sellers, Buyer shall have the right, at Buyer's sole option, to pay the amounts comprising the Backstop Amount directly to the counter-parties and other third parties identified as payees of any portion of the Backstop Amount in the Shortfall Notice.  In the event Buyer elects to make payments of the Backstop Amount directly to third parties as contemplated in the immediately preceding sentence, Sellers shall provide such information as Buyer may request in order to do so and otherwise reasonably cooperate with Buyer in making such direct payments. Notwithstanding anything to the contrary in this Agreement, if Buyer fails to fund or pay in full, as applicable, any Backstop Amount required to be funded or paid in full by Buyer in accordance with this Section 5.9, Seller shall be excused from performing Sellers' obligations to which such unpaid or unfunded Backstop Amounts relate and such failure shall be deemed a breach of Buyer's obligations under this Agreement. |
| **Good Faith Deposit** | None |
| **Outside Closing Date** | August 31, 2020 |

## F.    The Sale Timeline

13.    The Debtors propose that the hearing to approve the Bidding Procedures be held on **July 16, 2020 at 10:00 a.m. (Eastern Time)** (the "Bidding Procedures Hearing"), with objections to the Bidding Procedures, if any, to be filed on or before **July 14, 2020 at 4:00 p.m. (Eastern Time)** (the "Bidding Procedures Objection Deadline").  The Debtors propose that the bid deadline be set for **August 21, 2020 at 4:00 p.m. (Eastern Time)** (the "**Bid Deadline**"), and that the auction for the Assets (the "**Auction**"), if required, be scheduled for **August 25, 2020 at 10:00 a.m. (Eastern Time)**.  The Debtors propose that the Court hold a hearing to approve the sale and enter the Sale Order (the "**Sale Hearing**") on **August 27, 2020 at 10:00 a.m. (Eastern**

**Time)** with objections to the relief requested in the Sale Order (other than with respect to the conduct of the Auction), if any, to be filed on or before **August 20, 2020 at 4:00 p.m. (Eastern Time)** and objections to the conduct of the Auction, if any, to be filed on or before **August 26, 2020 at 4:00 p.m. (Eastern Time)**.

## <u>RELIEF REQUESTED</u>

14. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006, and 9014 of the Bankruptcy Rules, the Debtors hereby seek entry of the following:

    a. an order (the "<u>Bidding Procedures Order</u>"), substantially in the form attached hereto as <u>Exhibit B</u>, granting the following relief:

        i. authorizing the Debtors to enter into the Stalking Horse Agreement with the Stalking Horse Bidder and provide the Stalking Horse Protections, including the Break-Up Fee (as defined below), to the Stalking Horse Bidder in connection therewith;

        ii. approving the procedures, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 1</u> (the "<u>Bidding Procedures</u>"), to be used in connection with one or more sales (each, a "<u>Sale Transaction</u>") of the Assets;

        iii. approving the form of the notice attached to the Bidding Procedures Order as <u>Exhibit 2</u> (the "<u>Notice of Auction and Sale Hearing</u>") of the deadline to bid on the Assets;

        iv. scheduling (A) the Auction to begin on **August 25, 2020 at 10:00 a.m. (Eastern Time)** and (B) the Sale Hearing on **August 27, 2020 at 10:00 a.m. (Eastern Time)**;

        v. approving procedures for the assumption and assignment of executory contracts and unexpired leases (collectively, the "<u>Contracts</u>") in connection with any Sale Transaction (the "<u>Assumption and Assignment Procedures</u>");

        vi. approving the form and manner of notice to each relevant non-debtor counterparty to a Contract (each, a "<u>Counterparty</u>") of

(A) the Debtors' calculation of the amount necessary to cure any defaults under an applicable Contract (the "Cure Amounts") and (B) certain other information regarding the potential assumption and assignment of Contracts in connection with a Sale Transaction, substantially in the form attached to the Bidding Procedures Order as Exhibit 3 (the "Notice of Assumption and Assignment") and granting related relief; and

b.    one or more orders (each, a "Sale Order"), the form of which to be provided as a supplement to this Motion prior to the Sale Hearing, granting the following relief:

i.    authorizing one or more Sale Transactions for the sale of the Assets free and clear of all liens, claims, interests and encumbrances, except certain permitted encumbrances as determined by the Debtors and any Successful Bidder (as defined below), with liens to attach to the proceeds of the applicable Sale Transaction;

ii.    authorizing the assumption and assignment of certain Contracts in connection with an applicable Sale Transaction; and

iii.    granting related relief.

15.    The sale process proposed by the Debtors includes the following key dates:

| SALE PROCESS KEY DATES AND DEADLINES | |
|---|---|
| **July 16, 2020 at 10:00 a.m. (Eastern Time)** | Bidding Procedures Hearing |
| **July 23, 2020** | Deadline to File and Serve Cure Notices |
| **August 6, 2020** | Cure Objection Deadline |
| **August 20, 2020 at 4:00 p.m. (Eastern Time)** | Sale Objection Deadline |
| **August 21, 2020 at 4:00 p.m. (Eastern Time)** | Bid Deadline |
| **August 25, 2020 at 10:00 a.m. (Eastern Time)** | Auction, if necessary |
| **August 26, 2020 at 4:00 p.m. (Eastern Time)** | Adequate Assurance / Auction Objection Deadline |
| **August 27, 2020 at 10:00 a.m. (Eastern Time)** | Sale Hearing |

A.    **The Bidding Procedures**

16.    The Bidding Procedures are designed to promote a competitive and expedient sale process for the Assets.  If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids from potential buyers that constitute the highest or best offer for the Assets on a schedule consistent with the Debtors' chapter 11 strategy.   As the Bidding Procedures are attached to the Bidding Procedures Order, they are not restated here in their entirety.  Certain key terms of the Bidding Procedures for potential bidders to submit a bid (each a "Bid") that satisfy the terms for a qualified bid are highlighted in the chart below:[4]

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| **Provisions Governing Qualification of Bidders and Qualified Bids** | **Due Diligence**.  Each Potential Bidder must execute a confidentiality agreement with the Debtors.<br><br>**Bid Deadline**.  Qualified Bids are due on or before **August 21, 2020 at 4:00 p.m. (Eastern Time)**.<br><br>**Qualified Bidder Requirements**. A Potential Bidder must deliver the following to the Notice Parties to be a "Qualified Bidder":<br>(i)    written disclosure of the identity of the Potential Bidder; and<br>(ii)    information sufficient to demonstrate the Potential Bidder has the financial wherewithal to consummate the proposed Sale Transaction.<br><br>As used herein, "Notice Parties" means, collectively: (i) counsel for the Debtors; (ii) counsel for the Administrative Agent; and (iii) counsel for the Committee.<br><br>**Qualified Bid Requirements**. To be a "Qualified Bid," a Bid must be submitted by a Qualified Bidder and the Debtors determine, in consultation with (i) the Administrative Agent and (ii) the Committee |

---

[4] This summary is qualified in its entirety by the provisions of the Bidding Procedures. To the extent that there is any inconsistency between the terms of the Bidding Procedures and this summary, the terms of the Bidding Procedures shall control. Capitalized terms used but not defined prior to or in this summary shall have the respective meanings ascribed to such terms later in the Motion or in the Bidding Procedures, as applicable.

(together, the "<u>Consultation Parties</u>"), that such Bid complies with all of the following:

a.   it states whether such Bid is an offer to purchase, in cash, through a credit bid or a combination of both, all or a portion of the Assets upon terms and conditions that are no less favorable to the Debtors than those set forth in the Stalking Horse Agreement;

b.   if such Bid offers to purchase only a portion of the Assets, the value of such Bid, in combination with the value of other Bids for other Assets, must exceed (i) the Minimum Initial Overbid Amount or (ii) the amount set forth in (h) below;

c.   such Bid includes a signed writing stating that it is irrevocable until the selection of the Successful Bidder; <u>provided</u> that if such bidder is the Back-Up Bidder, its Bid will remain irrevocable until the later of (i) the closing of the Sale to the Successful Bidder or the Back-Up Bidder, and (ii) the date that is twenty (20) days after the Sale Hearing;

d.   it includes confirmation such bidder has all necessary internal and shareholder approvals upon making the Bid, and there are no conditions precedent to such Qualified Bidder's ability to enter into a definitive agreement;

e.   it includes a duly authorized and executed copy of an asset purchase agreement (an "<u>Asset Purchase Agreement</u>"), including the purchase price for the Assets (the "<u>Purchase Price</u>") and a copy marked to show amendments and modifications to the Stalking Horse Agreement;

f.   it includes information sufficient to establish the ability of the Qualified Bidder to consummate the proposed Sale, pay the Purchase Price and any Cure Amounts and consummate the transaction contemplated by the Asset Purchase Agreement;

g.   it has a value to the Debtors that is greater than the sum of the Stalking Horse Agreement, plus the Stalking Horse Protections, plus $100,000 (the "<u>Minimum Initial Overbid Amount</u>");

h.   it identifies which Contracts will be assumed and details the Qualified Bidder's proposal for the treatment of Cure Amounts and the provision of Adequate Assurance Information;

i.   it includes an acknowledgment and representation that such Qualified Bidder (i) has had an opportunity to conduct due diligence prior to making its offer; (ii) has relied solely on its due diligence in making its Bid; (iii) has not relied on any anything or anyone in making its Bid or in connection with the Auction except as expressly stated in the Asset Purchase Agreement; and (iv) is not entitled to any expense reimbursement, break-up fee, or

|  | similar type of payment in connection with its Bid; |
|---|---|
|  | j.    it includes evidence that such Qualified Bidder has corporate authorization and approval with respect to the submission, execution, delivery and closing of the Asset Purchase Agreement; |
|  | k.    it is accompanies by a good faith deposit in an amount equal to 10% of the Purchase Price (a "<u>Good Faith Deposit</u>"); |
|  | l.    it contains a detailed description of how the Qualified Bidder intends to treat current employees of the Debtors; and |
|  | m.    it is received prior to the Bid Deadline. |
|  | Notwithstanding the foregoing, a Stalking Horse Bidder shall be deemed a Qualified Bidder, and the Stalking Horse Agreement will be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the Sale without compliance with the above enumerated requirements. |
| **Modification of Bidding Procedures** | The Bidding Procedures sets forth the Debtors' reservation of rights to, in their reasonable business judgment and in a manner consistent with their fiduciary duties and applicable law, and after consulting with the Consultation Parties, modify the Bidding Procedures, including, among other things, extend or waive deadlines or other terms and conditions set forth therein; adopt new rules and procedures for conducting the bidding and Auction process; or otherwise modify the Bidding Procedures to further promote competitive bidding for and maximizing the of value of the Assets. |
| **Determining the Successful Bid and Back-up Bid** | Prior to the conclusion of the Auction, the Debtors (in consultation with the Consultation Parties) will review the Qualified Bids submitted at the Auction and determine which offer is the highest or otherwise best offer (one or more such bids, collectively the "<u>Successful Bid</u>" and the bidder(s) making such bid(s), collectively, the "<u>Successful Bidder</u>") and communicate to the Auction participants the identity of the Successful Bidder and the details of the Successful Bid.<br><br>In determining the Successful Bid, the Debtors will consider, *inter alia*, the following factors:<br><br>a.    Total expected consideration to be received by the Debtors;<br><br>b.    Likelihood of a Qualified Bidder's ability to close the Sale Transaction and the timing thereof;<br><br>c.    Qualified Bidder's ability to satisfy necessary approvals and the timing of such approvals; and |

| | |
|---|---|
| | d.     The expected net benefit to the estates.<br><br>The Qualified Bidder with the next highest or otherwise best Qualified Bid will be required to serve as the back-up bidder ("<u>Back-Up Bidder</u>"). The Back-Up Bidder's bid will remain open and irrevocable until the later to occur of twenty (20) days after the Sale Hearing and closing on the Successful Bid with the Successful Bidder.  If the Successful Bidder fails to consummate the Sale, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized and directed to consummate the Sale with the Back-Up Bidder without further order of the Court. |
| **Provisions Governing the Auction** | If the Debtors receive more than one Qualified Bid (inclusive of a Stalking Horse Agreement), the Debtors will conduct an Auction of the Assets, which shall take place on **August 25, 2020 at 10:00 a.m. (Eastern Time)**, at the offices of Warner Norcross + Judd LLP, 1500 Warner Building, 150 Ottawa Avenue, NW, Grand Rapids, Michigan 49503, or such other date, time and location (including by vide conference) as shall be timely communicated to all entities entitled to attend the Auction. The Auction, which shall be recorded and transcribed and shall run in accordance with the following procedures:<br><br>a.     only Qualified Bidders who have timely submitted Qualified Bids will be entitled to make any subsequent bids at the Auction;<br><br>b.     the Stalking Horse Bidder will be entitled to make subsequent bids for all or substantially all or any combination of the Assets comprised of further credit bids, cash, additional or different consideration of any type, or any combination of the foregoing;<br><br>c.     each Qualified Bidder shall be required to confirm that it has not engaged in any collusion, within the meaning of section 363(n) of the Bankruptcy Code with respect to any Bids submitted or not submitted in connection with the Sale;<br><br>d.     at least one (1) business day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction <u>and</u> all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder in attendance at the Auction in person; <u>provided</u> that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until the selection of the Successful Bidder and Back-Up Bidder at the conclusion of the Auction.  At least one (1) business day prior to the Auction, the Debtors will provide copies of the Qualified Bid, or combination of Qualified Bids, which the Debtors |

believe, after consultation with the Consultation Parties, is the highest or otherwise best offer for all or any portion of the Assets (the "Starting Bid") to the Stalking Horse Bidder (if any) and all other Qualified Bidders who have timely submitted Qualified Bids. For the avoidance of doubt, the Starting Bid may comprise multiple Qualified Bids if bids are submitted for less than all of the Assets, so long as the aggregate consideration paid in connection with such multiple Qualified Bids, taken together, represents the highest and best offer for the Assets;

e.  all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction and the actual identity of each Qualified Bidder will be disclosed on the record at the Auction;

f.  the Debtors, after consultation with the Consultation Parties, may modify, employ and announce at the Auction additional or amended procedural rules that are reasonable under the circumstances for conducting the Auction, provided that such rules (i) are not inconsistent with the Bidding Procedures, the Bankruptcy Code, or any order of the Court entered in connection herewith; and (ii) are disclosed to each Qualified Bidder attending the Auction; and

g.  bidding at the Auction will begin with the Starting Bid and continue in bidding increments (each, a "Subsequent Bid") providing a net value to the Debtors' estates of at least $100,000 above the prior bid. After the first round of bidding and between each subsequent round of bidding, the Debtors, after consultation with the Consultation Parties, shall announce the bid (and the value of such bid) that they believe to be the highest or otherwise best Bid (each, the "Leading Bid").

h.  A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.

i.  Except as specifically set forth in the Bidding Procedures, for the purpose of evaluating the value of the Purchase Price provided by each Subsequent Bid (including any Subsequent Bid by a Stalking Horse Bidder), the Debtors shall consider the Stalking Horse Protections, if applicable, as well as any additional liabilities to be assumed by a Qualified Bidder, and any additional costs which may be imposed on the Debtors.

The Debtors may accept bids for any portion of the Assets, as well as bids for substantially all of the Assets; provided, however, that a Qualified Bid that offers to purchase only a portion of the Assets may only be part of the Successful Bid to the extent that the value of such Qualified Bid, in

| | |
|---|---|
| | combination with the value of other Qualified Bids for other Assets, exceeds the value of any then-pending Qualified Bid for all or substantially all the Assets. |

## B.    Sale Noticing and Objection Procedures

17.    Given the desire to wind-down the Debtors' businesses expeditiously and minimize administrative expenses, on the one hand, and their desire to ensure a fair and transparent opportunity for all potentially interested parties to participate in the sale process, on the other hand, the Debtors propose that the Bidding Procedures, and related notice and other procedures set forth herein be implemented in connection with the marketing and sale of the Assets.  The Debtors propose the following sale noticing and objection procedures (the "Sale Noticing and Objection Procedures"):

| SALE NOTICING AND OBJECTION PROCEDURES | |
|---|---|
| **Sale Notice** | No later than three (3) calendar days after entry of the Bidding Procedures Order, the Debtors shall cause the Notice of Auction and Sale Hearing, attached as Exhibit 2 to the Bidding Procedures Order, and a copy of the Bidding Procedures Order to be served by first class mail upon: (a) the Office of the United States Trustee for Region 9; (b) counsel to the Committee; (c) counsel to the Administrative Agent; (d) all non-Debtor parties to the Contracts and any parties who are known to claim interests therein; (e) all government agencies and entities required to receive notice under the Bankruptcy Rules; and (f) all parties that have requested or that are required to receive special notice pursuant to Bankruptcy Rule 2002. |
| **Sale Objections** | Objections to the sale of the Assets, including any objection to (i) a sale of Assets free and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code and (ii) the entry of any Sale Order must (A) be in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (B) be filed with the Court; and (C) served no later than the later **August 20, 2020 at 4:00 p.m. (Eastern Time)** (the "Sale Objection Deadline") on the following parties: (i) counsel for the Debtors; (ii) counsel for the Administrative Agent; and |

|  | (iii) counsel for the Committee (collectively, the "Objection Notice Parties"). |
|---|---|
| **Auction Results** | Within two (2) business days after conclusion of the Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents necessary to consummate the Successful Bid. Within one (1) business days after conclusion of the Auction, the Debtors shall file a notice with the Court identifying the Successful Bidder and the Back-Up Bidder. |
|  | The Debtors will sell the Assets to the Successful Bidder pursuant to the terms of the Successful Bid upon the approval of such Successful Bid by the Court at the Sale Hearing. |
|  | All Good Faith Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or a Back-Up Bidder no later than seven (7) calendar days following the conclusion of the Auction. |

18.     In addition to the foregoing procedures, in the event the Administrative Agent has not consented to the Successful Bid, the Administrative Agent expressly reserves its right to object to the Sale on any grounds.

19.     The Debtors submit that the Sale Noticing and Objection Procedures, coupled with the Assumption and Assignment Procedures set forth below, constitute adequate and reasonable notice of the key dates and deadlines and other important information regarding the sale process for the Assets, including the Objection Deadlines (as defined below), the Bid Deadline, and the time and location of the Auction and Sale Hearing.  Accordingly, the Debtors request that the Court approve the form of Notice of Auction and Sale Hearing, substantially in the form attached to the Bidding Procedures Order as Exhibit 2 and find that the Sale Noticing and Objection Procedures comply with the requirements of Bankruptcy Rule 2002.

C.        **Assumption and Assignment Procedures**

20.       In connection with any Sale Transaction, the Debtors may seek to assume and assign to a Successful Bidder one or more Contracts.  The Assumption and Assignment Procedures are designed to, among other things, govern the Debtors' provision of information sufficient to demonstrate the Successful Bidder's proposed form of, and ability to provide, adequate assurance of future performance with respect to each Contract to be assumed and assigned ("Adequate Assurance Information") and notice of Cure Amounts to applicable Counterparties. The below chart sets forth the Assumption and Assignment Procedures:

| ASSUMPTION AND ASSIGNMENT PROCEDURES | |
|---|---|
| **Assumption and Assignment Notice** | Not later than three (3) business days after the Court's entry of the Bidding Procedures Order, the Debtors will file with the Court and serve a Notice of Assumption and Assignment on each Counterparty to a Contract that may be assumed in connection with any Sale Transaction, which will (i) identify the applicable Contracts; (ii) list the Debtors' good-faith calculation of Cure Amounts with respect to each Contract; (iii) expressly state that assumption or assignment of a Contract is not guaranteed and is subject to Court approval and (iv) prominently display the deadlines to file Cure Objections and Adequate Assurance Objections (each as defined below). |
| **Cure Objections** | Cure Objection Deadline.  Any Counterparty to a Contract that wishes to object to the Debtors' proposed Cure Amounts (each such objection, a "Cure Objection") shall file with the Court and serve on the Objection Notice Parties its Cure Objection, which must state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof, by no later than **August 6, 2020 at 4:00 p.m. (Eastern Time)** (the "Cure Objection Deadline"). |
| | Resolution of Cure Objections.  The Debtors (in consultation with the Consultation Parties) and the objecting Counterparty shall first confer in good faith to attempt to resolve the Cure Objection without Court intervention.  If the parties are unable to consensually resolve the Cure Objection prior to the commencement of the Sale Hearing, the Court shall make all necessary determinations relating to the applicable Cure Amounts and Cure Objection at a hearing scheduled |

|  | pursuant to the following paragraph.  If a Cure Objection is resolved in a manner that is not in the best interests of the Debtors and their estates, whether or not such resolution occurs prior to or after the closing of the applicable Sale Transaction, the Debtors may determine that any Contract subject to such resolved Cure Objection will no longer be assumed and assigned pursuant to the applicable Sale Transaction (subject to the terms of the applicable Sale Transaction). All other objections to the proposed assumption and assignment of the Debtors' right, title, and interest in, to, and under a Contract will be heard at the Sale Hearing. |
|---|---|
|  | Adjournment.  If a timely filed Cure Objection cannot otherwise be resolved by the parties, the Cure Objection may be heard at the Sale Hearing, or, at the Debtors' option, be adjourned to a subsequent hearing (each such Cure Objection, an "Adjourned Cure Objection").  An Adjourned Cure Objection may be resolved after the closing date of the applicable Sale Transaction.  Upon resolution of an Adjourned Cure Objection and the payment of the applicable cure amount, if any, the applicable Contract that was the subject of such Adjourned Cure Objection shall, as applicable, be deemed assumed and assigned to the applicable Successful Bidder as of the closing date of the applicable Sale Transaction. |
|  | Failure to Timely Object.  If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely Cure Objection, the Counterparty forever shall be barred from asserting any objection with regard to the cost to cure any defaults under the applicable Contract.  The Cure Amounts set forth in the applicable Notice of Assumption and Assignment shall be controlling and will be the only amount necessary to cure outstanding defaults under the Contract and satisfy the requirements of section 365(b) of the Bankruptcy Code, and the Counterparty to the Contract shall be bound by and deemed to have consented to the Cure Amounts. |
| **Adequate Assurance Objections** | Adequate Assurance Objection Deadline.  Any Counterparty to a Contract that wishes to object to the proposed assumption and assignment of the Contract, the subject of which objection is a Successful Bidder's (or any other relevant assignee's) proposed form of adequate assurance of future performance (each such objection, an "Adequate Assurance Objection"), shall file with the Court and serve on the Objection Notice Parties an Adequate Assurance Objection, which must state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof, by no later than **August 26, 2020 at 4:00 p.m. (Eastern Time)** (the "Adequate Assurance Objection Deadline" and, together with the Cure Objection Deadline, the Sale Objection Deadline and the |

|  | Supplemental Sale Objection Deadline, the "Objection Deadlines"). |
|---|---|
|  | Resolution of Adequate Assurance Objections.  The Debtors and the objecting Counterparty shall first confer in good faith to attempt to resolve the Adequate Assurance Objection without Court intervention.  If the parties are unable to consensually resolve the Adequate Assurance Objection prior to the commencement of the Sale Hearing, the Adequate Assurance Objection and all issues of adequate assurance of future performance of the applicable Successful Bidder (or any other relevant assignee) shall be determined by the Court at the Sale Hearing. |
|  | Failure to Timely Object.  If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely filed Adequate Assurance Objection, the Counterparty shall be forever barred from asserting any objection to the assumption and/or assignment of the applicable Contract with regard to adequate assurance of future performance.  The applicable Successful Bidder shall be deemed to have provided adequate assurance of future performance with respect to the Contract in accordance with section 365(f)(2)(B) of the Bankruptcy Code and, if applicable, section 365(b)(3) of the Bankruptcy Code, notwithstanding anything to the contrary in the Contract or any other document. |
| **Designation Rights** | Pursuant to the terms of any Asset Purchase Agreement executed by the Debtors, a Successful Bidder may have the right to, prior to the closing date of the applicable Sale Transaction, designate (i) for assumption and assignment Contracts that were not originally included in the Assets to be acquired in connection with the applicable Successful Bid and (ii) Contracts that previously were included in the Assets to be acquired in connection with the applicable Successful Bid as "excluded assets" that will not be assigned to or otherwise acquired by the Successful Bidder.  The Debtors will use commercially reasonable efforts to, as soon as reasonably practicable after the Debtors receive notice of any such designation, and in any event within two (2) business days thereof, file with the Court and serve on the applicable Counterparties a notice of such designation (a "Designation Notice"). |
| **Notice of Assumed Contracts** | As soon as reasonably practicable after the closing of a Sale Transaction, and in any event within two (2) business days thereof, the Debtors will file with the Court and serve on the applicable Counterparties, a notice containing the list of Contracts that the Debtors assumed and assigned pursuant to any asset purchase agreement with a Successful Bidder. |

| Reservation of Rights | The inclusion of a Contract or Cure Amounts with respect to any Contract on any Notice of Assumption and Assignment or any Notice of Auction Results, shall not constitute or be deemed a determination or admission by the Debtors, any Successful Bidder or any other party that such Contract is an executory contract or an unexpired lease within the meaning of the Bankruptcy Code, and shall not be a guarantee that such Contract ultimately will be assumed or assigned. The Debtors reserve all of their rights, claims and causes of action with respect to each Contract listed on the aforementioned notices. |
|---|---|

## APPLICABLE AUTHORITY

### A.    Bidding Procedures

21.    Section 363(b)(1) of the Bankruptcy Code provides that, after notice and a hearing, a debtor-in-possession "may use, sell, or lease, other than in the ordinary course of business, property of the estate."   11 U.S.C. § 363(b)(1).   A debtor-in-possession seeking bankruptcy court approval to sell or otherwise dispose of estate property pursuant to section 363 must demonstrate that the proposed disposition is supported by a sound business reason.   *See Stephen Industries, Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) ("We adopt the Second Circuit's reasoning in *In re Lionel*, *supra*, and conclude that a bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action.") (*citing Committee of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983)); *In re Quality Stores, Inc.*, 272 B.R. 643, 647-48 (Bankr. W.D. Mich. 2002) ("[A] sale of assets is appropriate if all provisions of § 363 are followed, the bid is fair, and the sale is in the best interests of the estate and its creditors.") (*quoting In re Embrace Systems Corp.*, 178 B.R. 112, 124 (Bankr. W.D. Mich. 1995)); *In re Lionel Corp.*, 722 F. 2d at 1071 (establishing rule requiring that "a judge determining a section 363(b) application

expressly find from the evidence presented before him at the hearing a good business reason to grant such an application.");

22.     In general, "[a] debtor's business decision [to monetize assets pursuant to section 363] should be approved by the court unless it is shown to be so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice." *In re Aerovox, Inc.*, 269 B.R. 74, 80 (Bankr. D. Mass. 2001) (citations omitted).  Moreover, a debtor that presents a business justification for a section 363 sale is entitled to the benefit of the business judgment rule, which raises "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."   *Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *citing Smith v. Van Gorkom*, 488 A.2d 848, 872 (D. Del. 1985); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).

23.     Based on the foregoing, there is ample business justification to sell the Assets in accordance with the Bidding Procedures.  Under the current circumstances of the Debtors, a sale of the Assets pursuant to the Bidding Procedures will likely generate greater value for the Debtors, their estates, and their creditors, than the continued use of such Assets by the Debtors or post-conversion disposition of such Assets under chapter 7.  Moreover, the competitive auction structure of the proposed Bidding Procedures will maximize the return from the sale by securing the highest or best offer available on the open market.

**B.**    **Bid Protections**

24.    The Debtors believe that approval of bid protections in the form of the Stalking

Horse Protections, consisting of a proposed Break-Up Fee in the amount of $525,000 (or 3.0% of

the $17.5 million credit bid) and the Expense Reimbursement (consisting of the reasonable

charges, costs, fees, payments and expenses paid or incurred by or on behalf of a Stalking Horse

Bidder relating to or in connection with its bid), is an essential motivating factor for Stalking

Horse Bidder to enter into the Stalking Horse Agreement and set a floor.  Moreover, considering

the resources that are likely to have been expended by the Stalking Horse Bidder, the Stalking

Horse Protections are fair and reasonable.  A Break-Up Fee of 3.00% of the Stalking Horse

Bidder's purchase price falls within the standard range for these types of fees.  Absent this Court's

approval of the Stalking Horse Protections, the Debtors believe that it would be difficult, if not

impossible, to compel the Stalking Horse Bidder to move forward with the Stalking Horse Bid.

Absent the Stalking Horse Bid, there would be no minimum threshold return for the Assets, thus

decreasing the likelihood that the Debtors will be able to obtain the highest and best offer for the

Assets.

25.    Bid protections such as the Stalking Horse Protections are routinely approved in

the section 363 sale context by bankruptcy courts.  Such provisions incentivize potential bidders

to dedicate the substantial amounts of time, resources and energy that are required to consummate

an acquisition of a debtor's assets, in spite of the inherent risks and uncertainties of the chapter

11 process.  *See In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989)

(bid protections may "be legitimately necessary to convince a white knight to enter the bidding

by providing some form of compensation for the risks it is undertaking" (citation omitted)).

Bankruptcy courts, in this District and in others, have approved similar bid protections. *See e.g., In re Great Lakes Comnet, Inc.*, *et al*., Case No. 16-00290 (JTG) (Bankr. W.D. Mich. March 10, 2016) (4.5% break-up fee); *In re Schletter*, Case No. 18-40169 (JCW) (Bankr. W.D.N.C. June 11, 2018) (3.00% break-up fee).

26.     Most courts apply the business judgment rule to bid protections with equal force as to other aspects of a section 363 sale. *See In re Global Crossing Ltd.*, 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) ("[N]o litigant has seriously argued the inapplicability of the business judgment test, and if any such argument had been made, the Court would be compelled . . . to reject it."); *Integrated Resources*, 147 B.R. at 660 ("[T]he business judgment rule does not become inapplicable simply because a court decides a break-up fee is too large."). Alternatively, at least one Circuit Court has held that the administrative expense provisions of section 503(b) of the Bankruptcy Code govern bid protections in the bankruptcy context and, accordingly, that bid protections must provide some benefit to the debtor's estate to merit court approval. *Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 533 (3d Cir. 1999). The Third Circuit specifically identified at least two instances where bid protections can provide benefit to the estate. First, it would be beneficial to an estate if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id*. at 537. Second, if the availability of bidding incentives induces a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the Bidder(s) may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id*.

27.     Here, whether evaluated under the business judgment rule or the Third Circuit's "benefit to the estate" standard, the Stalking Horse Protections are appropriate and should be approved.    The Stalking Horse Protections are designed to provide an incentive and compensation for a Stalking Horse Bidder to act as a "stalking horse," generating interest among potential participants in the Auction in spite of the attendant risk that a higher or better offer could prevail.    The Debtors' decision to seek approval of the Stalking Horse Protections was made in the honest belief that these protections will serve the best interests of the estates.    Thus, based on their sound business judgment, the Debtors believe that the Stalking Horse Protections are fair and reasonable in proportion to the time, effort, cost, and expense that a Stalking Horse Bidder would incur in negotiating a bid and a Stalking Horse Agreement.    Furthermore, as discussed above, the Break-Up Fee of approximately 3.0% of the purchase price is well within the range of similar fees approved by bankruptcy courts in chapter 11 cases pursuant to section 363.    *See*, *e.g.*, *In re Genuity Inc.*, Case No. 02-43558 (PCB) (Bankr. S.D.N.Y. 2002) (4.13% break-up fee); *In re PSINet, Inc.*, Case No. 01-13213 (REG) (Bankr. S.D.N.Y. 2001) (4.28% break-up fee); *In re Teligent, Inc.*, Case No. 01-12974 (SMB) (Bankr. S.D.N.Y. 2001) (1.3% to 4.25% break-up fee, depending on value of alternative transaction); *In re Ameriserve*, Case No. 00-0358 (PJW) (Bankr. D. Del., September 27, 2000) (3.64% break-up fee); *In re FoxMeyer Corp. et al.*, Case No. 96-1329 (HSB) through 96-1334 (HSB) (Bankr. D. Del., Oct. 9, 1996) (7.47% break-up fee); *In re Edison Bros. Stores. Inc. et al.*, Case No. 95-1354 (PJW) (Bankr. D. Del., Dec. 29, 1995) (3.5% break-up fee).

28.     In sum, the Debtors' ability to offer the Stalking Horse Protections and enter into the Stalking Horse Agreement lock the sale of the Assets into a contractually-committed bidder

at a fair price, while also providing the potential of even greater benefit to the estates. Moreover, the proposed Stalking Horse Protections will only be paid from the proceeds of a Successful Bid, meaning that they will only be paid to the extent there is a higher and otherwise better offer, establishing a benefit to the Debtors' estates and creditors.  Thus, the Stalking Horse Protections should be approved.

C.    **Sale Free and Clear**

29.    Section 363(f) of the Bankruptcy Code provides that a debtor-in-possession may sell property "free and clear of any lien, claim, or interest in such property of an entity other than the estate" if, among other things:

  a.    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

  b.    such entity consents;

  c.    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

  d.    such interest is in bona fide dispute; or

  e.    such entity could be compelled in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

30.    Except for any permitted liens identified in an Asset Purchase Agreement, each lien or encumbrance would attach with equal priority to the proceeds of the Sale Transaction, and therefore satisfies at least one of the five conditions of section 363(f).  The Debtors submit that any such lien or encumbrance will be adequately protected by attachment to the net proceeds of

the Sale Transaction, subject to any claims and defenses the Debtors may possess with respect thereto.  Accordingly, except for the permitted liens and encumbrances discussed in an Asset Purchase Agreement, the Debtors request that the Assets be transferred to the Successful Bidder(s) or Back-up Bidder(s), as the case may be, free and clear of all liens, claims and encumbrances, with such liens, claims and encumbrances to attach to the proceeds of the sale of the Assets.

**D.    Good Faith Negotiations**

31.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

32.    Pursuant to the terms of the Bidding Procedures, the Debtors have committed to negotiate all bids, and have negotiated the Stalking Horse Agreement, at arms'-length and in good faith.  Accordingly, the Debtors request that the Court find the Successful Bidder(s) or, if applicable, the Back-up Bidder(s), to be acting in good faith and entitled to the full protections available to a good faith buyer pursuant to section 363(m) of the Bankruptcy Code.  *See In re Oyster Bay Cove, Ltd.*, 196 B.R. 251, 254 (E.D.N.Y. 1996); *Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888  (S.D.N.Y. 1994); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990).

E.    <u>**Assumption and Assignment of the Contracts**</u>

33.    The Debtors respectfully submit that the Court should approve procedures relating to the assumption and assignment of the Contracts.  In assuming and assigning the Contracts, the Debtors intend to comply with the provisions of section 365(f)(2) of the Bankruptcy Code.

34.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and assign its executory contracts and unexpired leases subject to the approval of the bankruptcy court. *See, generally*, 11 U.S.C. § 365(a). Section 365 specifically provides, in pertinent part, that a debtor may assume and assign executory contracts and leases provided that all defaults under such agreements are cured and adequate assurance of future performance is provided by the assignee to the non-debtor party to such contracts or leases.  *See* 11 U.S.C. § 365(a), (b)(1), (f)(2).

35.    The general standard applied by courts considering whether to approve assumption of unexpired leases or executory contracts is the business judgment rule, which requires that a debtor determine in its sound business judgment that assumption and assignment is in its best interests.  *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, (4th Cir. 1985); *Orion Pictures Corp. v. Showtime Networks, Inc.*, 4 F.3d 1095, 1098-99 (2d Cir. 1993); *Control Data Corp. v. Zelman*, 602 F.2d 38, 42 (2d Cir. 1979).  This standard for assumption of a lease or contract is fundamentally identical to the standard for an asset disposition pursuant to section 363(b) of the Bankruptcy Code.  *See Sharon Steel Corp. v. National Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *In re III Enterprises, Inc.*, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) ("Generally, a court will give great deference to a debtor's decision to assume or reject a contract.  A debtor

need only show that its decision to assume or reject the contract is an exercise of sound business judgment—a standard which we have concluded many times is not difficult to meet.").

36.     Courts give the phrase "adequate assurance of future performance" a "practical, pragmatic construction."  *EBG Midtown South Corp. v. Mcharen/Hart Envtl. Engig Corp.*, 139 B.R. 585, 592 (S.D.N.Y. 1992), *aff'd*, 993 F.2d 300 (2d Cir. 1993); *see Sanshoe Worldwide*, 139 B.R. at 592 (presence of adequate assurance should be "determined under the facts of each particular case").  Courts have uniformly held that the Bankruptcy Code does not require total assurances.  *See In re Natco Industries, Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) ("[I]t does not mean absolute insurance that the debtor will thrive and make a profit."); *In re Prime Motor Inns Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").  Adequate assurance has been provided by demonstrating the Stalking Horse Bidder's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance existed when prospective assignee of lease from debtor had financial resources and had expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

37.     The Debtors hereby move to assume and/or assign the Contracts to the Successful Bidder(s) or Back-Up Bidder(s) as appropriate, should any such buyer choose to have such Contracts assigned, and to cause the Successful Bidder(s) or Back-Up Bidder(s) to pay the Cure Amounts in connection therewith.  The Debtors believe that any Successful Bidder(s) or Back-up Bidder(s) necessarily will be an established and sophisticated entity with the financial resources to

perform under the Contracts.  Moreover, if necessary, the Debtors will adduce facts at the Sale Hearing demonstrating the financial wherewithal of the Successful Bidder(s) or Back-up Bidder(s), as the case may be, and their willingness and ability to perform under the Contracts to be assumed and assigned to them.

38.    In accordance with the foregoing, the Debtors request that the Court grant authorization for the Debtors to assume (where applicable) and assign the Contracts to the Successful Bidder(s) or Back-up Bidder(s), as the case may be.

**F.    <u>Further Relief</u>**

39.    The Debtors request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above and in the First Day Declaration, time is of the essence and it is imperative that the Debtors be able to consummate a sale on the timeline proposed.  In order to maximize the value of the assets and minimize the estates' unnecessary administrative expenses, the Debtors believe a waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), to the extent that they apply, is in the best interest of the Debtors' estates and stakeholders.

<u>NOTICE</u>

40.    Notice of this Motion will be provided to: (a) the Office of the United States Trustee for Region 9; (b) counsel to the Administrative Agent, (c) counsel to the Committee; (d) all parties asserting liens or interests in the Assets; (e) landlords who are counterparties to the Debtors' unexpired leases; (f) counterparties to the Debtors' executory contracts; and (g) all

parties that have requested or that are required to receive special notice pursuant to Bankruptcy Rule 2002.  The Debtors respectfully submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully requests that the Court enter the Bidding Procedures Order in the form attached hereto and grant such other and further relief as is just and proper under the circumstances.

Dated: July 9, 2020                    Respectfully submitted,

                                       WARNER NORCROSS + JUDD LLP

                                       /s/ Elisabeth M. Von Eitzen
                                       Rozanne M. Giunta (P29969)
                                       Stephen B. Grow (P39622)
                                       Elisabeth M. Von Eitzen (P70183)
                                       1500 Warner Building
                                       150 Ottawa Avenue, NW
                                       Grand Rapids, Michigan 49503
                                       Telephone: (616) 752-2000

                                       -and-

                                       PACHULSKI STANG ZIEHL & JONES LLP

                                       John W. Lucas
                                       Jason Rosell
                                       Steven W. Golden
                                       150 California Street, 15th Floor
                                       San Francisco, California 94111
                                       Telephone: (415) 263-7000

                                       *Proposed Counsel to the Debtors*

20386498-2

**EXHIBIT A**

**(Asset Purchase Agreement)**

**EXECUTION VERSION**

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**BARFLY VENTURES, LLC,**

**EACH OF THE OTHER SELLERS PARTY HERETO**

**AND**

**PROJECT BARFLY LLC**

**July 9, 2020**

*STRICTLY PRIVATE AND CONFIDENTIAL DRAFT FOR DISCUSSION PURPOSES ONLY. CIRCULATION OF THIS DRAFT SHALL NOT GIVE RISE TO ANY DUTY TO NEGOTIATE OR CREATE OR IMPLY ANY OTHER LEGAL OBLIGATION. NO LEGAL OBLIGATION OF ANY KIND WILL ARISE UNLESS AND UNTIL A DEFINITIVE WRITTEN AGREEMENT IS EXECUTED AND DELIVERED BY ALL PARTIES HERETO.*

# TABLE OF CONTENTS

**Page**

Article I DEFINITIONS ................................................................................................. 2

Article II PURCHASE AND SALE ...............................................................................15

Section 2.1    Purchase and Sale of Purchased Assets...................................15
Section 2.2    Excluded Assets .......................................................................18
Section 2.3    Assumption of Assumed Liabilities .........................................20
Section 2.4    Excluded Liabilities .................................................................20
Section 2.5    Consideration ...........................................................................21
Section 2.6    Assumption and Assignment of Contracts...............................21
Section 2.7    Closing.....................................................................................22
Section 2.8    Deliveries at Closing................................................................23
Section 2.9    Allocation.................................................................................24
Section 2.10   Excluded Locations ..................................................................25

Article III SELLERS' REPRESENTATIONS AND WARRANTIES....................................25

Section 3.1    Organization of Sellers; Good Standing ..................................25
Section 3.2    Authorization of Transaction...................................................25
Section 3.3    Noncontravention; Consents and Approvals............................26
Section 3.4    Compliance with Laws.............................................................27
Section 3.5    Title to Purchased Assets ........................................................27
Section 3.6    Contracts ..................................................................................27
Section 3.7    Intellectual Property.................................................................27
Section 3.8    Litigation..................................................................................28
Section 3.9    Employees and Employment Matters.......................................28
Section 3.10   Employee Benefit Plans ...........................................................30
Section 3.11   Real Property............................................................................30
Section 3.12   Tangible Personal Property ......................................................31
Section 3.13   Permits.....................................................................................31
Section 3.14   Purchased Inventory ................................................................32
Section 3.15   Environmental Matters.............................................................32
Section 3.16   Financial Statements................................................................33
Section 3.17   Brokers' Fees ...........................................................................34
Section 3.18   No Other Agreements to Purchase ...........................................34
Section 3.19   Taxes .......................................................................................34
Section 3.20   Suppliers ..................................................................................36
Section 3.21   Insurance Policies....................................................................36
Section 3.22   Related Party Transactions......................................................36
Section 3.23   Bank Accounts.........................................................................37
Section 3.24   Trade Names; Business Locations ...........................................37

Article IV BUYER'S REPRESENTATIONS AND WARRANTIES....................................37

Section 4.1    Organization of Buyer..............................................................37

Section 4.2    Authorization of Transaction ...........................................................38
Section 4.3    Noncontravention ..............................................................................38
Section 4.4    Litigation............................................................................................39
Section 4.5    Adequate Assurances Regarding Executory Contracts..........................39
Section 4.6    Brokers' Fees .....................................................................................39
Section 4.7    No Outside Reliance ..........................................................................39

Article V PRE-CLOSING COVENANTS ........................................................................39

Section 5.1    Notices and Consents ........................................................................39
Section 5.2    Bankruptcy Actions ...........................................................................41
Section 5.3    Conduct of Business ..........................................................................42
Section 5.4    Notice of Developments .....................................................................45
Section 5.5    Access................................................................................................45
Section 5.6    Press Releases and Public Announcements .........................................46
Section 5.7    Bulk Transfer Laws ...........................................................................46
Section 5.8    Release of Claims ..............................................................................47
Section 5.9    Buyer Backstop.. ...............................................................................48

Article VI OTHER COVENANTS.................................................................................48

Section 6.1    Cooperation.......................................................................................48
Section 6.2    Further Assurances ...........................................................................49
Section 6.3    Availability of Business Records........................................................49
Section 6.4    Employee Matters ..............................................................................49
Section 6.5    Transfer Taxes ...................................................................................51
Section 6.6    Wage Reporting..................................................................................51
Section 6.7    Insurance Policies..............................................................................51
Section 6.8    Collection of Accounts Receivable .....................................................51
Section 6.9    Use of Name and Marks.....................................................................52
Section 6.10   Liquor License Approvals ..................................................................52
Section 6.11   Data Privacy Protection.....................................................................52
Section 6.12   Alternate Transactions .......................................................................53
Section 6.13   Purchased Actions .............................................................................53

Article VII CONDITIONS TO CLOSING.......................................................................53

Section 7.1    Conditions to Buyer's Obligations ......................................................53
Section 7.2    Conditions to Sellers' Obligations ......................................................54
Section 7.3    No Frustration of Closing Conditions ..................................................55
Section 7.4    Waiver of Conditions .........................................................................55
Section 7.5    Agreement Regarding Schedules and Exhibits Hereto.. ........................55

Article VIII TERMINATION .........................................................................................56

Section 8.1    Termination of Agreement ..................................................................56
Section 8.2    Procedure upon Termination ...............................................................58
Section 8.3    Effect of Termination..........................................................................58

Article IX MISCELLANEOUS.................................................................................................60

    Section 9.1    Remedies.................................................................................60
    Section 9.2    Expenses ................................................................................60
    Section 9.3    Entire Agreement...................................................................60
    Section 9.4    Incorporation of Schedules, Exhibits and Disclosure Schedule ..............60
    Section 9.5    Amendments and Waivers......................................................60
    Section 9.6    Succession and Assignment....................................................61
    Section 9.7    Notices..................................................................................61
    Section 9.8    Governing Law; Jurisdiction..................................................62
    Section 9.9    Consent to Service of Process.................................................62
    Section 9.10    WAIVERS OF JURY TRIAL ................................................63
    Section 9.11    Severability ..........................................................................63
    Section 9.12    No Third Party Beneficiaries.................................................63
    Section 9.13    No Survival of Representations, Warranties and Agreements ..............63
    Section 9.14    Non-Recourse.......................................................................63
    Section 9.15    Construction..........................................................................64
    Section 9.16    Computation of Time.............................................................64
    Section 9.17    Mutual Drafting.....................................................................64
    Section 9.18    Disclosure Schedule..............................................................64
    Section 9.19    Headings; Table of Contents ..................................................65
    Section 9.20    Counterparts; Facsimile and Email Signatures .....................65
    Section 9.21    Sellers' Rep..........................................................................65
    Section 9.22    Time of Essence ...................................................................66
    Section 9.23    Risk of Loss..........................................................................66
    Section 9.24    Buyer's Removal of Purchased Assets....................................66

EXHIBITS

| | | |
|---|---|---|
| Exhibit A | - | Form of Bill of Sale |
| Exhibit B | - | Form of Assignment and Assumption Agreement |
| Exhibit C | - | Form of Release |

SCHEDULES

| | | |
|---|---|---|
| Schedule 2.1(t) | - | Vehicles |
| Schedule 2.2 | - | Excluded Assets |
| Schedule 2.3(b) | | Accounts Payable |
| Schedule 2.6(a) | - | Contracts and Estimated Cure Amounts |
| Schedule 2.6(b) | - | Assumed Contracts |
| Schedule 3.3(b) | - | Consents and Approvals |
| Schedule 3.6 | - | Contracts |
| Schedule 3.7 | - | Intellectual Property |
| Schedule 3.8 | - | Litigation |
| Schedule 3.9 | - | Employment Matters |
| Schedule 3.10 | - | Employee Benefit Plans |
| Schedule 3.11(b) | - | Leased Real Property |
| Schedule 3.11(c) | - | Leasehold Improvements |
| Schedule 3.12 | - | Personal Property Leases |
| Schedule 3.13(a) | - | Permits |
| Schedule 3.13(b) | - | Liquor Licenses |
| Schedule 3.15 | - | Environmental Matters |
| Schedule 3.21 | - | Major Suppliers |
| Schedule 5.3 | - | Conduct of Business |
| Schedule 7.1 | - | Consents, Assumed Permits, and Liquor Licenses Approvals |

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is entered into as of July 9, 2020, by and among BARFLY VENTURES, LLC ("BarFly Ventures"), individually and as Sellers' Rep; 9 VOLT, LLC; 50 AMP FUSE, LLC; EL BREWPUB, LLC; GRBC HOLDINGS, LLC; HOPCAT-ANN ARBOR, LLC; HOPCAT-CHICAGO, LLC; HOPCAT-CONCESSIONS, LLC; HOPCAT-DETROIT, LLC; HOPCAT-GR BELTLINE, LLC; HOPCAT-HOLLAND, LLC; HOPCAT-INDIANAPOLIS, LLC; HOPCAT-KALAMAZOO, LLC; HOPCAT-KANSAS CITY, LLC; HOPCAT-LEXINGTON, LLC; HOPCAT-LINCOLN, LLC; HOPCAT-LOUISVILLE, LLC; HOPCAT-MADISON, LLC; HOPCAT-MINNEAPOLIS, LLC; HOPCAT-PORT ST. LUCIE, LLC; HOPCAT-ROYAL OAK, LLC; HOPCAT-ST. LOUIS, LLC; and LUCK OF THE IRISH, LLC (each of the foregoing, individually a "Seller" and sometimes collectively, the "Sellers" or, sometimes individually a "Debtor" or collectively, the "Debtors"), and Project BarFly LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"). The Sellers and Buyer are referred to collectively herein as the "Parties." Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Article I.

## RECITALS

WHEREAS, Sellers are in the business of operating restaurants, brewery restaurants and bars in numerous states (collectively, but excluding the Excluded Restaurants and the assets and Liabilities directly related thereto, the "Business");

WHEREAS, on June 3, 2020, Sellers filed voluntary petitions for relief (the "Chapter 11 Cases") pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Michigan (the "Bankruptcy Court");

WHEREAS, upon the filings of such Chapter 11 Cases, Sellers continued in possession of their assets and were authorized under the Bankruptcy Code to continue the operation of their businesses as debtors-in-possession;

WHEREAS, certain of the Sellers entered into a Credit Agreement as borrowers, dated as of August 31, 2015, with the lenders party thereto, as lenders (the "Credit Agreement Lenders"), CIP Administrative, LLC, as administrative agent for the Credit Agreement Lenders (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement" and, together with the other Loan Documents (as therein defined), the "Credit Agreement Loan Documents");

WHEREAS, on or about March 20, 2020, to comply with business closure mandates imposed by governmental authorities as a result of the COVID-19 outbreak, the Sellers ceased operating all of their restaurants and furloughed nearly all of their employees;

WHEREAS, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to acquire and assume from Sellers, pursuant to Sections 363 and 365 of the Bankruptcy Code, the Purchased Assets and the Assumed Liabilities upon the terms and subject to the conditions set forth herein;

WHEREAS, in connection with the Closing, and as a material inducement to Buyer's willingness to enter into this Agreement, each of Mark A. Sellers, III and Ned Lidvall has executed, or will execute, an employment agreement (in form acceptable to the Buyer) that by each of their terms are to become effective as of the Closing;

WHEREAS, Sellers intend to seek the entry of the Sale Order by the Bankruptcy Court approving this Agreement and authorizing Sellers to consummate the Contemplated Transactions upon the terms and subject to the conditions set forth herein and in the Sale Order;

WHEREAS, the board of directors or the managing members of each Seller has determined that it is advisable and in the best interests of each such Seller's estate and the beneficiaries of such estates to consummate the Contemplated Transactions provided for herein pursuant to the Sale Order and has approved this Agreement; and

WHEREAS, the Contemplated Transactions are subject to the approval of the Bankruptcy Court, subject to any higher and better offers that may be made for the Purchased Assets prior to or at the Sale Hearing, and will be consummated only pursuant to the Sale Order to be entered by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, the Parties agree as follows:

# ARTICLE I
# DEFINITIONS

"Accounts Receivable" means (a) all accounts, accounts receivable, Credit Card Receivables, contractual rights to payment, notes, notes receivable, negotiable instruments, chattel paper, and vendor and supplier rebates of Sellers in connection with the Business as conducted by the Sellers, and (b) any security interest, claim, remedy or other right related to any of the foregoing.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means, when used with reference to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Alternate Transaction" means a transaction or series of related transactions pursuant to which Sellers sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Sellers or otherwise), all or substantially all of the Purchased Assets (or agrees to do any of the foregoing) in a transaction or series of transactions to a Person or Persons other than Buyer, but

2

does not mean the sale of assets to customers conducted in the Ordinary Course of Business or a piecemeal liquidation of the Purchased Assets through a series of unrelated transactions.

"Assignment and Assumption Agreement" means a duly executed assignment and assumption agreement, substantially in the form attached as Exhibit B hereto.

"Assumed Contracts" has the meaning set forth in Section 2.6(b).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumed Permits" means all Permits relating to the Business that are transferable in accordance with their terms and under applicable Law (including, without limitation, those that are transferable without consent of the issuing entity by virtue of the effect of the Sale Order), but excluding all Permits (other than Liquor Licenses) to the extent related exclusively to any Excluded Asset (including any Lease that is not an Assumed Contract).

"Available Cash" is defined in Section 5.9.

"Available Cash Deficiency Amount" is defined in Section 5.9.

"Backstop Amount" is defined in Section 5.9.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bid Procedures" means bid procedures acceptable to Buyer, which shall, among other things: (i) schedule an auction for the Business (an "Auction") to be held not later than August 25, 2020; (ii) schedule the hearing to approve the sale of the Business (the "Sale Hearing") to be held not later than August 27, 2020; (iii) require that any sale transaction close not later than August 31, 2020; (iv) require the Sellers to promptly provide a copy of any Qualified Bid to Buyer; (v) provide that, at the Auction, the first bid shall be considered only if it exceeds the amount of the highest Qualified Bid submitted by the Qualified Bidders prior to such auction by a minimum of any Break-up Fee (if Buyer submitted the highest Qualified Bid) plus $100,000 (with $100,000 to be the minimum bid increment for each round of bidding); (vi) authorize the Buyer to bid, at each round of the Auction, the amount of the Break-up Fee; (vii) provide that no bidder(s) (other than, for the avoidance of doubt, the Buyer in those circumstances in which it is entitled to a Break-up Fee hereunder) shall be granted a break-up fee, expense reimbursement, termination payment, or other like compensation at any time during the sale process or the Auction; and (viii) grant Buyer relief from the automatic stay to enable Buyer to exercise rights and receive benefits under this Agreement.

"Bid Procedures Motion" means a motion filed by the Sellers with the Bankruptcy Court requesting the entry of the Bid Procedures Order.

"Bid Procedures Order" means an order of the Bankruptcy Court entered in the Chapter 11 Cases approving the Bid Procedures in form and substance agreeable to Buyer.

3

"Bid Procedures Order Deadline" means July 17, 2020.

"Bill of Sale" means a duly executed bill of sale, substantially in the form attached as Exhibit A hereto.

"Break-up Fee" means an amount equal to $525,000.

"Business" has the meaning set forth in the recitals.

"Business Cessation Event" means Sellers' cessation of its ongoing business on or about March 20, 2020, as the result of, among other things, the COVID-19 outbreak, and the accompanying furlough of substantially all of Sellers' employees.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks located in New York, New York shall be authorized or required by Law to close.

"Buyer" has the meaning set forth in the preamble.

"Buyer Released Parties" has the meaning set forth in Section 5.9.

"Cash and Cash Equivalents" means, collectively, cash (including Restaurant Petty Cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, government securities and other cash equivalents or similar cash items of Sellers, net of (i) Cure Claims to the extent not assumed by Buyer, if any, (ii) administrative claims incurred through the Closing Date, (iii) the Wind Down Budget, and (iv) uncleared checks issued by Sellers that are not yet reflected in the applicable bank account of Sellers.

"Chapter 11 Cases" has the meaning set forth in the recitals.

"Claim" means a "claim" as defined in Section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing" means the closing of the Contemplated Transactions, which shall be deemed to have occurred at 12:01 p.m. (prevailing Eastern Time) on the Closing Date.

"Closing Date" means the second (2nd) Business Day after the date on which all conditions to the obligations of Sellers and Buyer to consummate the Contemplated Transactions set forth in Article VII (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived by the Party entitled to waive that condition, or at such other time or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto.

"Consent" means any approval, consent, ratification, permission, clearance, designation, qualification, waiver or authorization, or an order of the Bankruptcy Court that deems or renders any of the foregoing unnecessary.

4

"<u>Contemplated Transactions</u>" means the sale by Sellers to Buyer, and the purchase by Buyer from Sellers, of the Purchased Assets and the assumption by Buyer of the Assumed Liabilities.

"<u>Continuing Restaurant</u>" means any of Sellers' restaurant locations with respect to which the associated Leases have been designated by Buyer as Assumed Contracts pursuant to <u>Section 2.6(b)</u>.

"<u>Contract</u>" means any written or oral agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, license agreement, contribution agreement, partnership agreement or other arrangement, understanding, permission or commitment that, in each case, is legally-binding.

"<u>COVID-19</u>" means the novel coronavirus disease 2019 caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2).

"<u>Credit Agreement</u>" has the meaning set forth in the recitals, as amended, restated, supplemented or otherwise modified from time to time in accordance with this Agreement.

"<u>Credit Agreement Lenders</u>" means the "Lenders" as such term is defined in the Credit Agreement.

"<u>Credit Agreement Lien Obligations</u>" means all "Obligations" (as defined in the Credit Agreement).

"<u>Credit Agreement Loan Documents</u>" has the meaning set forth in the recitals.

"<u>Credit Agreement Secured Parties</u>" shall mean Congruent Credit Opportunities Fund III, LP; Main Street Capital Corporation; and HMS Income Fund, Inc., and the successors and assignees of such parties.

"<u>Credit Bid</u>" means a bid by Buyer pursuant to Section 363(k) of the Bankruptcy Code equal to a portion of the Credit Agreement Lien Obligations in the initial amount of $17,500,000, and not to exceed $20,000,000.

"<u>Credit Bid And Release</u>" has the meaning set forth in <u>Section 2.5(b)</u>.

"<u>Credit Card Liabilities</u>" means all Liabilities and other rights of credit card processors or other Persons to amounts payable by any Seller (whether current or non-current) in connection with any customer purchases from any restaurants operated by Sellers in respect of credit or debit cards to any credit card processors to Sellers. Credit Card Liabilities are Excluded Liabilities.

"<u>Credit Card Receivables</u>" means all accounts receivable and other rights of Sellers to amounts owed to any Seller (whether current or non-current) in connection with any customer purchases from any restaurants operated by Sellers that are made with credit or debit cards or any

other related amounts owing (including deposits or holdbacks to secure chargebacks, offsets or otherwise) from credit card processors to Sellers.

"Cure Amounts" has the meaning set forth in Section 2.6(c).

"Current Employees" means all individuals employed by Sellers as of the day before the Closing Date, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

"Dataroom" has the meaning set forth in Section 4.7.

"Debtor" or "Debtors" has the meaning set forth in the preamble.

"Decree" means any judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order or any other order of any Governmental Entity.

"Disclosure Schedule" has the meaning set forth in Article III.

"Employee Benefit Plan" means (a) any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA, whether or not subject to ERISA), (b) employment, consulting, severance, termination protection, change in control, transaction bonus, retention or similar plan, program, policy, practice agreement or arrangement and (c) any other plan, program, policy, practice, agreement or arrangement providing for benefits or compensation of any kind, including without limitation bonuses, profit-sharing, or other forms of incentive or deferred compensation, vacation or paid time off benefits, insurance, medical, dental, vision, prescription or fringe benefits, life insurance, disability or sick leave benefits or post-employment or retirement benefits, in each case of clause (a), (b) and (c) above, sponsored, maintained, contributed to or required to be contributed to by any Seller or any entity that together with any Seller is, or at any time was, treated as a single employer under Section 414 of the Code or Title IV of ERISA ("ERISA Affiliate") or in which any Seller or any ERISA Affiliate participates or participated, or with respect to which any Seller or any ERISA Affiliate has or may have any liability, contingent or otherwise.

"Employee Roster" has the meaning set forth in Section 3.9(a).

"Environmental Laws" means all applicable Laws concerning pollution or protection of the environment, human health and safety, and natural resources.

"ERISA" means the United States Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" has the meaning set forth in the definition of "Employee Benefit Plan", as amended.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Cash" is defined in Section 2.1(a).

6

"Excluded Employee" has the meaning set forth in Section 6.4(b).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Restaurants" means any of Sellers' restaurant locations with respect to which the associated Leases have not been designated by Buyer as Assumed Contracts pursuant to Section 2.6(b).

"Existing Escrows" has the meaning set forth in Section 2.1(a).

"Expense Reimbursement Amount" means Buyer's and/or its Affiliates, as applicable, reasonable costs and expenses related to pursuing, negotiating, and documenting the Contemplated Transactions.

"Express Representations" has the meaning set forth in Section 4.7.

"Financial Statements" has the meaning set forth in Section 3.16.

"Former Employees" means all individuals who have been employed by the Sellers (or any of their predecessors) who are not Current Employees.

"GAAP" means United States generally accepted accounting principles as in effect from time to time, as consistently applied in accordance with Sellers' historic practices.

"Governmental Entity" means any United States federal, state or local or non-United States governmental or regulatory authority, agency, commission, court, body or other governmental entity.

"Hazardous Substance" means any toxic or hazardous material, substance or waste as to which Liability or standards of conduct may be imposed under any Environmental Laws.

"Intellectual Property" means any and all rights, title and interest in or relating to intellectual property of any type, which may exist or be created under the Laws of any jurisdiction throughout the world, including: (a) patents and patent applications, together with all reissues, continuations, continuations-in-part, divisionals, extensions and reexaminations in connection therewith; (b) trademarks, service marks, brand names, Internet domain names, logos, symbols, trade dress, assumed names, fictitious names, trade names, business names, product names, social media accounts, URLs, and other indicia of origin, all applications and registrations for all of the foregoing, and all goodwill associated therewith and symbolized thereby (the items of this subclause (b) collectively, "Trademarks"); (c) rights associated with works of authorship (including menus), including exclusive exploitation rights, mask work rights, copyrights, database and design rights, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and renewals thereof; (d) rights in electronic data processing systems, information management systems, recordkeeping systems, communications and telecommunications systems, networking systems, account management systems, Internet websites and related content, inventory management systems and other such applications, software, hardware, equipment and services (including all firmware, applications and software installed on such hardware and

7

equipment, and all associated databases, and related documentation); (e) trade secrets and proprietary or confidential information relating to the Business (including recipes, methods, ingredient lists, procedures, food and beverage preparation instructions and publications and guidelines, menu formulation processes, standards, operation manuals, specifications, pictures, drawings, mock-ups, prototypes, processes, ideas, formulae, compositions, know-how, discoveries, inventions, designs, plans, proposals, technical data, financial, business and marketing plans, price lists, and customer and supplier lists and related information); and (f) all other intellectual property rights related to the Business.

"Intellectual Property Assignments" has the meaning set forth in Section 2.9(a).

"Inventory" means all of Sellers' now owned or hereafter (prior to the Closing) acquired inventory and goods, wherever located, including, without limitation, consumable food, alcoholic beverages (whether unopened or opened to the extent permitted by applicable Law), and other beverages and raw materials and work-in-process therefor and all of Sellers' tangible property used in the preparation of, serving, and cleaning up from, food and drinks, including napkins, silverware, plates and dining ware, cups, glassware, mugs, cooking and cleaning utensils, packaging materials, paper products, ingredients, miscellaneous consumables, materials, supplies, inventories and other related items or that are otherwise included in the Purchased Assets and are permitted to be sold and transferred under applicable Law.

"IRC" means the United States Internal Revenue Code of 1986, as amended.

"Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Entity, or court of competent jurisdiction, or other legal requirement or rule of law, including applicable building, zoning, subdivision, health and safety and other land use Laws.

"Leased Real Property" means all (i) leasehold or sub-leasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property which is used in or otherwise related to the Business, including the right to all security deposits, letters of credit and other amounts and instruments deposited by or on behalf of Sellers thereunder, and (ii) any buildings, structures, improvements and fixtures located on any Leased Real Property which are owned by Seller, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the Lease for such Leased Real Property ("Leasehold Improvements").

"Leasehold Improvements" has the meaning set forth in the definition of "Leased Real Property."

8

"Leases" means all leases, subleases, licenses, concessions and other Contracts, including all amendments, extensions, renewals, guaranties and other agreements with respect thereto, in each case pursuant to which any Seller holds any Leased Real Property.

"Liability" means, as to any Person, any debt, Claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred, or asserted or when the relevant events occurred or circumstances existed.

"Lien" means any lien (as defined in Section 101(37) of the Bankruptcy Code), encumbrance, right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, judgments, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use (whether known or unknown, secured or unsecured or in the nature of setoff or recoupment, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, Law, equity, or otherwise, including claims otherwise arising under doctrines of successor liability).

"Liquor Licenses" means all liquor licenses (including, without limitation, beer and wine licenses) held or used by each Seller in respect of any Purchased Assets, including the Seller in whose name such license is issued, date of issuance and renewal date.

"Liquor License Approvals" means the necessary Consents pertaining to the transfer and/or issuance of any of the Liquor Licenses in respect of any Purchased Assets to Buyer.

"Litigation" means any action, cause of action, suit, claim, investigation, mediation, arbitration, audit, grievance, demand, hearing, proceeding or investigation, whether civil, criminal, administrative or arbitral, whether at law or in equity and whether before any Governmental Entity, arbitrator or mediator.

"Major Suppliers" has the meaning set forth in Section 3.21.

"Management Agreement" means an agreement in the form as shall be reasonably acceptable to Buyer and Sellers, and which provides, among other things, that all costs of operations of the Purchased Assets from and after the Closing Date shall be paid on a current basis by Buyer and the economic benefit of the operations of the Purchased Assets accrues to Buyer.

"Material Adverse Effect" means any change, event, effect, development, condition, circumstance or occurrence (when taken together with all other changes, events, effects, developments, conditions, circumstances or occurrences), that (a) has had, or would reasonably

9

be expected to have, individually or in the aggregate, a material adverse effect on the Purchased Assets (taken as a whole); provided, however, that no change, event, effect, development, condition, circumstance or occurrence related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: (i) any effect resulting from the filing, announcement, or pendency of the Chapter 11 Cases, including (1) any Seller's inability to pay certain prepetition obligations as a result of the commencement of such Chapter 11 Cases, (2) any Decree of the Bankruptcy Court, (3) any action or omission of any Seller taken or not taken in order to avoid violation of any Decree or objections of the Bankruptcy Court, or (4) any other effect, directly or indirectly, related thereto; (ii) acts of war, armed hostilities, sabotage or terrorism, or any escalation or worsening of any such acts of war, armed hostilities, sabotage or terrorism threatened or underway as of the date of this Agreements, except to the extent that such change has a materially disproportionate adverse effect on the Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (iii) changes in conditions in the U.S. or global economy or capital or financial markets generally, including changes in interest or exchange rates, except to the extent that such change has a materially disproportionate adverse effect on Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (iv) resulting from any act of God or other force majeure event (including natural disasters, or any epidemic, pandemic or wide-spread disease outbreak (including the COVID-19 virus outbreak)); (v) changes in Law or in GAAP or interpretations thereof; (vi) any actions taken by Buyer or any of its Affiliates (other than those expressly permitted to be taken hereunder); (vii) inaction by any Seller due to Buyer's refusal to consent to a request for consent by Seller under Section 5.3; (viii) the negotiation, announcement or pendency of this Agreement or the consummation of the sale and assumption contemplated hereby, or the identity, nature or ownership of Buyer; or (ix) the Business Cessation Event; provided, however, notwithstanding anything herein to the contrary, a Decree issued after the date hereof that requires restaurants or bars to close for dine-in business in any jurisdiction where a Continuing Restaurant is located shall constitute a Material Adverse Effect; or (b) would reasonably be expected to prevent, materially delay or materially impair to the ability of any Seller to consummate the Contemplated Transactions or the Related Agreements on the terms set forth herein and therein.

"Non-Real Property Contracts" means the Contracts to which any Seller is a party other than the Leases.

"Offeree" has the meaning set forth in Section 6.4(a).

"Ordinary Course of Business" means the ordinary and usual course of business of Sellers taken as a whole consistent with past custom and practice and taking into account the commencement of the Chapter 11 Cases and the Debtors' current distressed financial condition, excluding from the ordinary and usual course of business, for the avoidance of doubt, any modifications to the previous normal day-to-day operations of Sellers made in response to COVID-19, or any similar or related disease caused by COVID-19, or any mutation or evolution thereof, or any policies, guidelines or Laws enacted, directly or indirectly, in response to the same (including any "shelter-in-place", "stay at home" or similar Decrees and the Cybersecurity and Infrastructure Security Agency Critical Infrastructure Worker Guidance 2.0, as may be amended, supplemented, updated or otherwise modified from time to time).

"<u>Organizational Documents</u>" means, with respect to any entity, the certificate of incorporation, articles of incorporation, certificate of formation, articles of organization, by-laws, partnership agreement, limited liability company agreement, formation agreement and other similar organizational documents of such entity (in each case, as amended through the date of this Agreement).

"<u>Outside Date</u>" means August 31, 2020.

"<u>Parties</u>" has the meaning set forth in the preamble.

"<u>Permit</u>" means any and all franchise, approval, permit (including environmental, construction and operation permits), license, order, registration, certificate, variance, Consent, exemption or similar right issued, granted, given or otherwise obtained or required to be obtained, from or by any Governmental Entity, under the authority thereof or pursuant to any applicable Law.

"<u>Permitted Liens</u>" means (a) Liens for Taxes which are (i) being contested in good faith by appropriate proceedings or (ii) not due and payable as of the Closing Date and which shall be prorated or otherwise released at Closing and, in each case of clauses (i) and (ii), for which adequate reserves have been made on the Financial Statements to the extent required by GAAP; (b) mechanics liens and similar liens for labor (excluding Liens arising under ERISA or Code Section 430), materials or supplies provided with respect to real property incurred in the Ordinary Course of Business which are being contested in good faith by appropriate proceedings for which adequate reserves have been made on the Financial Statements to the extent required by GAAP and which shall be prorated or otherwise released at Closing (including, without limitation, by virtue of the effect of the Sale Order); (c) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business, except where any such violation would not, individually or in the aggregate, materially impair the use, operation or transfer of the affected property or the conduct of the Business thereon as it is currently being conducted; (d) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects, in each case that do not or would not materially impair value or the use or occupancy of such real property or materially interfere with the operation of the Business at such real property; (e) with respect to Leasehold Improvements, any reversion or similar rights to the landlord or other third party upon expiration or termination of the applicable Lease; (f) any Liens associated with or arising in connection with any Assumed Liabilities, (g) Liens resulting from Credit Agreement Lenders' and/or Buyer's actions or conduct upon or after the Closing, and (h) Liens that will be released or removed by operation of the Sale Order (including, without limitation, Liens under Credit Agreement Loan Documents).

"<u>Person</u>" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

"Personal Property Leases" means all leases of personal property relating to personal property used by Sellers or to which any Seller is a party or by which the properties or assets of any Seller are bound, in each case relating to the Business.

"Petition Date" means the date of the filing of the Chapter 11 Cases.

"PII" means "personally identifiable information" within the meaning of Section 101(41A) of the Bankruptcy Code.

"Plan" means a Chapter 11 plan or plans of reorganization or liquidation.

"PPP Cash" means cash received under the Coronavirus Aid, Relief and Economic Security Act's Paycheck Protection Program.

"Purchase Price" has the meaning set forth in Section 2.5(a).

"Purchased Assets" has the meaning set forth in Section 2.1; provided, however, that, notwithstanding the foregoing or anything contained in this Agreement to the contrary, the Purchased Assets shall not include any Excluded Assets or any asset held by any Seller pursuant to any Lease or Personal Property Lease (a "Possessory Agreement") unless the associated Possessory Agreement is among the Assumed Contracts.

"Purchased Actions" means all causes of action, lawsuits, Claims, rights of recovery and other similar rights of any Seller, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, in equity or otherwise (including any derivative Claims asserted or that may be asserted on behalf of any Seller), (i) arising under Chapter 5 of the Bankruptcy Code, whether relating to the Business and the Purchased Assets or otherwise, or (ii) against any current or former officer or director of any Seller or any shareholder of any Seller or any Affiliate of any Seller.

"Purchased Inventory" means Inventory that is part of the Purchased Assets as set forth in Section 2.1.

"Qualified Bid" means a written proposal provided to the Sellers for the purchase of substantially all of Sellers' assets that:  (a) does not contain any financing or due diligence contingencies;  (b) is accompanied by reasonable evidence of committed financing or other ability to perform;  (c) is accompanied by a good-faith deposit equal to 10 percent of the consideration proposed by such bidder; and (d) that is timely submitted by the bid deadline set forth in the Bidding Procedures Order. This Agreement shall be deemed a Qualified Bid.

"Qualified Bidder" means an entity that has entered into a confidentiality agreement with Sellers and that Sellers in good faith and in their sole discretion determine (based on the availability of financing and proof of financial ability, experience, and other relevant considerations) is capable of consummating the purchase of the Business, if selected as the successful bidder.  The Buyer shall be deemed to be a Qualified Bidder.

"Recent Employee" has the meaning set forth in Section 3.9(a).

12

"Recipes" has the meaning set forth in Section 2.1(x).

"Records" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Business.

"Registered" means issued by, registered with, renewed by or the subject of a pending application before any Governmental Entity, domain name registrar, or social media site.

"Rejection Damages" means the amount of the distribution that the applicable landlord under any Designated Contract would be entitled to under a Plan that the Bankruptcy Court has confirmed and that has gone effective in the Chapter 11 Cases (with such calculation to be made as if Sellers will not receive any proceeds from Buyer under this Agreement) solely for claims of the applicable landlord for rejection of the applicable Designated Contract of real property that are subject to section 502(b)(6)(A) of the Bankruptcy Code with the amount of such claims to be subject to the limitations in section 502(b)(6)(A) of the Bankruptcy Code even if Sellers do not object to such claims based on any applicable landlord's filed claim exceeding such limitations or the Bankruptcy Court does not adjudicate such claims.

"Related Agreements" means the Management Agreement, Bill of Sale, the Assignment and Assumption Agreement and the Intellectual Property Assignments and any other instruments of transfer and conveyance as may be required under applicable Law to convey valid title of the Purchased Assets to Buyer.

"Related Party" means each officer or director of a Seller, each spouse, sibling, parent, child, grandparent or grandchild of any director or officer of any Seller each trust for the benefit of any of the foregoing, and each Affiliate of any of the foregoing.

"Relief Proceeds" means, all rights of, or on behalf of, any Seller in respect of any current or future disaster relief or other similar assistance program of any Governmental Entity in respect of, or enacted in response to, the COVID-19 pandemic.

"Representative" means a Person's officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents.

"Restaurant Petty Cash" means any petty cash of Sellers on the premises of any Continuing Restaurant or Excluded Restaurant.

"Sale Hearing" means the hearing conducted in the Bankruptcy Court to seek approval of the Sale Motion and the Contemplated Transactions.

"Sale Motion" means a motion filed by the Sellers with the Bankruptcy Court in connection with the Chapter 11 Cases requesting the entry of the Sale Order.

13

"Sale Order" means an order of the Bankruptcy Court entered in the Chapter 11 Cases consistent with the terms of this Agreement approving the Sale Motion and sale to Buyer consistent with the terms of this Agreement in a form agreeable to Buyer.

"Sale Order Deadline" means August 28, 2020.

"Seller" or "Sellers" has the meaning set forth in the preamble.

"Seller Released Parties" has the meaning set forth in Section 5.9.

"Sellers' Knowledge" (or words of similar import) means the actual knowledge of Ned Lidvall and Mark A. Sellers, III, and the knowledge such person would have obtained, as a prudent business person, after making due inquiry with respect to the particular matter in question.

"Sellers' Rep" has the meaning set forth in Section 9.21.

"Service Provider" means each director, officer, employee, manager, independent contractor, consultant, leased employee or other service provider of any Seller.

"Statutory Deadline" means the date that is one hundred twenty (120) days after the date of commencement of the Chapter 11 Cases.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or other persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Tax" or "Taxes" means any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment healthcare, disability, natural resources, entertainment, amusement, registration, real property, personal property, ad valorem, escheat or unclaimed property (whether or not considered a tax under applicable Law), sales, use, liquor, cigarette, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever (however

14

denominated), whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed.

"Tax Return" means any return, declaration, report, claim for refund or information return (including any related or supporting schedules, statements or information and Treasury Form TD F 90-22.1 and FinCEN Form 114) or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Termination Event" has the meaning set forth in Section 8.1.

"Transfer Tax" means any stamp, documentary, registration, transfer, sales, use, added-value or similar Tax (including any penalties and interest thereon but excluding for the avoidance of doubt any income Taxes) imposed under any applicable Law in connection with the Contemplated Transactions.

"Transferred Employees" means all Offerees who accept offers prior to the Closing pursuant to Section 6.4(a).

"Transferring Party" has the meaning set forth in Section 5.1(c).

"Treasury Regulations" means regulations promulgated by the United States Department of Treasury under the IRC.

"Wind-Down Budget" is defined in Section 2.1(a).

## ARTICLE II
## PURCHASE AND SALE

**Section 2.1    Purchase and Sale of Purchased Assets**.  Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement (including, without limitation, Section 4.7 below), at the Closing, Buyer shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Buyer, all of the Sellers' right, title and interest in, to and under the Purchased Assets, free and clear of all Liens (other than Permitted Liens and any Liens included in the Assumed Liabilities) to the extent provided in the Sale Order, for the consideration specified in Section 2.5. "Purchased Assets" shall mean all of the direct or indirect right, title and interest of Sellers in, to and under the tangible and intangible assets (including goodwill), properties, rights, going concern value, claims and Contracts used, useful, or held for use in, or related to, the Business (but excluding Excluded Assets) wherever situated and of whatever kind and nature, real or personal, as of the Closing, including:

(a)    all Cash and Cash equivalents of Sellers, including Restaurant Petty Cash, except for (i) PPP Cash, (ii) cash that has otherwise been reserved or designated by Decree of the Bankruptcy Court entered prior to the date hereof for utility deposits (collectively, "Existing Escrows") to the extent actually applied for such designated purpose (it being expressly agreed that notwithstanding anything to the contrary in Section 2.2 below, any cash that reverts to the Sellers from any Existing Escrow shall constitute a Purchased Asset), and (iii) in an aggregate amount needed to fund the

15

wind-down budget set forth on Schedule 2.1(a) (as the same may hereafter be amended from time to time with the prior written consent of Buyer, the "Wind-Down Budget" and, the aggregate amount of such Cash and Cash Equivalents in the foregoing the "Excluded Cash"); provided, that to the extent that Excluded Cash described herein (after taking into account any Backstop Amount (as defined in Section 5.9 below) actually funded to Sellers by Buyer that has not been used or applied for the purposes required by Section 5.9 below prior to (and is not used or applied at) the Closing) is insufficient to fund the entire Wind-Down Budget (the "Excluded Cash Deficiency Amount"), Buyer shall fund the Excluded Cash Deficiency Amount to the Sellers at the Closing in accordance with Sections 2.5, 2.8(b)(ii), and 5.9 (including, for the avoidance of doubt, the limitations set forth therein) hereof;

(b)      all bank accounts of Sellers, other than (i) the PPP Cash account, to the extent such account holds Excluded Cash, or (ii) Existing Escrows (but including any amounts reverting to the Sellers from such Existing Escrows);

(c)      all Accounts Receivable of Sellers as of the Closing;

(d)      all Credit Card Receivables;

(e)      all Inventory of Sellers as of the Closing located at (or in Buyer's reasonable discretion movable and which is actually moved, at Buyer's sole cost and expense at any time prior to August 31, 2020 in accordance with Section 9.24 hereof to) a Continuing Restaurant, including all rights of Sellers to receive such Inventory, supplies and materials which are on order as of the Closing solely in respect of the operation of a Continuing Restaurant, but excluding alcoholic beverage Inventory in jurisdictions where the Law does not permit Buyer to take title to such Inventory until it obtains the requisite Liquor License Approvals or other authorization from the Bankruptcy Court or any other pertinent Governmental Entity; provided, however, Sellers shall promptly transfer, assign, convey and deliver (at Buyer's sole cost and expense) to Buyer such alcoholic beverage Inventories in each instance upon issuance of the relevant Liquor License Approval or other authorization from the Bankruptcy Court or relevant Governmental Entity;

(f)      without duplication of the above, all deposits (including, without limitation, deposits in transit, customer deposits and security deposits for rent, electricity, telephone, utilities or otherwise) and other prepaid charges and expenses of Sellers, including all amounts constituting Existing Escrows to the extent reverting to the Sellers;

(g)      all Assumed Contracts;

(h)      all Intellectual Property owned by Sellers, but as to any Intellectual Property which consists of a Possessory Agreement, only to the extent transfer or assignment of such Intellectual Property is not prohibited by Law;

(i)      all items of machinery, equipment, supplies, furniture, fixtures, leasehold improvements (to the extent of Sellers' rights to any Leasehold

16

Improvements under the Leases that are Assumed Contracts) owned by Sellers as of the Closing and related to (or to the extent movable and actually moved, at Buyer's sole cost and expense at any time prior to August 31, 2020 in accordance with Section 9.24 hereof to) the Continuing Restaurants;

(j)     all Records, including Records related to (i) Taxes paid or payable by any Seller related to the Business or the Purchased Assets (provided that Sellers are entitled to retain copies of all Records and Buyer will make all such Records available to Sellers upon request and at no charge), but excluding any materials exclusively related to any Excluded Assets and (ii) eligibility to receive Relief Proceeds;

(k)     all goodwill associated with the Business or the Purchased Assets, including all goodwill associated with the Intellectual Property owned by Sellers and all rights under any confidentiality agreements executed by any third party for the benefit of any of Sellers to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(l)     all rights of Sellers under non-disclosure or confidentiality, noncompete, or nonsolicitation agreements with Current Employees or Former Employees, directors, consultants, independent contractors and agents of any of Sellers to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(m)     all of the Assumed Permits or, all of the rights and benefits accruing under any Permits that are (i) related to the Continuing Restaurants, or (ii) to the extent related to the Excluded Restaurants, listed on Schedule 7.1, in each case of clauses (i) and (ii), including all Liquor Licenses to the extent transferrable and held by Sellers, other than alcohol permits (including Liquor Licenses) in jurisdictions where the Law does not permit Buyer to take title to such Permits until it obtains the requisite approvals or other authorization from the Bankruptcy Court or any other pertinent Governmental Entity in which case Sellers shall transfer, assign convey and deliver to Buyer such permits in each instance upon issuance of the requisite approvals from the relevant Governmental Entity;

(n)     all Liquor Licenses, to the extent transferable, associated with any Excluded Restaurants not included on Schedule 7.1 pursuant to Section 2.1(m), or which the Sellers presently hold in safe keeping, each at the sole cost and expense of the Buyer;

(o)     the amount of, and all rights to any, insurance proceeds received by any of Sellers after the date hereof in respect of (i) the loss, destruction or condemnation of any Purchased Assets, occurring prior to, on or after the Closing, in each case to the extent relating to loss, destruction or condemnation which has not been repaired or restored prior to the Closing, or (ii) any Assumed Liabilities;

(p)     all other rights, demands, claims, credits, allowances, rebates or other refunds (excluding any vendor or supplier rebates) and rights in respect of promotional allowances or rights of setoff and rights of recoupment of every kind and nature

17

(whether or not known or unknown or contingent or non-contingent), other than against Sellers, arising out of or relating to the Continuing Restaurants as of the Closing, including all deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances and prepayments, in each case to the extent the same relate to Continuing Restaurants;

(q)    all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent), including, without limitation, the Purchased Actions;

(r)    all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to equipment purchased, products sold, or services provided, to Sellers or to the extent affecting any Purchased Assets and/or Assumed Liabilities;

(s)    all cars, trucks, forklifts, other industrial vehicles and other motor vehicles set forth or described on Schedule 2.1(s);

(t)    all of the Sellers' telephone numbers, fax numbers, e-mail addresses, websites, URLs and Internet domain names related to the Continuing Restaurants;

(u)    the right to receive and retain mail relating to, Accounts Receivable payments and other communications of Sellers and the right to bill and receive payment for services performed but unbilled or unpaid as of the Closing;

(v)    all rights arising from (i) any refunds due from federal, state and/or local Governmental Entities with respect to Taxes paid by Sellers or (ii) Relief Proceeds;

(w)    all of Sellers' recipes, methods, procedures, cooking/preparation/mixing publications, guidelines, or standards, knowhow, ingredient lists, menus, price lists, nutritional, health, or dietary information, publications, or disclosures, and promotional or informational materials, in each case whether related to food, beverages (whether alcoholic or non-alcoholic), or otherwise (in each case, written or oral or in any other form whatsoever) (collectively, "Recipes"); and

(x)    all other assets that are related to or used in connection with the Purchased Assets or the Business (but excluding all of the Excluded Assets).

**Section 2.2    Excluded Assets.**    Notwithstanding anything to the contrary in Section 2.1, Buyer expressly understands and agrees that Buyer is not purchasing or acquiring, and Sellers are not selling or assigning, any of the following assets, properties and rights of Sellers (collectively, the "Excluded Assets"):

(a)    (i) the Excluded Cash;

18

(b)     all alcoholic beverage Inventory of Sellers in jurisdictions where the Law does not permit Buyer to take title to such Inventory until it obtains the requisite Liquor License Approvals or other authorization from the Bankruptcy Court or any other pertinent Governmental Entity; _provided_, _however_, Sellers shall transfer, assign, convey and deliver to Buyer (at Buyer's sole cost and expense) such alcoholic beverage Inventory in each instance upon issuance of the relevant Liquor License Approval or other authorization from the Bankruptcy Court or other relevant Governmental Entity;

(c)     all of Sellers' certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, unit certificates and other documents relating to the organization, maintenance and existence of any Seller as a limited liability company or other entity;

(d)     all equity securities of any Seller or securities convertible into, exchangeable, or exercisable for any such equity securities and all net operating losses of any Seller;

(e)     all Leases (and related Leased Real Property, if any) and Contracts, in each case, other than the Assumed Contracts;

(f)     any loans or notes payable to any Seller or any of its Affiliates from any employee of any Seller or any of its Affiliates;

(g)     any (1) Records containing confidential personal private information including confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the disclosure of such information is prohibited by applicable Law, (2) other Records that Sellers are required by Law to retain and (3) any Records or other documents relating to the Chapter 11 Cases that are protected by the attorney-client or similar privilege; _provided_ that Buyer shall have the right to make copies of any portions of such retained Records (other than the Records referenced in subsection (3)) to the extent that such portions relate to the Business or any Purchased Asset;

(h)     all Permits other than the Assumed Permits;

(i)     all directors' and officers' liability Insurance Policies, including any tail insurance policies, including the rights of the directors and officers thereunder for coverage (_i.e._, advancement of expenses and liability coverage with respect to claims made against such officers and directors);

(j)     all Employee Benefit Plans;

(k)     the Excluded Restaurants and those assets set forth on Schedule 2.2; and

(l)     the rights of Sellers under this Agreement and the Related Agreements and all consideration payable or deliverable to Sellers under this Agreement.

19

**Section 2.3    Assumption of Assumed Liabilities**.  On the terms and subject to the conditions of this Agreement and the Sale Order, at the Closing, Buyer shall assume from Sellers (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers shall irrevocably convey, transfer, and assign to Buyer, the following Liabilities of the Business and only to the extent not paid prior to the Closing and no others (collectively,  the "Assumed Liabilities"):

       (a)    Liabilities (i) for all Cure Amounts to the extent that the Sellers' Cash and Cash Equivalents are not sufficient to pay such amounts, and (ii) under the Assumed Contracts and Assumed Permits arising from and after the Closing Date as well as any Liabilities to the extent arising out of the Purchased Assets or the operation of the Business solely in respect of the Continuing Restaurants, in each case under clause (ii) of this Subpart (a), arising from and after the Closing Date;

       (b)    All Accounts Payable arising from the normal operation of Business that is accrued but not yet due as of the Closing and as set forth on Schedule 2.3(b) (as such Schedule may be updated and amended (i) by Sellers with Buyer's consent (such consent not to be unreasonably withheld) between the date hereof and August 21, 2020, and (ii) as otherwise agreed upon by Sellers and Buyer up to the Closing);

       (c)    all obligations of Sellers to honor gift cards in the Ordinary Course of Business at a Business restaurant (i.e., accepting such gift cards in exchange for goods or services delivered), whether relating to a Continuing Restaurant or an Excluded Restaurant, but excluding any escheatment claims related to such gift card obligations and excluding any claims for cash refunds to the extent not otherwise required by applicable Law in any jurisdiction  in which a Continuing  Restaurant is located; and

       (d)    all accrued payroll, accrued and unused vacation, or other accrued paid time-off, and accrued payroll Taxes, in each case, that is earned or accrued by, but not yet payable, as of the Closing Date (and not paid by Sellers prior thereto) to any Transferred Employee ("Assumed Payroll Obligations");

Notwithstanding the foregoing and except as otherwise provided in Section 5.9 of this Agreement, Assumed Liabilities shall not include (i) any other post-petition Liabilities of the Sellers nor (ii) any liability for Taxes of any kind, except as provided in the last sentence of Section 2.4 below.

**Section 2.4    Excluded Liabilities**.  Notwithstanding anything herein to the contrary, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Sellers, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities (all such Liabilities that Buyer is not assuming being referred to collectively as the "Excluded Liabilities", including without limitation all Liabilities relating to or arising from any Employee Benefit Plan or the employment or termination of any employee of any Seller (other than the Assumed Payroll Obligations.  For the avoidance of doubt, Excluded Liabilities shall include any liability for Taxes of any kind other than any Taxes which are a lien not yet due and payable as of and which are prorated between Sellers and Buyer at the Closing.

**Section 2.5    Consideration**.

(a)    In aggregate consideration for the sale and transfer of the Purchased Assets (the "Purchase Price") shall be composed of the following:

i.    the Credit Bid; and

ii.    the assumption by Buyer of the Assumed Liabilities.

(b)    The Purchase Price shall be satisfied at the Closing as to:

i.    the Credit Bid, by causing the Credit Agreement Lenders to acknowledge in writing satisfaction of the portion of the Credit Agreement Lien Obligations covered by the Credit Bid and to release all guarantees of the security interests and liens on the Purchased Assets securing such obligations, all in form and content reasonably satisfactory to Sellers (the "Credit Bid And Release"); and

ii.    the amount of the Assumed Liabilities described in Section 2.3, by assuming such Assumed Liabilities through one or more Assignment and Assumption Agreements.

In addition, at the Closing or as soon as practicable thereafter, Buyer shall pay to the applicable counterparties all Cure Amounts payable in connection with or as a condition to Sellers' assumption and assignment of the Assumed Contracts to the extent Sellers do not have sufficient cash to satisfy all Cure Amounts.

**Section 2.6    Assumption and Assignment of Contracts**.

(a)    Schedule 2.6(a) sets forth a list of all Contracts and Leases to which a Seller is a party (other than such Contracts and Leases that have been rejected by Decree of the Bankruptcy Court or are the subject of a pending motion to reject as of the date of this Agreement), together with estimated Cure Amounts for each Assumed Contract.

(b)    From and after the date hereof until the Closing, Buyer may, in its sole discretion, (i) designate a Contract or Lease listed on Schedule 2.6(a) for assumption and assignment to Buyer, effective on and as of the Closing (such Contracts and Leases, the "Assumed Contracts"), or (ii) without in any manner reducing or otherwise affecting the Purchase Price, designate any Contract or Lease listed on Schedule 2.6(a) for rejection; for the avoidance of doubt, the Sellers will not object to any such designation made by Buyer pursuant to this Section 2.6(b). Except as so designated by Buyer, the Sellers shall not designate any Contract or Lease listed on Schedule 2.6(a) for assumption and assignment or for rejection on or after the date hereof. The Assumed Contracts as of the date hereof are set forth on Schedule 2.6(b) hereto, which will be supplemented in writing by Buyer as additional Leases and Contracts are designated for assumption and assignment or rejection prior to the Closing as set forth in this Section 2.6(b).

(c)     In connection with the assumption by and assignment to Buyer of any Assumed Contracts pursuant to this Section 2.6, (i) the amounts, if any, necessary to cure all defaults, if any, and to pay all actual pecuniary losses, if any, that have resulted from such defaults under the Assumed Contracts (collectively, such amounts, the "Cure Amounts"), in each case as of the Petition Date and to the extent required by Section 365(b)(1)(A) and (B) of the Bankruptcy Code and any Decree of the Bankruptcy Court, shall be paid by Sellers at the Closing, and (ii) Buyer shall provide such adequate assurance of future performance as of the Sale Hearing as the Bankruptcy Court deems necessary to satisfy the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to Assumed Contracts.

(d)     Subject to Buyer's reasonable cooperation therewith, Sellers shall use their respective commercially reasonable efforts to obtain a Decree of the Bankruptcy Court to assign the Assumed Contracts to Buyer on the terms set forth in this Section 2.6. In the event Sellers are unable to assign any such Assumed Contract to Buyer pursuant to a Decree of the Bankruptcy Court, then the Parties shall use their respective commercially reasonable efforts to obtain, and to cooperate (at no material cost or expense to Sellers) in obtaining, all Consents from Governmental Entities and third parties necessary to assume and assign such Assumed Contracts to Buyer, including, in the case of Buyer, paying any applicable Cure Amounts.

(e)     Notwithstanding the foregoing, but subject to Section 5.1, a Contract shall not be an Assumed Contract hereunder and shall not be assigned to, or assumed by, Buyer to the extent that such Contract (i) is rejected by a Seller or terminated by a Seller in accordance with the terms hereof or by the other party thereto, or terminates or expires by its terms, on or prior to the Closing and is not continued or otherwise extended upon assumption, (ii) was not listed on Schedule 2.6(a) and not provided to Buyer by Sellers at least five (5) Business Days prior to the Closing and requires a Consent of any Governmental Entity or other third party (except as permitted by the Bankruptcy Code) in order to permit the sale or transfer to Buyer of Sellers' rights under such Contract, and no such Consent has been obtained prior to the Closing, or (iii) relates solely to Excluded Assets.   In addition, a Permit (including any Liquor License) shall not be assigned to, or assumed by, Buyer to the extent that such Permit requires a Consent of any Governmental Entity or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer of Sellers' rights under such Permit, and no such Consent has been obtained prior to the Closing.

(f)     Subject to the terms and conditions herein provided, Seller and Buyer shall use their good faith efforts to take, or cause to be taken, all reasonable action, or do, or cause to be done, all reasonable things, necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement.

**Section 2.7     Closing**.  The Closing shall take place remotely by electronic exchange of counterpart signature pages commencing at 10:00 a.m. Eastern Time on the Closing Date upon

22

satisfaction or waiver of all conditions hereunder to the parties' respective obligations to consummate the transactions provided for herein.

**Section 2.8** **Deliveries at Closing**.

(a) At the Closing, Sellers shall deliver to Buyer the following documents and other items, duly executed by Sellers, as applicable:

i. all Bills of Sale reasonably requested by Buyer;

ii. all Assignment and Assumption Agreements reasonably requested by Buyer;

iii. instruments of assignment in form and substance to be agreed to by the Parties in their reasonable discretion for all Registered Intellectual Property transferred or assigned hereby and general assignments of all other Intellectual Property of the Sellers, in each case as reasonably requested by Buyer (collectively, the "Intellectual Property Assignments");

iv. a non-foreign affidavit from the regarded owner of the Sellers for U.S. federal income Tax purposes, dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the IRC stating that such owner is not a "foreign person" as defined in Section 1445 of the IRC;

v. the officer's certificates required to be delivered pursuant to Section 7.1(l);

vi. the Management Agreement duly executed by Sellers;

vii. such other bills of sale, completed transfer tax returns, assignments of leases, notices to landlords, notices to subtenants, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form and content not inconsistent with the rights and obligations imposed upon Buyer and Sellers pursuant to the other provisions of this Agreement and otherwise reasonably satisfactory to Buyer (in each case signed and acknowledged as appropriate), as Buyer may reasonably request to vest in Buyer, to the extent transferable and assignable, all the right, title and interest of the Sellers in, to or under any or all the Purchased Assets subject only to Permitted Liens to the extent provided in the Sale Order (including, without limitation, releases and terminations of any Liens that are not Permitted Liens);

viii. originals (or, to the extent originals are not available, copies) of all Assumed Contracts (together with all material amendments, supplements or modifications thereto) to the extent not otherwise already made available to Buyer through the Dataroom;

23

ix.    physical possession, at their respective locations as of the Closing, of all of the Purchased Assets capable of passing by delivery with the intent that title in such Purchased Assets shall pass by and upon delivery;

x.    certificates of title and title transfer documents to all titled motor vehicles included within the Purchased Assets; and

xi.    all other previously undelivered certificates, agreements and other documents, instruments and writings reasonably requested by Buyer to be delivered by Sellers at or prior to the Closing pursuant to this Agreement.

(b)    At the Closing, Buyer shall deliver to Sellers the following documents and other items, duly executed by Buyer, as applicable:

i.    any and all Assignment and Assumption Agreements to which Buyer is party;

ii.    the Purchase Price, in the form of the Credit Bid And Release, in form reasonably satisfactory to Sellers and the Excluded Cash Deficiency Amount, if applicable, such Excluded Cash Deficiency Amount to be wired to Sellers in accordance with such written wiring instructions as Sellers may provide to Buyer at least two (2) Business Days prior to the Closing;

iii.    the officer's certificates required to be delivered pursuant to Section 7.2(g);

iv.    the Management Agreement, duly executed by Buyer; and

v.    all other previously undelivered certificates, agreements and other documents required by this Agreement to be delivered by Buyer at or prior to the Closing in connection with the Contemplated Transactions.

**Section 2.9    Allocation**.    Within ninety (90) calendar days after the Closing Date, Buyer shall in good faith prepare an allocation of the Purchase Price (and all capitalized costs and other amounts treated as purchase price for U.S. federal income Tax purposes) among the Purchased Assets and the Assumed Liabilities in accordance with Section 1060 of the IRC, the Treasury Regulations thereunder (and any similar provision of United States state or local or non-United States Law, as appropriate) (as finally determined, and subject to any further amendment, in each case pursuant to this Section 2.9, the "Allocation").  Sellers shall have thirty (30) calendar days following receipt of the Allocation to review and comment on such the Allocation. If the Sellers disagree with any determinations set forth on the Allocation (the sole permissible basis for which shall be that the Allocation was not prepared in accordance with this Section 2.9), the Sellers shall deliver a written notice to Buyer setting forth its objections. Unless Sellers deliver notice to Buyer within the thirty (30) day review period, Sellers shall be deemed to have accepted the determinations set forth in the Allocation. If the Sellers deliver the notice to Buyer within the thirty (30) day review period, Buyer and the Seller shall, during the thirty (30) days following such delivery or any mutually agreed extension thereof, use their commercially reasonable efforts to reach agreement on the disputed determinations. Buyer and

24

Sellers shall report, act and file Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with the Allocation as determined pursuant to this Section 2.9. Neither Buyer nor Sellers shall take any position (whether in audits, Tax Returns or otherwise) which is inconsistent with the Allocation, unless required by a "determination" within the meaning of Section 1313 of the IRC.

**Section 2.10   Excluded Locations**.  Any of Sellers' restaurant locations with respect to which the associated Leases have not been designated by Buyer as Assumed Contracts in accordance with Section 2.6(a) shall be deemed to have been classified as Excluded Restaurants and Excluded Assets.

## ARTICLE III
## SELLERS' REPRESENTATIONS AND WARRANTIES

Except as set forth in the disclosure schedule accompanying this Agreement, as may be updated, amended or supplemented by Sellers in writing from time to time until August 7, 2020 (the "Disclosure Schedule"), Sellers jointly and severally represent and warrant to Buyer as of the date hereof and as of the Closing Date in each case, unless otherwise specified in the representations and warranties below, in which case the representation and warranty is made as of such date, that the statements contained in this Article III are true and correct.

**Section 3.1   Organization of Sellers; Good Standing**.

(a) Each Seller is duly incorporated or organized, as the case may be, and validly existing and in good standing under the Laws of its state of incorporation or formation. Each Seller is duly qualified or otherwise authorized as a foreign entity to transact business in each jurisdiction listed on Schedule 3.1 of the Disclosure Schedule, which are all of the jurisdictions in which the nature of the Business or the Purchased Assets requires such Seller to so qualify. Sellers have made available to Buyer each Seller's Organizational Documents that set forth the state of incorporation or formation for each Seller. Subject to the requirements of the Bankruptcy Code, each Seller has all necessary power and authority to own, lease and operate its assets, properties and to conduct its business in all jurisdictions in which such Seller conducts business (or conducted business prior to the Business Cessation Event) and in the manner in which its business is currently being conducted (or was conducted prior to the Business Cessation Event) and has historically been conducted.

(b) None of the Sellers has any Subsidiaries (other than other Sellers, if applicable).

**Section 3.2   Authorization of Transaction**.  Subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing:

(a) each Seller has all requisite applicable corporate or limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder; the execution, delivery and performance of this Agreement and all Related Agreements to which such Seller is a party have been duly authorized by such Seller

25

and no other corporate or company action, as applicable, on the part of such Seller is necessary to authorize this Agreement or the Related Agreements to which it is party or to consummate the Contemplated Transactions; and

(b)    This Agreement constitutes the valid and legally-binding obligations of Sellers, enforceable against Sellers in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.  Each Related Agreement to which any Seller is a party, when executed and delivered, will constitute the valid and legally-binding obligations of such Seller, as applicable, enforceable against Sellers, as applicable, in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 3.3**    **Noncontravention; Consents and Approvals**.

(a)    Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the Related Agreements), subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, will (with or without notice or lapse of time or both) (i) conflict in any material respect with or result in a breach of the Organizational Documents of any Seller, (ii) violate any Law or Decree to which any Seller is, or its respective assets or properties are, subject, (iii) conflict with any Assumed Contract or Assumed Permit, or (iv) conflict with, or result in any violation of or constitute a breach or default under, any order of any Governmental Entity applicable to the Sellers or any of the Purchased Assets, and, in the case of clauses (ii), (iii) and (iv) for such conflicts, breaches, violations, defaults, accelerations, rights or failures to give notice, would not, individually or in the aggregate, have a Material Adverse Effect.

(b)    Except as set forth in Schedule 3.3(b) of the Disclosure Schedule, subject to the Sale Order having been entered and still being in effect (and not subject to any stay pending appeal at the time of Closing), no Consent, notice or filing is required to be obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement.  After giving effect to the Sale Order and any applicable order of the Bankruptcy Court authorizing the assignment and assumption of the Assumed Contracts, no Consent, notice or filing is required to be obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Person that is not a Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected have a Material Adverse Effect or prevent or materially impair or delay the Sellers' ability to consummate the Contemplated Transactions on a timely basis.

26

Section 3.4    **Compliance with Laws**.    Sellers are in compliance with all Laws applicable to the Business or the Purchased Assets in all material respects.  As of the date hereof, Sellers have not received any written notice of violation of any Law in any material respect with respect to any Seller, the Business or the Purchased Assets and, to Sellers' Knowledge, there is no reasonable basis for the issuance of any such notice or the taking of any action for such violation.

Section 3.5    **Title to Purchased Assets**.    Sellers, as of immediately prior to the Closing, have good and valid title to, or, in the case of leased assets, have good and valid leasehold interests in, the Purchased Assets, free and clear of all Liens (except for Permitted Liens), subject to entry of the Sale Order.  At the Closing or such time as title is conveyed under Section 2.6, Sellers will convey, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, good and valid title to, or valid leasehold interests in, all of the Purchased Assets, free and clear of all Liens (except for Permitted Liens), to the fullest extent permissible under Section 363(f) of the Bankruptcy Code and subject to the rights of licensees under Section 365(n) of the Bankruptcy Code.  The Purchased Assets constitute substantially all of the properties, assets and rights (including Intellectual Property) used by the Sellers to conduct and operate the Business at the Continuing Restaurants in all material respects as conducted and operated by the Sellers prior to the Business Cessation Event.  All of the Purchased Assets are in good order and repair (ordinary wear and tear excepted) for assets of comparable age and past use and are capable of being used in the Ordinary Course of Business to operate the Business substantially as conducted and operated by the Sellers prior to the Business Cessation Event.  No Person other than Sellers are engaged in the operation of, or hold rights, title and interest in (except for Permitted Liens), the Purchased Assets.  None of the personal or movable property included in the Purchased Assets is located other than at the Leased Real Property.

Section 3.6    **Contracts**.  Schedule 3.6 of the Disclosure Schedule sets forth an accurate list, as of the date hereof, of all material executory Contracts, including any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof, to which a Seller is a party with respect to the Business as of the date hereof and Sellers have made available to Buyer true and complete copies of all such Contracts or, to the extent any of such Contracts are oral, Schedule 3.6 of the Disclosure Schedule contains a description of the material terms thereof.  Except as set forth in Schedule 3.6 of the Disclosure Schedule, no Seller has assigned, delegated or otherwise transferred to any third party any of its rights or obligations with respect to any Assumed Contract.  The Assumed Contracts include all Contracts material to the ownership and/or operation of the Business at the Continuing Restaurants.  Sellers have not, and, to Sellers' Knowledge, no other party to any Assumed Contract has, commenced any action against any of the parties to any Assumed Contract or given or received any written notice of any material default or violation under any Assumed Contract that has not been withdrawn or dismissed except to the extent such default or violation will be cured as a result of the payment of the applicable Cure Amounts, assuming entry of the Sale Order.  To Sellers' Knowledge, each Assumed Contract is, or will be upon the Closing, valid, binding and in full force and effect in accordance with its terms.

Section 3.7    **Intellectual Property**.

27

(a)    Schedule 3.7 of the Disclosure Schedule sets forth a true and complete list of (i) all Registered Intellectual Property that is owned by any Seller, (ii) all executory Contracts pursuant to which any Seller obtains the right to use any Intellectual Property, and (iii) all material Contracts pursuant to which any Seller grants to any other Person the right to use any Intellectual Property (including all Contracts pursuant to which any Seller grants to any other Person any exclusive rights with respect to any Intellectual Property).  Sellers exclusively own all Intellectual Property included among the Purchased Assets (including all such Registered Intellectual Property) free and clear of all Liens (except for Permitted Liens), and all such Registered Intellectual Property is valid, subsisting and, enforceable, and is not subject to any outstanding Decree adversely affecting Sellers' use thereof or rights thereto.

(b)    To Sellers' Knowledge, and except as set forth on Schedule 3.7 of the Disclosure Schedule, none of the use of the Intellectual Property included in the Purchased Assets, the conduct of the Business as conducted prior to the Business Cessation Event (except with respect solely to the Excluded Restaurants), nor any of the products sold or services provided by Sellers or any of their Affiliates in connection therewith (except with respect solely to the Excluded Restaurants), infringes upon or otherwise violates the Intellectual Property of any other Person.  To Sellers' Knowledge, no third party is infringing any Intellectual Property owned by any Seller and included in the Purchased Assets.

(c)    Sellers have used commercially reasonable efforts to maintain, defend, protect, enforce, and preserve all trade secrets and material confidential information included in the Purchased Assets, including all Recipes, and, to Sellers' Knowledge, no such trade secrets, confidential information, or Recipes have been disclosed or accessed by any other Person other than to Persons under binding obligations of confidentiality and non-use. To Sellers' Knowledge, no such trade secrets, material confidential information, or Recipes have been improperly accessed, disclosed, or used.

## Section 3.8    Litigation.

(a)    Other than the Chapter 11 Cases, Schedule 3.8(a) of the Disclosure Schedule sets forth, as of the date hereof, all unresolved Litigation brought or threatened in writing by or against any Seller, in each case, which seeks to impose Liability upon any party in an amount greater than $50,000, and to Sellers' Knowledge, there is no other Litigation threatened in writing against any Seller which would affect the ability of any Seller to enter into this Agreement, any Related Agreement, or to consummate the Contemplated Transactions.

(b)    Schedule 3.8(c) of the Disclosure Schedule sets forth sets forth any Decree to which any Seller is subject.

## Section 3.9    Employees and Employment Matters.

(a)    No Seller is or within the last three (3) years has been a party to or bound by any collective bargaining agreement covering the Current Employees or

28

Former Employees nor has there been in the last three (3) years any strike, walkout, work stoppage, or other material collective dispute affecting any Seller with respect to the Business. No Current Employee is and within the last (3) years no Current Employee or Former Employee has been represented by a union or other collective bargaining representative with respect to his or her employment with any Seller. To Sellers' Knowledge, there is no organizational effort being made or threatened by or on behalf of any labor union with respect to any of the Current Employees, nor has there been in the last three (3) years with respect to any Current Employees or Former Employees. No later than ten (10) Business Days following the date hereof, Sellers shall make available to Buyer a list of all Current Employees and Former Employees who were employed by Sellers as of February 29, 2020 (such Former Employees, "Recent Employees"), including such individual's name; title or position; status (part-time, full-time, exempt, nonexempt, etc.); whether a Current Employee or Recent Employee; whether paid on a salaried, hourly or other basis; current base salary or wage rate; current target bonus; other incentive or non-incentive based compensation; start date; service reference date (if different from the start date); work location; vacation entitlement formula; and an indication of whether or not any Current Employee is on leave of absence or furlough (the "Employee Roster").

(b)     There are no grievances or unfair labor practice complaints pending against any Seller before the National Labor Relations Board or any other Governmental Entity with respect to any Current Employees or Former Employees.

(c)     Sellers are in compliance in all material respects with all applicable Laws relating to employment or labor, including those related to hiring, background checks, wages, pay equity, hours, collective bargaining and labor relations, classification of independent contractors and employees, equal opportunity, document retention, notice, plant closing and mass layoff, health and safety, employment eligibility verification, immigration, child labor, discrimination, harassment, retaliation, accommodations, disability rights or benefits, affirmative action, workers' compensation, unemployment insurance, employment and reemployment rights of members of the uniformed services, secondment, employee leave issues and the payment of social security and other Taxes, and are not liable for any arrears of wages, other compensation or benefits (other than such Liabilities that have been incurred in the Ordinary Course of Business of the Seller and are not past due), or any Taxes or penalties for failure to comply with any of the foregoing, including, without limitation, any of the foregoing arising out of other otherwise in connection with the Business Cessation Event.

(d)     No Current Employee, Former Employee, or other service provider has been improperly excluded from participation in any Employee Benefit Plan (to the extent such individual is or should be eligible under the terms of such Employee Benefit Plan), and none of the Sellers has any direct or indirect liability, whether absolute or contingent, with respect to any misclassification of any service provider as an independent contractor or on any other non-employee basis for such Seller rather than as an employee, with respect to any individual employed, engaged, or leased by

DOCS_SF:103743.4 07979/002

the Seller from another employer, or with respect to any misclassification of any employee as exempt versus non-exempt under the Fair Labor Standards Act.

(e) Except as set forth on Schedule 3.9(e) of the Disclosure Schedule, there is no employment or labor-related claim, complaint, demand for arbitration, or administrative charge pending against any Seller brought by or on behalf of any Current Employee, Former Employee or any Governmental Entity, and to Sellers' Knowledge, no such claim is threatened. Except as disclosed to Buyer confidentially, in the last five (5) years, there have been no allegations of sexual or other unlawful harassment or discrimination made against any Current Employee or Former Employee at the management level or higher.

(f) All Current Employees are, and Recent Employees were, authorized to work in the United States.

(g) Except as set forth on Schedule 3.9(g) of the Disclosure Schedule, Sellers have not made application to receive or otherwise sought Relief Proceeds.

**Section 3.10   Employee Benefit Plans**. Schedule 3.10 of the Disclosure Schedule lists each Employee Benefit Plan that Sellers maintain or to which Sellers contribute or which Sellers have maintained or to which Sellers have contributed in the past twelve (12) months and that provides or provided benefits to any Current Employee or Recent Employee. No event or circumstance exists, or could exist as of the Closing, under which Buyer could incur any Liability with respect to any Employee Benefit Plan.

**Section 3.11   Real Property**.

(a) Sellers do not own any real property.

(b) Schedule 3.11(b) of the Disclosure Schedule sets forth the address of each Leased Real Property, and a true and complete list of all Leases (including the date and name of the parties to such Lease document). Sellers have made available to Buyer a true and complete copy of all Leases (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto) for such Leased Real Property, as amended through the date hereof. Except as set forth in Schedule 3.11(b) of the Disclosure Schedule, with respect to each of the Leases: (i) to Sellers' Knowledge and subject to the effect on enforceability of (A) any applicable Law relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfers, or similar Laws relating to or affecting creditors' rights generally and (B) general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law), such Lease is legal, valid, binding, enforceable and in full force and effect in accordance with its terms; (ii) Sellers' possession and quiet enjoyment of the Leased Real Property under such Lease has not been disturbed, and to Sellers' Knowledge, there are no disputes with respect to Sellers' or the applicable guarantor's obligations under such Lease that will not be satisfied by the Sale Order; (iii) to Sellers' Knowledge, no other party to a Lease (including, without limitation, any guarantor) is in material breach or default under such Lease, and

30

no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a material breach or default; (iv) no security deposit or portion thereof deposited with respect such Lease has been applied in respect of a breach or default under such Lease which has not been redeposited in full; (v) the other party to such Lease is not an affiliate of, and otherwise does not have any economic interest in, Sellers; (vi) the Sellers have not subleased, licensed or otherwise granted any Person the right to use or occupy such Leased Real Property or any portion thereof; and (vii) there are no liens or encumbrances (other than Permitted Liens) on the estate or interest created by such Lease.

(c)    Schedule 3.11(c) of the Disclosure Schedule sets forth a description of all material Leasehold Improvements with outstanding commitments in excess of $100,000 for each Leased Real Property.

(d)    The Leased Real Property identified in Schedule 3.11(b) of the Disclosure Schedule and the Leasehold Improvements comprise all of the real property used in or otherwise related to the operation by Sellers prior to the Business Cessation Event of, the Business.

(e)    Sellers have received no written notice of any condemnation, expropriation or other proceeding in eminent domain pending or, to Sellers' Knowledge, which is threatened, affecting any real property underlying the Leased Real Property or any portion thereof or interest therein.

**Section 3.12    Tangible Personal Property**.    Schedule 3.12 of the Disclosure Schedule sets forth all material Personal Property Leases related to the Continuing Restaurants, and, to Sellers' Knowledge, each such material Personal Property Lease is valid and enforceable, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 3.13    Permits**.

(a)    Schedule 3.13(a) of the Disclosure Schedule contains a list of all Permits related to the Continuing Restaurants that Sellers hold as of the date hereof in connection with the operations of the Business. The Permits set forth on Schedule 3.13(a) of the Disclosure Schedule represent all Permits required for the operation of the Continuing Restaurants as operated prior to the Business Cessation Event. Each Seller complies, and has at all times complied, in all material respects with all such Permits, and no Seller has received in the past five years any notice or other communication from any Governmental Entity or any other Person that any Seller is not in compliance in any material respect with any such Permit or of any actual or possible revocation, withdrawal, suspension, cancellation, termination or material modification of any such Permit. As of the date hereof, there is no Litigation pending or, to Sellers' Knowledge, threatened in writing that seeks the revocation, cancellation, suspension, failure to renew or adverse modification of any material Assumed Permits, except where a failure of this representation and warranty to be so true and correct would not be material to the ownership and operation of the Continuing Restaurant or

31

Continuing Restaurants that operate under such Permit.  All required filings with respect to the Assumed Permits have been made and all required applications for renewal thereof have been filed, except where a failure of this representation and warranty to be so true and correct would not be material to the ownership and operation of the Business.

(b)     Schedule 3.13(b) of the Disclosure Schedule sets forth a complete and correct list as of the date of this Agreement of Liquor Licenses related to the Continuing Restaurants.  To Sellers' Knowledge, each of the Sellers is in compliance in all material respects with all applicable state, municipal and other governmental laws, regulations and rules with respect to the sale of liquor and all alcoholic beverages and has the right to sell liquor at retail for consumption within each of the restaurant locations of such Seller where the Leases constitute Assumed Contracts, subject to and in accordance with all applicable provisions of the Liquor Licenses.   To Sellers' Knowledge, except as set forth in Schedule 3.13(b) of the Disclosure Schedule, in the past five years, (i) there has been no Litigation brought or threatened in writing to be brought by or before a Governmental Entity in respect of any such Liquor License related to a Continuing Restaurant or the activities of such Seller in connection with any such Liquor License (or in connection with any other liquor licenses previously held or used by such Seller), (ii) no such Liquor License related to a Continuing Restaurant is subject to any due but unpaid Tax obligation owed to a Governmental Entity, the outstanding nature of which would preclude transfer of such Liquor License from any of the Sellers to Buyer, and (iii) no such Liquor License related to a Continuing Restaurant has been threatened by a Governmental Entity to be revoked, limited or not renewed.

**Section 3.14    Purchased Inventory**.

(a)     No Inventory that is Purchased Inventory is damaged in any way or subject to a current or past product recall, except for any such damage or any such recall which would not be material to the Purchased Inventory taken as a whole;

(b)     To Sellers' Knowledge, the Purchased Inventory is in material compliance with United States federal and applicable state guidelines for such products as of the date hereof; and

(c)     To Sellers' Knowledge, the Purchased Inventory is in working condition or in a condition fit for sale and consumption in accordance with all applicable Laws, as the case may be.

**Section 3.15    Environmental Matters**.   Except as set forth in Schedule 3.15 of the Disclosure Schedule:

(a)     Each Seller is, and has been during the prior two (2) years, in compliance in all material respects with all applicable Environmental Laws, which compliance has included obtaining and maintaining all permits, licenses and authorizations required under applicable Environmental Laws;

32

(b)     No Seller has received during the prior two (2) years written notice from any Governmental Entity or third party regarding any actual or alleged violation of or Liability under Environmental Laws;

(c)     To Sellers' Knowledge, no Hazardous Substance has been released at any current or former Leased Real Property, or other real property, by Sellers in violation of any Environmental Law; and

(d)     Sellers have made available to Buyer copies of all material environmental audits, assessments and reports in its possession relating any actual or potential Liabilities under Environmental Laws with respect to any current or former Leased Real Property.

**Section 3.16    Financial Statements.**

(a)     The Sellers have made available to Buyer true and correct copes of (i) the unaudited consolidated balance sheet of the Sellers for the fiscal year ended on or about December 31, 2018 and December 31, 2019, and the related consolidated statement of income and cash flows of Sellers for the years then ended, and (ii) the unaudited consolidated balance sheet of the Sellers for the fiscal quarter ended on or about March 31, 2020, and the related consolidated statement of income and cash flows of Sellers for the three months then ended (such unaudited statements, including the related notes and schedules thereto, are referred to herein as the "Financial Statements").  Each of the Financial Statements has been prepared in accordance with GAAP consistently applied and presents fairly in all material respects the consolidated financial position, results of operations and cash flows of Sellers as of the dates and for the periods indicated therein, subject to normal year-end adjustments (which will not be material individually or in the aggregate) and the absence of complete notes in the case of the unaudited statements.  Other than with respect to Excluded Liabilities as to which the Sellers do not provide any representations and warranties, no Seller has any material Liabilities that would be required by GAAP to be reflected on a consolidated balance sheet (or the notes thereto) of the Sellers, except for liabilities and obligations (a) reflected, accrued or reserved against in the Sellers' consolidated balance sheet for the period ended on March 31, 2020 (or the notes thereto) included in the Financial Statements, (b) incurred in the Ordinary Course of Business since March 31, 2020, (c) incurred pursuant to the Contemplated Transactions, or (d) obligations under Assumed Contracts (other than liabilities or obligations related to or arising out of breaches of such Assumed Contracts to the extent arising prior to the Closing Date). Since December 31, 2019, to Sellers' Knowledge, as of the date hereof, no Seller has received any written complaint, allegation, assertion or Claim regarding the accounting or auditing practices, procedures, methodologies or methods of Sellers or their respective internal accounting controls with respect to the Business.

(b)     The Sellers have established and maintained and, for the past five years, have maintained in all material respects, a system of internal accounting controls sufficient to reasonably ensure (i) the reliability of financial reporting and the preparation of the financial statements of the Sellers and (ii) that (A) all transactions are

33

executed in accordance with management's general or specific authorizations; (B) all transactions are recorded when and as necessary to maintain asset accountability and to permit preparation of financial statements in conformity with GAAP applied using the same accounting practices, policies, principles and methodologies, with consistent classifications, judgments and valuation and estimation accrual methodologies, used in the preparation of the Financial Statements; and (C) all accounts, notes and other receivables are recorded accurately, and proper and adequate procedures are implemented to effect the collection thereof on a current and timely basis.

(c)    The Sellers have established and maintained and, for the past five years, have maintained in all material respects, disclosure controls sufficient to reasonably ensure that material information relating to the Sellers (including any deficiencies or weaknesses in the design or operation of the internal controls of the Sellers and any fraud that involves management or other Service Providers of the Sellers is made known to the Sellers' management by others within the Sellers and disclosed to the Sellers' board of directors and outside auditors. The Sellers have provided to the Buyer a summary of any of the foregoing disclosures made to the Sellers' board of directors or outside auditors.

**Section 3.17    Brokers' Fees**.    Except for amounts due to Mastodon Ventures, Inc. ("Mastodon") (which amounts are to be paid by the Sellers under a Credit Bid, but if any overbid is a cash bid in excess of the Credit Bid, such fee shall be paid from the cash sale proceeds (i.e., Mastodon's fee in excess of its minimal fee), no Seller has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the Contemplated Transactions for which Buyer could become liable or obligated to pay.

**Section 3.18    No Other Agreements to Purchase**.    Sellers have not entered into any agreement with any other Person (written or oral) which grants such third party the right or option to purchase or acquire from Sellers any Purchased Asset, other than purchase orders for Inventory accepted by Sellers in the Ordinary Course of Business.

**Section 3.19    Taxes**.

(a)    Each Seller has duly and timely filed all income and other material Tax Returns that it was required to file, and all such filed Tax Returns were true, correct and complete in all material respects. All material Taxes owed by the Sellers and all material Taxes owed with respect to the Purchased Assets (in each case, whether or not shown on any Tax Return) have been paid. In the last three (3) years, no claim has been made in writing by a Governmental Entity in a jurisdiction where the Sellers do not file Tax Returns that the Sellers or the Business is or may be subject to taxation by that jurisdiction. Any deficiencies proposed as a result of any audits of Seller by any Governmental Authority have been fully paid or finally settled, and there are no present disputes as to Taxes payable by Seller.

(b)    There is no audit, dispute, claim or controversy concerning any Tax Liability or Tax Return of Sellers or with respect to the Business in progress or pending by any taxing authority. No Seller has received from any Governmental Authority any

(i) written notice indicating an intent to open an audit or other review with respect to Taxes that relate to the Business, (ii) written request for information related to Tax matters that relate to the Business, (iii) written notice of deficiency or proposed adjustment for any amount of Tax that relate to the Business, or (iv) any ruling or binding agreement relating to Taxes that could impact the amount of Taxes due from Buyer or its Affiliates. No Seller has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency that could result in a Lien on the Purchased Assets or the imposition of any liability for Taxes on Buyer, its direct or indirect equityholders, or their Affiliates.

(c)      There are no Liens for Taxes on any of the Purchased Assets, other than Permitted Liens.

(d)      No Seller has any liability for Taxes of another Person under Treasury Regulations Section 1.1502-6, as a transferee or successor, by contract, or otherwise.

(e)      No Seller is party to any Tax sharing, Tax allocation or Tax indemnity agreement, except for customary gross-up or indemnification provisions in commercial agreements entered into in the Ordinary Course of Business, the primary subject matter of which is not related to Taxes, in each case that would be binding on Buyer.

(f)      No Seller has participated in any "reportable transaction" within the meaning of Treasury Regulation section 1.6011-4(b)(1).

(g)      Each Seller has collected or withheld all Taxes required to have been collected or withheld (including from payments made to employees, independent contractors, creditors, stockholders and other Persons) and such collected and withheld Taxes have been duly paid to the proper Governmental Entity, and each of the Seller has complied in all material respects with all Laws relating to withholding, including any reporting and record keeping requirements. The Company has consistently treated any workers that it treats as independent contractors (and any similarly situated workers) as independent contractors for purposes of Section 530 of the Revenue Act of 1978.

(h)      No Seller has requested or received a ruling from any Governmental Authority or signed any binding agreement with any Governmental Authority that might impact the amount of Tax due from Buyer or any of its Affiliates after the Closing Date.

(i)      Each Seller has collected all amounts of sales and use Taxes required to be collected, and has remitted, on a timely basis, such amounts to the appropriate Governmental Entity, or has been furnished properly completed exemption certificates and has, in all material respects, maintained all such records and supporting documents in the manner required by all applicable sales and use Tax statutes and regulations

(j)      None of the Purchased Assets are "Section 197(f)(9) intangibles" (as defined in Treasury Regulations Section 1.197-2(h)(1)(i) and assuming for this purpose that the transition period ends on August 10, 1993) or an interest in an entity or

35

arrangement classified as a partnership for U.S. federal, state or local income Tax purposes.

(k)    No Seller has deferred the inclusion of any amounts in gross income pursuant to Internal Revenue Service Revenue Procedure 2004-34, Treasury Regulations Section 1.451-5, Sections 451(c), 455, 456 or 460 of the Code, as a deposit or pre-paid amount, or any corresponding or similar provision of state or local Law (irrespective of whether or not such deferral is elective).

(l)    None of the Purchased Assets or Assumed Liabilities is a Tax allocation, Tax sharing, Tax distribution, Tax indemnification or Tax gross-up agreement or arrangement.

**Section 3.20    Suppliers**.    Schedule 3.20 of the Disclosure Schedule lists the ten (10) largest suppliers (excluding utilities) (measured by invoiced dollars) of the Continuing Restaurants collectively ("Major Suppliers") for the 12 month periods ended December 31, 2019 and June 30, 2020 and the amount of business done with each Major Supplier in such period.  As of the date of this Agreement, to Sellers' Knowledge, (a) there has not been a material dispute with, or actual or potential material and adverse change in the business relationship of, any Seller with any Major Supplier since December 31, 2018, and (b) no Seller is in material breach of or in material default of any agreement with any of its Major Suppliers, and to the Sellers' Knowledge, no Major Supplier is in material breach or in default of any agreements with any Seller.  None of the Sellers has received any notice, nor does the Seller or any of its Subsidiaries have any Knowledge, that any Major Supplier intends to terminate or adversely modify the amount, frequency or terms of the business such Major Supplier conducts with the Sellers.

**Section 3.21    Insurance Policies**.    Schedule 3.21 of the Disclosure Schedule contains a true, complete and accurate list of all insurance policies to which any Seller is a party or which provide coverage to or for the benefit of or with respect to any Seller, or any Service Provider in his or her capacity as such (the "Insurance Policies"), indicating in each case the type of coverage, name of the insured, the insurer, the expiration date of each policy and the amount of coverage.   True, complete and accurate copies of all such Insurance Policies have been provided or made available to Buyer.  Each Insurance Policy is in full force and effect and shall remain in full force and effect in accordance with its terms immediately following the Closing.  Each Seller is current in all premiums or other payments due under the Insurance Policies and has otherwise complied in all material respects with all of its obligations under each Insurance Policy.  Each Seller has given timely notice to the insurer of all material claims that may be insured thereby under any Insurance Policy.   During the past three years, no Seller has been refused any insurance by, nor has coverage been limited by, any insurance carrier with which any Seller has carried insurance or any other insurance carrier to which any Seller has applied for insurance, and no insurer has issued a reservation of rights or denial of coverage for claims or incidents which could give rise to a claim under any Insurance Policy.  No Insurance Policy provides for any retrospective premium adjustment or other experience based liability on the part of any Seller.

**Section 3.22    Related Party Transactions**.   Except as set forth on Schedule 3.22 of the Disclosure Schedule, no Related Party (a) has any direct or indirect interest in any asset used in

36

or otherwise relating to any Seller or the Business, (b) is indebted to any Seller, (c) has entered into, or has had any direct or indirect financial interest in, any Contract, transaction or business dealing involving any Seller, (d) is competing, directly or indirectly, with any Seller, (e) is a member, manager, director, officer or employee of, or consultant to, or owns, directly or indirectly, any interest in, any vendor, supplier or customer of any Seller, or is in any way associated with or involved in the Business (except in his or her official capacity as a director, officer or employee of a Seller, as the case may be), (f) has any interest in or has filed any application with respect to any Intellectual Property, which arises out of or relates to any Seller, or (g) has any claim or right against any Seller (other than rights to receive compensation for, or expense reimbursement in connection with, services performed as an employee or director). Each Seller does not share any facilities or equipment with any Related Party, and each Seller does not purchase or provide assets or services for any business conducted by any Related Party. For the past five years there has not been, and there is not currently, pending, or, to the Knowledge of the Sellers, threatened, any Litigation against any current or former Related Party with respect to which any Seller has an indemnification obligation.

**Section 3.23  Bank Accounts**.  Schedule 3.23 of the Disclosure Schedule is a true, complete and accurate list of each bank or financial institution in which any Seller has an account, safe deposit box or lockbox, or maintains a banking, custodial, trading or similar relationship, the number of each such account or box, and the names of all persons authorized to draw thereon or to having signatory power or access thereto.

**Section 3.24  Trade Names; Business Locations**.  Schedule 3.24 of the Disclosure Schedule sets forth all fictitious or trade names that any Seller has been known as or used and all offices or places of business any Seller has used, in each case, in the past five years.  No Seller is the surviving entity of a merger or consolidation.

Notwithstanding anything to the contrary in this Agreement, Buyer acknowledges and agrees that Buyer's sole and exclusive recourse and remedy by virtue of any breach at any time of any of the representations and warranties set forth in this Article III shall be to terminate this Agreement, in which event Buyer and Sellers shall all thereupon conclusively be deemed released and relieved of any further liability or obligation hereunder, except as otherwise set forth in Section 8.3; provided, that this paragraph shall in no way limit or affect the satisfaction of Section 7.1(a) as a condition to Buyer's obligation to consummate the transactions contemplated by this Agreement.

### ARTICLE IV
### BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Sellers as follows as of the date hereof and as of the Closing Date:

**Section 4.1  Organization of Buyer**.  Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite limited liability company power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

**Section 4.2    Authorization of Transaction**.

(a)    Buyer has full limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.

(b)    The execution, delivery and performance of this Agreement and all other Related Agreements to which Buyer is a party have been duly authorized by Buyer, and no other limited liability company action on the part of Buyer is necessary to authorize this Agreement or the Related Agreements to which it is a party or to consummate the Contemplated Transactions.

(c)    This Agreement has been duly and validly executed and delivered by Buyer, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which Buyer is a party will have been duly and validly executed and delivered by Buyer. This Agreement constitutes a valid and legally-binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. To the extent each Related Agreement constitutes a valid and legally-binding obligation of each Seller party thereto, each Related Agreement to which Buyer is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 4.3    Noncontravention**.    Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the assignments and assumptions referred to in Section 2.6) will (with or without notice or lapse of time or both) (i) conflict with or result in a breach of the certificate of incorporation, operating agreement, or other organizational documents, of Buyer, (ii) subject to any consents required to be obtained from any Governmental Entity, violate any Law or Decree to which Buyer is, or its assets or properties are subject, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (ii) or (iii), for such conflicts, breaches, defaults, accelerations or rights as would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the ability of Buyer to consummate the Contemplated Transactions or the Related Agreements. Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Entity in order for the Parties to consummate the Contemplated Transactions or any of the Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the ability of Buyer to consummate the Contemplated Transactions or the Related Agreements.

Section 4.4    **Litigation**.    There is no Litigation pending or, to Buyer's knowledge, threatened against or affecting Buyer that will adversely affect Buyer's performance under this Agreement or the consummation of the Contemplated Transactions.

Section 4.5    **Adequate Assurances Regarding Executory Contracts**.    Buyer will be capable of satisfying as of the Sale Hearing the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

Section 4.6    **Brokers' Fees**.    Neither Buyer nor any of its Affiliates has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the Contemplated Transactions for which any Seller could become liable or obligated to pay.

Section 4.7    **No Outside Reliance**.    Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, Buyer acknowledges and agrees that the representations and warranties made by the Sellers to Buyer in Article III (as qualified by the Disclosure Schedules and as supplemented by any Schedule Updates and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations") are the sole and exclusive representations, warranties, and statements of any kind made by Sellers to Buyer in connection with the Contemplated Transactions.    Buyer acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations, all of which lapse and cease to be of any further force or effect upon the Closing) including any projections, meetings, calls or correspondence with management of Sellers and their Representatives, or any other Person on behalf of Sellers or any of their respective Affiliates or Representatives and (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, contracts, and prospects of Sellers, or the value, quality, quantity, marketability, transferability or condition of Sellers' assets, are, in each case, specifically disclaimed by Sellers and that Buyer has not relied on any such representations, warranties or statements.    Without limiting the foregoing, Buyer acknowledges that Sellers hereby disclaim any warranty, express or implied, of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets and will accept the Purchased Assets and assume the Assumed Liabilities at the Closing "AS IS," "WHERE IS" and "WITH ALL FAULTS."

## ARTICLE V
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

Section 5.1    **Notices and Consents**.

(a)    To the extent required by the Bankruptcy Code or the Bankruptcy Court, Sellers shall give any notices to third parties, and to the extent the need therefor is not obviated by the entry of the Sale Order, each Seller shall use its commercially

reasonable efforts to obtain any third party Consents or sublicenses; provided, however, that neither Sellers nor Buyer shall be required to incur any Liabilities or provide any financial accommodation, in order to obtain any such third party Consent with respect to the transfer or assignment of any Purchased Asset.

(b)    Sellers and Buyer shall cooperate with one another (i) in promptly determining whether any filings are required to be or should be made or consents, approvals, permits or authorizations are required to be or should be obtained under any applicable Law in connection with this Agreement and the Contemplated Transactions and (ii) in promptly making any such filings, furnishing information required in connection therewith and seeking to obtain timely any such consents, permits, authorizations, approvals or waivers; provided, however, that Sellers' obligations hereunder shall only continue until Sellers cease to be debtors in possession under the Chapter 11 Cases or the Chapter 11 Cases are closed or dismissed.

(c)    To the extent permitted by applicable Law and the terms of the Purchased Assets, in the event any third party Consent has not been obtained by the Closing, at Buyer's written request, the Party contemplated to be transferring such Purchased Asset under this Agreement (the "Transferring Party") shall, at Buyer's cost and expense, hold in trust for Buyer, as applicable, the relevant Purchased Asset until the earlier of such time as (i) the third party Consent is obtained, (ii) the applicable Seller ceases to be a debtor in possession under the Chapter 11 Cases or the Chapter 11 Cases are closed or dismissed or (iii) Buyer elects not to assume such Purchased Asset. During such time period, Buyer shall comply with all applicable covenants and obligations under the Purchased Assets, including the payment of any costs or expenses in connection therewith and the maintenance and continuation thereof.  Buyer shall be entitled to receive all of the benefits of the Transferring Party under the Purchased Asset.  Buyer shall satisfy all Liabilities with respect to such Purchased Assets until the earlier of such time as (i) the third party Consent is obtained, (ii) the applicable Seller ceases to be a debtor in possession under the Chapter 11 Cases or the Chapter 11 Cases are closed or dismissed or (iii) Buyer elects not to assume such Purchased Asset (provided, with respect to any such Liabilities related to the payment of rent for Leased Real Property, Buyer shall satisfy such Liabilities through the end of the month), and shall indemnify and hold Sellers harmless with respect to any such reasonable out-of-pocket expenses arising in the Ordinary Course of Business with respect to such Purchased Asset during such period.

(d)    Subject to the terms and conditions set forth in this Agreement and applicable Law or as otherwise required in the Chapter 11 Cases, Buyer and Sellers shall (A) promptly notify the other Party of any communication to that Party from any Governmental Entity in respect of any filing, investigation or inquiry concerning this Agreement or the Contemplated Transactions, (B) if practicable, permit the other Party the opportunity to review in advance all the information relating to Sellers and their respective Subsidiaries or Buyer and its Affiliates, as the case may be, that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Entity in connection with the Agreement and the Contemplated Transactions and consider in good faith the other Party's reasonable comments, (C) not

40

participate in any substantive meeting or discussion with any Governmental Entity in respect of any filing, investigation, or inquiry concerning this Agreement and the Contemplated Transactions unless it consults with the other Party in advance, and, to the extent permitted by such Governmental Entity, gives the other Party the opportunity to attend, and (D) furnish the other Party with copies of all substantive correspondence, filings, and written communications between them and their Subsidiaries and Representatives, on the one hand, and any Governmental Entity or its respective staff, on the other hand, with respect to this Agreement and the Contemplated Transactions, provided, however, that any materials or information provided pursuant to any provision of this Section 5.1(d) may be redacted before being provided to the other Party (i) to remove references concerning the valuation of Buyer, Sellers, or any of their Subsidiaries, (ii) financing arrangements, (iii) as necessary to comply with contractual arrangements, and (iv) as necessary to address reasonable privilege or confidentiality issues. Sellers and Buyer may, as each deems advisable and necessary, reasonably designate any commercially or competitively sensitive material provided to the other under this Section 5.1(d) as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel and any retained consultants or experts of the recipient and shall not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Sellers or Buyer, as the case may be). Each of Sellers and Buyer shall promptly notify the other Party if such Party becomes aware that any third party has any objection to the Agreement on antitrust or anti-competitive grounds.

**Section 5.2   Bankruptcy Actions**.

(a)   The Chapter 11 Cases shall be continuing as of the date hereof.

(b)   The Bankruptcy Court shall have entered the Bid Procedures Order by no later than the Bid Procedures Order Deadline.

(c)   The hearing on the Sale Motion shall occur no later than by August 27, 2020, after or during which the Bankruptcy Court shall have entered the Sale Order, in any case by no later than the Sale Order Deadline, that provides the parties, inter alia, consummate the Closing as soon as practicable after the entry of the Sale Order and no later than August 31, 2020, subject to the satisfaction of all conditions to the obligations of Sellers and Buyer as set forth in Article VII (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions).

(d)   Sellers will provide Buyer with a reasonable opportunity to review and comment upon all motions, applications, and supporting papers relating to the Contemplated Transactions prepared by Sellers or any Affiliates (including forms of orders and notices to interested parties) prior to the filing thereof in the Chapter 11 Cases. All motions, applications, and supporting papers prepared by Sellers and relating to the Contemplated Transactions to be filed on behalf of Sellers after the date

hereof must be approved in form and substance by Buyer, such approval not unreasonably withheld or delayed.

(e)    Each of Buyer and Sellers shall continue to act in good faith and without any improper conduct, including collusion or fraud of any kind.

(f)    Each of Buyer and Sellers will promptly take such actions as are reasonably requested by the other Party and consistent with their respective rights and obligations hereunder to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by Sellers of their obligations under this Agreement and the Related Agreements and demonstrating that Buyer is a good faith buyer under Section 363(m) of the Bankruptcy Code.

(g)    The Sellers and Buyer agree, and the Sale Order shall reflect the fact that, the provisions of this Agreement are reasonable, were a material inducement to Buyer to enter into this Agreement and, subject to the results of the Auction, are the highest and best offer for the Purchased Assets.

(h)    Sellers shall use commercially reasonable efforts to provide appropriate notice of the hearings on the Sale Motion to all Persons entitled to notice, including, but not limited to, all Persons that have asserted Liens in the Purchased Assets, all parties to the Assumed Contracts and all Taxing authorities in jurisdictions applicable to Sellers and as otherwise required by the Bankruptcy Code and bankruptcy rules.

(i)    Sellers shall serve a notice of the Contemplated Transactions by first class mail on all non-debtor counterparties to all Non-Real Property Contracts and Leases as set forth in the Sale Motion and provide a copy of the same to Buyer.

**Section 5.3    Conduct of Business**.    Until the earlier of the termination of this Agreement and the Closing, and except as expressly contemplated by this Agreement or as set forth on Schedule 5.3 of the Disclosure Schedules, or as appropriate in response to the Business Cessation Event or required under the Bankruptcy Code or other applicable Law and except with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned, or delayed):

i.    Sellers shall use commercially reasonable efforts to maintain, preserve and protect all of the Purchased Assets in the condition in which they existed immediately prior to the Business Cessation Event, except for ordinary wear and tear and casualty and except for replacements, modifications or maintenance in the Ordinary Course of Business and shall maintain insurance coverage with financially responsible insurance companies substantially similar in all material respects to the insurance coverage maintained by the Business and Sellers on the Petition Date; provided, however, during any period when any of its properties and/or Purchased Assets are not being utilized in the Ordinary Course of Business due to the Business Cessation Event (such assets during such period, collectively, "Non-Operating Assets"), Sellers shall be deemed

to have satisfied their obligations under this <u>Section 5.3(i)</u> with respect to such Non-Operating Assets by taking reasonable and customary precautions as to the safety and security of the same;

ii.    Sellers shall use commercially reasonable efforts not to take, or agree to or commit to assist any other Person in taking, any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (ii) that would reasonably be expected to impair the ability of Sellers or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation;

iii.    Except as permitted by this Agreement, no Seller shall, directly or indirectly, sell or otherwise transfer or dispose, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer or dispose of any of the Purchased Assets other than in the Ordinary Course of Business;

iv.    No Seller shall, directly or indirectly, permit, offer, agree or commit to permit, any of the Purchased Assets to become subject, directly or indirectly, to any Lien or Claim except for Permitted Liens;

v.    No Seller shall assume, reject or assign any Contract or Lease that may become an Assumed Contract other than through the assumption and assignment of the Assumed Contracts, as contemplated by this Agreement, to Buyer (or, following the termination of this Agreement in accordance with its terms, to a third party in connection with an Alternate Transaction);

vi.    No Seller shall enter into new Contracts or amend or modify Contracts other than extensions, renewals or modifications in the Ordinary Course of Business, and no Seller shall amend, modify, encumber, extend, renew or terminate any Lease, nor enter into any new lease, sublease, or license;

vii.    No Seller shall remove or permit to be removed from any building, facility, or real property any Purchased Asset or any Purchased Inventory (other than the sale of Inventory in the Ordinary Course of Business or any Purchased Assets from an Excluded Restaurant);

viii.    No Seller shall return Inventory with an aggregate value of more than $5,000 to any single vendor unless defective;

ix.    No Seller shall (i) enter into any commitment for any expenditures in excess of $20,000 for any individual commitment and $50,000 for all commitments in the aggregate, or (ii) enter into any commitment with respect to remodeling, except as required by the terms of any Lease for Leased Real Property;

x.    Sellers shall comply in all material respects with all material Laws applicable to them or having jurisdiction over the Business or any Purchased Asset;

DOCS_SF:103743.4 07979/002

xi.　No Seller shall, directly or indirectly, cancel, forgive or compromise any material debt or claim or waive or release any material right of any Seller, in each case that constitutes an Purchased Asset;

xii.　Sellers shall use diligent and commercially reasonable efforts to maintain in full force and effect each Assumed Permit and Liquor License held by any Seller as of the date hereof or otherwise obtained by any Seller prior to the Closing, and shall comply with the material terms of each such Permit and Liquor License and no Seller shall permit any such Permit or Liquor License to terminate, expire or lapse other than in the Ordinary Course of Business;

xiii.　Subject to the consequences of the Business Cessation Event, Sellers shall (v) use commercially reasonable efforts to preserve the existing business organization and keep management of the Business intact, (w) use commercially reasonable efforts to keep available the services of the Service Providers, to the extent reasonably feasible, and (x) use commercially reasonable efforts to maintain the existing relations with customers, carriers, suppliers, creditors, business partners, Service Providers, and others having business dealings with the Business, to the extent reasonably feasible;

xiv.　Other than as required by applicable Law, no Seller shall (i) re-hire any Former Employees, Recent Employees or anyone not otherwise a Current Employee as of the date of this Agreement, (ii) grant any loan to or pay any bonus to any employee, (iii) hire or, except as required by a written agreement with such employee existing as of the date hereof, promote or terminate the employment (other than for cause) of any Current Employee, (iv) grant or increase any other severance, change in control, retention, termination or similar compensation or benefits to (or amend any existing severance, change in control, retention, termination or similar compensation, benefits or arrangement with) any Current Employee, (v) recognize any union or other collective employee representative, (vi) except in each case as required by a written agreement with such employee existing as of the date hereof, increase the compensation, bonus or other benefits payable to any employee, (vii) pay to any employee any benefit or amount not required under any Employee Benefit Plan as in effect on the date of this Agreement, (viii) adopt any new Employee Benefit Plan or amend or terminate or increase the benefits under any Employee Benefit Plan, or (ix) take any action to accelerate the vesting of, or payment of, any compensation or benefit under any Employee Benefit Plan;

xv.　Except as required by GAAP, change any accounting policies, procedures, methods or practices (including with respect to reserves, revenue recognition, inventory control, prepayment of expenses, timing for payments of accounts payable and collection of accounts receivable);

xvi.　Sellers shall use commercially reasonable efforts to maintain their business records in accordance with their past practices;

44

xvii.    Sellers shall, at all times, maintain the retention of the current financial advisors and investment banker on terms, scope and conditions identical to the terms scope and conditions existing on the date of this Agreement; and

xviii.    Except as permitted by this Agreement, no Seller shall authorize any of the foregoing, enter into an agreement to do any of the foregoing, or agree or enter into any Contract to do any of the foregoing.

Nothing contained in this Agreement is intended to give Buyer or its Affiliates, directly or indirectly, the right to control or direct the business of Sellers prior to the Closing.

**Section 5.4**    **Notice of Developments**.  From the date hereof until the Closing Date, each of the Sellers (with respect to itself), as the case may be, shall promptly disclose to Buyer, on the one hand, and Buyer shall promptly disclose to Sellers, on the other hand, in writing after attaining knowledge (as applicable to each of Sellers and Buyer) of any real or alleged failure of any of Sellers or Buyer to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; provided, however, that the delivery of any notice pursuant to this Section 5.4 shall not limit or otherwise affect the remedies available to the party receiving such notice under this Agreement if such party objects to the disclosures contained in such notice within five (5) days of receipt of such notice.

**Section 5.5**    **Access**.

(a)    Upon reasonable advance written request by Buyer, until the earlier of the Closing and the termination of this Agreement, Sellers shall permit Buyer and its Representatives to have reasonable access to, and make (at Buyer's sole cost and expense) reasonable investigation of, during normal business hours, subject to the terms of Leases and in a manner so as not to interfere unreasonably with the normal business operations of Sellers, to all of the books and records, premises, properties, personnel, Records, Contracts, businesses, assets, accountants, auditors, counsel and operations of the Sellers related to the Business; provided, however, that, for avoidance of doubt, (i) the foregoing shall not require any Party to waive, or take any action with the effect of waiving, its attorney-client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable Law, and (ii) nothing herein shall be deemed to condition or otherwise make Buyer's obligations to consummate the Contemplated Transactions contingent upon the results of any investigation or inspection conducted by Buyer or its Representatives pursuant to this Section 5.5.    Sellers shall cause their respective officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Buyer and Buyer's Representatives in commercially reasonable respects (but at no cost or expense to Sellers) in connection with such investigation and examination, and Buyer and its Representatives shall cooperate with Sellers and their respective Representatives and shall use their reasonable efforts to minimize any disruption to the Business. Notwithstanding the foregoing, Buyer shall not have the right to conduct any Phase II environmental or other "invasive" environmental testing without Sellers' written consent (which consent may be conditioned upon, among other reasonable conditions,

45

Buyer's execution and delivery of an access and indemnity agreement in form and content reasonably satisfactory to Sellers).

(b)     As soon as possible after the date of this Agreement, but in any event no later than five (5) calendar days prior to the Closing Date, Sellers shall deliver to Buyer the unaudited consolidated balance sheet of the Sellers for the fiscal quarter ended on or about June 30, 2020, and the related consolidated statement of income and cash flows of Sellers for the three (3) months then ended.

**Section 5.6    Press Releases and Public Announcements**.    After notice to and consultation with Buyer, Sellers shall be entitled to disclose, only to the extent required by applicable Law or by order of the Bankruptcy Court or as appropriate in the conduct of the Chapter 11 Cases, this Agreement and all information provided by Buyer in connection herewith to the Bankruptcy Court, the United States Trustee, the Committee, parties in interest in the Chapter 11 Cases.    Other than statements made in the Bankruptcy Court (or in pleadings filed therein), no Party shall issue (prior to, on or after the Closing) any press release or make any public announcement without the prior written consent of the other Parties, which shall not be unreasonably withheld or delayed.    Notwithstanding anything contained in this Agreement or any contractual confidentiality obligation of Buyer to the contrary, Buyer may disclose the Agreement and all information provided by Sellers in connection herewith (such information, other than this Agreement, the "Seller Confidential Information"): (a) to its Affiliates who are instructed to maintain the confidentiality of the Seller Confidential Information, (b) to the extent required or requested by, or required to be disclosed to, any regulatory or similar authority purporting to have jurisdiction over such Person or its Affiliates and to whom Buyer discloses only so much of the Seller Confidential Information to such authority as so required in Buyer's reasonable discretion, (c) to the extent required by applicable Law or in any legal, judicial, administrative or other compulsory process; provided that Buyer discloses only so much of the Seller Confidential Information in connection with such process as is so required in Buyer's reasonable discretion, (d) to any other party hereto, (e) in connection with the exercise of any remedies under this Agreement or any action or proceeding relating to this Agreement or the enforcement of rights hereunder, (f) with the written consent of Sellers, (g) to the extent such information becomes publicly available other than as a result of a breach of this Agreement or any contractual confidentiality obligation, (h) to governmental regulatory authorities in connection with any regulatory examination of any agent or lender or in accordance with any such agent's or lender's regulatory compliance policy if such agent or such lender deems necessary for the mitigation of claims by those authorities against such agent or such lender or any of its subsidiaries or Affiliates, or (i) for the purposes of establishing a "due diligence" defense.

**Section 5.7    Bulk Transfer Laws**.    Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the Contemplated Transactions, and hereby waives all claims related to the noncompliance therewith.    The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any Liens on the Purchased Assets (other than Permitted Liens) to the extent provided in the Sale Order, including any Liens arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

46

**Section 5.8    Release of Claims**.  Notwithstanding anything contained herein to the contrary, effective as of the Closing, (i) each Seller, on behalf of itself and its Affiliates (individually and collectively, the "Seller Releasing Parties"), fully, irrevocably and unconditionally releases Buyer, the Credit Agreement Secured Parties, and each of their respective Affiliates, each in their capacity as such (individually and collectively, the "Buyer Released Parties"), from any and all actions, causes of action, damages, claims, refunds, choses in action, suits or proceedings, rights of recovery, rights of setoff, rights of recoupment, and demands whatsoever, in law or in equity, known or unknown, matured and unmatured, accrued or contingent or liquidated, regardless of whether such rights are currently exercisable, whether derivative claims asserted or assertable on behalf of any of the Seller Releasing Parties or direct claims or for indemnification or contribution, including but not limited to any Claims under section 506(c) of the Bankruptcy Code, that such Seller Releasing Parties (whether individually or collectively) ever had, now have, or may have against the Buyer Released Parties relating to, or in any manner arising from, in whole or in part, the Sellers, the Debtors, the Chapter 11 Cases, the Credit Agreement Loan Documents, or the negotiation, formulation, or preparation of this Agreement, in each case, in connection with any event, conduct or circumstance occurring on or prior to the Closing; and (ii) the Buyer and the Credit Agreement Secured Parties, on behalf of themselves and their respective Affiliates (individually and collectively, the "Buyer Releasing Parties") fully, irrevocably and unconditionally release each Seller and each of their respective Affiliates, each in their capacity as such (individually and collectively, the "Seller Released Parties"), from any and all actions, causes of action, damages, claims, refunds, choses in action, suits or proceedings, rights of recovery, rights of setoff, rights of recoupment, and demands whatsoever, in law or in equity, known or unknown, matured and unmatured, accrued or contingent or liquidated, regardless of whether such rights are currently exercisable, whether derivative claims asserted or assertable on behalf of any of the Buyer Releasing Parties or direct claims or for indemnification or contribution, that such Buyer Releasing Parties (whether individually or collectively) ever had, now have, or may have against the Seller Released Parties relating to, or in any manner arising from, in whole or in part, the Sellers, the Debtors, the Chapter 11 Cases, the Credit Agreement Loan Documents, or the negotiation, formulation, or preparation of this Agreement, in each case, in connection with any event, conduct or circumstance occurring on or prior to the Closing; provided, however, that the foregoing provisions shall not operate to waive or release: (i) any deficiency claim against the Sellers in any remaining Credit Agreement Lien Obligations after giving effect to the Credit Bid and Release, (ii) rights to enforce this Agreement and the other agreements or instruments being executed and delivered pursuant to the terms hereof to give effect to the Contemplated Transactions, or (iii) claims against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Sellers.    Notwithstanding anything contained in this Section 5.8 to the contrary, (a) the effectiveness of the release in this Section 5.8 by the Buyer Releasing Parties for the benefit of the direct equityholders of Barfly Ventures, LLC shall be conditioned upon such direct shareholders executing and delivering a release in the form of Exhibit C hereto in favor of the Buyer Released Parties, and (b) in the event that any Seller Released Party asserts any claim or cause of action against a Buyer Released Party that the Seller has released (or purported to release) on behalf of such Seller Released Party pursuant to this Section 5.8, then any release granted by such Buyer Releasing Party to such Seller Released Party pursuant to this Section 5.8 shall be deemed immediately

47

revoked, and the grant of such release shall be deemed null and void ab initio, without the need for any further action by the Parties.

**Section 5.9    Buyer Backstop.** To the extent that the performance of Sellers' obligations under this Agreement prior to or at the Closing require the use or payment of money, Sellers shall utilize the from time to time Cash and Cash Equivalents (other than any Excluded Cash) on hand and available for use in the Business ("Available Cash") to perform and satisfy such obligations. If, at any time prior to or at the Closing, there is not sufficient Available Cash for Sellers to perform any such obligations (an "Available Cash Deficiency"), Buyer shall fund to Sellers (within two (2) Business Days following Buyer's receipt from time to time of written notification from Sellers of the amount of such Cash Deficiency and reasonable support therefor (each, a "Shortfall Notice") cash in the amount of the then Available Cash Deficiency (a "Backstop Amount"), which Backstop Amount shall be used by Sellers only to satisfy Sellers' obligations under this Agreement specifically identified in the Shortfall Notice as obligations Sellers had insufficient Available Cash to satisfy; provided, however, and notwithstanding anything to the contrary set forth herein, Buyer's aggregate payments with respect to Backstop Amounts and the Excluded Cash Deficiency Amount shall not exceed $613,708 and Buyer shall have no further obligation for the payment of any Backstop Amounts or the Excluded Cash Deficiency Amount in excess of such aggregate amount, provided further, however, in lieu of funding the Backstop Amount to Sellers, Buyer shall have the right, at Buyer's sole option, to pay the amounts comprising the Backstop Amount directly to the counter-parties and other third parties identified as payees of any portion of the Backstop Amount in the Shortfall Notice.  In the event Buyer elects to make payments of the Backstop Amount directly to third parties as contemplated in the immediately preceding sentence, Sellers shall provide such information as Buyer may request in order to do so and otherwise reasonably cooperate with Buyer in making such direct payments. Notwithstanding anything to the contrary in this Agreement, if Buyer fails to fund or pay in full, as applicable, any Backstop Amount required to be funded or paid in full by Buyer in accordance with this Section 5.9, Seller shall be excused from performing Sellers' obligations to which such unpaid or unfunded Backstop Amounts relate and such failure shall be deemed a breach of Buyer's obligations  under this Agreement.

## ARTICLE VI
## OTHER COVENANTS

The Parties agree as follows with respect to the period from and after the Closing; provided that (i) Sellers shall not be obligated to incur any costs or expenses, associated with their obligations hereunder during such period, other than such ordinary and necessary professional fees as are required for Sellers to comply with the obligations hereunder and (ii) Sellers' obligations hereunder shall only continue until Sellers are no longer debtors in possession under the Chapter 11 Cases or the Chapter 11 Cases are closed or dismissed:

**Section 6.1    Cooperation**.  Each of the Parties shall cooperate with each other, and shall use their commercially reasonable efforts to cause their respective Representatives to cooperate with each other, to provide an orderly transition of the Purchased Assets and Assumed Liabilities from Sellers to Buyer and to minimize the disruption to the Business resulting from the Contemplated Transactions.

**Section 6.2    Further Assurances**.  In case at any time from and after the Closing any further action is necessary or reasonably required to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the terms and conditions of the Sale Order (and, as to Sellers, taking into account their status as debtors-in-possession), at any Party's request and sole cost and expense, each Party shall take such further action (including the execution and delivery to any other Party of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and information) as another Party may reasonably request (which are consistent with the rights and obligations imposed upon the Parties pursuant to the other provisions hereof) as shall be necessary to transfer, convey and assign to Buyer all of the Purchased Assets, to confirm Buyer's assumption of the Assumed Liabilities and to confirm Sellers' retention of the Excluded Assets and Excluded Liabilities.  Without limiting the generality of this Section 6.2, to the extent that either Buyer or Sellers discovers any additional assets or properties which the parties mutually agree should have been transferred or assigned to Buyer as Purchased Assets but were not so transferred or assigned, Buyer and Sellers shall cooperate and execute and deliver any instruments of transfer or assignment (which are consistent with the rights and obligations imposed upon the Parties pursuant to the other provisions hereof) necessary to transfer and assign such asset or property to Buyer.

**Section 6.3    Availability of Business Records**.  From and after the Closing, Buyer shall promptly provide to Sellers and their respective Representatives (after reasonable notice and during normal business hours and without charge to Sellers) access to all Records included in the Purchased Assets for periods prior to the Closing and reasonable access to Transferred Employees to the extent such access is necessary in order for Sellers (as applicable) to comply with applicable Law or any contract to which it is a party, for liquidation, winding up, Tax reporting or other proper purposes and so long as such access is subject to an obligation of confidentiality, and shall preserve such Records until the latest of (i) six (6) years after the Closing Date, (ii) the required retention period for all government contact information, records or documents, (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases or (iv) in the case of Records related to Taxes, the expiration of the statute of limitation applicable to such Taxes.  Such access shall include access to any information in electronic form to the extent reasonably available.  Buyer acknowledges that Sellers have the right to retain originals or copies of all of Records included in the Purchased Assets for periods prior to the Closing.  Prior to destroying any Records included in the Purchased Assets for periods prior to the Closing, Buyer shall notify Sellers thirty (30) days in advance of any such proposed destruction of its intent to destroy such Records, and Buyer shall permit Sellers to retain such Records, at Sellers' cost and expense.  With respect to any Litigation and claims that are Excluded Liabilities, Buyer shall render all reasonable assistance that Sellers may request in defending or prosecuting such Litigation or claim and shall make available to Sellers such personnel as are most knowledgeable about the matter in question, all without charge.

**Section 6.4    Employee Matters**.

(a)    No later than ten (10) Business Days prior to Closing Sellers will update the Employee Roster.  At least two (2) Business Days prior to the Closing, Buyer will identify the employees (or corresponding positions) on the Employee Roster to whom Buyer intends make an offer of employment.  Prior to Closing, Buyer may but is under

49

no obligation to offer employment to such identified employees listed on the Employee Roster (an "Offeree") to the extent such identified employee is a Current Employee and remains a Current Employee as of immediately prior to the Closing on such employment terms as Buyer may determine in its sole discretion.

(b)    Each Offeree of Sellers who is not a Transferred Employee shall be referred to herein as an "Excluded Employee."

(c)    Following the date of this Agreement:

i.    Sellers will allow Buyer or any of its Representatives reasonable access upon reasonable advance notice to meet with and interview the individuals listed on the Employee Roster during normal business hours;

ii.    Sellers shall not, nor shall any Seller authorize or direct or give express permission to any Affiliate, officer, director or employee of any Seller or any Affiliate, to (A) interfere with Buyer's or its Representatives' rights under Section 6.4(a) to make offers of employment to any Offeree, or (B) solicit or encourage any Offeree not to accept, or to reject, any such offer of employment;

iii.    Sellers shall provide reasonable cooperation and information to Buyer or the relevant Representative as reasonably requested by Buyer or such Representative with respect to its determination of terms and conditions of employment for any Offeree;

iv.    Sellers shall process the payroll for and pay, or cause to be paid, the base wages, base salary and benefits that are due and payable on or prior to the Closing Date with respect to all Current Employees. Sellers shall withhold and remit all applicable payroll taxes as required by Law on or prior to the Closing Date with respect to all Current Employees as of such date;

v.    Sellers shall retain and be solely responsible for all Liabilities and obligations arising under or relating to any Employee Benefit Plans or the employment or termination of employment of any employee of any Seller, including without limitation any Current Employee or Former Employee (excluding the Assumed Payroll Obligations). With respect to all Liabilities arising under or relating to Section 4980B of the Code or Part 6 of Subtitle B of Title I of ERISA ("COBRA"), Sellers and their respective ERISA Affiliates shall retain all Liability to provide continued group health coverage to all M&A qualified beneficiaries (as defined in Treasury Regulation § 54.4980B-9, Q/A(a) who expense a qualifying event (as defined in Treasury Regulation § 54.4980B-9, Q/A-6) as result of transactions contemplated by this Agreement.

(d)    Nothing in this Section 6.4 shall be construed as requiring, and neither Sellers nor any of their Affiliates shall take any affirmative action that would have the effect of requiring Buyer to continue (or prevent the termination of employment of) any specific employee benefit plan or to continue the employment of any specific person following the Closing. Nothing in this Agreement is intended to establish, create or amend, nor shall anything in this Agreement be construed as establishing, creating or

50

amending, any employee benefit plan, practice or program of Buyer, any of its Affiliates or any of Sellers' Employee Benefit Plans, nor shall anything in this Agreement create or be construed as creating any contract of employment or as conferring upon any Current Employee, Former Employee, Transferred Employee or upon any other person, other than the parties to this Agreement in accordance with its terms, any rights to enforce any provisions of this Agreement under ERISA or otherwise. No provision of this Agreement shall create any third party beneficiary rights in any Current Employee or Former Employee of any Seller or any other Person (including any beneficiary or dependent thereof) of any nature or kind whatsoever, including without limitation, in respect of continued employment (or resumed employment) for any specified period.

**Section 6.5** __Transfer Taxes__. To the extent not exempt under Section 1146 of the Bankruptcy Code and subject to Section 5.9 of this Agreement, Sellers shall pay all Transfer Taxes. Sellers and Buyer shall cooperate to prepare and timely file any Tax Returns required to be filed in connection with Transfer Taxes described in the immediately preceding sentence.

**Section 6.6** __Wage Reporting__. Buyer and Sellers agree to utilize, or cause their respective Affiliates to utilize, the alternate procedure set forth in Internal Revenue Service Revenue Procedure 2004-53 with respect to wage reporting.

**Section 6.7** __Insurance Policies__. Other than as provided in Section 2.2(k) above, upon Closing, and until Sellers cease to be debtors in possession in the Chapter 11 Cases or the Chapter 11 Cases are closed or dismissed, the Sellers shall use commercially reasonable efforts (but at no material cost or expense to Sellers) to cause the assignment of all rights of the Sellers in and to all insurance coverage provided in relation to Sellers and the Purchased Assets that is maintained by any Seller or its Affiliates (whether such policies are maintained with third party insurers or with such Seller or its Affiliates) to Buyer as soon as reasonably practicable. To the extent that any current or prior Insurance Policy is not transferable to Buyer at the Closing in accordance with the terms thereof, each Seller, as applicable, shall (so long as Sellers remain debtors in possession in the Chapter 11 Cases and the Chapter 11 Cases have not been closed or dismissed and at no cost or expense to Sellers) hold such Insurance Policy for the benefit of Buyer, shall reasonably cooperate with Buyer (at Buyer's cost and expense) in pursuing any claims thereunder, and shall pay over to Buyer promptly any insurance proceeds paid or recovered thereunder with respect to the Purchased Assets or the Assumed Liabilities. In the event Buyer determines to purchase replacement coverage with respect to any such Insurance Policy, Sellers shall (so long as Sellers remain debtors in possession in the Chapter 11 Cases and the Chapter 11 Cases have not been closed or dismissed and at no cost or expense to Sellers) reasonably cooperate with Buyer to terminate such Insurance Policy to the extent only applicable to the Purchased Assets, and Sellers shall, at the option of Buyer, promptly pay over to Buyer any refunded or returned insurance premiums received by any Sellers in connection therewith (or, if applicable, Buyer's pro rata portion thereof) or cause such premiums to be applied by the applicable carrier to the replacement coverage arranged by Buyer.

**Section 6.8** __Collection of Accounts Receivable__.

(a)    As of the Closing Date, each Seller hereby (i) authorizes Buyer to open any and all mail addressed to any Seller relating to the Business or the Purchased Assets and delivered to the offices of the Business or otherwise to Buyer if received on or after the Closing Date and (ii) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, made payable or endorsed to any Seller or Sellers' order, for Buyer's own account.

(b)    As of the Closing Date, each Seller agrees that any monies, checks or negotiable instruments received by any Seller after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, shall be held in trust by such Seller for Buyer's benefit and account, and promptly upon receipt by a Seller of any such payment (but in any event within five (5) Business Days of such receipt), such Seller shall pay over to Buyer or its designee the amount of such payments. In addition, Buyer agrees that, after the Closing, it shall hold and shall promptly transfer and deliver to Sellers, from time to time as and when received by Buyer or its Affiliates, any cash, checks with appropriate endorsements, or other property that Buyer or its Affiliates may receive on or after the Closing which properly belongs to Sellers hereunder, including any Excluded Assets.

(c)    As of the Closing Date, Buyer shall have the sole authority to bill and collect Accounts Receivable that are Purchased Assets and accounts receivable relating to work performed by Buyer after the Closing.

**Section 6.9    Use of Name and Marks**.  Neither Sellers nor any of their Affiliates shall use, license or affirmatively authorize any third party to use, any Trademark which is similar to, confusing with, or which dilutes any Trademark included in the Purchased Assets.

**Section 6.10    Liquor License Approvals**.  Sellers shall reasonably cooperate with Buyer in connection with Buyer's filings with any Governmental Entity or third party with respect to any Liquor Licenses and obtaining any Liquor License Approval, including by entering into the Management Agreement and, if reasonably requested by Buyer, initiating and/or participating, at Buyer's sole cost and expense, in such Litigation reasonably requested by Buyer to obtain such Liquor License Approvals.  For the avoidance of doubt, Sellers shall not bear any of the costs or expenses of Buyers' efforts to obtain Liquor License Approval, except as explicitly provided in the Management Agreement.

**Section 6.11    Data Privacy Protection**.  Buyer acknowledges that the Purchased Assets include PII, along with associated personal information about the Sellers' customers.  In connection with the same, Buyer agrees to: (i) employ appropriate security controls and procedures (technical, operational and managerial) to protect PII and personal information, (ii) abide by all applicable Laws and regulations with respect to PII and (iii) take such further actions with respect to PII as may be agreed in writing between the Parties.  Buyer agrees that it shall, absent a customer's express consent received after adequate notice: (a) abide by the

Sellers' privacy policies and privacy-related covenants made in Sellers' terms of service that were in effect as of the Petition Date, (b) respect prior requests of customers to opt out of receipt of marketing messages (to the extent Sellers make Buyer aware of such requests; provided that Buyer shall seek to obtain such information from Sellers), and (c) use personal information only for the purposes of continuing Business operations and continuing to provide similar goods and services to customers, including marketing the products and services related to Purchased Assets. Buyer shall require express consent of a customer for any additional use of PII or personal information or before making material changes to the privacy policies that weaken a customer's consumer protection. Furthermore, to the extent PII includes any social security numbers, Buyer shall limit such use to tax reporting purposes, and shall purge such information from its databases when such information is no longer required for that purpose.

**Section 6.12    Alternate Transactions**. Buyer acknowledges that, pursuant to the Bid Procedures Order, and only after entry of the Bid Procedures Order on the Bankruptcy Court's docket, Sellers will solicit bids from other prospective purchasers for the sale of all of the Purchased Assets in accordance with the procedures set forth in the Bid Procedures Order; provided, however, that, following completion of the Auction (if any) until the Closing (in the event that Buyer is selected as the winning bidder), Sellers shall not, directly or indirectly, through any officer, director, employee, agent, professional or advisor, solicit any Alternate Transaction or participate in any negotiations or discussions with respect to any Alternate Transaction, and Sellers shall not, and Sellers shall cause their Affiliates not to, (i) execute an agreement (other than a customary confidentiality agreement) with respect to an Alternate Transaction or (ii) seek or support Bankruptcy Court approval of a motion or Order inconsistent in any material respect with the transactions contemplated by this Agreement.

**Section 6.13    Purchased Actions**. Buyer covenants and agrees (on behalf of itself and its successors and assigns) not to assert any Purchased Action other than as a defense or counterclaim to any claim alleged or asserted against Buyer or its Affiliates by a Person that is or may be a Purchased Action defendant.

## ARTICLE VII
## CONDITIONS TO CLOSING

**Section 7.1    Conditions to Buyer's Obligations**.

Subject to Section 7.3, Buyer's obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or written waiver of the following conditions (any or all of which may be waived in writing by the Sellers and Buyer in whole or in part to the extent permitted by applicable Law):

    (a)    as of the date hereof and as of the Closing (in each case, except to the extent for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), each representation or warranty contained in Article III shall be true and correct in all respects other than *de minimis* exceptions;

    (b)    Sellers shall have performed and complied with their covenants and agreements hereunder to the extent required to be performed prior to the Closing in all

material respects, and Sellers shall have caused the documents and instruments required by Section 2.9(a) to be delivered to Buyer (or tendered subject only to Closing);

(c)    no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)    all Cure Amounts shall have been paid by the Sellers or as otherwise set forth in this Agreement;

(e)    Buyer shall have received all of the Consents from third parties (including any Governmental Entities) and Assumed Permits (including Liquor Licenses Approvals), except to the extent such Assumed Permits (including Liquor Licenses Approvals) are to be transitioned under the Management Agreement (including Liquor Licenses Approvals pursuant to Section 6.10) or the need for such Consents is obviated by the effect of the Sale Order, in each case, as listed on Schedule 7.1 (as the same may be revised, amended or modified by Buyer in its sole discretion up until the Sale Hearing);

(f)    the Bid Procedures Order shall have been entered by the Bankruptcy Court on a final, non-appealable basis;

(g)    the Sale Order shall have been entered by the Bankruptcy Court and shall be in full force and effect and not be subject to a stay pending appeal;

(h)    from the date of this Agreement until the Closing Date, there shall not have occurred and be continuing any Material Adverse Effect;

(i)    Buyer shall have received all of the deliverables pursuant to Section 2.9(a); and

(j)    Sellers shall have delivered a certificate from an authorized officer of Sellers to the effect that each of the conditions specified in Section 7.1(a), Section 7.1(b) and Section 7.1(h) has been satisfied.

**Section 7.2    Conditions to Sellers' Obligations**.    Subject to Section 7.3, Sellers' obligation to consummate the Contemplated Transactions in connection with the Closing are subject to satisfaction or written waiver of the following conditions (any or all of which may be waived in writing by the Sellers and Buyer in whole or in part to the extent permitted by applicable Law):

(a)    as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 4.1, Section 4.2 or Section 4.3 shall be true and correct in all respects other than *de minimis* exceptions, and (ii) each other representation or warranty set forth in Article IV shall be true and correct in all material respects, except where the failure of such representations

54

and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, would not reasonably be expected to materially prevent, restrict or delay the consummation of the Contemplated Transactions or by any Related Agreement; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)    Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Buyer shall have caused the documents, instruments and payments required by Section 2.9(b) to be delivered to Sellers (or tendered subject only to Closing);

(c)    no Governmental Entity of competent jurisdiction shall have (i) enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)    the Bid Procedures Order shall have been entered by the Bankruptcy Court and shall be in full force and effect and not be subject to a stay pending appeal;

(e)    the Sale Order shall have been entered by the Bankruptcy Court and shall be in full force and effect and not be subject to a stay pending appeal;

(f)    Sellers shall have received all of the deliverables pursuant to Section 2.9(b); and

(g)    Buyer shall have delivered a certificate from an authorized officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) has been satisfied.

**Section 7.3    No Frustration of Closing Conditions**.  Neither Buyer nor Sellers may rely on the failure of any condition to its obligation to consummate the Contemplated Transactions set forth in Section 7.1 or Section 7.2, as the case may be, to be satisfied if such failure was caused by such Party's failure to use its commercially reasonable efforts with respect to those matters contemplated by the applicable Sections of this Agreement to satisfy the conditions to the consummation of the Contemplated Transactions or other breach of a representation, warranty or covenant hereunder.

**Section 7.4    Waiver of Conditions**.  Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing.

**Section 7.5    Agreement Regarding Schedules and Exhibits Hereto.** Notwithstanding anything to the contrary in this Agreement, the Parties will not append the various schedules and exhibits referred to in this Agreement upon the mutual execution and

delivery of this Agreement. Rather, the Parties will work to mutually agree upon and append all schedules and exhibits hereto by no later than August 7, 2020 (the "Outside Agreement Date"). The Parties shall cooperate reasonably and in good faith to achieve such mutual agreement on or before the Outside Agreement Date. In the event that the Parties have not mutually agreed upon the form and content of all schedules and exhibits to this Agreement by the Outside Agreement Date, then either Buyer or Sellers shall have the right upon written notice to the other(s) to terminate this Agreement at any time prior to the Parties achieving mutual agreement on the form and content of such schedules and exhibits. Notwithstanding anything to the contrary herein, upon any such termination, the Parties shall conclusively be deemed released and relieved of any further liability or obligation hereunder, except as otherwise set forth in Section 8.3. Upon the Parties' mutual agreement upon the form and content of the schedules and exhibits hereto prior to the Outside Agreement Date, such schedules and agreements shall be deemed appended to and included in this Agreement and this Section 7.5 shall lapse and cease to be of any force or effect whatsoever as though it had never been included in this Agreement.

## ARTICLE VIII
## TERMINATION

**Section 8.1    Termination of Agreement**.    This Agreement may be terminated in accordance with this Article VIII and the Contemplated Transactions abandoned at any time prior to the Closing (each a "Termination Event"):

(a)    by the mutual written consent of Buyer, on the one hand, and Sellers, on the other hand;

(b)    by written notice of either Buyer or Sellers, if there shall be any Law that makes consummation of the Contemplated Transactions illegal or otherwise prohibited, or upon the issuance by any Governmental Entity of an Decree restraining, enjoining, or otherwise prohibiting the consummation of the Contemplated Transactions or declaring unlawful the Contemplated Transactions, and such Decree having become final, binding and non-appealable; provided that no termination may be made by a Party under this Section 8.1(b) if the issuance of such Decree was caused by the breach or action or inaction of such Party;

(c)    by written notice of either Buyer or Sellers, if the Closing shall not have occurred on or before the Outside Date;

(d)    by written notice of either Buyer or Sellers, if any of the Chapter 11 Cases is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Sellers is appointed in the Chapter 11 Cases;

(e)    by Buyer, if (i) Bid Procedures Order shall not have been entered by the Bankruptcy Court on or before the Bid Procedures Order Deadline or (ii) at any time after entry of the Bid Procedures Order, such Bid Procedures Order is reversed, stayed, vacated or otherwise modified;

(f)     by Buyer, if (i) the Sale Order shall not have been entered by the Bankruptcy Court on or before the Sale Order Deadline or (ii) at any time after entry of the Sale Order, such Sale Order is reversed, stayed, vacated or otherwise modified;

(g)     by Buyer by giving written notice to Sellers at any time prior to Closing (i) in the event Sellers have breached any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in  Sections 7.1(a)  and 7.1(b) hereof, as the case may be, would not then be satisfied at the time of such breach, Buyer has notified Sellers of the breach, and the breach has continued without cure until the earlier of (i) five (5) days prior to the Outside Date so long as all other conditions of Buyer have been satisfied or (ii) thirty (30) days after the notice of the breach, in each case, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by Buyer;

(h)     by Sellers by giving written notice to Buyer at any time prior to Closing (i) in the event Buyer has breached any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in  Sections 7.2(a)  and 7.2(b) hereof, as the case may be, would not then be satisfied at the time of such breach, Sellers has notified Buyer of the breach, and the breach has continued without cure until the earlier of (i) five (5) days prior to the Outside Date so long as all other conditions of Sellers have been satisfied or (ii) thirty (30) days after the notice of the breach, in each case, unless such failure shall be due to the failure of Sellers to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by Sellers;

(i)     by written notice from Sellers to Buyer, if all of the conditions set forth in Section 7.1 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Buyer fails to complete the Closing at the time required by Section 2.7(a);

(j)     by Buyer if any secured creditor of any Seller obtains relief from the stay to foreclose on a material portion of the Purchased Assets;

(k)     by Buyer if any Affiliates of the Sellers (other than other debtors in the Chapter 11 Cases on the date hereof) that, directly or indirectly through one or more intermediaries, controls Sellers, files for relief pursuant to the Bankruptcy Code;

(l)     by Buyer if, at any time on or before the August 21, 2020, Buyer becomes aware of any matter as a result of its due diligence investigation (including by way of information delivered or made available by Sellers hereunder or on a Disclosure Schedule or Schedule hereto) that Buyer determines is unacceptable in its sole discretion; or

DOCS_SF:103743.4 07979/002

(m)    by Seller, upon a Decree by the Bankruptcy Court approving an Alternate Transaction.

Notwithstanding anything to the contrary contained herein, (i) in no event may Buyer terminate this Agreement under Section 8.1(f) on account of Buyer's failure to satisfy the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to any proposed Assumed Contract, and (ii) a Party shall not be permitted to terminate this Agreement pursuant to this Article VIII if the applicable Termination Event was caused by the breach of such Party or such Party's gross negligence, willful misconduct, or bad faith.

**Section 8.2    Procedure upon Termination.**    In the event of termination and abandonment by Buyer, on the one hand, or Sellers, on the other hand, or both, pursuant to Section 8.1, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate and the Contemplated Transactions shall be abandoned, without further action by Buyer or Sellers.

**Section 8.3    Effect of Termination.**

(a)    In the event that this Agreement is validly terminated pursuant to a right of termination as provided herein, then each of the Parties shall be relieved of its duties and obligations arising under this Agreement effective as of the date of such termination and such termination shall be without Liability to Buyer or the Sellers; provided, however, that Section 8.1, Section 8.2, this Section 8.3, and Article IX shall survive any such termination and shall be enforceable hereunder. In no event shall any termination of this Agreement relieve any Party hereto of any Liability for any breach of this Agreement by such Party.

(b)    In consideration of Buyer and its Affiliates having expended considerable time and expense in connection with this Agreement and the negotiation thereof, and the identification and quantification of assets to be included in the Purchased Assets, and to compensate Buyer as a stalking-horse bidder, and regardless of whether or not Buyer makes any matching or competing bids at the Auction, the Sellers shall pay to Buyer the Break-Up Fee, (i) in the event that this Agreement is terminated pursuant to Section 8.1(m) and the Sellers close an Alternate Transaction; and (ii) in the event that this Agreement is otherwise terminated pursuant to Sections 8.1(c) through (g), Section 8.1(j) or Section 8.1(k), and in each case, within twelve (12) months following the termination of this Agreement the Sellers close an Alternate Transaction. Such Break-Up Fee shall be immediately due and payable in full in cash from the proceeds of such Alternate Transaction and after the closing of an Alternate Transaction as set forth in clause (i) and clause (ii) of the immediately preceding sentence. The Break-Up Fee shall, subject to Bankruptcy Court approval, be treated as a superpriority administrative expense in the Chapter 11 Case under Section 503(b)(1)(A) and Section 507(a)(2) of the Bankruptcy Code. The Sellers acknowledge and agree that: (A) the approval of the Break-Up Fee in the circumstances provided in this Section 8.3(b) is an integral part of the transactions contemplated by this Agreement; (B) in the absence of the Sellers' obligation to pay the Break-Up Fee as provided herein, Buyer would not have entered into this Agreement; (C) the entry of

58

Buyer into this Agreement is necessary for preservation of the estates of the Sellers and is beneficial to the Sellers because, in the Sellers' business judgment, it will enhance the Sellers' ability to maximize the value of their assets for the benefit of their creditors and other stakeholders; (D) time is of the essence with respect to the payment of the Break-Up Fee and (E) the Break-Up Fee is reasonable in relation to Buyer's costs and efforts and to the magnitude of the transactions contemplated hereby and Buyer's lost opportunities resulting from the time spent pursuing the transactions contemplated hereby. For the avoidance of doubt, the Break-Up Fee, if payable pursuant to this Section 8.3(b), shall be in addition to the payment of the Expense Reimbursement Amount, to the extent payable to Buyer pursuant to Section 8.3(c).

(c)     In consideration of Buyer and its Affiliates having expended considerable time and expense in connection with this Agreement and the negotiation thereof, and the identification and quantification of assets to be included in the Purchased Assets, upon any termination of this Agreement, other than any termination pursuant to Section 8.1(a) or by Sellers pursuant to Sections 8.1(h) or (i) (unless, in case of a termination pursuant to Sections 8.1(h) or (i), at the time of any such termination Buyer would have been entitled to terminate this Agreement pursuant to Sections 8.1(c) through (g), Sections 8.1(j) or (k) Sellers shall pay to Buyer in full in cash the Expense Reimbursement Amount within five (5) Business Days after the termination of this Agreement. Sellers acknowledge and agree that (i) the payment of the Expense Reimbursement Amount is an integral part of the transactions contemplated by this Agreement, (ii) in the absence of the Sellers' obligation to make this payment, Buyer would not have entered into this Agreement, (iii) the delivery of the Expense Reimbursement Amount to Buyer is not a penalty, but rather shall constitute a reasonable amount that will compensate Buyer in the circumstances where Buyer is entitled to the reimbursable expenses for the efforts and resources expended and opportunities forgone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummating of the transactions contemplated thereby, and that, without these agreements, Buyer would not have entered into this Agreement, (iv) time is of the essence with respect to the payment of the Expense Reimbursement Amount and (v) the Expense Reimbursement Amount shall, subject to Bankruptcy Court approval, constitute a superpriority administrative expense of the Sellers' estates under Sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code. For the avoidance of doubt, the Expense Reimbursement Amount, if payable pursuant to this Section 8.3(c), shall be in addition to the Break-Up Fee to the extent payable to Buyer pursuant to Section 8.3(b).

(d)     In the event the Sellers consummate an Alternate Transaction and the Sellers fail to take any action necessary to cause the delivery of the Break-Up Fee and/or the Expense Reimbursement Amount under circumstances where Buyer is entitled to the Break-Up Fee and/or the Expense Reimbursement Amount and, in order to obtain such Break-Up Fee and/or Expense Reimbursement Amount, Buyer commences a suit which results in a final non-appealable judgment in favor of Buyer, the Sellers shall pay to Buyer, in addition to the Break-Up Fee and/or Expense Reimbursement Amount, an amount in cash equal to the reasonable, documented, out-

59

of-pocket costs and expenses (including reasonable attorneys' fees) incurred by Buyer in connection with such suit.

# ARTICLE IX
# MISCELLANEOUS

**Section 9.1** **Remedies**. Except as set forth in Section 8.3, the Parties recognize that if a Party breaches or refuses to perform any of their covenants set forth in this Agreement, monetary damages alone would not be adequate to compensate the non-breaching Party for their injuries. The non-breaching Party shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of, or to enjoin the violation of, the terms of such covenants. If any Litigation is brought by the non-breaching Party to enforce such covenants, the breaching Party shall waive the defense that there is an adequate remedy at Law. The Parties agree to waive any requirement for the security or posting of any bond in connection with any Litigation seeking specific performance of, or to enjoin the violation of, such covenants. The right to equitable relief, including specific performance and injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Agreement. Each of the Sellers and Buyer hereby agrees not to assert that specific performance, injunctive and other equitable remedies are unenforceable, violate public policy, invalid, contrary to Law or inequitable for any reason. The Parties agree that the only permitted objection that they may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants. The right of specific performance, injunctive and other equitable remedies is an integral part of the transactions contemplated by this Agreement and without that right, neither the Sellers nor the Buyer would have entered into this Agreement.

**Section 9.2** **Expenses**. Except as otherwise provided in this Agreement (including Section 8.3), or a Related Agreement, Sellers and Buyer shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement, the Related Agreements and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions.

**Section 9.3** **Entire Agreement**. This Agreement (including the schedules and exhibits hereto and other documents specifically referred to herein) and the Related Agreements constitute the entire agreement among the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or among the Parties, written or oral, with respect to the subject matter hereof.

**Section 9.4** **Incorporation of Schedules, Exhibits and Disclosure Schedule**. The schedules, appendices and exhibits to this Agreement, the documents and other information made available in the Disclosure Schedule are incorporated herein by reference and made a part hereof.

**Section 9.5** **Amendments and Waivers**. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as

60

expressly provided herein.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant.  No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this <u>Section 9.5</u> except as expressly provided herein.  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege  hereunder shall operate as a waiver thereof.

       **Section 9.6**    <u>**Succession and Assignment**</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  None of the Parties may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of all Parties; <u>provided</u>, <u>however</u>, that Buyer shall be permitted to assign any of its rights hereunder to one or more of its Affiliates, as designated by Buyer in writing to Sellers; <u>provided</u>, <u>however</u>, Buyer shall remain liable for all of its obligations under this Agreement after any such assignment (including, without limitation, its obligation to provide adequate assurance of future performance with respect to all Assumed Contracts); <u>provided</u>, <u>further</u>, that Sellers shall be permitted to assign any of their rights hereunder pursuant to a confirmed chapter 11 plan or pursuant to an order of the Bankruptcy Court.

       **Section 9.7**    <u>**Notices**</u>.    All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient; (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (iii) when sent by email (with written confirmation of transmission); or (iv) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient  as set forth below:

    If to any Sellers or Sellers' Rep, then to:

                    BarFly Ventures LLC
                    35 Oakes St. SW #400
                    Grand Rapids, Michigan  49503
                    Attention:  Mark A. Sellers, III
                    Email:  mark@barflyventures.com

                    with copies (which shall not constitute notice) to:

                    Pachulski Stang Ziehl & Jones LLP
                    150 California  St., 15th Floor

61

San Francisco, CA 94111
Attention: John W. Lucas
Email: jlucas@pszjlaw.com

If to Buyer, then to:

CIP Administrative, LLC
3131 McKinney Avenue
Dallas, Texas 75204
Attention: Travis Baldwin
Email: tbaldwin@congruentinv.com

with copies (which shall not constitute notice) to:

Paul Hastings LLP
71 S. Wacker Drive, 45th Floor
Chicago, IL 60606
Attention: Matt Murphy
        Amit Mehta
E-mail: mattmurphy@paulhastings.com
        amitmehta@paulhastings.com

Any Party may change the mailing address or email address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this Section 9.7.

     **Section 9.8     Governing Law; Jurisdiction**.  This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of New York, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws.  The Parties agree that any Litigation one Party commences against any other Party pursuant to this Agreement shall be brought exclusively in the Bankruptcy Court and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum; provided that if the Bankruptcy Court is unwilling or unable to hear any such Litigation, then the courts of the State of Michigan, sitting in Grand Rapids, and the federal courts of the United States of America sitting in Grand Rapids, shall have exclusive jurisdiction over such Litigation.

     **Section 9.9     Consent to Service of Process**.  Each of the Parties hereby consents to process being served by any Party, respectively, in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 9.7.

Section 9.10  **WAIVERS OF JURY TRIAL**.   EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE RELATED AGREEMENTS OR THE CONTEMPLATED TRANSACTIONS OR THEREBY.

Section 9.11  **Severability**.   The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement so long as the economic or legal substance of the Contemplated Transactions is not affected in a manner adverse to any Party.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) the Parties shall negotiate in good faith to find a suitable and equitable provision that shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

Section 9.12  **No Third Party Beneficiaries**.  Except as set forth in Section 5.8 hereof, this Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

Section 9.13  **No Survival of Representations, Warranties and Agreements**. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing.  Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for six (6) years following the Closing Date, and nothing in this Section 9.13 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Buyer and Sellers acknowledge and agree, on their own behalf and, with respect to Buyer that the agreements contained in this Section 9.13 (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for six (6) years; and (b) are an integral part of the Contemplated Transactions and that, without the agreements set forth in this Section 9.13, none of the Parties would enter into this Agreement.  For the avoidance of all doubt, nothing herein shall be deemed to require Sellers to perform any obligations under this Agreement beyond the date which is the first to occur of Sellers ceasing to be debtors in possession in the Chapter 11 Cases or the Chapter 11 Cases being closed or dismissed.

Section 9.14  **Non-Recourse**.  This Agreement may only be enforced against, and any Litigation based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement.  Except to the extent named as

63

a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or representative of any party to this Agreement will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Litigation based upon, arising out of or related to this Agreement.

**Section 9.15    Construction**.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.  The word "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation." The words "herein," "hereto" and "hereby," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement.  Unless expressly stated in connection therewith or the context otherwise requires, the phrase "relating to the Business" and other words of similar import shall be deemed to mean "relating to the operation of the Business as conducted as of the date hereof." Except as otherwise provided herein, references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Exhibits, Appendices and the Disclosure Schedule herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Appendices, Exhibits and the Disclosure Schedule of this Agreement.  Any reference herein to any Law (or any provision thereof) shall include such Law (or any provision thereof) and any rule or regulation promulgated thereunder, in each case, including any successor thereto, and as it may be amended, modified or supplemented from time to time.  Any reference herein to "dollars" or "$" means United States dollars.  Where used with respect to information, the phrases "delivered" or "made available" means that the information referred to has been physically or electronically delivered (including the Data Room) no later five (5) calendar days prior to the expiration of the Due Diligence Period.

**Section 9.16    Computation of Time**.  In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

**Section 9.17    Mutual Drafting**.  Each of the Parties has participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**Section 9.18    Disclosure Schedule**.  The Disclosure Schedule has been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement.  The disclosure of any fact or item in any numbered and lettered section of the Disclosure Schedule shall, should the existence of such fact or item be relevant to any other section of the Disclosure Schedule, be deemed to be disclosed with respect to such other section of the Disclosure Schedule only so long as the relevance of such disclosure to such other section of the Disclosure Schedule is readily apparent.  Capitalized terms used in the Disclosure Schedule and not otherwise defined therein have the meanings given to them in this Agreement.

The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Disclosure Schedule or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business or consistent with past practice, and no party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Disclosure Schedule or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Disclosure Schedule or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business.  In addition, matters reflected in the Disclosure Schedule are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedule.  Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature.  No information set forth in the Disclosure Schedule will be deemed to broaden in any way the scope of the parties' representations and warranties.  The information contained in this Agreement, in the Disclosure Schedule and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party or any third party of any matter whatsoever, including any violation of Law or breach of contract.

**Section 9.19    Headings; Table of Contents**.  The section headings and the table of contents contained in this Agreement, the Schedules and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 9.20    Counterparts; Facsimile and Email Signatures**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

**Section 9.21    Sellers' Rep**.

(a)    Sellers hereby appoint BarFly Ventures as the representative of Sellers (the "Sellers' Rep") to act in each Seller's name, place and stead, as such Seller's attorney-in-fact, to exercise all of the powers conferred upon it pursuant to this Agreement, for and on behalf of such Seller and without any act of such Seller.  BarFly Ventures as Sellers' Rep hereby accepts such appointment.    The dissolution, liquidation, insolvency or bankruptcy of any Seller shall not terminate such appointment or the authority and agency of the Sellers' Rep.  The power-of-attorney granted in this Section 9.22(a) is coupled with an interest and is irrevocable.  Buyer may conclusively rely upon, without independent verification or investigation, all decisions made by Sellers' Rep on behalf of Sellers.

(b)    From and after the date hereof, any notice given to the Sellers' Rep shall constitute notice to each and all of the Sellers at the time notice is given to the Sellers'

Rep (other than notice for service of process relating to any Litigation before a court or other tribunal of competent jurisdiction, which notice must be given to each Seller individually, as applicable). Any action taken or foregone by, or notice or instruction received from, the Sellers' Rep shall be deemed to be action or inaction by, or notice or instruction from, each and all Sellers.

(c)    BarFly Ventures shall serve as the Sellers' Rep until its resignation or it is otherwise unable to continue to serve. Upon the resignation of BarFly Ventures or if it is not able to continue to serve for any reason, Sellers by a majority vote shall select a new Sellers' Rep by written consent signed by such majority. No resignation or replacement of the Sellers' Rep shall become effective unless and until written notice of the replacement or resignation of such Sellers' Rep shall be provided to Buyer. Each time a new Sellers' Rep is appointed pursuant to this Agreement, such Person, as a condition precedent to the effectiveness of such appointment, shall accept such position in writing.

**Section 9.22    Time of Essence**. Time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement.

**Section 9.23    Risk of Loss.**    Notwithstanding anything to the contrary in this Agreement, the risk of loss or damage to the Purchased Assets (wherever located) shall unconditionally shift to the Buyer on the Closing Date.

**Section 9.24    Buyer's Removal of Purchased Assets.** At any time prior to August 31, 2020 (the "Removal Date"), Buyer shall remove, or cause to be removed from the Excluded Restaurants, at Buyer's sole cost and expense, all portions of the Purchased Assets located there. Buyer shall use commercially reasonable efforts to cause such removal to be accomplished in such manner as will minimize any damage to the Excluded Restaurants or any Excluded Assets or other assets of any other party having an interest in any of the Excluded Restaurants and shall cooperate in all reasonable respects (i) with any plans of Sellers to vacate the Excluded Restaurants and Sellers' removal of the Excluded Assets during the Removal Period and (ii) in the coordination of Sellers' and Buyer's activities at the Excluded Restaurants during the period prior to the Removal Date. Buyer shall, at Buyer's sole cost and expense, promptly (and in no event later than the timeframe allowed for completion of such repairs under the Lease pursuant to which the applicable Seller occupies the relevant Excluded Restaurant) cause any damage to the Excluded Restaurants resulting from Buyer's removal, handling, shipping, disposition or other activities in connection with the Purchased Assets to be fully and completely repaired or restored; provided, however, that Buyer's obligation shall in no event exceed the relevant Seller's obligations under the applicable Leases pursuant to which such Seller occupies and has the right of possession of the Excluded Restaurant. Buyer shall indemnify, defend and protect and hold Sellers, Sellers' bankruptcy estates, and Sellers' Affiliates harmless of, from and against any and all direct claims, demands, losses, damages, liabilities, obligations, actions, causes of action and costs and expenses (including, without limitation, all court costs and all reasonable attorneys' fees, costs and charges) as Sellers or such other indemnitees may suffer or incur as a result of Buyer's or Buyer's Representatives', employees', agents', contractors', shippers' removal or handling of the Purchased Assets at or from the Excluded Restaurants. It is

expressly understood that Buyer shall bear any and all costs and expenses of packing, shipping and handling the Purchased Assets following their removal from the Excluded Restaurants.

**[SIGNATURE PAGES TO FOLLOW]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the date first set forth above.

**SELLERS' REP:**

BARFLY VENTURES, LLC

By: _____

Name: _Ned Kidvall_____

Title: _Interim CEO_____

**SELLERS:**

**BARFLY VENTURES, LLC**

By: _____
Name: _Ned Lidvall_____
Title: _Interim CEO_____

**9 VOLT, LLC**

By: _____
Name: _Ned Lidvall_____
Title: _Interim CEO_____

**50 AMP FUSE, LLC**

By: _____
Name: _Ned Lidvall_____
Title: _Interim CEO_____

**EL BREWPUB, LLC**

By: _____
Name: _Ned Lidvall_____
Title: _Interim CEO_____

**GRBC HOLDINGS, LLC**

By: _____
Name: _Ned Lidvall_____
Title: _Interim CEO_____

HOPCAT-ANN ARBOR, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-CHICAGO, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-CONCESSIONS, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-DETROIT LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-GR BELTLINE, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-HOLLAND, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-INDIANAPOLIS, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-KALAMAZOO, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-KANSAS CITY, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-LEXINGTON, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-LINCOLN, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-LOUSVILLE, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-MADISON, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-MINNEAPOLIS, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-PORT- ST. LUCIE, LLC

By: _____
Name: _Ned Lidvall_____
Title: _Interim CEO_____


HOPCAT-ROYAL OAK, LLC

By: _____
Name: _Ned Lidvall_____
Title: _Interim CEO_____


HOPCAT-ST. LOUIS, LLC

By: _____
Name: _Ned Lidvall_____
Title: _Interim CEO_____


LUCK OF THE IRISH, LLC

By: _____
Name: _Ned Lidvall_____
Title: _Interim CEO_____

**BUYER:**

PROJECT BARFLY LLC

By:

Name: Travis Baldwin
Title:   President

**EXHIBIT B**

**(Bid Procedures Order)**

## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re: | Chapter 11 |
| BARFLY VENTURES, LLC, *et al.* | Case No. 20-01947-jwb |
| Debtors. [1] | Jointly Administered |

## ORDER (A) APPROVING BIDDING PROCEDURES AND SCHEDULING SALE HEARING, (B) APPROVING THE FORM OF THE ASSET PURCHASE AGREEMENT, INCLUDING THE BID PROTECTIONS, AND (C) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for the entry of an order (this "Order"), pursuant to sections 105(a), 363, and 365 of Title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"): approving bidding procedures in connection with the sale of all or substantially all of the Debtors' assets (the "Assets"); (ii) approving the form of the asset purchase agreement, including the bid protections, (iii) scheduling an auction and a hearing to consider the sale of the Assets, (iv) approving the form and manner of notice thereof; and (v) granting related relief; and the Court having considered the Motion and all exhibits, objections, and other papers filed in connection

---

[1] The Debtors and the last four digits of their federal employment identification number are: Barfly Ventures, LLC (8379); 9 Volt, LLC (d/b/a HopCat) (1129); 50 Amp Fuse, LLC (d/b/a Stella's Lounge) (3684); GRBC Holdings, LLC (d/b/a Grand Rapids Brewing Company) (2130); E L Brewpub, LLC (d/b/a HopCat East Lansing) (5334); HopCat-Ann Arbor, LLC (5229); HopCat-Chicago, LLC (7552); HopCat-Concessions, LLC (2597); HopCat-Detroit, LLC (8519); HopCat-GR Beltline, LLC (9149); HopCat-Holland, LLC (7132); HopCat-Indianapolis, LLC (d/b/a HopCat-Broad Ripple) (7970); HopCat-Kalamazoo, LLC (8992); HopCat-Kansas City, LLC (d/b/a HopCat,-KC, LLC and Tikicat) (6242); HopCat-Lexington, LLC (6748); HopCat-Lincoln, LLC (2999); HopCat-Louisville, LLC (0252); HopCat-Madison, LLC (9108); HopCat-Minneapolis, LLC (8622); HopCat-Port St. Lucie, LLC (0616); HopCat-Royal Oak, LLC (1935); HopCat-St. Louis, LLC (6994); Luck of the Irish, LLC (d/b/a The Waldron Public House, LLC and McFadden's Restaurant Saloon) (4255).

[2] A capitalized term used but not defined herein shall have the meaning ascribed to it in the Motion.

therewith; and the Court having determined that the relief provided herein is in the best interest of the Debtors, their estates, creditors and other parties in interest; and due and adequate notice of the Motion having been given under the circumstances; and upon the record of the hearing on the Motion, and the full record of these cases; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby:

### FOUND AND DETERMINED THAT:[3]

A.    This Court has jurisdiction over the Motion and the transactions contemplated therein pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.    Notice of the Motion, the relief sought therein and the hearing on the Motion was good and sufficient under the circumstances, and no other or further notice is required except as set forth herein with respect to the Bidding Procedures and the Assumption and Assignment Procedures.  A reasonable opportunity to object or be heard regarding the relief provided herein has been afforded to parties in interest.

C.    The bidding procedures attached hereto as Exhibit 1 (the "Bidding Procedures") are fair, reasonable and appropriate and are designed to maximize the value of the proceeds of Sale Transaction with respect to the Assets.

D.    The procedures set forth herein regarding the Debtors' assumption and assignment of executory contracts and unexpired leases (collectively, the "Contracts") in connection with any Sale Transaction (the "Assumption and Assignment Procedures") are

---

[3] Pursuant to Bankruptcy Rule 7052, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when applicable.

fair, reasonable and appropriate and comply with the provisions of section 365 of the Bankruptcy Code and Rule 6006 of the Bankruptcy Rules.

E.    The Debtors have articulated good and sufficient business reasons for the Court to approve (i) the Bidding Procedures; (ii) the form and manner of notice of the Bidding Procedures, the auction of the Assets (the "Auction") and the hearing to consider approval of any proposed Sale Transaction(s) (the "Sale Hearing"), substantially in the form attached hereto as Exhibit 2 (the "Notice of Auction and Sale Hearing"); (iii) the form and manner of notice to each relevant non-debtor counterparty to a Contract (each, a "Counterparty") of (a) the Debtors' calculation of the amount necessary to cure any defaults under an applicable Contract ("Cure Amounts") and (b) certain other information regarding the potential assumption and assignment of Contracts in connection with a Sale Transaction, substantially in the form attached hereto as Exhibit 3 (the "Notice of Assumption and Assignment"); and (iv) the Assumption and Assignment Procedures.

F.    The Bidding Procedures are reasonably designed to promote participation in, and active bidding at, the Auction to ensure that the highest or otherwise best value is generated for the Assets.

G.    The Notice of Auction and Sale Hearing and the Notice of Assumption and Assignment are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Auction, the Sale Hearing, the Bidding Procedures, the Assumption and Assignment Procedures, the Debtors' proposed Cure Amounts, any proposed assumption of a Contract in connection with a Sale Transaction and all relevant and important dates and deadlines with respect to the foregoing, and no other or further notice of the

Auction, the sale of the Assets or the assumption and assignment of Contracts in connection therewith shall be required.

H.      Good and sufficient business reasons exist for the Court to authorize the Debtors to enter into that certain *Asset Purchase Agreement* dated July 9, 2020 with the Stalking Horse Bidder (the "Stalking Horse Agreement") and to grant the bid protections set forth therein and in the Motion, including the payment of a "break up" fee and an expense reimbursement (together, the "Stalking Horse Protections").

I.      The entry of this Order is in the best interests of the Debtors, their estates, creditors, and other parties in interest.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      The Motion is **GRANTED** as set forth herein.

2.      All objections to the relief granted in this Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby overruled and denied on the merits with prejudice.

A.      **The Stalking Horse Agreement**

3.      The Stalking Horse Agreement is approved and the Debtors and Stalking Horse Bidder are authorized to perform as required thereunder, subject to the Bidding Procedures.

4.      The Stalking Horse Protections contained in the Stalking Horse Agreement and as described in the Motion are approved, based on the substantial value the Stalking Horse Bid created for the Debtors' estates and the exercise of the Debtors' reasonable business judgment.

B.      **The Bidding Procedures**

5.      The Bidding Procedures attached hereto as <u>Exhibit 1</u> are hereby approved and incorporated herein by reference.  The Bidding Procedures shall govern the bids and proceedings related to the Auction and the sale of the Assets.  The Debtors are authorized to take all actions necessary or appropriate to implement the Bidding Procedures.

6.      Subject to this Order and the Bidding Procedures, the Debtors, in the exercise of their reasonable business judgment and in a manner consistent with their fiduciary duties and applicable law, shall have the right to: (a) determine which bidders qualify as "Qualified Bidders" and which bids qualify as "Qualified Bids"; (b) determine the amount of each minimum overbid; (c) determine which Qualified Bid(s) is the highest or otherwise best bid(s) for the Assets (a "<u>Successful Bid</u>") and which Qualified Bid(s) are the next highest and best bid(s) after the Successful Bid (the "<u>Back-Up Bids</u>"); (d) reject any bid that is (i) inadequate or insufficient, not in conformity with the requirements of this Order or any other order of the Court, the Bidding Procedures, the Bankruptcy Code or other applicable law or (iii) contrary to the best interests of the Debtors and their estates; (e) adjourn or cancel the Auction with respect to any or all of the Assets in accordance with the Bidding Procedures; and (f) adjourn the Sale Hearing with respect to a Sale Transaction involving any or all of the Assets in accordance with the Bidding Procedures.

7.      In accordance with the Bidding Procedures, the Debtors, in the exercise of their reasonable business judgment and in a manner consistent with their fiduciary duties and applicable law, in consultation with the Consultation Parties, shall have the right to modify the Bidding Procedures, including to: (a) extend or waive deadlines or other terms and conditions set forth herein; (b) adopt new rules and procedures for conducting the bidding and Auction process; (c) if applicable, provide reasonable accommodations to a Stalking Horse Bidder; and (d)

otherwise modify the Bidding Procedures to further promote competitive bidding for, and maximizing the value of, the Assets.

**C.      Bid Deadline and Auction**

8.      Each person other than the Stalking Horse Bidder that intends to participate in the Auction must submit in writing to the Notice Parties (as defined in the Bidding Procedures) a Qualified Bid on or before **August 21, 2020 at 4:00 p.m. (Eastern Time)** (the "Bid Deadline").

9.      If the Debtors receive more than one Qualified Bid for the Assets (inclusive of a Stalking Horse Bid), the Debtors shall conduct an Auction for the Assets.  With respect to Assets for which the Debtors receives one Qualified Bid, the Debtors, in their reasonable business judgment, may consummate the Sale Transaction with the applicable Qualified Bidder (subject to Court approval).

10.      The Auction, if required, will be conducted at the offices of Warner Norcross + Judd LLP, 1500 Warner Building, 150 Ottawa Avenue, NW, Grand Rapids, Michigan 49503 on **August 25, 2020 at 10:00 a.m. (Eastern Time)**, or such other date, time, and location (including by video conference) as designated by the Debtors after providing notice to the Notice Parties and all parties entitled to attend the Auction.  The Auction shall be recorded and transcribed.

11.      In the event the Debtors determine not to hold an Auction for some or all of the Assets, the Debtors shall promptly file with the Court and serve on the Notice Parties, a notice containing the following information (as applicable): (a) a statement that the Auction for the relevant Assets has been cancelled; (b) the identity of the Successful Bidder; (c) a copy of the Successful Bid or a summary of the material terms of such bid, including any assumption or

assignment of Contracts contemplated thereby; and (d) the date, time and location of the Sale Hearing.

12.     Only a Qualified Bidder that has submitted a Qualified Bid shall be eligible to participate in the Auction, subject to any other limitations as the Debtors may reasonably impose in accordance with the Bidding Procedures.  Qualified Bidders participating in the Auction must appear in person at the Auction or through a duly authorized representative who has the ability to bind such Qualified Bidder.  The Debtors may establish a reasonable limit on the number of representatives and/or professional advisors that may appear on behalf of or accompany each Qualified Bidder at the Auction.  Notwithstanding the foregoing, the Auction shall be conducted openly, and all creditors, their counsel, and any necessary advisors, shall be permitted to attend so long as such parties provide counsel for the Debtors two (2) business days' written notice of their intent to attend the Auction (subject to any security screening procedures set forth in the Notice of Auction and Sale Hearing).

13.     Each Qualified Bidder participating in the Auction shall confirm in writing on the record that (a) it has not engaged in any collusion with respect to the Auction or the submission of any bid for any of the Assets; and (b) the Qualified Bid that gained the Qualified Bidder admission to participate in the Auction constitutes a binding, good-faith and *bona fide* offer to purchase the Assets identified in such bid.

14.     Within two (2) business days after conclusion of the Auction, the Debtors shall file with the Court and serve on the Notice Parties a notice setting forth the results of the Auction (the "Notice of Auction Results"), which shall (a) identify each Successful Bidder and each Back-Up Bidder; (b) include a copy of each Successful Bid and each Back-Up Bid or a summary

of the material terms of such bids, including any assumption and assignment of Contracts contemplated thereby; and (c) set forth the date, time and location of the Sale Hearing and any other relevant dates or other information necessary to reasonably apprise the Notice Parties of the outcome of the Auction.

**D.    Sale Noticing and Objection Procedures**

15.    The Notice of Auction and Sale Hearing, substantially in the form attached hereto as Exhibit 2, is approved, and no other or further notice of the proposed sale of the Assets, the Auction, the Sale Hearing or the Sale Objection Deadline shall be required if the Debtors serve the Notice of Auction and Sale Hearing in the manner provided in the Bidding Procedures and this Order.

16.    By no later than three (3) calendar days after entry of this Order, the Debtors will cause the Notice of Auction and Sale Hearing and a copy of this Order to be sent by first-class mail, postage prepaid, to the following: (a) the Office of the United States Trustee for Region 9; (b) counsel to the Committee; (c) counsel to the Administrative Agent; (d) all non-Debtor parties to the Contracts and any parties who are known to claim interests therein; (e) all government agencies and entities required to receive notice under the Bankruptcy Rules; and (f) all parties that have requested or that are required to receive special notice pursuant to Bankruptcy Rule 2002 (collectively, the "Sale Notice Parties").

17.    On or before three (3) calendar days after entry of this Order, the Debtors will serve the Notice of Auction and Sale Hearing on all creditors appearing on the Debtors' creditor matrix.

18.     Within two (2) business days after the conclusion of the Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents necessary to consummate the Successful Bid.  Consummation of any Sale Transaction pursuant to a Successful Bid shall be subject to Court approval.

19.     All Good Faith Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or a Back-Up Bidder no later than seven (7) calendar days following the conclusion of the Auction.

20.     All objections to any Sale Transaction (each, a "Sale Objection"), including (a) any objection to the sale of any Assets free and clear of liens, claims, interests and encumbrances pursuant to section 363(f) of the Bankruptcy Code to a Successful Bidder and/or a Back-Up Bidder (as applicable) and (b) any objection to the entry of any Sale Order shall be (i) in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (ii) be filed with the Court; and (ii) served by no later than **August 20, 2020 at 4:00 p.m. (Eastern Time)** (the "Sale Objection Deadline") on the following: (i) counsel for the Debtors; (ii) counsel for the Administrative Agent; and (iii) counsel for the Committee (collectively, the "Objection Notice Parties").

21.     Any party who fails to file and serve a timely Sale Objection in accordance with the terms of this Order shall be forever barred from asserting, at the Sale Hearing or thereafter, any Sale Objection, including to the consummation or performance of the applicable Sale Transaction(s) and the transfer of Assets to the applicable Successful Bidder free and clear of liens, claims, interests and encumbrances pursuant to section 363(f) of the Bankruptcy Code, and shall be deemed to "consent" to such sale for purposes of section 363(f) of the Bankruptcy Code.

22.     The Sale Hearing shall be held before the Court on **August 27, 2020 at 10:00 a.m. (Eastern Time)**, or as soon thereafter as counsel and interested parties may be heard; *provided*, the Debtors may seek an adjournment of the Sale Hearing, consistent with the Bidding Procedures.

E.     **Assumption and Assignment Procedures**

23.     The Notice of Assumption and Assignment, substantially in the form attached hereto as <u>Exhibit 3</u>, is approved, and no other or further notice of the Debtors' proposed Cure Costs with respect to the Contracts listed on a Notice of Assumption and Assignment is necessary or required.

24.     By no later than three (3) business days after the Court's entry of the Bidding Procedures Order, the Debtors shall file with the Court and serve on the applicable Counterparties the Notice of Assumption and Assignment.  The Notice of Assumption and Assignment shall identify the calculation of the Cure Amounts that the Debtors believe must be paid to cure all defaults under the Assigned Contracts.  If the Debtors or Successful Bidder identify additional executory contracts or unexpired leases that might be assumed by the Debtors and assigned to the Successful Bidder or that were not set forth in the original Notice of Assumption and Assignment, the Debtors will promptly file with the Court and send a supplemental notice (a "<u>Supplemental Notice of Assumption and Assignment</u>") to the applicable counterparties to such additional executory contracts and unexpired leases.[4]

---

[4] The inclusion of any contract or unexpired lease of nonresidential real property on any Notice of Assumption and Assignment or Supplemental Notice of Assumption and Assignment shall not be an admission by the Debtors or their estates that any such contract or unexpired lease so included is an executory contract.  Nor shall the inclusion of any contract or unexpired lease on any Notice of Assumption and Assignment or Supplemental Notice of Assumption and

25.     Any objection to the Debtors' proposed Cure Amounts (each such objection, a "Cure Objection") shall be: (a) in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (b) filed with the Court; and (c) served on the Objection Notice Parties by no later fourteen (14) days after service of the Notice of Assumption and Assignment (the "Cure Objection Deadline").

26.     The Debtors, in consultation with the Consultation Parties, and the objecting Counterparty shall first confer in good faith to attempt to resolve the Cure Objection without Court intervention.  If the parties are unable to consensually resolve the Cure Objection prior to the commencement of the Sale Hearing, the Court shall make all necessary determinations relating to the applicable Cure Amounts and Cure Objection at the Sale Hearing.  All other objections to the Debtors' proposed assumption and assignment of the Debtors' right, title and interest in, to and under a Contract shall be heard at the Sale Hearing.

27.     If a timely Cure Objection cannot otherwise be resolved by the parties, the Cure Objection may be heard at the Sale Hearing or, at the Debtors' option, be adjourned to a subsequent hearing (each such Cure Objection, an "Adjourned Cure Objection").  An Adjourned Cure Objection may be resolved after the closing date of the applicable Sale Transaction.  Upon resolution of an Adjourned Cure Objection and the payment of the applicable cure amount, if any, the Contract that was the subject of such Adjourned Cure Objection shall be deemed assumed and

---

Assignment constitute an admission of liability by the Debtors or their estates or effectuate the assumption or assignment of such contract or lease, absent entry of an order of the Court approving the assumption and/or assignment of such contract or lease of nonresidential real property in conjunction or as part of the Sale Order.

assigned to the applicable Successful Bidder as of the closing date of the applicable Sale Transaction.

28.     If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely Cure Objection, the Counterparty forever shall be barred from asserting any objection with regard to the cost to cure any defaults under the applicable Contract.  The Cure Amounts set forth in the applicable Notice of Assumption and Assignment shall be controlling and will be the only amount necessary to cure outstanding defaults under the Contract and satisfy the requirements of section 365(b) of the Bankruptcy Code, and the Counterparty to the Contract shall be bound by and deemed to have consented to the Cure Amounts.

29.     In accordance with the Bidding Procedures, Qualified Bids shall be accompanied by information sufficient to demonstrate the Successful Bidder's proposed form of, and ability to provide, adequate assurance of future performance with respect to each Contract to be assumed and assigned ("Adequate Assurance Information").  The Debtors shall use commercially reasonable efforts to furnish all available Adequate Assurance Information to the applicable Counterparties as soon as reasonably practicable following their receipt of such information pursuant to the terms of the Notice of Assumption and Assignment.  Counterparties shall be required to keep confidential any nonpublic Adequate Assurance Information, and Counterparties shall be permitted to file such nonpublic Adequate Assurance Information, if necessary, under seal without further order of the Court.

30.     Any objection to the proposed assumption and assignment of a Contract, the subject of which objection is a Successful Bidder's (or any other relevant assignee's) proposed form of adequate assurance of future performance with respect to such Contract (each such

objection, an "Adequate Assurance Objection") shall (a) be in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; be filed with the Court; and (c) served on the Objection Notice Parties by no later than **August 26, 2020 at 4:00 p.m. (Eastern Time)**.

31.     The Debtors and a Counterparty that has filed an Adequate Assurance Objection shall first confer in good faith to attempt to resolve the Adequate Assurance Objection without Court intervention.  If the parties are unable to consensually resolve the Adequate Assurance Objection prior to the commencement of the Sale Hearing, the Adequate Assurance Objection and all issues of adequate assurance of future performance of the applicable Successful Bidder (or any other relevant assignee) shall be determined by the Court at the Sale Hearing.

32.     If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely Adequate Assurance Objection, the Counterparty shall be forever barred from asserting any objection to the assumption and/or assignment of a Contract with regard to adequate assurance of future performance.  The applicable Successful Bidder (or any other relevant assignee) shall be deemed to have provided adequate assurance of future performance with respect to a Contract in accordance with sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code and, if applicable, section 365(b)(3) of the Bankruptcy Code, notwithstanding anything to the contrary in the Contract or any other document.

33.     Successful Bidders (including the Stalking Horse Bidder, if any, or Back-Up Bidder ultimately named a Successful Bidder) may, pursuant to the terms of an applicable asset purchase agreement executed with the Debtors, designate (a) for assumption and assignment to the applicable Successful Bidder (or other relevant assignee) Contracts that were not originally

included among the Assets to be acquired in connection with the applicable Successful Bid or for which the Successful Bidder had not determined to acquire or exclude as of the filing of the Notice of Auction Results and (b) Contracts that previously were included among the Assets to be acquired in connection with the applicable Successful Bid or for which the Successful Bidder had not determined to acquire or exclude as of the filing of the Notice of Auction Results as "excluded assets" that will not be assigned to or otherwise acquired by the Successful Bidder, by providing written notice of such designation to the Debtors.  The Debtors shall use commercially reasonable efforts to, as soon as reasonably practicable after the Debtors receive notice of any such designation and in any event within two (2) business days thereof, file with the Court and serve on the applicable Counterparties, a Designation Notice containing sufficient information to apprise Counterparties of the designation of their respective Contracts.

34.    As soon as reasonably practicable after the closing of a Sale Transaction, and in any event within two (2) business days thereof, the Debtors shall file with the Court and serve on the applicable Counterparties, a notice containing the list of Contracts that the Debtors assumed and assigned pursuant to any asset purchase agreement with a Successful Bidder.

35.    The inclusion of a Contract or Cure Amounts with respect to any Contract on any Notice of Assumption and Assignment, shall not constitute or be deemed a determination or admission by the Debtors, any Successful Bidder or any other party that such Contract is an executory contract or an unexpired lease within the meaning of the Bankruptcy Code, and shall not be a guarantee that such Contract ultimately will be assumed or assigned.  The Debtors reserve all of their rights, claims and causes of action with respect to each Contract listed on any Notice of Assumption and Assignment.

**F.**   **Other Related Relief**

36.    All persons and entities that participate in the Auction or bidding for Asset during the sale process shall be deemed to have knowingly and voluntarily (a) consented to the core jurisdiction of the Court to enter any order related to the Bidding Procedures, the Auction, or any other relief requested in the Motion or granted in this Order; (b) waived any right to a jury trial in connection with any disputes relating to the Bidding Procedures, the Auction or any other relief requested in the Motion or granted in this Order; and (c) consented to the entry of a final order or judgment in connection with any disputes relating to the Bidding Procedures, the Auction or any other relief requested in the Motion or granted in this Order, if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the relevant parties.

37.    Notwithstanding the applicability of any of Bankruptcy Rules 6004(h), 6006(d), or any other provisions of the Bankruptcy Rules, the terms and provisions of this Order shall be immediately effective and enforceable upon its entry and any applicable stay of the effectiveness and enforceability of this Order is hereby waived.

38.    The automatic stay pursuant to section 362 of the Bankruptcy Code shall be hereby lifted with respect to the Debtors to the extent necessary, without further order of the Court, to allow the Stalking Horse Bidder to deliver any notice provided for in the Stalking Horse Agreement, including, without limitation, a notice terminating the Stalking Horse Agreement, and allow the Stalking Horse Bidder to take any and all actions permitted under the Stalking Horse Agreement in accordance with the terms and conditions thereof.

39.     The Debtors are authorized to take all steps necessary or appropriate to implement the relief granted in this Order.

40.     This Court shall retain exclusive jurisdiction over any and all matters arising from or related to the implementation or interpretation of this Order.

41.     This Court shall retain jurisdiction over any matters related to or arising from the implementation of this Order.

**END OF ORDER**

*Order prepared and submitted by:*

PACHULSKI STANG ZIEHL & JONES LLP
Jason Rosell
150 California Street, 15th Floor
San Francisco, California 94111
Telephone: (415) 263-7000

and

WARNER NORCROSS + JUDD LLP
Elisabeth M. Von Eitzen (P70183)
1500 Warner Building
150 Ottawa Avenue, NW
Telephone: (616) 752-2418
evoneitzen@wnj.com
*Proposed Counsel to the Debtors*

**<u>Exhibit 1 to Bidding Procedures Order</u>**

**Bidding Procedures**

# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

BARFLY VENTURES, LLC, *et al.*

Debtors.[1]

Chapter 11

Case No. 20-01947-jwb

Jointly Administered

## BIDDING PROCEDURES

Set forth below are the bidding procedures (the "**Bidding Procedures**") to be employed in connection with the proposed sale of certain tangible and intangible assets (the "**Purchased Assets**") of the above-captioned debtors and debtors in possession (collectively, the "**Sellers**" or the "**Debtors**") that relate to each of the restaurant locations owned or operated by the Debtors in connection with the Debtors' jointly administered chapter 11 cases pending in the United States Bankruptcy Court for the Western District of Michigan (the "**Court**"), lead case number 20-01947.

As set forth in the *Motion of Debtors for Entry of (I) an Order (A) Approving Bidding Procedures and Scheduling Sale Hearing, (B) Approving the Form of the Asset Purchase Agreement, Including the Bid Protections, and (C) Granting Related Relief; and (II) an Order (A) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (the "**Motion**"), the Sellers are seeking to sell substantially all of their assets related to their restaurants, subject to competitive bidding as set forth herein. A capitalized term used but not defined herein shall have the meaning ascribed to it in the Motion.

## I. ASSETS TO BE SOLD

The Sellers seek to consummate a sale of the Purchased Assets (the "**Sale**"). The sale of the Purchased Assets is on an "as is, where is" and "with all faults" basis and without representations, warranties, or guarantees, express, implied, or statutory, written or oral, of any kind, nature or description by the

---

[1] The Debtors and the last four digits of their federal employment identification number are: Barfly Ventures, LLC (8379); 9 Volt, LLC (d/b/a HopCat) (1129); 50 Amp Fuse, LLC (d/b/a Stella's Lounge) (3684); GRBC Holdings, LLC (d/b/a Grand Rapids Brewing Company) (2130); E L Brewpub, LLC (d/b/a HopCat East Lansing) (5334); HopCat-Ann Arbor, LLC (5229); HopCat-Chicago, LLC (7552); HopCat-Concessions, LLC (2597); HopCat-Detroit, LLC (8519); HopCat-GR Beltline, LLC (9149); HopCat-Holland, LLC (7132); HopCat-Indianapolis, LLC (d/b/a HopCat-Broad Ripple) (7970); HopCat-Kalamazoo, LLC (8992); HopCat-Kansas City, LLC (d/b/a HopCat,-KC, LLC and Tikicat) (6242); HopCat-Lexington, LLC (6748); HopCat-Lincoln, LLC (2999); HopCat-Louisville, LLC (0252); HopCat-Madison, LLC (9108); HopCat-Minneapolis, LLC (8622); HopCat-Port St. Lucie, LLC (0616); HopCat-Royal Oak, LLC (1935); HopCat-St. Louis, LLC (6994); Luck of the Irish, LLC (d/b/a The Waldron Public House, LLC and McFadden's Restaurant Saloon) (4255).

Sellers, their affiliates, or any of their respective representatives, agents, or estates, except to the extent set forth in the purchase agreement of the Successful Bidder (as defined herein) as approved by the Court. Except as otherwise provided in such approved purchase agreement, all of the Sellers' right, title, and interest in and to each Purchased Asset to be acquired shall be sold free and clear of all liens, claims, interests, and encumbrances (collectively, the "**Encumbrances**"), with such Encumbrances to attach solely to the net proceeds of the Sale.

## II.    THE STALKING HORSE AGREEMENT AND STALKING HORSE PROTECTIONS

The Sellers have entered into that certain *Asset Purchase Agreement* dated July 9, 2020 (the "**Stalking Horse Agreement**") with Project BarFly LLC (a "**Stalking Horse Bidder**"), an affiliate of the Prepetition Secured Lender, for the Purchased Assets. The Stalking Horse Agreement is subject to higher or otherwise better offers and the Sellers intend to continue to solicit offers from possible bidders. Pursuant to the terms of the Stalking Horse Agreement, the Stalking Horse Bidder has agreed, among other things, to credit bid $17,500,000 for the Purchased Assets (the "**Credit Bid**").

In recognition of the expenditure of time, energy, and resources by the Stalking Horse Bidder, if the Stalking Horse Bidder is not the Successful Bidder, the Sellers will pay the Stalking Horse Bidder (i) an aggregate Break-Up Fee not to exceed $525,000 and (ii) an amount in cash equal to the aggregate amount of the reasonable charges, costs, fees, payments, and expenses (including, without limitation, all reasonable fees, expenses and disbursements of any representatives of the Stalking Horse Bidder) paid or incurred by or on behalf of Stalking Horse Bidder relating to or in connection with its bid, to the extent not otherwise paid, which such amount shall be estimated and communicated to the Qualified Bidders on or prior to the Auction (the "**Expense Reimbursement**," and together with the Break-Up Fee, the "**Stalking Horse Protections**").[2]

## III.    THE BIDDING PROCEDURES

In order to ensure that the Sellers receive the maximum value for the Purchased Assets, a Stalking Horse Agreement shall be subject to higher or better offers as provided in these Bidding Procedures.

### A.    Provisions Governing Qualifications of Bidders

Unless otherwise ordered by the Court, in order to participate in the bidding process, prior to the Bid Deadline (defined below), each person who wishes to participate in the bidding process (a "**Potential Bidder**") must deliver the following to the Notice Parties (as defined below):

> (i)    a written disclosure of the identity of each entity that will be bidding for the Purchased Assets or otherwise participating in connection with such bid; and

> (ii)    information satisfactory to the Sellers that the Potential Bidder has the financial wherewithal to consummate the proposed Sale,

---

[2] For the avoidance of doubt, no bidder other than the Stalking Horse Bidder shall be granted a break-up fee, expense reimbursement, termination payment, or other like compensation at any time in connection with the Debtors' sale process or Bidding Procedures.

including payment of any cure amount and the provision of adequate assurance of future performance with respect to any contract that may be assigned; and

(iii)  an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers and their advisors.

A Potential Bidder that delivers the documents and information described above or that the Sellers determine, in consultation with the Consultation Parties (as defined below), is likely (based on availability of financing, experience, and other considerations) to be able to consummate the Sale, will be deemed a "**Qualified Bidder**."

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Sellers will determine, in consultation with the Consultation Parties (as defined below), and will notify the Potential Bidder if such Potential Bidder is a Qualified Bidder.

Upon a Potential Bidder being notified that such Potential Bidder is a Qualified Bidder, the Sellers will provide the Stalking Horse Agreement for the Qualified Bidder to use in connection with preparing its bid.

### B.    Due Diligence

The Sellers will provide any Potential Bidder such due diligence access or additional information as the Sellers deem appropriate, which may include differentiations between the diligence provided to strategic and financial bidders, as appropriate, and contractual obligations to limit access to certain proprietary information.  The Sellers reserve the right to withhold any diligence materials that the Sellers determine are business-sensitive or otherwise not appropriate for disclosure to a competitor of the Sellers.  The due diligence period will extend through and include the Bid Deadline.  Additional due diligence will not be provided after the Bid Deadline, unless otherwise deemed reasonably appropriate by the Sellers.  All due diligence requests must be directed to Robert Hersch, Senior Managing Director of Mastodon Ventures, Inc., via email at rhersch@mastodonventures.com.

### C.    Provisions Governing Qualified Bids

A bid will be considered a "**Qualified Bid**" only if the bid is submitted by a Qualified Bidder and the Sellers determine, in consultation with (i) the Administrative Agent and (ii) the Committee (together with the Administrative Agent, the "**Consultation Parties**"), that such bid complies with all of the following:

(i)  it states that the applicable Qualified Bidder offers to purchase, in cash or, if applicable, through a credit bid, or any combination of the two, all or a portion of the Purchased Assets upon the terms and conditions that the Sellers, in consultation with the Consultation Parties, reasonably determine are no less favorable

to the Sellers than those set forth in the Stalking Horse Agreement;

(ii)    it offers to purchase all or substantially all of the Purchased Assets or only a portion of the Purchased Assets; <u>provided</u>, <u>however</u>, a bid that offers to purchase only a portion of the Purchased Assets may only be a Qualified Bid to the extent that the value of such bid, in combination with the value of other Bids for other Purchased Assets, exceeds the amount set forth in paragraph (vii) below;

(iii)    it includes a signed writing stating that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder, provided that if such bidder is selected as the Successful Bidder or the Back-Up Bidder (each, as defined below) its offer shall remain irrevocable until the later of (i) the closing of the Sale to the Successful Bidder or the Back-Up Bidder, and (ii) the date that is twenty (20) calendar days after the Sale Hearing;

(iv)    it includes confirmation that there are no conditions precedent to the Qualified Bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the submission of the bid;

(v)    it includes a duly authorized and executed copy of an asset purchase agreement, including the purchase price for the Purchased Assets expressed in U.S. Dollars (the "**Purchase Price**"), together with all exhibits and schedules thereto (an "**Asset Purchase Agreement**"), and, copies marked to show any amendments and modifications to the Stalking Horse Agreement;

(vi)    it includes financial statements or other written evidence, including (if applicable) a firm commitment for financing, establishing the ability of the Qualified Bidder to consummate the proposed Sale and pay the Purchase Price, including payment of any cure amount with respect to any contract that may be assigned, in cash, such as will allow the Sellers to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Asset Purchase Agreement;

(vii)    the bid has a value to the Sellers, determined in the Sellers' reasonable business judgment after consultation with the Consultation Parties, that is greater than or equal to the sum of the value offered under the Stalking Horse Agreement, plus (i) the aggregate amount of the Stalking Horse Protections, plus (ii) $100,000 (the "**Minimum Initial Overbid Amount**"); <u>provided</u>, for the avoidance of doubt, this requirement may be satisfied by

the aggregation of bids for portions of the Purchased Assets under the proviso in the foregoing clause (ii);

(viii)    it identifies with particularity which Contracts the Qualified Bidder wishes to assume and provides details of the Qualified Bidder's proposal for the treatment of related cure costs and the provision of adequate assurance of future performance to the counterparties to such Contracts; provided, a landlord submitting a bid for its own real property lease(s) under which it is the landlord and no other Purchased Assets (a "**Landlord Bid**") shall not be required to detail its proposal for providing adequate assurance of future performance;

(ix)    it includes an acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the Purchased Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Purchased Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets or the completeness of any information provided in connection therewith or with the Auction, except as expressly stated in the Asset Purchase Agreement; and (iv) is not entitled to any expense reimbursement, break-up fee, or similar type of payment in connection with its bid;

(x)    it includes evidence, in form and substance reasonably satisfactory to the Sellers, in consultation with the Consultation Parties, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Asset Purchase Agreement;

(xi)    it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Sellers), certified check or such other form acceptable to the Sellers, in consultation with the Consultation Parties, payable to the order of the Sellers (or such other party as the Sellers may determine) in an amount equal to 10% of the Purchase Price (a "**Good Faith Deposit**"); provided, however, none of the Prepetition Secured Lender, Administrative Agent, or Stalking Horse Bidder shall have to provide a Good Faith Deposit to the extent of any credit bid, the Credit Bid, or the Stalking Horse Agreement, as applicable;

(xii)    it contains a detailed description of how the Qualified Bidder intends to treat current employees of the Sellers;

(xiii)    it is received prior to the Bid Deadline (as defined below).

The Stalking Horse Bidder shall be deemed a Qualified Bidder, and the Stalking Horse Agreement will be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the Sale without compliance with the above enumerated requirements.

The Sellers reserve the right to negotiate with any Qualified Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualified Bid.

No later than two (2) business days prior to the Auction, the Sellers shall notify the Stalking Horse Bidder (if any), the Committee, the Administrative Agent, and all Potential Bidders in writing as to whether or not any bids constitute Qualified Bids, and will notify each Qualified Bidder that has submitted a bid whether such Qualified Bidder's bid constitutes a Qualified Bid promptly after such determination has been made.

Each Potential Bidder shall comply with all reasonable requests for additional information by the Sellers or their advisors regarding such Potential Bidder's financial wherewithal to consummate the Sale.  Failure by the Potential Bidder to comply with such requests may be a basis for the Sellers to determine that a Potential Bidder is not a Qualified Bidder and that bid made by a Potential Bidder or a Qualified Bidder is not a Qualified Bid.

## D.    **Bid Deadline**

A Qualified Bidder that desires to make a bid will deliver written copies via email of its bid to the following parties (collectively, the "**Notice Parties**"): (i) the Debtors (Mark A. Sellers, III at mark@barflyventures.com and Ned Lidvall at nlidvall@barflyventures.com); (ii) counsel to the Debtors (John Lucas at jlucas@pszjlaw.com and Jason Rosell at jrosell@pszjlaw.com); (iii) the investment banker to the Debtors (Robert Hersch at rhersch@mastodonventures.com); (iv) counsel to the Committee (Michael Brandess at mbrandess@sfgh.com); and (v) counsel to the Administrative Agent (Nathan Gimpel at nathangimpel@paulhastings.com) so as to be received by the foregoing parties no later than **August 21, 2020 at 4:00 p.m. (Eastern Time)** (the "**Bid Deadline**").  The Bid Deadline may be extended by the Sellers in consultation with the Consultation Parties.

## E.    **Evaluation of Competing Bids**

A Qualified Bid will be valued based upon several factors including, without limitation, (1) the amount of the Purchase Price provided by such bid, (2) the risks and timing associated with consummating such bid, any proposed revisions to the Stalking Horse Agreement and/or the proposed sale order, (3) the number of employees being retained, (4) the value of assumed liabilities, (5) cash component to pay, or assumption of, all cure costs, and (6) any other factors deemed relevant by the Sellers, in consultation with the Consultation Parties.  The Prepetition Secured Lender, Administrative Agent, or the Stalking Horse Bidder, as applicable, shall have the right to credit bid up to a maximum of $20 million of the obligations owed by the Sellers under that certain *Credit Agreement* dated as of August 31, 2015.

F.    <u>No Qualified Bids</u>

If the Sellers do not receive any Qualified Bids other than the Stalking Horse Agreement, no Auction (as defined below) will be held and the Stalking Horse Bidder will be named the Successful Bidder upon the expiration of the Bid Deadline.

IV.    <u>THE AUCTION PROCESS</u>

A.    <u>The Auction</u>

If the Sellers receive more than one Qualified Bid (including a Stalking Horse Agreement), the Sellers will conduct an auction of the Purchased Assets (the "**<u>Auction</u>**"), which shall take place on **August 25, 2020 at 10:00 a.m. (Eastern Time)**, at the offices of Warner Norcross + Judd LLP, 1500 Warner Building, 150 Ottawa Avenue, NW, Grand Rapids, Michigan 49503, or such other date, time, and location (including by video conference) as shall be timely communicated to all entities entitled to attend the Auction.  The Auction, which shall be recorded and transcribed and shall run in accordance with the following procedures:

> (i)    only Qualified Bidders (including the Stalking Horse Bidder, if any) who have timely submitted Qualified Bids will be entitled to make any subsequent bids at the Auction;

> (ii)    the Stalking Horse Bidder will be entitled to make subsequent bids for all or substantially all or any combination of the Purchased Assets comprised of further credit bids, cash, additional or different consideration of any type, or any combination of the foregoing;

> (iii)    each Qualified Bidder shall be required to confirm that it has not engaged in any collusion, within the meaning of section 363(n) of the Bankruptcy Code with respect to any Bids submitted or not submitted in connection with the Sale;

> (iv)    at least one (1) business day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction <u>and</u> all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder in attendance at the Auction in person; <u>provided</u> that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until the selection of the Successful Bidder and Back-Up Bidder at the conclusion of the Auction.  At least one (1) business day prior to the Auction, the Sellers will provide copies of the Qualified Bid, or combination of Qualified Bids, which the Sellers believe, after consultation with the Consultation Parties, is the highest or otherwise best offer for all or any portion of the Purchased Assets

(the "**Starting Bid**") to the Stalking Horse Bidder and all other Qualified Bidders who have timely submitted Qualified Bids. For the avoidance of doubt, the Starting Bid may comprise multiple Qualified Bids if bids are submitted for less than all of the Purchased Assets, so long as the aggregate consideration paid in connection with such multiple Qualified Bids, taken together, represents the highest or otherwise best offer for the Purchased Assets;

(v)   all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction, and the actual identity of each Qualified Bidder will be disclosed on the record at the Auction;

(vi)   the Sellers, after consultation with the Consultation Parties, may modify, employ, and announce at the Auction additional or amended procedural rules that are reasonable under the circumstances for conducting the Auction, provided that such rules (i) are not inconsistent with the Bidding Procedures, the Bankruptcy Code, or any order of the Court entered in connection herewith; and (ii) are disclosed to each Qualified Bidder attending the Auction;

(vii)   bidding at the Auction will begin with the Starting Bid and continue in bidding increments (each, a "**Subsequent Bid**") providing a net value to the Sellers' estates of at least $100,000 above the prior bid.  After the first round of bidding and between each subsequent round of bidding, the Sellers, after consultation with the Consultation Parties, shall announce the bid (and the value of such bid) that they believe to be the highest or otherwise best bid (each, the "**Leading Bid**");

(viii)   a round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid;

(ix)   except as specifically set forth herein, for the purpose of evaluating the value of the Purchase Price provided by each Subsequent Bid (including any Subsequent Bid by a Stalking Horse Bidder), the Sellers shall consider the Stalking Horse Protections, if applicable, as well as any additional liabilities to be assumed by a Qualified Bidder, and any additional costs which may be imposed on the Sellers; and

(x)   the Sellers may accept bids for any portion of the Purchased Assets, as well as bids for substantially all of the Purchased Assets; provided, however, that a Qualified Bid that offers to purchase only a portion of the Purchased Assets may only be part

of the Successful Bid to the extent that the value of such Qualified Bid, in combination with the value of other Qualified Bids for other Purchased Assets, exceeds the value of any then-pending Qualified Bid for all or substantially all the Purchased Assets.

**B.**     **Selection of Successful Bid**

Prior to the conclusion of the Auction, the Sellers, in consultation with the Consultation Parties, will review and evaluate each Qualified Bid submitted at the Auction in accordance with the procedures set forth herein and determine which offer is the highest or otherwise best offer (one or more such bids, collectively the "**Successful Bid**" and the bidder(s) making such bid(s), collectively, the "**Successful Bidder**"), and communicate to the Auction participants the identity of the Successful Bidder and the details of the Successful Bid. The determination of the Successful Bid by the Sellers at the conclusion of the Auction shall be final, subject to approval by the Court, provided that if the Successful Bidder has not been consented to by the Administrative Agent then the rights of the Administrative Agent to object to such Sale on any grounds are expressly reserved. In determining whether a bid is a Successful Bid, in the exercise of their reasonable, good-faith business judgment, and in the exercise of their fiduciary duties, the Sellers shall, in good faith, consider, *inter alia*, the following factors:

(i)     The total expected consideration to be received by the Sellers;

(ii)     The likelihood of the bidder's ability to close a transaction and the timing thereof; and

(iii)     The expected net benefit to the Debtors' estates.

The Qualified Bidder with the next highest or otherwise best Qualified Bid, as determined by the Sellers in consultation with the Consultation Parties, will be required to serve as the back-up bidder ("**Back-Up Bidder**") and its bid open and irrevocable until the later to occur of twenty (20) days after the Sale Hearing and closing on the Successful Bid with the Successful Bidder. If the Successful Bidder fails to consummate the Sale, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Sellers will be authorized and directed to consummate the Sale with the Back-Up Bidder without further order of the Court.

Within two (2) business days after conclusion of the Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents necessary to consummate the Successful Bid. Within one (1) business day after conclusion of the Auction, the Sellers shall file a notice with the Court setting forth the results of the Auction, which shall (a) identify the Successful Bidder and the Back-Up Bidder; (b) include a copy of the Successful Bid and the Back-Up Bid or a summary of all material terms of such bids, including any assumption and assignment of Contracts contemplated thereby; and (c) set forth the date, time and location of the Sale Hearing and any other relevant dates or other information necessary to reasonably apprise the Notice Parties of the outcome of the Auction. The Sellers will sell the Purchased Assets to the Successful Bidder pursuant to the terms of the Successful Bid upon the approval of such Successful Bid by the Court at the Sale Hearing.

C.      **Return of Deposits**

The Good Faith Deposit of the Successful Bidder shall, upon consummation of the Successful Bid, be credited to the purchase price paid.  If the Successful Bidder fails to consummate the Successful Bid, then the Good Faith Deposit shall be forfeited to, and retained by, the Sellers in accordance with the applicable Asset Purchase Agreement.  All Good Faith Deposits shall be returned to each bidder not selected by the Seller as the Successful Bidder or the Back-Up Bidder no later than seven (7) calendar days following the conclusion of the Auction.  The Good Faith Deposit of the Back-Up Bidder shall be returned to the Back-Up Bidder no later than seven (7) calendar days following the closing of the Sale to the Successful Bidder.

V.      **SALE HEARING**

The Sellers will seek entry of an order from the Court at a hearing (the "**Sale Hearing**") to begin on or about **August 27, 2020 at 10:00 a.m. (Eastern Time)**, subject to the availability of the Court, to approve and authorize the Sale to the Successful Bidder on the terms and conditions memorialized in the Successful Bid and in accordance with the Bidding Procedures.

**<u>Exhibit 2 to Bidding Procedures Order</u>**

**Notice of Auction and Sale Hearing**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| In re: | Chapter 11 |
| BARFLY VENTURES, LLC, *et al.* | Case No. 20-01947-jwb |
| Debtors. [1] | Jointly Administered |

<u>**NOTICE OF AUCTION AND SALE HEARING**</u>

**PLEASE TAKE NOTICE THAT:**

      1.     On July 9, 2020, the above-captioned debtors and debtors-in-possession (the "<u>Debtors</u>") filed a motion (the "<u>Motion</u>")[2] [Docket No. ] for *Entry of (I) an Order (A) Approving Bidding Procedures and Scheduling Sale Hearing, (B) Approving the Form of the Asset Purchase Agreement, Including the Bid Protections, and (C) Granting Related Relief; and (II) an Order (A) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief.*

      2.     The Debtors are seeking to sell the Assets to the Successful Bidder(s) or Back-Up Bidder(s).  Approval of the sale of the Assets to either the Successful Bidder(s) or Back-Up Bidder(s) may result in, among other things, the assumption, assignment and/or transfer by the Debtors of certain executory contracts and unexpired leases.  If you are a party to an executory contract or lease with one or more of the Debtors, you will receive a separate notice that contains relevant dates and other information that may impact you as a party to any such executory contract or lease.

      3.     On [   ], 2020, the United States Bankruptcy Court for the Western District of Michigan entered the Bidding Procedures Order.  Pursuant to the Bidding Procedures Order, if the Debtors receive more than one Qualified Bid (as defined in the Bidding Procedures), an auction for any or all

---

[1] The Debtors and the last four digits of their federal employment identification number are: Barfly Ventures, LLC (8379); 9 Volt, LLC (d/b/a HopCat) (1129); 50 Amp Fuse, LLC (d/b/a Stella's Lounge) (3684); GRBC Holdings, LLC (d/b/a Grand Rapids Brewing Company) (2130); E L Brewpub, LLC (d/b/a HopCat East Lansing) (5334); HopCat-Ann Arbor, LLC (5229); HopCat-Chicago, LLC (7552); HopCat-Concessions, LLC (2597); HopCat-Detroit, LLC (8519); HopCat-GR Beltline, LLC (9149); HopCat-Holland, LLC (7132); HopCat-Indianapolis, LLC (d/b/a HopCat-Broad Ripple) (7970); HopCat-Kalamazoo, LLC (8992); HopCat-Kansas City, LLC (d/b/a HopCat,-KC, LLC and Tikicat) (6242); HopCat-Lexington, LLC (6748); HopCat-Lincoln, LLC (2999); HopCat-Louisville, LLC (0252); HopCat-Madison, LLC (9108); HopCat-Minneapolis, LLC (8622); HopCat-Port St. Lucie, LLC (0616); HopCat-Royal Oak, LLC (1935); HopCat-St. Louis, LLC (6994); Luck of the Irish, LLC (d/b/a The Waldron Public House, LLC and McFadden's Restaurant Saloon) (4255).

[2] A capitalized term used but not defined herein shall have the meaning ascribed to it in the Motion.

of the Assets shall take place on **August 25, 2020, at 10:00 a.m. (Eastern Time)**, at the offices of Warner Norcross + Judd LLP, 1500 Warner Building, 150 Ottawa Avenue, NW, Grand Rapids, Michigan 49503, or at such other place, time, and location (including by video conference) as the Debtors shall notify all Qualified Bidders and other invitees and creditors.  Only parties that have submitted a Qualified Bid in accordance with the Bidding Procedures, attached to the Bidding Procedures Order as <u>Exhibit 1</u>, by no later than **August 21, 2020 at 4:00 p.m. (Eastern Time)** (the "<u>Bid Deadline</u>"), may participate at the Auction.  If, however, one or no Qualified Bids are received by the Bid Deadline, then the Auction will not be held.  Any party that wishes to take part in this process and submit a bid for the Assets must submit its bid prior to the Bid Deadline and in accordance with the Bidding Procedures.  Notwithstanding the foregoing, the Auction shall be conducted openly, and all creditors, their counsel and any necessary advisors shall be permitted to attend the Auction so long as they provide counsel for the Debtors no less than two (2) business days' written notice of their intent to attend the Auction so that the Debtors can make appropriate arrangements.

4.     The Sale Hearing to consider approval of the sale of the Assets to the Successful Bidder(s) or Back-Up Bidder(s) free and clear of all liens, claims and encumbrances (the "<u>Sale</u>") will be held before the Honorable Judge Boyd in the United States Bankruptcy Court for the Western District of Michigan on **August 27, 2020, at 10:00 a.m. (Eastern Time)** or at such other time thereafter as counsel may be heard.  The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

5.     Objections, if any, to the Sale or other relief requested in the Motion (other than with respect to (i) cure amounts (which are subject to a separate notice)); or (ii) the conduct of the Auction or adequate assurance of future performance (which are subject to paragraph 6 below)) must: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the clerk of the Bankruptcy Court for the Western District of Michigan on or before **August 20, 2020 at 4:00 p.m. Eastern Time)** (the "<u>Sale Objection Deadline</u>") and be served upon: (i) counsel to the Debtors (John Lucas at jlucas@pszjlaw.com and Jason Rosell at jrosell@pszjlaw.com); (ii) counsel to the Committee (Michael Brandess at mbrandess@sfgh.com); and (iii) counsel to the Administrative Agent (Nathan Gimpel at nathangimpel@paulhastings.com).

6.     Objections, if any, to the conduct of the Auction, or adequate assurance of future performance by the Successful Bidder may be raised at the Sale Hearing.

7.     Unless an objection is timely served and filed in accordance with this notice, it may not be considered by the bankruptcy court and the bankruptcy court may grant the relief requested in the motion without further hearing and notice.

8.     This Notice and the Sale Hearing is subject to the complete terms and conditions of the Motion, the Bidding Procedures Order, and the Bidding Procedures, which shall control in the event of any conflict and the Debtors encourage parties-in-interest to review such documents in their entirety.  Parties interested in receiving more information regarding the sale of the Assets or in obtaining a copy of any related document, subject to any necessary confidentiality agreement, may make a written request to counsel for the Debtors by emailing John Lucas at jlucas@pszjlaw.com and Jason Rosell at jrosell@pszjlaw.com.

Dated: _____                    Respectfully submitted,

                                      WARNER NORCROSS + JUDD LLP

                                      /s/ DRAFT_____
                                      Rozanne M. Giunta (P29969)
                                      Stephen B. Grow (P39622)
                                      Elisabeth M. Von Eitzen (P70183)
                                      1500 Warner Building
                                      150 Ottawa Avenue, NW
                                      Grand Rapids, Michigan 49503
                                      Telephone: (616) 752-2000
                                      Counsel for Debtor

                                      PACHULSKI STANG ZIEHL & JONES LLP

                                      John W. Lucas
                                      Jason Rosell
                                      Steven W. Golden
                                      150 California Street, 15th Floor
                                      San Francisco, California 94111
                                      Telephone: (415) 263-7000

                                      *Proposed Counsel to the Debtors*

**<u>Exhibit 3 to Bidding Procedures Order</u>**

**Notice of Assumption and Assignment**

**UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| In re: | Chapter 11 |
| BARFLY VENTURES, LLC, *et al.* | Case No. 20-01947-jwb |
| Debtors. [1] | Jointly Administered |

**NOTICE OF ASSUMPTION AND ASSIGNMENT
OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.    On July [], 2020, the United States Bankruptcy Court for the Western District of Michigan (the "Bankruptcy Court") entered an order (the "Bidding Procedures Order"),[2] pursuant to sections 105(a), 363, and 365 of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure, in the chapter 11 cases of the above-captioned debtors and debtors in possession (the "Debtors") approving, among other things, the fixing of cure amounts (the "Cure Amounts") related to the Debtors' potential assumption and assignment of certain executory contracts and unexpired leases (the "Executory Contracts and Unexpired Leases") listed on Exhibit A annexed hereto in connection with the sale (the "Sale") of substantially all of the Debtor's assets (the "Assets"). The Debtors may assume and assign the Executory Contracts and Unexpired Leases to the Successful Bidder or Back-Up Bidder for the Assets under the bidding procedures (the "Bidding Procedures") approved by the Bankruptcy Court and attached to the Bidding Procedures Order as Exhibit 1.   A hearing to consider approval of the Sale of the Assets to a Successful Bidder or Back-Up Bidder free and clear of all liens, claims and encumbrances will be held before the Honorable Judge Boyd in the United States Bankruptcy Court for the Western District of

---

[1] The Debtors and the last four digits of their federal employment identification number are: Barfly Ventures, LLC (8379); 9 Volt, LLC (d/b/a HopCat) (1129); 50 Amp Fuse, LLC (d/b/a Stella's Lounge) (3684); GRBC Holdings, LLC (d/b/a Grand Rapids Brewing Company) (2130); E L Brewpub, LLC (d/b/a HopCat East Lansing) (5334); HopCat-Ann Arbor, LLC (5229); HopCat-Chicago, LLC (7552); HopCat-Concessions, LLC (2597); HopCat-Detroit, LLC (8519); HopCat-GR Beltline, LLC (9149); HopCat-Holland, LLC (7132); HopCat-Indianapolis, LLC (d/b/a HopCat-Broad Ripple) (7970); HopCat-Kalamazoo, LLC (8992); HopCat-Kansas City, LLC (d/b/a HopCat,-KC, LLC and Tikicat) (6242); HopCat-Lexington, LLC (6748); HopCat-Lincoln, LLC (2999); HopCat-Louisville, LLC (0252); HopCat-Madison, LLC (9108); HopCat-Minneapolis, LLC (8622); HopCat-Port St. Lucie, LLC (0616); HopCat-Royal Oak, LLC (1935); HopCat-St. Louis, LLC (6994); Luck of the Irish, LLC (d/b/a The Waldron Public House, LLC and McFadden's Restaurant Saloon) (4255).

[2] A capitalized term used but not defined herein shall have the meaning ascribed to it in the Bidding Procedures Order.

Michigan on **August 27, 2020, at 10:00 a.m. (Eastern Time)**, or at such other time thereafter as counsel may be heard (the "Sale Hearing").

2.      The Debtors have identified the Executory Contract(s) or Unexpired Lease(s) to which you are a party listed on Exhibit A.  In the event that a determination is made by the Debtors and the Successful Bidder(s) or Back-Up Bidder(s) to seek assumption and assignment of such Executory Contract(s) or Unexpired Lease(s) in connection with the Sale, the Debtors believe that any and all defaults (other than the filing of these Chapter 11 Cases) and actual pecuniary losses under the Executory Contracts and Unexpired Leases can be cured by the payment of the Cure Amounts listed on Exhibit A annexed hereto.  If no amount is listed on the Notice of Assumption and Assignment with respect to an Executory Contract or Unexpired Lease, the Debtors believe that there is no Cure Amount applicable to such Executory Contract or Unexpired Lease.

3.      Any objections to the amount asserted as the Cure Amount (each, a "Cure Objection"), must be in writing and shall set forth the cure amount being claimed by the objecting party and the dates and corresponding amounts of the alleged defaults by the Debtors. If a Cure Objection is timely filed, the Debtors, with the approval of the Successful Bidder, may resolve any Cure Objection by mutual agreement with the objecting counterparty to any Executory Contract or Unexpired Lease without further order of the Court.  In the event that the Debtors, the Successful Bidder and any objecting party are unable to consensually resolve any Cure Objection prior to the Sale Hearing, the Debtors shall request that the Court resolve such Cure Objection at the Sale Hearing.

4.      To be considered a timely Cure Objection, the Cure Objection must be filed with the Bankruptcy Court and served upon the following parties **by no later than August 6, 2020 at 4:00 p.m. (Eastern Time)**: (i) counsel to the Debtors (John Lucas at jlucas@pszjlaw.com and Jason Rosell at jrosell@pszjlaw.com); (ii) counsel to the Committee (Michael Brandess at mbrandess@sfgh.com); and (iii) counsel to the Administrative Agent (Nathan Gimpel at nathangimpel@paulhastings.com) (collectively, the "**Objection Notice Parties**").

5.      Any objections to the assumption and assignment of an Executory Contract or Unexpired Lease (other than a Cure Objection), including the proposed form of adequate assurance of future performance with respect to an Executory Contract or Unexpired Lease (each, an "Adequate Assurance Objection"), must be in writing and shall state with specificity the legal and factual basis for objection to assumption and assignment of an Executory Contract or Unexpired Lease and include all supporting documentation.  If an Adequate Assurance Objection is timely filed, the Debtors, with the approval of the Successful Bidder, may resolve any Adequate Assurance Objection without further order of the Court.  In the event that the Debtors, the Successful Bidder, and any objecting party are unable to consensually resolve any Adequate Assurance Objection prior to the Sale Hearing, the Debtors shall request that the Court resolve such Adequate Assurance Objection at the Sale Hearing.

6.      To be considered a timely Adequate Assurance Objection, the Adequate Assurance Objection must be filed with the Bankruptcy Court and served upon the Objection Notice Parties **by no later than August 26, 2020 at 4:00 p.m. (Eastern Time)**.

7.      Unless a Cure Objection or Adequate Assurance Objection is timely filed and served, the assumption and assignment of the applicable Executory Contracts and Unexpired Leases will proceed without further notice at the Sale Hearing.

8.      Parties that fail to file and serve timely a Cure Objection and/or Adequate Assurance Objection, as applicable, shall (i) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Executory Contract or Unexpired Lease and the Debtors shall be entitled to rely solely upon the Cure Amount listed on Exhibit A; and (ii) subject to the procedures for objecting to adequate assurance of future performance as set forth herein and in the Bidding Procedures Order, be deemed to have consented to the assumption and assignment of such Executory Contract or Unexpired Lease to the Successful Bidder or Back-Up Bidder and shall be forever barred and estopped from asserting or claiming against the Debtors, the Successful Bidder or Back-Up Bidder, in relation to this sale, that any additional amounts are due or defaults exist, or additional conditions to assumption, assignment and/or transfer must be satisfied, under such Executory Contract or Unexpired Lease.

9.      If no Cure Amounts are due under an Executory Contract or Unexpired Lease, or if the non-Debtor party agrees to the Cure Amounts listed on Exhibit A hereto, and the non-Debtor party to the Executory Contract or Unexpired Lease does not otherwise object to the Debtors' assumption and assignment of the Executory Contract or Unexpired Lease, no further action needs to be taken on the part of that non-Debtor party.

10.     The Successful Bidder(s) or the Back-Up Bidder(s), as the case may be, may determine to exclude any Executory Contract or Unexpired Lease from the list of Executory Contracts and Unexpired Leases proposed to be assumed and assigned under the applicable asset purchase agreement through the closing of the Sale; *provided*, *however*, the non-Debtor party or parties to any such excluded contract or lease will be notified of such exclusion by written notice by electronic mail within two (2) business days of such determination and the Debtors will file a notice of such determination with the Court.

11.     The Debtors' decision to sell and assign to the Successful Bidder(s) or Back-Up Bidder(s) the Executory Contracts and Unexpired Leases is subject to Bankruptcy Court approval and the closing of the Sale.  Accordingly, absent such closing, the Executory Contracts and Unexpired Leases shall not be deemed to be sold and assigned, and shall in all respects be subject to further administration under the Bankruptcy Code.  The inclusion of any document on the list of Executory Contracts and Unexpired Leases shall not constitute or be deemed to be a determination or admission that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code (all rights with respect thereto being expressly reserved).  Nor shall the inclusion of any document constitute an admission of liability by the Debtors or their estates.

Dated: _____                        Respectfully submitted,

                                          WARNER NORCROSS + JUDD LLP

                                          /s/ DRAFT
_____
                                          Rozanne M. Giunta (P29969)
                                          Stephen B. Grow (P39622)
                                          Elisabeth M. Von Eitzen (P70183)
                                          1500 Warner Building
                                          150 Ottawa Avenue, NW
                                          Grand Rapids, Michigan 49503
                                          Telephone: (616) 752-2000
                                          Counsel for Debtor

                                          PACHULSKI STANG ZIEHL & JONES LLP

                                          John W. Lucas
                                          Jason Rosell
                                          Steven W. Golden
                                          150 California Street, 15th Floor
                                          San Francisco, California 94111
                                          Telephone: (415) 263-7000

                                          *Proposed Counsel to the Debtors*