IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re<br><br>BARFLY VENTURES, LLC., *et al.*[1],<br><br>Debtors. | Chapter 11<br><br>Case No. 20-01947-jwb<br><br>(Jointly Administered) |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
OBJECTION TO SALE MOTION**

The Official Committee of Unsecured Creditors of Barfly Ventures, LLC, *et al.* (the "Committee"), through counsel, hereby submits its objection (the "Objection") with respect to the *Motion of Debtors for Entry of an Order (A) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Doc. No. 127] (the "Sale Motion"). In support of the Objection, the Committee respectfully states:

---

[1] The Debtors are: Barfly Ventures, LLC, (8379), Barfly Management, LLC (6274), 9 Volt, LLC (d/b/a HopCat)(1129), 50 Amp Fuse, LLC (d/b/a Stella's Lounge)(3684), GRBC Holdings, LLC, (d/b/a Grand Rapids Brewing Company)(2130), E L Brewpub, LLC (d/b/a HopCat East Lansing)(5334), HopCat-Ann Arbor, LLC (5229), HopCat-Chicago LLC (7552), HopCat-Concessions, LLC (2597), HopCat-Detroit, LLC (8519), HopCat- GR Beltline, LLC (9149), HopCat-Holland, LLC (7132), HopCat Indianapolis, LLC (d/b/a HopCat-Broad Ripple)(7970), HopCat-Kalamazoo, LLC (8992), HopCat-Kansas City, LLC (d/b/a HopCat-KC, LLC and TikiCat)(6242), HopCat Lexington, LLC (6748), HopCat-Lincoln, LLC (2999), HopCat-Louisville, LLC (0252), HopCat-Madison, LLC (9108), HopCat- Minneapolis, LLC (8622), HopCat-Port St. Lucie, LLC (0616), HopCat- Royal Oak, LLC (1935), HopCat-St. Louis, LLC (6994), Luck of the Irish, LLC (d/b/a The Waldron Public House LLC and McFadden's Restaurant Saloon) (4255).

**PRELIMINARY STATEMENT**

1. The stalking horse asset purchase agreement (the "Stalking Horse APA") is a fundamentally bad deal that cannot be approved under applicable bankruptcy law. The proposed stalking horse bidder, Project BarFly LLC (the "Stalking Horse Bidder"), is a shell company recently created by the Debtors' prepetition lenders. It has no known assets and its meager adequate assurance package provides no comfort that the prepetition lenders are serious owners willing to make the capital outlay necessary to outlast the pandemic. The Stalking Horse Bidder promises a winddown budget that will satisfy, in full, administrative expenses, cure costs and winddown costs but, to date, no budget has been circulated. Further, the Stalking Horse APA provides for the sale of certain unencumbered assets – principally including causes of action arising under common law and chapter 5 of the Bankruptcy Code – by way of a credit bid, notwithstanding the axiomatic principle that a secured creditor cannot credit bid for assets that it does not have a lien on. Finally, if approved in its current form, the Stalking Horse APA leaves absolutely no recovery for unsecured creditors.

2. In addition, the Stalking Horse APA provides for the retention of current executive, Mark Sellers ("Sellers"), who has admitted to misappropriating millions in corporate funds to, among other things, pay his alimony. By acquiring causes of action that the estates may hold against Sellers, and his insiders and affiliates, the Stalking Horse Bidder is effectively granting Sellers an impermissible third-party release. Sellers' business judgment is unquestionably conflicted, and given past indiscretions, vendors and landlords cannot seriously depend on him to ethically operate this business going forward. If nothing else, his business judgment must be carefully scrutinized in connection with this proposed sale.

3. The Committee prefers a going-concern sale of substantially all of the Debtors' assets, particularly given the current state of the restaurant industry. But it cannot support *this* sale, which so clearly flaunts the Bankruptcy Code and its protection of vulnerable creditors. At a minimum, any sale of the Debtors' assets must:

(i) ensure that the Prepetition Lenders' post-acquisition business plan is feasible under the circumstances;

(ii) exclude unencumbered causes of action, including common law claims (such as insider causes of action) and chapter 5 causes of action, which should be preserved for the benefit of unsecured creditors;

(iii) provide for payment in full of all administrative expenses, cure costs, and winddown costs at closing; and

(iv) provide a recovery for unsecured creditors.

Absent satisfaction of these requirements, the Committee objects to approval of the Sale Motion.

## BACKGROUND

4. On June 3, 2020 (the "Petition Date"), the above-captioned debtors (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.[2]

5. Upon information and belief, substantially all of the cash in the Debtors' possession on the Petition Date consisted of the proceeds of an unencumbered, unsecured Paycheck Protection Program loan (the "PPP Loan").

6. Subsequent to the Petition Date, the Debtors have operated their businesses in the ordinary course of business and, upon information and belief, have generated additional cash, which itself is unencumbered.

7. On June 23, 2020, the Office of the United States Trustee formed the Official Committee of Unsecured Creditors [Doc. No. 85] (the "Committee").

---

[2] The Bankruptcy Code is set forth in 11 U.S.C. §§ 101 *et seq.* Specific sections of the Bankruptcy Code are identified herein as "section __." Similarly, specific rules from the Federal Rules of Bankruptcy Procedure are identified herein as "Bankruptcy Rule __."

3

8. On July 9, 2020, the Debtors filed the Sale Motion requesting approval of, among other things: (i) bidding procedures and a sale timeline to govern the sale of substantially all of the Debtors' non-cash assets to the Stalking Horse Bidder, subject to higher or otherwise better bids at an auction, (ii) the Stalking Horse APA, and (iii) certain stalking horse bid protections in favor of the Stalking Horse Bidder. The Stalking Horse Bidder is a shell company created by the Debtors' pre-petition lenders, Congruent Credit Opportunities Fund III, LP, Main Street Capital Corporation, and HMC Income Fund, Inc. (collectively, the "Prepetition Lenders"). Upon information and belief, the Stalking Horse Bidder was created in July 2020 for the sole purpose of acquiring the Debtors' assets and does not, independently, have any assets.

9. On July 17, 2020, the Committee filed the *Official Committee of Unsecured Creditors' Statement and Reservation of Rights Regarding Debtors' Bid Procedures Motion* [Doc. No. 167] (the "Reservation") regarding the Sale Motion. In the Reservation, the Committee noted that it shared in the Debtors' assessment that an expedited sale was in the best interests of the Debtors' estates and advocated for approval of the Debtors' proposed bid procedures. At that time, it was contemplated that several million dollars of unencumbered PPP Loan proceeds would remain at an August 31st sale closing and that such funds would have been available for distribution to unsecured creditors. Exigency was in the estates' (and unsecured creditors') best interest.

10. Unfortunately, the Debtors have repeatedly delayed the closing, as the Prepetition Lenders have focused their efforts not on advancing the Stalking Horse APA but, rather, on finding a buyer for their debt position. The Prepetition Lenders now desire to close on the transaction contemplated in the Stalking Horse APA in mid- to late October. As a result of this delay, the Debtors have now largely depleted the unencumbered PPP Loan proceeds, which should have been

available for a distribution to unsecured creditors. Should a sale close in mid-October, few, if any of the PPP Loan proceeds will remain.

11. In its Reservation, the Committee highlighted several material issues with the Stalking Horse APA, stating that should the Prepetition Lenders, or any bidder using the Stalking Horse APA, prevail at auction, the Committee expected to object to the proposed sale for the following reasons:

(a) The Stalking Horse APA fails to provide that all unencumbered cash must remain in the estate. The Prepetition Lenders cannot acquire such cash via a credit bid, as such cash is unencumbered.

(b) The Prepetition Lenders, and not the estate and the unsecured creditors, should be responsible for paying all expenses associated with the sale process, which is being conducted primarily for their benefit. Such expenses include cure costs, transfer taxes and other administrative expenses.

(c) The Stalking Horse APA needs to be revised to ensure that: (i) an administratively insolvent estate is not left behind after the closing of any sale transaction, and (ii) assets are left behind to provide for a meaningful distribution to unsecured creditors.

(d) A "Wind-Down Budget" is referenced, yet no such budget is included with the agreement.

(e) A sale of "Purchased Actions" is contemplated, inclusive of unencumbered litigation claims that could inure to the benefit of unsecured creditors, such as those against insiders and those arising under chapter 5 of the Bankruptcy Code. To date, no investigation of such causes of action has been conducted by the Committee. Such causes of action should not be sold but, rather, should stay in the estate for the benefit of unsecured creditors.

(f) Even if the Prepetition Lenders could acquire the Purchased Actions, they cannot credit bid for such assets because they do not have a lien on such assets.

(g) The Stalking Horse APA improperly provides for broad third-party releases for both the Prepetition Lenders and the Debtors' insiders before the Committee has had an opportunity to conduct a thorough review of the viability of any colorable claims.

(h) The tax allocation provisions of the Stalking Horse APA suggest that such an accounting might not conclude for 210 days after the closing date—at which time

> it is unlikely that the bankruptcy cases will remain open, and therefore it is unclear who, on the seller's side, will be responsible for such allocation.

Despite efforts by the Committee to negotiate with the Prepetition Lenders, substantially all of these issues remain unresolved.

12. On July 22, 2020, the Court entered an order approving the bid procedures and scheduling a sale hearing for August 27, 2020 [Doc. No. 184]. On August 26, 2020, the Court entered an order upon the request of the Debtors adjourning the sale hearing and cure hearings until September 15, 2020 [Doc. No. 285]. On September 14, the Court entered an order upon the request of the Debtors adjourning the sale hearing and cure hearings until September 25, 2020 [Doc. No. 311]. At a status conference regarding the sale on September 14, 2020, the Debtors advised that the targeted date for closing on a sale transaction with the Stalking Horse Bidder is now October 18, 2020.

## **OBJECTION**

13. The Committee has supported a going-concern sale since the outset of these cases. But the Stalking Horse APA cannot be approved under applicable bankruptcy law.

14. Although a sale of substantially all of a debtor's assets outside the structure of a chapter 11 plan and disclosure statement is certainly not prohibited by the Bankruptcy Code, courts have repeatedly cautioned that, in the absence of the protections and procedures offered by a plan and disclosure statement, the court must closely scrutinize a proposed sale. *See In re President Casinos, Inc.*, 314 B.R. 784, 785 (Bankr. E.D. Mo. 2004); *see also Mission Iowa Wind Co. v. Enron Corp.*, 291 B.R. 39, 43 (S.D.N.Y. 2003).

15. Although courts are deferential to a debtors' business judgment concerning the use, sale or lease of assets under section 363(b):

> 'there must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b).' . . . [E]ven this ostensibly deferential standard requires findings based on a fair preponderance of evidence actually presented. The facially lenient requirement of an 'articulated business justification,' for a transaction outside the ordinary course of business is not a license to rely on pretextual justifications that fail to withstand scrutiny. This is particularly true when the proposed transaction and the motion filed seeking its approval are the subject of a substantive objection.

*In re FirstEnergy Sols. Corp.*, 591 B.R. 688, 694–95 (Bankr. N.D. Ohio 2018) (quoting *In re Lionel Corp.,* 722 F.2d 1063, 1071 (2d Cir. 1983)); *see also See In re Gulf Coast Oil Corp*., 404 B.R. 407, 423 (Bankr. S.D. Tex. 2009).[3]

16.    In the present case, the business judgment standard has not been met as the proposed sale transaction constitutes nothing more than a foreclosure conducted pursuant to a flawed process driven by the Prepetition Lenders.  As the court noted in *Gulf Coast Oil*:

> [T]he essence of the proposed transaction is a foreclosure supplemented materially by a release, by assignment of executory contracts (but only the contracts chosen by the secured lender), by a federal court order eliminating any successor liability, and by preservation of the going concern. Congress provided a process by which these benefits could be obtained. That scheme requires bargaining, voting, and a determination by the Court that Bankruptcy Code § 1129 requirements are met. The Court sees no authority to provide the benefits of the Congressional scheme in this case without compliance with Congressional requirements.

*Id.* at 428.

---

[3] In *Gulf Coast Oil,* the court identified various factors that courts look to in assessing whether the sale of substantially all of a business' assets is a proper exercise of business judgment, including: (a) whether there is evidence of a need for speed, *e.g.,* based on perishable nature of assets or looming, adverse market conditions; (b) whether there is business justification for sale and sale process, as well as for having sale process proceed apart from confirmation process; (c) whether the case is sufficiently mature that parties in interest have received adequate notice, have obtained appropriate information, and have been able to participate; (d) whether proposed sales process is sufficiently straightforward to facilitate competitive bids; (e) whether assets have been aggressively marketed in active market; (f) whether fiduciaries that control debtor are truly disinterested, so that court can have faith in their business judgment; (g) whether proposed sale includes all of debtor's assets or the "crown jewel" of such assets; (h) whether purchaser will receive any extraordinary protections; (i) burdens of proposing sale as part of plan confirmation process; (j) who will benefit from sale; (k) whether any special adequate protection measures are necessary or possible; and (l) whether hearing on proposed sale was true adversary presentation.

17. The Committee identified obvious, fatal flaws with respect to this sale process in the Reservation. Nevertheless, in the two and a half months since the Reservation was filed, the Prepetition Lenders have largely refused to address these issues. As of the date of this filing, no amended Stalking Horse APA has been provided, nor have any meaningful concessions been offered by the Prepetition Lenders. Instead of having productive discussions and negotiations, the sale process has been repeatedly delayed while the Prepetition Lenders continue to drag their feet. This delay has cost unsecured creditors dearly – it is anticipated that all PPP Loan proceeds will have been expended by the proposed closing date.

18. Given the foregoing, the proposed sale must not be approved. It is not a proper exercise of the Debtors' business judgment to seek to move forward with a contested sale that, as set forth below, cannot be approved under applicable bankruptcy law and that amounts to little more than a court-supervised foreclosure by the Prepetition Lenders, without the requisite procedures and protections of a chapter 11 plan.

**I.    The Prepetition Lenders have provided no evidence that the Stalking Horse Bidder's post-acquisition business plan is feasible.**

19. The Committee is acutely aware of the difficult economic circumstances under which these cases are proceeding. Keeping these restaurants in operation is, itself, a victory. The sale of this business as a going concern could save jobs, preserve trade relationships, avoid empty store fronts, and help the communities where the restaurants are situated. But such benefits are necessarily premised on a buyer having a business plan for the assets that is realistic and feasible. Of particular importance is the following question: If revenues do not remain stable or increase over the coming months, are the Prepetition Lenders prepared to invest the necessary capital and expertise to keep the business alive?

20. Section 1129(a)(11) provides that, in order to qualify as feasible, a bankruptcy plan proponent must demonstrate that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." *See e.g., In re Waterford Hotel, Inc.*, 497 B.R. 255, 263 (Bankr. E.D. Mich. 2013) ("When assessing the future commercial viability of a debtor's business, the question of feasibility under § 1129(a)(11) is fundamentally one of whether the debtor has the ability to meet its future obligations, both as provided for in the plan and as may be incurred in its business operations.").

21. In *Waterford Hotel*, the court identified the following factors with respect to the feasibility determination: "(1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan." *Id.* (quoting *Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc. (In re U.S. Truck Co., Inc.*), 800 F.2d 581, 589 (6th Cir.1986) (citation omitted)).

22. Where, as here, the Debtors propose to sell substantially of their assets outside the context of a chapter 11 plan, the feasibility requirements of section 1129(a)(11) must be incorporated into the section 363 sale process. *See e.g., In re Gulf Coast Oil Corp.*, 404 B.R. at 428 (where proposed section 363 sale is fundamentally a foreclosure, court must determine that section 1129 confirmation requirements are met).

23. Because many of the creditors represented by the Committee may be asked to continue to provide goods and services to the Stalking Horse Bidder if the Stalking Horse APA is approved, feasibility of any buyer's business plan has been of paramount concern to the Committee

from the outset of this sale process. The Committee wants to ensure that the any sale transaction in these cases is not followed by yet another bankruptcy filing mere months down the road.

24.  The Committee has requested information necessary to evaluate the Prepetition Lenders' means, experience, and intent to successfully operate the restaurants through the remainder of the pandemic. But only limited information has been provided in response to these inquiries. Moreover, the Committee believes that the post-sale financing that the Prepetition Lenders intend to provide to capitalize the Stalking Horse Bidder is insufficient and based on unreasonable projections regarding how the business will operate over the next several months as fall turns to winter and outdoor dining becomes impractical.

25.  Unfortunately, the Committee's overtures to discuss the feasibility of the Stalking Horse Bidder's business plan have largely been ignored. Because the Debtors and the Stalking Horse Bidder are trying to bypass the chapter 11 plan process with this section 363 sale, the feasibility analyses contemplated in section 1129(a)(11) should be incorporated into the 363 sale process. *Id.* Based on the limited information that the Stalking Horse Bidder has provided to the Committee, it appears that the Stalking Horse's proposed post-sale business plan would not pass muster under such an analysis. Absent assurances and evidence that the Prepetition Lenders are not simply kicking the can down the road, and subjecting the Debtors' trade creditors and landlords to yet another difficult bankruptcy filing in the near future, the Sale Motion should be denied.

**II.    The sale must exclude unencumbered causes of action, including common law claims (including insider causes of action) and chapter 5 causes of action, which should be preserved for the benefit of unsecured creditors.**

26.  It is commonly understood that certain of a debtors' assets are not saleable, such as causes of action arising under chapter 5 of the Bankruptcy Code. *See In re Cybergenics Corp.,* 226 F.3d 237, 245 (3d Cir. 2000) ("The fraudulent transfer claims, which state law provided to

Cybergenics' creditors, were never assets of Cybergenics, and this conclusion is not altered by the fact that a debtor in possession is empowered to pursue those fraudulent transfer claims for the benefit of all creditors."); *see also In re Dinoto,* 562 B.R. 679, 682 (Bankr. E.D. Mich. 2016) ("fraudulent transfer claims may not be assigned by the Chapter 7 Trustee, as part of a settlement or a sale, or otherwise"); *In re Clements Mfg. Liquidation Co., LLC,* 558 B.R. 187, 189 (Bankr. E.D. Mich. 2016) (finding that chapter 5 causes of action were not assignable).

27. In *In re Parirokh*, a case decided in this jurisdiction, the court concurred with *Cybergenics* in finding that avoidance actions were not saleable to third parties.[4] *In re Parirokh,* SWD 11-05409 (Bankr. W.D. Mich. May 2, 2013), *Mem. Order Re Sale of Avoidance Actions*. Quoting from *Cybergenics,* Judge Dales stated:

> 'Much like a public official has certain powers upon taking office as a means to carry out the functions bestowed by virtue of the office or public trust, the debtor in possession is similarly endowed to bring certain claims on behalf of, and for the benefit of, all creditors.' Just as we do not permit public officials to sell the powers of their office or delegate their authority to private actors, so should we pause when a trustee proposes what amounts to the same thing.

*Id.* at *3-4 (quoting *In re Cybergenics Corp.,* 226 F.3d 237, 244 (3d Cir. 2000). Moreover, the *Parirokh* court noted:

> Regarding whether the sale of the Avoidance Actions is in the best interests of the estate as required under § 363(b), the fact that the Trustee has not identified with any precision the transfers at issue, the theories of avoidance, or possible defenses, precludes the court from approving this aspect of the Motion. Neither the court nor the Trustee may meaningfully evaluate causes of action defined in exceedingly broad, categorical, and therefore unspecific, terms.

*Id.* at *5 (internal citations omitted).

28. The proposed sale of causes of action to the Stalking Horse Bidder, as contemplated in the Stalking Horse APA, must fail for the reasons discussed in *Parirokh*. First, the causes of

---

[4] The Committee will make the *Parirokh* memorandum opinion available upon request.

action are not saleable to a third party. Second, even should this Court disagree with the decision reached in *Cybergenics*, the Stalking Horse APA does not sufficiently identify the transfers at issue.

29.     Finally, upon information and belief, the primary causes of action proposed to be sold consist of chapter 5 causes of action and tort claims (including claims against Sellers). Such claims are unencumbered assets belonging to the Debtors' estates. Even if they were saleable, the Stalking Horse APA, supported by a credit bid, provides no clear consideration for the proposed acquisition of these claims. It should go without saying that where, as here, a secured creditor does not have a lien on unencumbered assets such as these causes of action, such creditor cannot credit bid its secured claim but, rather, must pay cash for such property. *See* 3 COLLIER ON BANKRUPTCY, ¶ 363.00[3] (Alan N. Resnick & Henry J. Sommers eds., 16th ed. 2013); *see also In re Charles St. African Methodist Episcopal Church of Boston,* 510 B.R. 453 (Bankr. D. Mass. 2014) ("Section 363(k) permits a secured creditor to credit bid for an asset with the claim for which the asset serves as collateral -- and only with that claim"); *Quality Props. Asset Mgmt. Co. v. Trump Va. Acquisitions, LLC,* No. 3:11-cv-00053, 2012 WL 3542527, at *7 n. 13 (W.D. Va. Aug. 16, 2012) (a "credit bid allows the secured creditor to bid for *its collateral* using the debt it is owed to offset the purchase price"); *In re Hickey Props., Ltd.,* 181 B.R. 171, 173 (D. Vt. 1995) (concluding that secured creditor could not credit bid at sale of partnership interest because the partnership interest was not part of its collateral); *In re Pine Coast Enters., Ltd.,* 147 B.R. 30, 31 (Bankr. N.D. Ill. 1992) (holding that credit bid to acquire collateral and non-collateral assets amounted to bad faith by secured creditor).

### III. The Stalking Horse Bidder must ensure payment in full of all administrative expenses, including post-sale wind-down costs.

30. It is well established that a section 363 sale should not be approved if it will leave behind an administratively insolvent estate. The transaction contemplated in the Stalking Horse APA threatens to do just that. If the Prepetition Lenders desire to obtain the benefits provided by a sale under section 363, then they must "pay the freight" associated with that process. Put simply, the Court should condition approval of the Sale Motion on payment of all administrative expenses incurred in these chapter 11 cases.

31. Administrative expenses must generally be paid in full on or before the effective date of any confirmed chapter 11 plan.[5] Where a bankruptcy case is commenced to orchestrate a pre-plan section 363 sale, then the beneficiaries of the sale (usually the secured lenders) must ensure that the costs of administration are paid in full. If secured lenders are unwilling to pay such costs, then they should exercise their contractual rights and remedies in an alternative forum without the benefits afforded to them through the bankruptcy process.

32. Bankruptcy courts generally agree that a proposed section 363 sale should not be approved unless provision is made for the payment of all administrative expenses incurred in the bankruptcy case. *See e.g., In re Family Christian Stores, LLC*, 533 B.R. 600, 630-31 (Bankr. W.D. Mich. 2016) (declining to approve either of two bids in section 363 sale because, among other reasons, neither bidder had committed to payment in full of administrative expenses); *In re Flour City Bagels,* 557 B.R. 53, 79-80 (Bankr. W.D. N.Y. 2016) (denying proposed section 363 sale because, among other reasons, proposed bid raised "serious concerns that the sale, if approved,

---

[5] Section 1129(a)(9)(A) provides: "Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that – with respect to a claim of a kind specified in section 507(a)(2) … on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim."

would result in [the debtor] being rendered administratively insolvent."); *In re On-Site Sourcing, Inc.,* 412 B.R. 817, 827-28 (Bankr. E.D. Va. 2009) (conditioning approval of a pre-plan section 363 sale on removal of certain provisions from the asset purchase agreement which would likely have resulted in inadequate funds to pay all administrative expenses in full); *In re NEC Holdings Corp.,* Case No. 10-11890 (PJW) (Bankr. D. Del. 2011) (stating that where secured lender is primary beneficiary of sale, it has to pay the freight and "the freight is certainly an administratively solvent estate."); *In re Townsends, Inc.,* Case No. 10-14092 (CSS) (Bankr. D. Del. 2010) (refusing to approve DIP financing and sale process because debtors and secured lender had failed to provide reasonable certainty that administrative expenses would be paid in full).

33. In *In re Gulf Coast Oil Corp.* 404 B.R. 407 (Bankr. S.D. Tex. 2009), the debtors filed a motion to sell substantially all of their assets to their secured lender, who held a lien on all assets, through a credit bid. The debtors' financial advisor, who held an administrative expense that would not be paid in full, objected to the sale. The court denied the sale motion, concluding that the debtors had not demonstrated a substantial business reason for conducting a section 363 sale in lieu of a sale pursuant to, and in accordance with the requirements of, a chapter 11 plan.

34. The court first noted that sales in bankruptcy can be accomplished under section 363(b) (when a substantial business justification for approving the sale is established) or under section 1123, which provides that a chapter 11 plan may include provisions providing for the sale of estate property. The court noted that "The Bankruptcy Code does not provide any explicit guidance to determine when § 363(b) is the appropriate procedure and when § 1123 is the appropriate procedure." *Id.* at 415. Ultimately, the court concluded that "the bankruptcy court must not authorize a § 363(b) transaction if the transaction would effectively evade the 'carefully crafted scheme' of the chapter 11 plan confirmation process." *Id.* at 422.

14

35. Regarding the requirement that all administrative expenses be paid in full as part of a section 363 sale, the court stated:

> If only one party … will benefit from the sale, the movant should be prepared to explain why the sale should take place in a bankruptcy case and why the bankruptcy court should provide the benefits for which Congress imposed substantial requirements. If the sale will not follow the "carefully crafted [Congressional] scheme" by utilizing the "balanced set of tools for both the debtor and the creditor [and] ... multiparty bargaining" then it is hard to justify entitling the few lucky parties to the extraordinary benefits that Congress provided for those who do satisfy the statutory plan confirmation requirements.
>
> [B]ankruptcy is, at its essence, a collective remedy intended to benefit all creditors, not just the secured lender. The § 363(b) movant should be prepared to prove, not just allege, why it is appropriate to provide extraordinary bankruptcy authority and remedies solely for the benefit of a party whose contract under state law does not provide those remedies and benefits. **And if the proposed transaction will not even pay all of the expenses of the bankruptcy proceeding, it would be especially difficult to understand why the purchaser should get the benefit of extraordinary bankruptcy powers and remedies for which it did not pay.**

*Id.* at 426-27 (emphasis added).

36. Similarly, in *In re Encore Healthcare Assoc.*, 312 B.R. 52 (Bankr. E.D. Pa. 2004), the debtor sought authority to sell substantially all of its assets for $2.5 million. Such assets secured a debt to the secured lender of approximately $8.4 million and, thus, an administratively insolvent estate would remain post-sale. No parties objected to the proposed sale, but the bankruptcy court *sua sponte* raised its own concerns.

37. Finding that the bankruptcy sale was effectively a state law foreclosure conducted in chapter 11, the court stated:

> While this Court understands [the purchaser's] interest in acquiring the assets along with a bankruptcy order insulating it from future claims and providing a federal forum to litigate any contract issues, I am hard pressed to see why the bankruptcy court should assume jurisdiction over this sale.

\* \* \*

> The proposed sale would not, as a whole benefit the Debtor or creditors. In fact, if allowed, the sale would terminate Debtor's existence. If Debtor's proposed sale were authorized, the likelihood of reorganization would dissipate as there would remain no assets from which a plan could be proposed. Additionally, the proceeds from the proposed sale would, at most, benefit one creditor only. The sale would not create proceeds that would inure to the benefit of the unsecured creditors.

*Id.* at 56-57 (quoting *In re Fremont Battery Co.,* 73 B.R. 277 (Bankr. N.D. Ohio 1987)). Ultimately, after stating that the section 363 sale could be approved if it "ensure[d] the payment of administrative claims," the court denied the proposed sale. The court reasoned that the proposed sale would generate funds solely for the secured creditor, who "could realize the value of its collateral by foreclosing and selling the assets itself." *Id.*

38. In these cases, the major administrative expenses include: (i) amounts owed to trade creditors and landlords for post-petition goods and services, (ii) cure costs that must be paid pursuant to section 365(b)(1)(A), (iii) fees incurred by professionals retained by the Debtors and the Committee, and (iv) the projected wind-down costs that will necessarily be incurred by these estates after the closing of any sale.

39. Although the Stalking Horse APA provides for the Stalking Horse Bidder's assumption of cure claims, it does so only to the extent that the Debtors' existing cash reserves, all of which are unencumbered, are insufficient to first satisfy these claims. Cure amounts in these cases could exceed $2 million. And, per the Debtors' own forecasts and estimates, administrative expenses and winddown costs are expected to be no less than $3 million. The current terms of the Stalking Horse APA lead to a very realistic scenario in which, not only has an unencumbered asset been drained, but also insufficient capital remains, post-sale, to satisfy cure costs, administrative claims, and winddown costs. For the forgoing reasons, the Sale Motion should not be granted unless the Prepetition Lenders ensure that all administrative expenses in these cases are paid in full. That is the price of admission for obtaining the benefits that chapter 11 can provide.

    **IV.    The Stalking Horse APA should provide for a recovery for unsecured creditors.**

40.    The Stalking Horse APA proposes to transfer substantially all of the Debtors' assets to the Prepetition Lenders, leaving nothing behind for unsecured creditors. Not only does the Stalking Horse APA leave unsecured creditors without a guaranteed monetary recovery, the proposed sale of unencumbered causes of action also eliminates <u>any</u> prospect of a distribution. *See In re Encore Healthcare Assoc.*, 312 B.R. at fn. 10 ("most secured creditors understand the necessity of making some distribution available to other creditors as the price of a court-approved sale.").

41.    Moreover, the Prepetition Lenders' inclusion of a section 506(c) waiver in the Stalking Horse APA is wholly inappropriate in this matter. The sale process, and transfer of collateral, has almost exclusively benefited the Prepetition Lenders.

42.    Finally, if these cases were to convert to chapter 7 today, there would still be a distribution to unsecured creditors. It is the Prepetition Lenders' delay in moving forward with the sale that has cost unsecured creditors a recovery. This is patently inequitable.

## DEBTORS' BUSINESS JUDGMENT IS COMPROMISED

43.    The Stalking Horse APA proposes to keep Sellers in a control position and, either expressly or implicitly, give him a release of material causes of action against him and his insiders and affiliates.[6] He demonstrably breached his fiduciary duties to the Debtors by misappropriating approximately $1.7 million from the Debtors to pay alimony to his ex-wife. Sellers only agreed to repurpose the transfers as a forgivable loan after a shareholder dispute approximately two years ago. He additionally transferred one of the Debtors' leases in Western Michigan to a separate entity

---

[6] Section 5.8 of the Stalking Horse APA grants a release to the Debtors and their Affiliates; however, "Affiliates" is not a defined term.

that he owns and controls, without providing the Debtors any consideration in return. There are likely more instances of such conduct that would give rise to additional causes of action, but the Committee has not yet had an opportunity to undertake a comprehensive investigation.

44.     Even if Sellers isn't expressly released from such causes of action under Section 5.8 of the Stalking Horse APA, by proposing to retain Sellers and acquiring the Debtors' causes of action against him, the Stalking Horse APA grants Sellers, his insiders, and his affiliates with a blanket release. This renders him materially conflicted and compromises his business judgment.

## CONCLUSION

For the foregoing reasons, the Committee respectfully requests that the Court (i) deny the Sale Motion, and (ii) grant the Committee such other and further relief as the Court may deem just and proper.

Respectfully submitted by,

**JAFFE RAIT HEUER & WEISS, P.C.**

By: /s/ Paul R. Hage
Paul R. Hage (P70460)
27777 Franklin Road, Suite 2500
Southfield, MI 48034
Phone: (248) 351-3000
phage@jaffelaw.com

-and-

**SUGAR FELSENTHAL GRAIS & HELSINGER, LLP**

Michael A. Brandess
Elizabeth Vandesteeg
30 N. LaSalle Street, Suite 3000
Chicago, IL 60602
Phone: (312) 704-9400
mbradness@sfgh.com
evandesteeg@sfgh.com

*Counsel to the Official Committee of Unsecured Creditors of Barfly Ventures, LLC et al.*

Dated: September 23, 2020