UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
| BARFLY VENTURES, LLC, *et al.*,[1] | : | Case No. 20-01947-jwb |
| Debtors. | : | Jointly Administered |

### RESPONSE OF CIP ADMINISTRATIVE, LLC, IN ITS CAPACITY AS ADMINISTRATIVE AGENT FOR THE PREPETITION SECURED LENDERS, TO OBJECTIONS TO SALE MOTION

CIP Administrative, LLC, in its capacity as administrative agent for the Prepetition Secured Lenders (the "Administrative Agent"),[2] through its undersigned counsel, hereby submits its response (this "Response") to (a) the *United States Trustee's Objection to the Approval of the Proposed Sale* [Docket No. 328] (the "UST Objection") filed by the United States Trustee for the Western District of Michigan (the "U.S. Trustee") and (b) the *Official Committee of Unsecured Creditors' Objection to Sale Motion* [Docket No. 329] (the "Committee Objection" and, together with the UST Objection, the "Objections") filed by the official committee of unsecured creditors

---

[1] The Debtors and the last four digits of their federal employment identification number are: Barfly Ventures, LLC (8379); 9 Volt, LLC (d/b/a HopCat) (1129); 50 Amp Fuse, LLC (d/b/a Stella's Lounge) (3684); GRBC Holdings, LLC (d/b/a Grand Rapids Brewing Company) (2130); E L Brewpub, LLC (d/b/a HopCat East Lansing) (5334); HopCat-Ann Arbor, LLC (5229); HopCat-Chicago, LLC (7552); HopCat-Concessions, LLC (2597); HopCat-Detroit, LLC (8519); HopCat-GR Beltline, LLC (9149); HopCat-Holland, LLC (7132); HopCat-Indianapolis, LLC (d/b/a HopCat-Broad Ripple) (7970); HopCat-Kalamazoo, LLC (8992); HopCat-Kansas City, LLC (d/b/a HopCat-KC, LLC and Tikicat) (6242); HopCat-Lexington, LLC (6748); HopCat-Lincoln, LLC (2999); HopCat-Louisville, LLC (0252); HopCat-Madison, LLC (9108); HopCat-Minneapolis, LLC (8622); HopCat-Port St. Lucie, LLC (0616); HopCat-Royal Oak, LLC (1935); HopCat-St. Louis, LLC (6994); Luck of the Irish, LLC (d/b/a The Waldron Public House, LLC and McFadden's Restaurant Saloon) (4255).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Motion of Debtors for Entry of (I) an Order (A) Approving Bidding Procedures and Scheduling Sale Hearing, (B) Approving the Form of the Asset Purchase Agreement, Including the Bid Protections, and (C) Granting Related Relief; and (II) an Order (A) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Authorizing the Assumption and Assignment of Certain (C) Granting Related Relief* [Docket No. 127] (the "Sale Motion").

appointed in these chapter 11 cases (the "Committee") and in support of this Response respectfully states as follows:

## PRELIMINARY STATEMENT

1. In the midst of a global pandemic, all stakeholders in these chapter 11 cases should be thrilled that we have an opportunity to preserve a business in the restaurant industry as a going concern. As the Committee acknowledges in its objection, this will save jobs, preserve trade relationships, avoid empty storefronts, and help the communities where these restaurants are situated. Unfortunately, the Committee and the U.S. Trustee filed objections based upon inaccurate facts and a misstatement of the relevant law in this jurisdiction with respect to approval of the Sale Motion. As set forth in detail below, the Committee's and the U.S. Trustee's factual allegations do not accurately portray the events related to the sale. Further, the Committee and the U.S. Trustee repeatedly attempt to hold the Debtors to statutory requirements that are not applicable to a sale under section 363 of the Bankruptcy Code.

2. After a robust marketing and sale process, the Buyer was the only party to offer a viable bid for the Debtors' assets. The going-concern sale to the Buyer, as proposed, will preserve hundreds of jobs and existing business relationships and sets the business up for long-term success, for the benefit of all stakeholders. For reasons that bely the economic realities of this case and the restaurant industry, the Committee and the U.S. Trustee would rather force the downside scenario of the Debtors shutting down operations and conducting a piecemeal fire-sale liquidation; they do this because they believe there is not enough of an undeserved financial windfall to certain constituents.

3. For the reasons set forth below, the Court should overrule the Objections and enter the Sale Order approving the sale of the Debtors' assets to the Buyer.

## ARGUMENT

**I.      The Sale Is in the Best Interests of the Estate and Its Creditors.**

4.      The Committee wrongly asserts that, although the Debtors seek approval of the Sale Motion under section 363 of the Bankruptcy Code, they must nevertheless satisfy the "feasibility" test of section 1129(a)(11) of the Bankruptcy Code.  The Sixth Circuit Court of Appeals has clearly stated that "a bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action."  *Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986).  Courts in this district, following this guidance from the Sixth Circuit, have consistently found that "a sale of assets is appropriate if all provisions of § 363 are followed, the bid is fair, and the sale is in the best interests of the estate and its creditors."  *In re Quality Stores, Inc.*, 272 B.R. 643, 647–48 (Bankr. W.D. Mich. 2002) (*quoting In re Embrace Systems Corp.*, 178 B.R. 112, 124 (Bankr. W.D. Mich. 1995)).  Accordingly, in this district the only statutory requirements necessary for approval of the Sale are those set forth in section 363 of the Bankruptcy Code.

5.      The proposed sale to the Buyer is manifestly in the best interests of the Debtors' estates and creditors because, among other things, it will provide for the payment of Cure Costs, it will preserve the Debtors' business as a going concern (no small feat given the current state of the economy in general and the restaurant industry in particular), it will preserve hundreds of jobs, it will avoid a piecemeal and value-destructive liquidation of the Debtors' assets in chapter 7, and, based upon the extensive marketing efforts conducted by the Debtors, it will obtain the best possible value for the Debtors' assets.  Absent the proposed sale to the Buyer, the Debtors would be forced to cease operations, terminate their employees, and liquidate in a fire-sale fashion that would be highly detrimental to the recoveries by the Debtors' estates.  Accordingly, the proposed sale to the Buyer is in the best interests of the Debtors' estates and should be approved.

## II. The Buyer Will Be Adequately Capitalized and the Go-Forward Business Is Viable.

6. No opinion in this district or elsewhere has required a showing of feasibility under section 1129(a)(11) of the Bankruptcy Code in connection with a sale of assets under section 363 of the Bankruptcy Code. Notably, the Committee fails to support its allegations by citing to any supporting authority that has imposed such a requirement. Instead, the Committee alludes to a decade-old decision from the Bankruptcy Court for the Southern District of Texas, *In re Gulf Coast Oil Corp.*, 404 B.R. 407 (Bankr. S.D. Tex. 2009), that is not binding on this Court and that has not been followed by other courts in this district. Beyond the fact that *Gulf Coast* does not serve as precedent in this district, the Committee's reliance on the case is misplaced.

7. The Committee cites to *Gulf Coast* for the proposition that the plan confirmation requirements of section 1129 of the Bankruptcy Code are applicable to asset sales under section 363 of the Bankruptcy Code. However, **the determinative issue in *Gulf Coast* was whether the debtor had demonstrated a sound business judgment for the sale, as opposed to proceeding to confirmation of a plan of reorganization, and the court concluded that the debtor had not**. In other words, the court in *Gulf Coast* did not insist upon a feasibility standard (used as part of determining whether a plan of reorganization should be confirmed) being used in a 363 sale context as the Committee would like to do in these cases.

8. In the present case, the Debtors clearly have a sound business judgment for proceeding with the sale instead of pursuing a plan of reorganization because, among other things, the value of the Debtors' assets will depreciate—if not completely disappear—absent a sale. Not only is the value of the business continuing to "melt away" while operating in chapter 11, the Debtors do not have the resources to fund a chapter 11 plan process.

9. Regardless of the Committee's confusion as to the correct, applicable legal standard, the Buyer's go-forward business is viable. The Prepetition Secured Lenders have not only provided approximately $30 million of capital into the Debtors' business, but they have committed to providing a revolving credit facility of $3 million to fund the business's operational and growth capital needs after the Closing. Indeed, on September 15, 2020, the Prepetition Secured Lenders provided a draft of the revolving credit agreement to the Committee.

10. The Committee has provided no evidence that the amount of the post-close revolver is inadequate, and the Committee continuing to pretend that the Prepetition Secured Lenders have not given enough or committed enough to the success of the business is insulting. It simply makes no sense for the Prepetition Secured Lenders to continue to put money into the business, on top of the $30 million already provided by the Prepetition Secured Lenders to the Debtors, if the Prepetition Secured Lenders were not fully committed to the future success of the business.

11. In fact, the Prepetition Secured Lenders have already spent countless hours ensuring a smooth operational transition. To do all of that work and commit to spending additional money only to let the business waste away defies logic. The adequate post-sale capitalization of the business, and the Prepetition Secured Lenders' proven track record in funding the Debtors' business, demonstrate that the Buyer's capital needs in running the post-sale business will be met and that the business is viable post-closing.

12. Additionally, the Committee's assertion that the Buyer being a newly formed entity serves as a basis for the sale not to be approved has no merit and, if true, would have invalidated numerous bankruptcy sales across multiple jurisdictions. *See, e.g.*, *In re Goodrich Quality Theaters, Inc.*, No. 20-00759 (SWD) (W.D. Mich. June 26, 2020) (newly formed entity approved as purchaser in bankruptcy sale); *In re: Great Lakes Comnet, Inc.*, No. 16-00290 (JTG) (W.D.

Mich. Apr. 4, 2016) (same); *In re Alpha Entm't LLC*, No. 20-10940 (LSS) (Bankr. D. Del. Aug. 3, 2020) (same); *In re Kona Grill, Inc.*, No. 19-10953 (CSS) (Bankr. D. Del. Sept. 24, 2019) (same); *In re Gracious Home LLC*, No. 16-12500 (MKV) (Bankr. S.D.N.Y. June 29, 2017) (same).

**III.     The Prepetition Secured Lenders Are Not Using Their Credit Bid to Bid on Unsecured Assets.**

13. The Committee alleges that the Buyer is seeking, through its credit bid, to acquire assets upon which the Buyer does not have a lien. This claim by the Committee fails to understand the nature of the sale transaction and the consideration that is being provided by the Buyer. The consideration offered by the Buyer as part of the sale includes significantly more than the prepetition secured debt. The Buyer is not only providing a backstop to ensure that the Debtors have sufficient funds to pay required cure costs and administrative expenses and to fund the wind-down budget, but is also agreeing to assume substantial liabilities (*e.g.*, post-petition accounts payable and accrued-but-unpaid vacation). As such, the Committee's claim that the Buyer cannot acquire assets upon which it does not have a lien is meritless.

14. There is an additional legitimate business reason for including the chapter 5 claims in the sale: the Buyer does not want the Debtors, the Committee, or a trustee vigorously pursuing avoidance actions against critical vendors of the business, among others, without the Buyer having any control, supervision, or oversight of that pursuit, which could have a significantly adverse effect on vendors' willingness to do business with the Buyer.

**IV.     The Buyer Is Not Giving Mark Sellers a Third-Party Release, as the Committee Alleges.**

15. The Committee claims that the sale transaction cannot be approved because it would purportedly provide a release to the Debtors' current executive, Mark Sellers ("Mr. Sellers") and the judgment of Mr. Sellers with respect to the sale transaction cannot be trusted as a result. This argument of the Committee's is factually inaccurate.

16. To begin with, it is not Mr. Sellers's business judgment that the Debtors are relying on as justification for their entry into the value-maximizing APA; Mr. Sellers does not control the Debtors. Furthermore, the amended APA removes any reference to Mr. Sellers or his continued employment, and the Buyer does not have any formal or informal agreement in place with Mr. Sellers to participate in the post-close business. The Buyer and Prepetition Secured Lenders are not in any way colluding with Mark Sellers, as the Committee implies, again without any evidence to support its position.

17. The Buyer is not giving Mark Sellers a third-party release, whether directly or indirectly, as the Committee argues. Rather, the Buyer is purchasing the Debtors' assets, including potential claims and causes of action, pursuant to the APA, and the Buyer will exercise its business judgment post-close on how it may use and monetize those assets. As the Sixth Circuit Court of Appeals has recently noted, such causes of action can be sold by the Debtors. *Church J.V., L.P. v. Blasingame (In re Blasingame)*, 920 F.3d 384, 389 (6th Cir. 2019) (citing *Cadie Co. v. Mims (In re Moore)*, 608 F.3d 253, 257-58 (5th Cir. 2010)). The Committee relies on an earlier decision in a chapter 7 case, which is easily distinguishable from the Debtors' cases. *See In re Parirokh*, Case No. 11-05409 (SWD) (Bankr. W.D. Mich. May 2, 2013).

18. At the time of the court's decision, the Sixth Circuit had not commented on whether chapter 5 causes of action can be sold. *Id.* at 1. In *Parirokh*, the trustee sought to sell causes of action pursuant to chapter 5 in a chapter 7 case. *Id.* The court in *Parirokh* held that avoidance actions were not saleable to third parties and based its refusal to follow the Fifth Circuit's decision in *Moore* upon the grounds that *Moore* was a chapter 11 case. *Id.* at 3. Unlike the debtor in *Priirokh*, the Debtors in these cases, like the debtors in *Moore*, seek to pursue a sale in their chapter 11 cases, rather than a chapter 7 case. Thus, *Moore* rather than *Cybergencis Corp.*, 226 F.3d 237,

245 (3rd Cir. 2000), is more persuasive in these cases and thus, the Debtors' case is distinguished from *Parirokh*.

**V.     The APA Does Allow for the Payment in Full of All Administrative Expenses, Cure Costs, and Wind-Down Costs.**

19.     The Committee and the U.S. Trustee allege, without more, that the sale transaction could leave the Debtors' estates without the funds necessary to pay administrative expenses. Neither the Committee nor the U.S. Trustee has, however, offered any evidence or factual basis for this assertion. To the contrary, the Prepetition Secured Lenders have worked closely with the Debtors to ensure that sufficient funds will be available to fund administrative expenses, Cure Costs, and wind-down costs.

**VI.    The Sale Does Not Need to Provide a Recovery for Unsecured Creditors.**

20.     The Committee and the U.S. Trustee make the unfounded assertion that the Court cannot approve the sale transaction unless there is a recovery for unsecured creditors. There is no requirement under the Bankruptcy Code or any other applicable law dictating that the Court can only approve the sale if the Buyer goes further out of pocket to pay off unsecured creditors.[3] This objection displays the Committee's objection for what it is: a shakedown attempt by creditors who do not actually have a right to payment under the Bankruptcy Code and who wish to skip ahead of higher-priority creditors.[4] And not only higher-priority claims, but what are likely to be, by far,

---

[3] Numerous sales under section 363 of the Bankruptcy Code have been approved without providing a distribution for unsecured creditors. *See, e.g.*, *In re KG Wind Down, Inc.*, No. 19-10953 (CSS) (Bankr. D. Del. Sept. 24, 2019) (no unencumbered assets and no funds to pay unsecured creditors following sale); *In re The Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Mar. 29, 2019) (same).

[4] This argument is also inconsistent with other arguments made by the Committee related to the alleged applicability of the Bankruptcy Code's plan confirmation requirements set forth in section 1129. Specifically, if the requirements of 1129 were applicable to this sale under section 363 (which they are not), then any distribution to unsecured creditors would violate the absolute priority rule. It would seem that the Committee only wants the requirements of section 1129 to apply to this sale when it is convenient for the Committee.

the largest unsecured claims in these cases: the Prepetition Secured Lenders' deficiency claims of at least $12 million. The Committee's position inappropriately elevates the status of certain creditors to the detriment of others.

21. The Committee's inclusion of a defined recovery to unsecured creditors as a requirement for any sale under section 363 of the Bankruptcy Code would thwart the priority of creditors' claims laid out in the Bankruptcy Code and would give lower-priority creditors veto power over any such sale. The Bankruptcy Code, rightfully, does not contemplate this as a prerequisite for a bankruptcy sale, and no courts have held it to be.

**VII.     The Buyer Has Not Unnecessarily Delayed the Sale Process.**

22. Despite the Committee's allegations, the Buyer has not delayed the sale process but, instead, has been pushing for the sales process to remain on track and to conclude as quickly and efficiently as reasonably practical. The Debtors have adjourned the sale hearing primarily in order to: (a) allow the parties to continue negotiations and resolve objections; and (b) further solicit interest and opposing bids in the Debtors' assets. The Prepetition Secured Lenders and Buyer have been supportive of these goals.

23. Prepetition Secured Lenders' counsel has many times reached out to the Committee's counsel to secure a consensual resolution of the Committee's reservations. The Committee has, however, been unwilling to budge. The Committee's strategy has, instead, been to ask the Prepetition Secured Lenders, which have already sunk approximately $30 million into the Debtors' business, to go further out of pocket for the benefit of certain unsecured creditors that are not entitled to such a recovery. Instead of being a productive party in discussions and negotiations around a going-concern sale of the Debtors' business that would preserve hundreds of local jobs and business relationships with vendors, the Committee has chosen to attempt to coerce the Prepetition Secured Lenders into making even greater concessions than the Prepetition

Secured Lenders have already made. This litigious, value-destructive strategy has unnecessarily increased administrative expenses for the Debtors, which the Committee expects the Prepetition Secured Lenders to bankroll.

24. The Committee has admitted that it was counting the PPP Cash as its own from early on this case. Committee Obj. ¶ 10. But the PPP Cash was never theirs, and the Debtors have made it clear that their intent is to use those funds for their proscribed uses, such as employee payroll and rent (*i.e.*, payment of unsecured claims). It is inappropriate, and there is no basis, for the Committee to insist that the Debtors instead earmark these funds for a distribution to every unsecured creditor regardless of their status or relationship with the Debtors or their business.

**VIII.     The Prepetition Secured Lenders Have Been Focused on Advancing the APA and Working Toward a Going-Concern Sale of the Business.**

25. The Prepetition Secured Lenders understand that the Debtors' investment banker has, as part of the Debtors' marketing efforts, solicited third parties that may be interested in acquiring the Debtors' assets either through putting in a competing bid pursuant to the Bid Procedures Order or by purchasing the Prepetition Secured Lenders' debt, which those third parties may credit bid for the business. The Debtors' advisors—not the Prepetition Secured Lenders or Buyer—have been driving those outreach efforts. The Prepetition Secured Lenders have communicated to the Committee, on multiple occasions, that the Prepetition Secured Lenders and Buyer were focused on advancing the APA, achieving Court approval of the sale, and closing the sale. The Committee's allegations otherwise are intentionally disingenuous, at best.

26. For all of the reasons above, the Objections should be overruled.

[*Remainder of Page Intentionally Left Blank*]

WHEREFORE, the Administrative Agent respectfully requests that the Court overrule the Objections and enter the Sale Order, granting the relief requested in the Sale Motion and such other and further relief as is just and proper under the circumstances.

Dated:  September 24, 2020

/s/ Steven L. Rayman
Steven L. Rayman (P30882)
**RAYMAN & KNIGHT**
141 e. Michigan Avenue, Suite 301
Kalamazoo, Michigan 49007
Telephone:   (269) 345-5156
Facsimile:    (269) 345-5161
slr@raymanknight.com

*Local Counsel for CIP Administrative, LLC*

-and-

Matthew M. Murphy, Esq.
Nathan S. Gimpel, Esq.
**PAUL HASTINGS LLP**
71 South Wacker Drive
Suite 4500
Chicago, Illinois 60606
Telephone:   (312) 499-6000
Facsimile:    (312) 499-6100
mattmurphy@paulhastings.com
nathangimpel@paulhastings.com

*Counsel for CIP Administrative, LLC*