# EXHIBIT A

## Cure Costs

DOCS_SF:104202.12

## EXECUTORY CONTRACTS*

| Debtor | Counter Party | Contract Description | Agreed Upon Cure for Sale Order |
|---|---|---|---|
| Barfly Ventures, LLC | Accident Fund Insurance Company of America | Workers Compensation Insurance | $0.00 |
| Barfly Ventures, LLC | Admiral Insurance Company | Excessive Liability Insurance | $0.00 |
| Hopcat Beltline | ArrowWaste Inc. | Trash and recycling services | $0.00 |
| GRBC Holdings, LLC | ArrowWaste Inc. | Trash and recycling services | $0.00 |
| 50 Amp Fuse, LLC | ArrowWaste Inc. | Trash and recycling services | $0.00 |
| Hopcat Grand Rapids | ArrowWaste Inc. | Trash and recycling services | $0.00 |
| Barfly Ventures, LLC | AvidXchange Inc. | Payment network services | $0.00 |
| Barfly Ventures, LLC | Blackhawk Network | Gift cards | $0.00 |
| Hopcat Holland | Coverall of Western Michigan | Janitorial services | $0.00 |
| Barfly Ventures, LLC | DoorDash, Inc. | delivery services | $0.00 |
| Hopcat Broad Ripple | DVCLEANINDY, LLC | Cleaning services | $0.00 |
| Barfly Ventures, LLC | ECOLAB | warehousing, housekeeping, laundry, and other cleaning and sanitizing chemical products | $16,929.29 |
| Barfly Ventures, LLC | eFileCabinet | document management software services | $0.00 |
| Barfly Ventures, LLC | Egencia LLC | Travel services/assisted booking | $0.00 |
| EL Brewpub | Enviro - Master of West Michigan | Janitorial | $0.00 |
| Hopcat Beltline | Enviro - Master of West Michigan | Janitorial | $0.00 |
| Hopcat Kalamazoo | Enviro - Master of West Michigan | Janitorial | $0.00 |
| GRBC Holdings | Enviro - Master of West Michigan | Janitorial | $0.00 |
| Hopcat Grand Rapids | Enviro - Master of West Michigan | Janitorial | $0.00 |
| Stellas | Enviro - Master of West Michigan | Janitorial | $0.00 |

| Debtor | Counterparty | Description | Amount |
|---|---|---|---|
| Barfly Ventures, LLC<br>50 Amp Fuse, LLC<br>GRBC Holdings, LLC<br>9 Volt, LLC<br>Hopcat Ann Arbor, LLC<br>Hopcat Detroit, LLC<br>EL Brewpub, LLC<br>Hopcat Lexington, LLC<br>Hopcat Indianapolis<br>Hopcat Kansas City<br>Hopcat Lincoln<br>Hopcat Madison | Gordon Food Service | Food distribution | $1,701,615.40 due prepetition, plus any amounts due and unpaid postpetition, or such other treatment as GFS and the Buyer may agree prior to the assumption and assignment of the GFS Distribution Agreement as permitted by Paragraph 27 of this Order. For the avoidance of doubt, the payment to GFS of the foregoing cure shall apply (i) first, in satisfaction of GFS' allowed PACA claim, (ii) second, in satisfaction of GFS' allowed claim under 503(b)(9) of the Bankruptcy Code, and (iii) third to reduce the remaining balance of GFS' unsecured claim, but the cure payment shall not be a waiver or release by GFS, nor a satisfaction of or defense to, the remaining balance of GFS' general unsecured claim, which shall remain as a general unsecured claim against the Debtors' estates. |
| Barfly Ventures, LLC | HotSchedules.com, Inc | scheduling software | $16,968.00 |
| Hopcat Lincoln | Huskers IMG Sports Marketing | marketing and sponsorship | $0.00 |
| Barfly Ventures, LLC | Indian Harbor Insurance Company | Umbrella Insurance | $0.00 |
| EL Brewpub LLC | My Green Michigan LLC | Composting services | $0.00 |
| Barfly Ventures, LLC | NCR Corporation | IT software | $0.00 |
| Barfly Ventures, LLC | NCR Corporation | cloud applications | $0.00 |
| Barfly Ventures, LLC | NCR Corporation | CMC software | $0.00 |
| Barfly Ventures, LLC | NCR Corporation | remove loyalty | $0.00 |
| Barfly Ventures, LLC | Nexonia Technologies Inc. | expense management software | $0.00 |
| Barfly Ventures, LLC | OLO | delivery application | $0.00 |
| Barfly Ventures, LLC | Paytronix Systems, Inc. | IT software services | $17,535.93 |
| Barfly Ventures, LLC | Pepsi Beverages Company | Pepsi beverages exclusively | $0.00 |
| GRBC Holdings, LLC | POSitive Solutions Group | phone support and POS hardware maintenance | $5.00 |
| Hopcat Ann Arbor | POSitive Solutions Group | phone support and POS hardware maintenance | $5.00 |
| Hopcat Beltline | POSitive Solutions Group | phone support and POS hardware maintenance | $5.00 |

| | | | |
|---|---|---|---|
| Hopcat Broad Ripple | POSitive Solutions Group | phone support and POS hardware maintenance | $5.00 |
| Hopcat Detroit | POSitive Solutions Group | phone support and POS hardware maintenance | $5.00 |
| EL Brewpub LLC | POSitive Solutions Group | phone support and POS hardware maintenance | $5.00 |
| Hopcat Grand Rapids | POSitive Solutions Group | phone support and POS hardware maintenance | $5.00 |
| Hopcat Kalamazoo | POSitive Solutions Group | phone support and POS hardware maintenance | $5.00 |
| Hopcat Lincoln | POSitive Solutions Group | phone support and POS hardware maintenance | $5.00 |
| 50 Amp Fuse, LLC | POSitive Solutions Group | phone support and POS hardware maintenance | $5.00 |
| Barfly Ventures, LLC | Red Bull North America, Inc. | energy drink distribution and exclusivity | $0.00 |
| Hopcat Detroit | Republic Services | trash and recycling services | $0.00 |
| Barfly Ventures, LLC | Round It Up America, Inc. | charitable donation collections | $0.00 |
| GRBC Holdings | Swept Away | Janitorial | $0.00 |
| Grand Rapids | Swept Away | Janitorial | $0.00 |
| Stellas | Swept Away | Janitorial | $0.00 |
| Hopcat Beltline | Swept Away | Janitorial | $0.00 |
| Barfly Ventures, LLC | TBX | menu design | $0.00 |
| Barfly Ventures, LLC | Untappd | marketing services | $0.00 |
| EL Brewpub LLC | Waste Management of Michigan | Trash and recycling services | $0.00 |
| Barfly Ventures, LLC | Yelp Inc | advertising services | $8.22 |
| Barfly Ventures, LLC | Travelers | General Liability Insurance | $0.00 |
| Barfly Ventures, LLC | Travelers | Automobile Insurance | $0.00 |

**As noted in the Sale Order, Debtor reserves the right to still reject any executory contract up until the Closing Date

## ADDITIONAL EXECUTORY CONTRACTS

| Debtor | Counter Party | Contract Description | Cure Amount |
|---|---|---|---|
| BarFly Ventures | 58 Ionia Holdings, LLC | Equipment Lease for equipment located in Detroit restaurant | $4,165.00 |
| BarFly Ventures | Compeat | Back office software provider | $0.00 |
| BarFly Ventures | Wisely | Reservation / Table Mgmt. Software | $0.00 |

## UNEXPIRED REAL PROPERTY LEASES*

| Debtor | Counter Party | Property Address | Cure Amount in Sale Order | Amendment to Lease |
|---|---|---|---|---|
| GRBC Holdings*** | Ionia Ventures, LLC | 1 Ionia Ave SW, Grand Rapids, MI 49503 | $86,420.96 | Yes |
| Hopcat-Detroit*** | 4265 Woodward Ventures LLC | 4265 Woodward Ave, Detroit, MI 48201 | $23,515.64 | Yes |
| Hopcat-Grand Rapids | Lee Shore-Lemon Wheeler Building | 25 Ionia Ave., Grand Rapids, MI 49503 | $48,764.37 | No |
| Hop Cat-Ann Arbor**** | Liberty Maynard LLC | 311 Maynard, Ann Arbor, MI 48104 | $50,986.80 | Yes |
| Hopcat-E. Lansing/EL Brewpub*** | A&G Partnership | 300 Grove, East Lansing, MI 48823 | $58,301.54 | Yes |
| Hopcat-E. Beltine** | JK East Beltline Real Estate | 2183 E Beltline Ave NE, Grand Rapids MI, 49525 | $61,451.39 | Yes |
| Hopcat-Holland** | Greenen Dekock Properties, LLC | 80 West 8th Street, Holland MI | $23,320.13 | Yes |
| Hopcat-Indianapolis** | 6280 LLC | 6280 N. College Ave. Indianapolis, IN 46220 | $102,312.12 | Yes |
| Hopcat-Kalamazoo | GTW Depot, LLC | 300 E. Water St., Kalamazoo, Michigan, 49007 | $54,894.59 | No |
| Hopcat-Lincoln** | Project Oscar, LLC | 601 P. Street, Lincoln, NE 68508 | $50,733.66 | Yes |
| Stella's/50 Amp Fuse LLC*** | 50 Commerce Building, LLC | 53 Commerce Ave, SW, Grand Rapids, MI 49503 | $20,000.00 | Yes |

**\*As noted in the Sale Order, Debtor reserves the right to still reject any Lease up until the Closing Date**

**\*\*Lease Amendment Signed**

**\*\*\*Remains Subject to Execution of Lease Amendment**

## NEW REAL PROPERTY LEASE

| Debtor | Counter Party | Property Address | Agreed Upon Cure for Sale Order |
|---|---|---|---|
| Barfly Ventures (Temporary Corporate Office) | 280 Ann LLC | 280 Ann Street NW, Suite 110, Grand Rapids, Michigan 49504 | N/A |

# EXHIBIT B

## Asset Purchase Agreement

DOCS_SF:104202.12

---

## ASSET PURCHASE AGREEMENT

## BY AND AMONG

## BARFLY VENTURES, LLC,

## EACH OF THE OTHER SELLERS PARTY HERETO

## AND

## PROJECT BARFLY LLC

## July 9, 2020

---

*STRICTLY PRIVATE AND CONFIDENTIAL DRAFT FOR DISCUSSION PURPOSES ONLY. CIRCULATION OF THIS DRAFT SHALL NOT GIVE RISE TO ANY DUTY TO NEGOTIATE OR CREATE OR IMPLY ANY OTHER LEGAL OBLIGATION. NO LEGAL OBLIGATION OF ANY KIND WILL ARISE UNLESS AND UNTIL A DEFINITIVE WRITTEN AGREEMENT IS EXECUTED AND DELIVERED BY ALL PARTIES HERETO.*

**TABLE OF CONTENTS**

**Page**

Article I DEFINITIONS ................................................................................................ 2

Article II PURCHASE AND SALE ............................................................................15

Section 2.1    Purchase and Sale of Purchased Assets.................................15
Section 2.2    Excluded Assets .....................................................................18
Section 2.3    Assumption of Assumed Liabilities .....................................20
Section 2.4    Excluded Liabilities ..............................................................20
Section 2.5    Consideration .........................................................................21
Section 2.6    Assumption and Assignment of Contracts.............................21
Section 2.7    Closing....................................................................................22
Section 2.8    Deliveries at Closing..............................................................23
Section 2.9    Allocation................................................................................24
Section 2.10   Excluded Locations ...............................................................25

Article III SELLERS' REPRESENTATIONS AND WARRANTIES.....................25

Section 3.1    Organization of Sellers; Good Standing ...............................25
Section 3.2    Authorization of Transaction.................................................25
Section 3.3    Noncontravention; Consents and Approvals..........................26
Section 3.4    Compliance with Laws...........................................................27
Section 3.5    Title to Purchased Assets ......................................................27
Section 3.6    Contracts .................................................................................27
Section 3.7    Intellectual Property...............................................................27
Section 3.8    Litigation.................................................................................28
Section 3.9    Employees and Employment Matters.....................................28
Section 3.10   Employee Benefit Plans .........................................................30
Section 3.11   Real Property..........................................................................30
Section 3.12   Tangible Personal Property ...................................................31
Section 3.13   Permits ....................................................................................31
Section 3.14   Purchased Inventory ..............................................................32
Section 3.15   Environmental Matters...........................................................32
Section 3.16   Financial Statements..............................................................33
Section 3.17   Brokers' Fees ..........................................................................34
Section 3.18   No Other Agreements to Purchase.........................................34
Section 3.19   Taxes ......................................................................................34
Section 3.20   Suppliers .................................................................................36
Section 3.21   Insurance Policies ..................................................................36
Section 3.22   Related Party Transactions .....................................................36
Section 3.23   Bank Accounts .......................................................................37
Section 3.24   Trade Names; Business Locations .........................................37

Article IV BUYER'S REPRESENTATIONS AND WARRANTIES.....................37

Section 4.1    Organization of Buyer............................................................37

Section 4.2    Authorization of Transaction ..............................................................38
Section 4.3    Noncontravention ...............................................................................38
Section 4.4    Litigation............................................................................................39
Section 4.5    Adequate Assurances Regarding Executory Contracts.......................39
Section 4.6    Brokers' Fees ......................................................................................39
Section 4.7    No Outside Reliance ...........................................................................39

Article V PRE-CLOSING COVENANTS ........................................................................39

Section 5.1    Notices and Consents ..........................................................................39
Section 5.2    Bankruptcy Actions ............................................................................41
Section 5.3    Conduct of Business ...........................................................................42
Section 5.4    Notice of Developments......................................................................45
Section 5.5    Access..................................................................................................45
Section 5.6    Press Releases and Public Announcements .........................................46
Section 5.7    Bulk Transfer Laws ............................................................................46
Section 5.8    Release of Claims ...............................................................................47
Section 5.9    Buyer Backstop.. .................................................................................48

Article VI OTHER COVENANTS....................................................................................48

Section 6.1    Cooperation.........................................................................................48
Section 6.2    Further Assurances ..............................................................................49
Section 6.3    Availability of Business Records.........................................................49
Section 6.4    Employee Matters................................................................................49
Section 6.5    Transfer Taxes ....................................................................................51
Section 6.6    Wage Reporting...................................................................................51
Section 6.7    Insurance Policies ...............................................................................51
Section 6.8    Collection of Accounts Receivable .....................................................51
Section 6.9    Use of Name and Marks......................................................................52
Section 6.10   Liquor License Approvals ...................................................................52
Section 6.11   Data Privacy Protection.......................................................................52
Section 6.12   Alternate Transactions ........................................................................53
Section 6.13   Purchased Actions ..............................................................................53
Section 6.14   Buyer Designee ...................................................................................53

Article VII CONDITIONS TO CLOSING.........................................................................53

Section 7.1    Conditions to Buyer's Obligations ......................................................53
Section 7.2    Conditions to Sellers' Obligations.......................................................54
Section 7.3    No Frustration of Closing Conditions .................................................55
Section 7.4    Waiver of Conditions ..........................................................................55
Section 7.5    Agreement Regarding Schedules and Exhibits Hereto.. .......................56

Article VIII TERMINATION .............................................................................................56

Section 8.1    Termination of Agreement ..................................................................56
Section 8.2    Procedure upon Termination ...............................................................58

DOCS_SF:103743.4 07979/002

Section 8.3    Effect of Termination..........................................................................58

Article IX MISCELLANEOUS..........................................................................................60

Section 9.1    Remedies.........................................................................................60
Section 9.2    Expenses .........................................................................................60
Section 9.3    Entire Agreement.............................................................................60
Section 9.4    Incorporation of Schedules, Exhibits and Disclosure Schedule ..............60
Section 9.5    Amendments and Waivers................................................................61
Section 9.6    Succession and Assignment..............................................................61
Section 9.7    Notices.............................................................................................61
Section 9.8    Governing Law; Jurisdiction ............................................................62
Section 9.9    Consent to Service of Process...........................................................63
Section 9.10   WAIVERS OF JURY TRIAL .............................................................63
Section 9.11   Severability .....................................................................................63
Section 9.12   No Third Party Beneficiaries ...........................................................63
Section 9.13   No Survival of Representations, Warranties and Agreements ...............63
Section 9.14   Non-Recourse ..................................................................................64
Section 9.15   Construction ....................................................................................64
Section 9.16   Computation of Time .......................................................................64
Section 9.17   Mutual Drafting...............................................................................64
Section 9.18   Disclosure Schedule ........................................................................64
Section 9.19   Headings; Table of Contents ............................................................65
Section 9.20   Counterparts; Facsimile and Email Signatures .......................................65
Section 9.21   Sellers' Rep.....................................................................................65
Section 9.22   Time of Essence ..............................................................................66
Section 9.23   Risk of Loss.....................................................................................66
Section 9.24   Buyer's Removal of Purchased Assets................................................66

DOCS_SF:103743.4 07979/002

EXHIBITS

Exhibit A        -        Form of Bill of Sale
Exhibit B        -        Form of Assignment and Assumption Agreement
Exhibit C        -        Form of Release

SCHEDULES

Schedule 2.1(t)      -        Vehicles
Schedule 2.2         -        Excluded Assets
Schedule 2.3(b)               Accounts Payable
Schedule 2.6(a)      -        Contracts and Estimated Cure Amounts
Schedule 2.6(b)      -        Assumed Contracts
Schedule 3.3(b)      -        Consents and Approvals
Schedule 3.6         -        Contracts
Schedule 3.7         -        Intellectual Property
Schedule 3.8         -        Litigation
Schedule 3.9         -        Employment Matters
Schedule 3.10        -        Employee Benefit Plans
Schedule 3.11(b)     -        Leased Real Property
Schedule 3.11(c)     -        Leasehold Improvements
Schedule 3.12        -        Personal Property Leases
Schedule 3.13(a)     -        Permits
Schedule 3.13(b)     -        Liquor Licenses
Schedule 3.15        -        Environmental Matters
Schedule 3.21        -        Major Suppliers
Schedule 5.3         -        Conduct of Business
Schedule 7.1         -        Consents, Assumed Permits, and Liquor Licenses Approvals

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is entered into as of July 9, 2020, by and among BARFLY VENTURES, LLC ("BarFly Ventures"), individually and as Sellers' Rep; 9 VOLT, LLC; 50 AMP FUSE, LLC; EL BREWPUB, LLC; GRBC HOLDINGS, LLC; HOPCAT-ANN ARBOR, LLC; HOPCAT-CHICAGO, LLC; HOPCAT-CONCESSIONS, LLC; HOPCAT-DETROIT, LLC; HOPCAT-GR BELTLINE, LLC; HOPCAT-HOLLAND, LLC; HOPCAT-INDIANAPOLIS, LLC; HOPCAT-KALAMAZOO, LLC; HOPCAT-KANSAS CITY, LLC; HOPCAT-LEXINGTON, LLC; HOPCAT-LINCOLN, LLC; HOPCAT-LOUISVILLE, LLC; HOPCAT-MADISON, LLC; HOPCAT-MINNEAPOLIS, LLC; HOPCAT-PORT ST. LUCIE, LLC; HOPCAT-ROYAL OAK, LLC; HOPCAT-ST. LOUIS, LLC; and LUCK OF THE IRISH, LLC (each of the foregoing, individually a "Seller" and sometimes collectively, the "Sellers" or, sometimes individually a "Debtor" or collectively, the "Debtors"), and Project BarFly LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"). The Sellers and Buyer are referred to collectively herein as the "Parties." Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Article I.

## RECITALS

WHEREAS, Sellers are in the business of operating restaurants, brewery restaurants and bars in numerous states (collectively, but excluding the Excluded Restaurants and the assets and Liabilities directly related thereto, the "Business");

WHEREAS, on June 3, 2020, Sellers filed voluntary petitions for relief (the "Chapter 11 Cases") pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Michigan (the "Bankruptcy Court");

WHEREAS, upon the filings of such Chapter 11 Cases, Sellers continued in possession of their assets and were authorized under the Bankruptcy Code to continue the operation of their businesses as debtors-in-possession;

WHEREAS, certain of the Sellers entered into a Credit Agreement as borrowers, dated as of August 31, 2015, with the lenders party thereto, as lenders (the "Credit Agreement Lenders"), CIP Administrative, LLC, as administrative agent for the Credit Agreement Lenders (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement" and, together with the other Loan Documents (as therein defined), the "Credit Agreement Loan Documents");

WHEREAS, on or about March 20, 2020, to comply with business closure mandates imposed by governmental authorities as a result of the COVID-19 outbreak, the Sellers ceased operating all of their restaurants and furloughed nearly all of their employees;

WHEREAS, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to acquire and assume from Sellers, pursuant to Sections 363 and 365 of the Bankruptcy Code, the Purchased Assets and the Assumed Liabilities upon the terms and subject to the conditions set forth herein;

WHEREAS, in connection with the Closing, and as a material inducement to Buyer's willingness to enter into this Agreement, Ned Lidvall has executed, or will execute, an employment agreement (in form acceptable to the Buyer) that by its terms is to become effective as of the Closing;

WHEREAS, Sellers intend to seek the entry of the Sale Order by the Bankruptcy Court approving this Agreement and authorizing Sellers to consummate the Contemplated Transactions upon the terms and subject to the conditions set forth herein and in the Sale Order;

WHEREAS, the board of directors or the managing members of each Seller has determined that it is advisable and in the best interests of each such Seller's estate and the beneficiaries of such estates to consummate the Contemplated Transactions provided for herein pursuant to the Sale Order and has approved this Agreement; and

WHEREAS, the Contemplated Transactions are subject to the approval of the Bankruptcy Court, subject to any higher and better offers that may be made for the Purchased Assets prior to or at the Sale Hearing, and will be consummated only pursuant to the Sale Order to be entered by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

"Accounts Receivable" means (a) all accounts, accounts receivable, Credit Card Receivables, contractual rights to payment, notes, notes receivable, negotiable instruments, chattel paper, and vendor and supplier rebates of Sellers in connection with the Business as conducted by the Sellers, and (b) any security interest, claim, remedy or other right related to any of the foregoing.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means, when used with reference to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Alternate Transaction" means a transaction or series of related transactions pursuant to which Sellers sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Sellers or otherwise), all or substantially all of the Purchased Assets (or agrees to do any of the foregoing) in a transaction or series of transactions to a Person or Persons other than Buyer, but

2

does not mean the sale of assets to customers conducted in the Ordinary Course of Business or a piecemeal liquidation of the Purchased Assets through a series of unrelated transactions.

"Assignment and Assumption Agreement" means a duly executed assignment and assumption agreement, substantially in the form attached as Exhibit B hereto.

"Assumed Contracts" has the meaning set forth in Section 2.6(b).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumed Permits" means all Permits relating to the Business that are transferable in accordance with their terms and under applicable Law (including, without limitation, those that are transferable without consent of the issuing entity by virtue of the effect of the Sale Order), but excluding all Permits (other than Liquor Licenses) to the extent related exclusively to any Excluded Asset (including any Lease that is not an Assumed Contract).

"Available Cash" is defined in Section 5.9.

"Available Cash Deficiency Amount" is defined in Section 5.9.

"Backstop Amount" is defined in Section 5.9.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bid Procedures" means bid procedures acceptable to Buyer, which shall, among other things: (i) schedule an auction for the Business (an "Auction") to be held not later than August 25, 2020; (ii) schedule the hearing to approve the sale of the Business (the "Sale Hearing") to be held not later than August 27, 2020; (iii) require that any sale transaction close not later than August 31, 2020; (iv) require the Sellers to promptly provide a copy of any Qualified Bid to Buyer; (v) provide that, at the Auction, the first bid shall be considered only if it exceeds the amount of the highest Qualified Bid submitted by the Qualified Bidders prior to such auction by a minimum of any Break-up Fee (if Buyer submitted the highest Qualified Bid) plus $100,000 (with $100,000 to be the minimum bid increment for each round of bidding); (vi) authorize the Buyer to bid, at each round of the Auction, the amount of the Break-up Fee; (vii) provide that no bidder(s) (other than, for the avoidance of doubt, the Buyer in those circumstances in which it is entitled to a Break-up Fee hereunder) shall be granted a break-up fee, expense reimbursement, termination payment, or other like compensation at any time during the sale process or the Auction; and (viii) grant Buyer relief from the automatic stay to enable Buyer to exercise rights and receive benefits under this Agreement.

"Bid Procedures Motion" means a motion filed by the Sellers with the Bankruptcy Court requesting the entry of the Bid Procedures Order.

"Bid Procedures Order" means an order of the Bankruptcy Court entered in the Chapter 11 Cases approving the Bid Procedures in form and substance agreeable to Buyer.

3

"Bid Procedures Order Deadline" means July 17, 2020.

"Bill of Sale" means a duly executed bill of sale, substantially in the form attached as Exhibit A hereto.

"Break-up Fee" means an amount equal to $525,000.

"Business" has the meaning set forth in the recitals.

"Business Cessation Event" means Sellers' cessation of its ongoing business on or about March 20, 2020, as the result of, among other things, the COVID-19 outbreak, and the accompanying furlough of substantially all of Sellers' employees.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks located in New York, New York shall be authorized or required by Law to close.

"Buyer" has the meaning set forth in the preamble.

"Buyer Released Parties" has the meaning set forth in Section 5.9.

"Cash and Cash Equivalents" means, collectively, cash (including Restaurant Petty Cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, government securities and other cash equivalents or similar cash items of Sellers, net of (i) Cure Claims to the extent not assumed by Buyer, if any, (ii) administrative claims incurred through the Closing Date, (iii) the Wind Down Budget, and (iv) uncleared checks issued by Sellers that are not yet reflected in the applicable bank account of Sellers.

"Chapter 11 Cases" has the meaning set forth in the recitals.

"Claim" means a "claim" as defined in Section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing" means the closing of the Contemplated Transactions, which shall be deemed to have occurred at 12:01 p.m. (prevailing Eastern Time) on the Closing Date.

"Closing Date" means the second (2nd) Business Day after the date on which all conditions to the obligations of Sellers and Buyer to consummate the Contemplated Transactions set forth in Article VII (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived by the Party entitled to waive that condition, or at such other time or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto.

"Consent" means any approval, consent, ratification, permission, clearance, designation, qualification, waiver or authorization, or an order of the Bankruptcy Court that deems or renders any of the foregoing unnecessary.

4

"Contemplated Transactions" means the sale by Sellers to Buyer, and the purchase by Buyer from Sellers, of the Purchased Assets and the assumption by Buyer of the Assumed Liabilities.

"Continuing Restaurant" means any of Sellers' restaurant locations with respect to which the associated Leases have been designated by Buyer as Assumed Contracts pursuant to Section 2.6(b).

"Contract" means any written or oral agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, license agreement, contribution agreement, partnership agreement or other arrangement, understanding, permission or commitment that, in each case, is legally-binding.

"COVID-19" means the novel coronavirus disease 2019 caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2).

"Credit Agreement" has the meaning set forth in the recitals, as amended, restated, supplemented or otherwise modified from time to time in accordance with this Agreement.

"Credit Agreement Lenders" means the "Lenders" as such term is defined in the Credit Agreement.

"Credit Agreement Lien Obligations" means all "Obligations" (as defined in the Credit Agreement).

"Credit Agreement Loan Documents" has the meaning set forth in the recitals.

"Credit Agreement Secured Parties" shall mean Congruent Credit Opportunities Fund III, LP; Main Street Capital Corporation; and HMS Income Fund, Inc., and the successors and assignees of such parties.

"Credit Bid" means a bid by Buyer pursuant to Section 363(k) of the Bankruptcy Code equal to a portion of the Credit Agreement Lien Obligations in the initial amount of $17,500,000, and not to exceed $20,000,000.

"Credit Bid And Release" has the meaning set forth in Section 2.5(b).

"Credit Card Liabilities" means all Liabilities and other rights of credit card processors or other Persons to amounts payable by any Seller (whether current or non-current) in connection with any customer purchases from any restaurants operated by Sellers in respect of credit or debit cards to any credit card processors to Sellers.  Credit Card Liabilities are Excluded Liabilities.

"Credit Card Receivables" means all accounts receivable and other rights of Sellers to amounts owed to any Seller (whether current or non-current) in connection with any customer purchases from any restaurants operated by Sellers that are made with credit or debit cards or any

5

other related amounts owing (including deposits or holdbacks to secure chargebacks, offsets or otherwise) from credit card processors to Sellers.

"Cure Amounts" has the meaning set forth in Section 2.6(c).

"Current Employees" means all individuals employed by Sellers as of the day before the Closing Date, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

"Dataroom" has the meaning set forth in Section 4.7.

"Debtor" or "Debtors" has the meaning set forth in the preamble.

"Decree" means any judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order or any other order of any Governmental Entity.

"Disclosure Schedule" has the meaning set forth in Article III.

"Employee Benefit Plan" means (a) any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA, whether or not subject to ERISA), (b) employment, consulting, severance, termination protection, change in control, transaction bonus, retention or similar plan, program, policy, practice agreement or arrangement and (c) any other plan, program, policy, practice, agreement or arrangement providing for benefits or compensation of any kind, including without limitation bonuses, profit-sharing, or other forms of incentive or deferred compensation, vacation or paid time off benefits, insurance, medical, dental, vision, prescription or fringe benefits, life insurance, disability or sick leave benefits or post-employment or retirement benefits, in each case of clause (a), (b) and (c) above, sponsored, maintained, contributed to or required to be contributed to by any Seller or any entity that together with any Seller is, or at any time was, treated as a single employer under Section 414 of the Code or Title IV of ERISA ("ERISA Affiliate") or in which any Seller or any ERISA Affiliate participates or participated, or with respect to which any Seller or any ERISA Affiliate has or may have any liability, contingent or otherwise.

"Employee Roster" has the meaning set forth in Section 3.9(a).

"Environmental Laws" means all applicable Laws concerning pollution or protection of the environment, human health and safety, and natural resources.

"ERISA" means the United States Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" has the meaning set forth in the definition of "Employee Benefit Plan", as amended.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Cash" is defined in Section 2.1(a).

6

"Excluded Employee" has the meaning set forth in Section 6.4(b).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Restaurants" means any of Sellers' restaurant locations with respect to which the associated Leases have not been designated by Buyer as Assumed Contracts pursuant to Section 2.6(b).

"Existing Escrows" has the meaning set forth in Section 2.1(a).

"Expense Reimbursement Amount" means Buyer's and/or its Affiliates, as applicable, reasonable costs and expenses related to pursuing, negotiating, and documenting the Contemplated Transactions.

"Express Representations" has the meaning set forth in Section 4.7.

"Financial Statements" has the meaning set forth in Section 3.16.

"Former Employees" means all individuals who have been employed by the Sellers (or any of their predecessors) who are not Current Employees.

"GAAP" means United States generally accepted accounting principles as in effect from time to time, as consistently applied in accordance with Sellers' historic practices.

"Governmental Entity" means any United States federal, state or local or non-United States governmental or regulatory authority, agency, commission, court, body or other governmental entity.

"Hazardous Substance" means any toxic or hazardous material, substance or waste as to which Liability or standards of conduct may be imposed under any Environmental Laws.

"Intellectual Property" means any and all rights, title and interest in or relating to intellectual property of any type, which may exist or be created under the Laws of any jurisdiction throughout the world, including: (a) patents and patent applications, together with all reissues, continuations, continuations-in-part, divisionals, extensions and reexaminations in connection therewith; (b) trademarks, service marks, brand names, Internet domain names, logos, symbols, trade dress, assumed names, fictitious names, trade names, business names, product names, social media accounts, URLs, and other indicia of origin, all applications and registrations for all of the foregoing, and all goodwill associated therewith and symbolized thereby (the items of this subclause (b) collectively, "Trademarks"); (c) rights associated with works of authorship (including menus), including exclusive exploitation rights, mask work rights, copyrights, database and design rights, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and renewals thereof; (d) rights in electronic data processing systems, information management systems, recordkeeping systems, communications and telecommunications systems, networking systems, account management systems, Internet websites and related content, inventory management systems and other such applications, software, hardware, equipment and services (including all firmware, applications and software installed on such hardware and

7

equipment, and all associated databases, and related documentation); (e) trade secrets and proprietary or confidential information relating to the Business (including recipes, methods, ingredient lists, procedures, food and beverage preparation instructions and publications and guidelines, menu formulation processes, standards, operation manuals, specifications, pictures, drawings, mock-ups, prototypes, processes, ideas, formulae, compositions, know-how, discoveries, inventions, designs, plans, proposals, technical data, financial, business and marketing plans, price lists, and customer and supplier lists and related information); and (f) all other intellectual property rights related to the Business.

"Intellectual Property Assignments" has the meaning set forth in Section 2.9(a).

"Inventory" means all of Sellers' now owned or hereafter (prior to the Closing) acquired inventory and goods, wherever located, including, without limitation, consumable food, alcoholic beverages (whether unopened or opened to the extent permitted by applicable Law), and other beverages and raw materials and work-in-process therefor and all of Sellers' tangible property used in the preparation of, serving, and cleaning up from, food and drinks, including napkins, silverware, plates and dining ware, cups, glassware, mugs, cooking and cleaning utensils, packaging materials, paper products, ingredients, miscellaneous consumables, materials, supplies, inventories and other related items or that are otherwise included in the Purchased Assets and are permitted to be sold and transferred under applicable Law.

"IRC" means the United States Internal Revenue Code of 1986, as amended.

"Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Entity, or court of competent jurisdiction, or other legal requirement or rule of law, including applicable building, zoning, subdivision, health and safety and other land use Laws.

"Leased Real Property" means all (i) leasehold or sub-leasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property which is used in or otherwise related to the Business, including the right to all security deposits, letters of credit and other amounts and instruments deposited by or on behalf of Sellers thereunder, and (ii) any buildings, structures, improvements and fixtures located on any Leased Real Property which are owned by Seller, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the Lease for such Leased Real Property ("Leasehold Improvements").

"Leasehold Improvements" has the meaning set forth in the definition of "Leased Real Property."

8

"Leases" means all leases, subleases, licenses, concessions and other Contracts, including all amendments, extensions, renewals, guaranties and other agreements with respect thereto, in each case pursuant to which any Seller holds any Leased Real Property.

"Liability" means, as to any Person, any debt, Claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred, or asserted or when the relevant events occurred or circumstances existed.

"Lien" means any lien (as defined in Section 101(37) of the Bankruptcy Code), encumbrance, right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, judgments, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use (whether known or unknown, secured or unsecured or in the nature of setoff or recoupment, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, Law, equity, or otherwise, including claims otherwise arising under doctrines of successor liability).

"Liquor Licenses" means all liquor licenses (including, without limitation, beer and wine licenses) held or used by each Seller in respect of any Purchased Assets, including the Seller in whose name such license is issued, date of issuance and renewal date.

"Liquor License Approvals" means the necessary Consents pertaining to the transfer and/or issuance of any of the Liquor Licenses in respect of any Purchased Assets to Buyer.

"Litigation" means any action, cause of action, suit, claim, investigation, mediation, arbitration, audit, grievance, demand, hearing, proceeding or investigation, whether civil, criminal, administrative or arbitral, whether at law or in equity and whether before any Governmental Entity, arbitrator or mediator.

"Major Suppliers" has the meaning set forth in Section 3.21.

"Management Agreement" means an agreement in the form as shall be reasonably acceptable to Buyer and Sellers, and which provides, among other things, that all costs of operations of the Purchased Assets from and after the Closing Date shall be paid on a current basis by Buyer and the economic benefit of the operations of the Purchased Assets accrues to Buyer.

"Material Adverse Effect" means any change, event, effect, development, condition, circumstance or occurrence (when taken together with all other changes, events, effects, developments, conditions, circumstances or occurrences), that (a) has had, or would reasonably

9

be expected to have, individually or in the aggregate, a material adverse effect on the Purchased Assets (taken as a whole); provided, however, that no change, event, effect, development, condition, circumstance or occurrence related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: (i) any effect resulting from the filing, announcement, or pendency of the Chapter 11 Cases, including (1) any Seller's inability to pay certain prepetition obligations as a result of the commencement of such Chapter 11 Cases, (2) any Decree of the Bankruptcy Court, (3) any action or omission of any Seller taken or not taken in order to avoid violation of any Decree or objections of the Bankruptcy Court, or (4) any other effect, directly or indirectly, related thereto; (ii) acts of war, armed hostilities, sabotage or terrorism, or any escalation or worsening of any such acts of war, armed hostilities, sabotage or terrorism threatened or underway as of the date of this Agreements, except to the extent that such change has a materially disproportionate adverse effect on the Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (iii) changes in conditions in the U.S. or global economy or capital or financial markets generally, including changes in interest or exchange rates, except to the extent that such change has a materially disproportionate adverse effect on Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (iv) resulting from any act of God or other force majeure event (including natural disasters, or any epidemic, pandemic or wide-spread disease outbreak (including the COVID-19 virus outbreak)); (v) changes in Law or in GAAP or interpretations thereof; (vi) any actions taken by Buyer or any of its Affiliates (other than those expressly permitted to be taken hereunder); (vii) inaction by any Seller due to Buyer's refusal to consent to a request for consent by Seller under Section 5.3; (viii) the negotiation, announcement or pendency of this Agreement or the consummation of the sale and assumption contemplated hereby, or the identity, nature or ownership of Buyer; or (ix) the Business Cessation Event; provided, however, notwithstanding anything herein to the contrary, a Decree issued after the date hereof that requires restaurants or bars to close for dine-in business in any jurisdiction where a Continuing Restaurant is located shall constitute a Material Adverse Effect; or (b) would reasonably be expected to prevent, materially delay or materially impair to the ability of any Seller to consummate the Contemplated Transactions or the Related Agreements on the terms set forth herein and therein.

"Non-Real Property Contracts" means the Contracts to which any Seller is a party other than the Leases.

"Offeree" has the meaning set forth in Section 6.4(a).

"Ordinary Course of Business" means the ordinary and usual course of business of Sellers taken as a whole consistent with past custom and practice and taking into account the commencement of the Chapter 11 Cases and the Debtors' current distressed financial condition, excluding from the ordinary and usual course of business, for the avoidance of doubt, any modifications to the previous normal day-to-day operations of Sellers made in response to COVID-19, or any similar or related disease caused by COVID-19, or any mutation or evolution thereof, or any policies, guidelines or Laws enacted, directly or indirectly, in response to the same (including any "shelter-in-place", "stay at home" or similar Decrees and the Cybersecurity and Infrastructure Security Agency Critical Infrastructure Worker Guidance 2.0, as may be amended, supplemented, updated or otherwise modified from time to time).

10

"Organizational Documents" means, with respect to any entity, the certificate of incorporation, articles of incorporation, certificate of formation, articles of organization, by-laws, partnership agreement, limited liability company agreement, formation agreement and other similar organizational documents of such entity (in each case, as amended through the date of this Agreement).

"Outside Date" means August 31, 2020.

"Parties" has the meaning set forth in the preamble.

"Permit" means any and all franchise, approval, permit (including environmental, construction and operation permits), license, order, registration, certificate, variance, Consent, exemption or similar right issued, granted, given or otherwise obtained or required to be obtained, from or by any Governmental Entity, under the authority thereof or pursuant to any applicable Law.

"Permitted Liens" means (a) Liens for Taxes which are (i) being contested in good faith by appropriate proceedings or (ii) not due and payable as of the Closing Date and which shall be prorated or otherwise released at Closing and, in each case of clauses (i) and (ii), for which adequate reserves have been made on the Financial Statements to the extent required by GAAP; (b) mechanics liens and similar liens for labor (excluding Liens arising under ERISA or Code Section 430), materials or supplies provided with respect to real property incurred in the Ordinary Course of Business which are being contested in good faith by appropriate proceedings for which adequate reserves have been made on the Financial Statements to the extent required by GAAP and which shall be prorated or otherwise released at Closing (including, without limitation, by virtue of the effect of the Sale Order); (c) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business, except where any such violation would not, individually or in the aggregate, materially impair the use, operation or transfer of the affected property or the conduct of the Business thereon as it is currently being conducted; (d) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects, in each case that do not or would not materially impair value or the use or occupancy of such real property or materially interfere with the operation of the Business at such real property; (e) with respect to Leasehold Improvements, any reversion or similar rights to the landlord or other third party upon expiration or termination of the applicable Lease; (f) any Liens associated with or arising in connection with any Assumed Liabilities, (g) Liens resulting from Credit Agreement Lenders' and/or Buyer's actions or conduct upon or after the Closing, and (h) Liens that will be released or removed by operation of the Sale Order (including, without limitation, Liens under Credit Agreement Loan Documents).

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

11

"Personal Property Leases" means all leases of personal property relating to personal property used by Sellers or to which any Seller is a party or by which the properties or assets of any Seller are bound, in each case relating to the Business.

"Petition Date" means the date of the filing of the Chapter 11 Cases.

"PII" means "personally identifiable information" within the meaning of Section 101(41A) of the Bankruptcy Code.

"Plan" means a Chapter 11 plan or plans of reorganization or liquidation.

"PPP Cash" means cash received under the Coronavirus Aid, Relief and Economic Security Act's Paycheck Protection Program.

"Purchase Price" has the meaning set forth in Section 2.5(a).

"Purchased Assets" has the meaning set forth in Section 2.1; provided, however, that, notwithstanding the foregoing or anything contained in this Agreement to the contrary, the Purchased Assets shall not include any Excluded Assets or any asset held by any Seller pursuant to any Lease or Personal Property Lease (a "Possessory Agreement") unless the associated Possessory Agreement is among the Assumed Contracts.

"Purchased Actions" means all causes of action, lawsuits, Claims, rights of recovery and other similar rights of any Seller, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, in equity or otherwise (including any derivative Claims asserted or that may be asserted on behalf of any Seller), (i) arising under Chapter 5 of the Bankruptcy Code, whether relating to the Business and the Purchased Assets or otherwise, or (ii) against any current or former officer or director of any Seller or any shareholder of any Seller or any Affiliate of any Seller.

"Purchased Inventory" means Inventory that is part of the Purchased Assets as set forth in Section 2.1.

"Qualified Bid" means a written proposal provided to the Sellers for the purchase of substantially all of Sellers' assets that:  (a) does not contain any financing or due diligence contingencies; (b) is accompanied by reasonable evidence of committed financing or other ability to perform; (c) is accompanied by a good-faith deposit equal to 10 percent of the consideration proposed by such bidder; and (d) that is timely submitted by the bid deadline set forth in the Bidding Procedures Order. This Agreement shall be deemed a Qualified Bid.

"Qualified Bidder" means an entity that has entered into a confidentiality agreement with Sellers and that Sellers in good faith and in their sole discretion determine (based on the availability of financing and proof of financial ability, experience, and other relevant considerations) is capable of consummating the purchase of the Business, if selected as the successful bidder.  The Buyer shall be deemed to be a Qualified Bidder.

"Recent Employee" has the meaning set forth in Section 3.9(a).

12

"Recipes" has the meaning set forth in Section 2.1(x).

"Records" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Business.

"Registered" means issued by, registered with, renewed by or the subject of a pending application before any Governmental Entity, domain name registrar, or social media site.

"Rejection Damages" means the amount of the distribution that the applicable landlord under any Designated Contract would be entitled to under a Plan that the Bankruptcy Court has confirmed and that has gone effective in the Chapter 11 Cases (with such calculation to be made as if Sellers will not receive any proceeds from Buyer under this Agreement) solely for claims of the applicable landlord for rejection of the applicable Designated Contract of real property that are subject to section 502(b)(6)(A) of the Bankruptcy Code with the amount of such claims to be subject to the limitations in section 502(b)(6)(A) of the Bankruptcy Code even if Sellers do not object to such claims based on any applicable landlord's filed claim exceeding such limitations or the Bankruptcy Court does not adjudicate such claims.

"Related Agreements" means the Management Agreement, Bill of Sale, the Assignment and Assumption Agreement and the Intellectual Property Assignments and any other instruments of transfer and conveyance as may be required under applicable Law to convey valid title of the Purchased Assets to Buyer.

"Related Party" means each officer or director of a Seller, each spouse, sibling, parent, child, grandparent or grandchild of any director or officer of any Seller each trust for the benefit of any of the foregoing, and each Affiliate of any of the foregoing.

"Relief Proceeds" means, all rights of, or on behalf of, any Seller in respect of any current or future disaster relief or other similar assistance program of any Governmental Entity in respect of, or enacted in response to, the COVID-19 pandemic.

"Representative" means a Person's officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents.

"Restaurant Petty Cash" means any petty cash of Sellers on the premises of any Continuing Restaurant or Excluded Restaurant.

"Sale Hearing" means the hearing conducted in the Bankruptcy Court to seek approval of the Sale Motion and the Contemplated Transactions.

"Sale Motion" means a motion filed by the Sellers with the Bankruptcy Court in connection with the Chapter 11 Cases requesting the entry of the Sale Order.

13

"Sale Order" means an order of the Bankruptcy Court entered in the Chapter 11 Cases consistent with the terms of this Agreement approving the Sale Motion and sale to Buyer consistent with the terms of this Agreement in a form agreeable to Buyer.

"Sale Order Deadline" means August 28, 2020.

"Seller" or "Sellers" has the meaning set forth in the preamble.

"Seller Released Parties" has the meaning set forth in Section 5.9.

"Sellers' Knowledge" (or words of similar import) means the actual knowledge of Ned Lidvall and Mark A. Sellers, III, and the knowledge such person would have obtained, as a prudent business person, after making due inquiry with respect to the particular matter in question.

"Sellers' Rep" has the meaning set forth in Section 9.21.

"Service Provider" means each director, officer, employee, manager, independent contractor, consultant, leased employee or other service provider of any Seller.

"Statutory Deadline" means the date that is one hundred twenty (120) days after the date of commencement of the Chapter 11 Cases.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or other persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Tax" or "Taxes" means any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment healthcare, disability, natural resources, entertainment, amusement, registration, real property, personal property, ad valorem, escheat or unclaimed property (whether or not considered a tax under applicable Law), sales, use, liquor, cigarette, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever (however

14

denominated), whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed.

"Tax Return" means any return, declaration, report, claim for refund or information return (including any related or supporting schedules, statements or information and Treasury Form TD F 90-22.1 and FinCEN Form 114) or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Termination Event" has the meaning set forth in Section 8.1.

"Transfer Tax" means any stamp, documentary, registration, transfer, sales, use, added-value or similar Tax (including any penalties and interest thereon but excluding for the avoidance of doubt any income Taxes) imposed under any applicable Law in connection with the Contemplated Transactions.

"Transferred Employees" means all Offerees who accept offers prior to the Closing pursuant to Section 6.4(a).

"Transferring Party" has the meaning set forth in Section 5.1(c).

"Treasury Regulations" means regulations promulgated by the United States Department of Treasury under the IRC.

"Wind-Down Budget" is defined in Section 2.1(a).

## ARTICLE II
## PURCHASE AND SALE

**Section 2.1    Purchase and Sale of Purchased Assets**. Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement (including, without limitation, Section 4.7 below), at the Closing, Buyer shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Buyer, all of the Sellers' right, title and interest in, to and under the Purchased Assets, free and clear of all Liens (other than Permitted Liens and any Liens included in the Assumed Liabilities) to the extent provided in the Sale Order, for the consideration specified in Section 2.5. "Purchased Assets" shall mean all of the direct or indirect right, title and interest of Sellers in, to and under the tangible and intangible assets (including goodwill), properties, rights, going concern value, claims and Contracts used, useful, or held for use in, or related to, the Business (but excluding Excluded Assets) wherever situated and of whatever kind and nature, real or personal, as of the Closing, including:

(a)    all Cash and Cash equivalents of Sellers, including Restaurant Petty Cash, except for (i) PPP Cash, (ii) cash that has otherwise been reserved or designated by Decree of the Bankruptcy Court entered prior to the date hereof for utility deposits (collectively, "Existing Escrows") to the extent actually applied for such designated purpose (it being expressly agreed that notwithstanding anything to the contrary in Section 2.2 below, any cash that reverts to the Sellers from any Existing Escrow shall constitute a Purchased Asset), and (iii) in an aggregate amount needed to fund the

15

wind-down budget set forth on <u>Schedule 2.1(a)</u> (as the same may hereafter be amended from time to time with the prior written consent of Buyer, the "<u>Wind-Down Budget</u>" and, the aggregate amount of such Cash and Cash Equivalents in the foregoing the "<u>Excluded Cash</u>"); provided, that to the extent that Excluded Cash described herein (after taking into account any Backstop Amount (as defined in <u>Section 5.9</u> below) actually funded to Sellers by Buyer that has not been used or applied for the purposes required by <u>Section 5.9</u> below prior to (and is not used or applied at) the Closing) is insufficient to fund the entire Wind-Down Budget (the "<u>Excluded Cash Deficiency Amount</u>"), Buyer shall fund the Excluded Cash Deficiency Amount to the Sellers at the Closing in accordance with <u>Sections 2.5</u>, <u>2.8(b)(ii)</u>, and <u>5.9</u> (including, for the avoidance of doubt, the limitations set forth therein) hereof;

(b)     all bank accounts of Sellers, other than (i) the PPP Cash account, to the extent such account holds Excluded Cash, or (ii) Existing Escrows (but including any amounts reverting to the Sellers from such Existing Escrows);

(c)     all Accounts Receivable of Sellers as of the Closing;

(d)     all Credit Card Receivables;

(e)     all Inventory of Sellers as of the Closing located at (or in Buyer's reasonable discretion movable and which is actually moved, at Buyer's sole cost and expense at any time prior to August 31, 2020 in accordance with <u>Section 9.24</u> hereof to) a Continuing Restaurant, including all rights of Sellers to receive such Inventory, supplies and materials which are on order as of the Closing solely in respect of the operation of a Continuing Restaurant, but excluding alcoholic beverage Inventory in jurisdictions where the Law does not permit Buyer to take title to such Inventory until it obtains the requisite Liquor License Approvals or other authorization from the Bankruptcy Court or any other pertinent Governmental Entity; <u>provided</u>, <u>however</u>, Sellers shall promptly transfer, assign, convey and deliver (at Buyer's sole cost and expense) to Buyer such alcoholic beverage Inventories in each instance upon issuance of the relevant Liquor License Approval or other authorization from the Bankruptcy Court or relevant Governmental Entity;

(f)     without duplication of the above, all deposits (including, without limitation, deposits in transit, customer deposits and security deposits for rent, electricity, telephone, utilities or otherwise) and other prepaid charges and expenses of Sellers, including all amounts constituting Existing Escrows to the extent reverting to the Sellers;

(g)     all Assumed Contracts;

(h)     all Intellectual Property owned by Sellers, but as to any Intellectual Property which consists of a Possessory Agreement, only to the extent transfer or assignment of such Intellectual Property is not prohibited by Law;

(i)     all items of machinery, equipment, supplies, furniture, fixtures, leasehold improvements (to the extent of Sellers' rights to any Leasehold

16

Improvements under the Leases that are Assumed Contracts) owned by Sellers as of the Closing and related to (or to the extent movable and actually moved, at Buyer's sole cost and expense at any time prior to August 31, 2020 in accordance with Section 9.24 hereof to) the Continuing Restaurants;

(j)    all Records, including Records related to (i) Taxes paid or payable by any Seller related to the Business or the Purchased Assets (provided that Sellers are entitled to retain copies of all Records and Buyer will make all such Records available to Sellers upon request and at no charge), but excluding any materials exclusively related to any Excluded Assets and (ii) eligibility to receive Relief Proceeds;

(k)    all goodwill associated with the Business or the Purchased Assets, including all goodwill associated with the Intellectual Property owned by Sellers and all rights under any confidentiality agreements executed by any third party for the benefit of any of Sellers to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(l)    all rights of Sellers under non-disclosure or confidentiality, noncompete, or nonsolicitation agreements with Current Employees or Former Employees, directors, consultants, independent contractors and agents of any of Sellers to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(m)    all of the Assumed Permits or, all of the rights and benefits accruing under any Permits that are (i) related to the Continuing Restaurants, or (ii) to the extent related to the Excluded Restaurants, listed on Schedule 7.1, in each case of clauses (i) and (ii), including all Liquor Licenses to the extent transferrable and held by Sellers, other than alcohol permits (including Liquor Licenses) in jurisdictions where the Law does not permit Buyer to take title to such Permits until it obtains the requisite approvals or other authorization from the Bankruptcy Court or any other pertinent Governmental Entity in which case Sellers shall transfer, assign convey and deliver to Buyer such permits in each instance upon issuance of the requisite approvals from the relevant Governmental Entity;

(n)    all Liquor Licenses, to the extent transferable, associated with any Excluded Restaurants not included on Schedule 7.1 pursuant to Section 2.1(m), or which the Sellers presently hold in safe keeping, each at the sole cost and expense of the Buyer;

(o)    the amount of, and all rights to any, insurance proceeds received by any of Sellers after the date hereof in respect of (i) the loss, destruction or condemnation of any Purchased Assets, occurring prior to, on or after the Closing, in each case to the extent relating to loss, destruction or condemnation which has not been repaired or restored prior to the Closing, or (ii) any Assumed Liabilities;

(p)    all other rights, demands, claims, credits, allowances, rebates or other refunds (excluding any vendor or supplier rebates) and rights in respect of promotional allowances or rights of setoff and rights of recoupment of every kind and nature

17

(whether or not known or unknown or contingent or non-contingent), other than against Sellers, arising out of or relating to the Continuing Restaurants as of the Closing, including all deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances and prepayments, in each case to the extent the same relate to Continuing Restaurants;

(q)     all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent), including, without limitation, the Purchased Actions;

(r)     all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to equipment purchased, products sold, or services provided, to Sellers or to the extent affecting any Purchased Assets and/or Assumed Liabilities;

(s)     all cars, trucks, forklifts, other industrial vehicles and other motor vehicles set forth or described on Schedule 2.1(s);

(t)     all of the Sellers' telephone numbers, fax numbers, e-mail addresses, websites, URLs and Internet domain names related to the Continuing Restaurants;

(u)     the right to receive and retain mail relating to, Accounts Receivable payments and other communications of Sellers and the right to bill and receive payment for services performed but unbilled or unpaid as of the Closing;

(v)     all rights arising from (i) any refunds due from federal, state and/or local Governmental Entities with respect to Taxes paid by Sellers or (ii) Relief Proceeds;

(w)     all of Sellers' recipes, methods, procedures, cooking/preparation/mixing publications, guidelines, or standards, knowhow, ingredient lists, menus, price lists, nutritional, health, or dietary information, publications, or disclosures, and promotional or informational materials, in each case whether related to food, beverages (whether alcoholic or non-alcoholic), or otherwise (in each case, written or oral or in any other form whatsoever) (collectively, "Recipes"); and

(x)     all other assets that are related to or used in connection with the Purchased Assets or the Business (but excluding all of the Excluded Assets).

Section 2.2     Excluded Assets.     Notwithstanding anything to the contrary in Section 2.1, Buyer expressly understands and agrees that Buyer is not purchasing or acquiring, and Sellers are not selling or assigning, any of the following assets, properties and rights of Sellers (collectively, the "Excluded Assets"):

(a)     (i) the Excluded Cash;

18