(b)    all alcoholic beverage Inventory of Sellers in jurisdictions where the Law does not permit Buyer to take title to such Inventory until it obtains the requisite Liquor License Approvals or other authorization from the Bankruptcy Court or any other pertinent Governmental Entity; provided, however, Sellers shall transfer, assign, convey and deliver to Buyer (at Buyer's sole cost and expense) such alcoholic beverage Inventory in each instance upon issuance of the relevant Liquor License Approval or other authorization from the Bankruptcy Court or other relevant Governmental Entity;

(c)    all of Sellers' certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, unit certificates and other documents relating to the organization, maintenance and existence of any Seller as a limited liability company or other entity;

(d)    all equity securities of any Seller or securities convertible into, exchangeable, or exercisable for any such equity securities and all net operating losses of any Seller;

(e)    all Leases (and related Leased Real Property, if any) and Contracts, in each case, other than the Assumed Contracts;

(f)    any loans or notes payable to any Seller or any of its Affiliates from any employee of any Seller or any of its Affiliates;

(g)    any (1) Records containing confidential personal private information including confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the disclosure of such information is prohibited by applicable Law, (2) other Records that Sellers are required by Law to retain and (3) any Records or other documents relating to the Chapter 11 Cases that are protected by the attorney-client or similar privilege; provided that Buyer shall have the right to make copies of any portions of such retained Records (other than the Records referenced in subsection (3)) to the extent that such portions relate to the Business or any Purchased Asset;

(h)    all Permits other than the Assumed Permits;

(i)    all directors' and officers' liability Insurance Policies, including any tail insurance policies, including the rights of the directors and officers thereunder for coverage (i.e., advancement of expenses and liability coverage with respect to claims made against such officers and directors);

(j)    all Employee Benefit Plans;

(k)    the Excluded Restaurants and those assets set forth on Schedule 2.2; and

(l)    the rights of Sellers under this Agreement and the Related Agreements and all consideration payable or deliverable to Sellers under this Agreement.

19

**Section 2.3**    **Assumption of Assumed Liabilities**.  On the terms and subject to the conditions of this Agreement and the Sale Order, at the Closing, Buyer shall assume from Sellers (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers shall irrevocably convey, transfer, and assign to Buyer, the following Liabilities of the Business and only to the extent not paid prior to the Closing and no others (collectively,  the "Assumed Liabilities"):

       (a)    Liabilities (i) for all Cure Amounts to the extent that the Sellers' Cash and Cash Equivalents are not sufficient to pay such amounts, and (ii) under the Assumed Contracts and Assumed Permits arising from and after the Closing Date as well as any Liabilities to the extent arising out of the Purchased Assets or the operation of the Business solely in respect of the Continuing Restaurants, in each case under clause (ii) of this Subpart (a), arising from and after the Closing Date;

       (b)    All Accounts Payable arising from the normal operation of Business that is accrued but not yet due as of the Closing and as set forth on Schedule 2.3(b) (as such Schedule may be updated and amended (i) by Sellers with Buyer's consent (such consent not to be unreasonably withheld) between the date hereof and August 21, 2020, and (ii) as otherwise agreed upon by Sellers and Buyer up to the Closing);

       (c)    all obligations of Sellers to honor gift cards in the Ordinary Course of Business at a Business restaurant (i.e., accepting such gift cards in exchange for goods or services delivered), whether relating to a Continuing Restaurant or an Excluded Restaurant, but excluding any escheatment claims related to such gift card obligations and excluding any claims for cash refunds to the extent not otherwise required by applicable Law in any jurisdiction in which a Continuing Restaurant is located; and

       (d)    all accrued payroll, accrued and unused vacation, or other accrued paid time-off, and accrued payroll Taxes, in each case, that is earned or accrued by, but not yet payable, as of the Closing Date (and not paid by Sellers prior thereto) to any Transferred Employee ("Assumed Payroll Obligations");

Notwithstanding the foregoing and except as otherwise provided in Section 5.9 of this Agreement, Assumed Liabilities shall not include (i) any other post-petition Liabilities of the Sellers nor (ii) any liability for Taxes of any kind, except as provided in the last sentence of Section 2.4 below.

**Section 2.4**    **Excluded Liabilities**.  Notwithstanding anything herein to the contrary, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Sellers, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities (all such Liabilities that Buyer is not assuming being referred to collectively as the "Excluded Liabilities", including without limitation all Liabilities relating to or arising from any Employee Benefit Plan or the employment or termination of any employee of any Seller (other than the Assumed Payroll Obligations.  For the avoidance of doubt, Excluded Liabilities shall include any liability for Taxes of any kind other than any Taxes which are a lien not yet due and payable as of and which are prorated between Sellers and Buyer at the Closing.

20

**Section 2.5    Consideration**.

(a)    In aggregate consideration for the sale and transfer of the Purchased Assets (the "Purchase Price") shall be composed of the following:

i.    the Credit Bid; and

ii.    the assumption by Buyer of the Assumed Liabilities.

(b)    The Purchase Price shall be satisfied at the Closing as to:

i.    the Credit Bid, by causing the Credit Agreement Lenders to acknowledge in writing satisfaction of the portion of the Credit Agreement Lien Obligations covered by the Credit Bid and to release all guarantees of the security interests and liens on the Purchased Assets securing such obligations, all in form and content reasonably satisfactory to Sellers (the "Credit Bid And Release"); and

ii.    the amount of the Assumed Liabilities described in Section 2.3, by assuming such Assumed Liabilities through one or more Assignment and Assumption Agreements.

In addition, at the Closing or as soon as practicable thereafter, Buyer shall pay to the applicable counterparties all Cure Amounts payable in connection with or as a condition to Sellers' assumption and assignment of the Assumed Contracts to the extent Sellers do not have sufficient cash to satisfy all Cure Amounts.

**Section 2.6    Assumption and Assignment of Contracts**.

(a)    Schedule 2.6(a) sets forth a list of all Contracts and Leases to which a Seller is a party (other than such Contracts and Leases that have been rejected by Decree of the Bankruptcy Court or are the subject of a pending motion to reject as of the date of this Agreement), together with estimated Cure Amounts for each Assumed Contract.

(b)    From and after the date hereof until the Closing, Buyer may, in its sole discretion, (i) designate a Contract or Lease listed on Schedule 2.6(a) for assumption and assignment to Buyer, effective on and as of the Closing (such Contracts and Leases, the "Assumed Contracts"), or (ii) without in any manner reducing or otherwise affecting the Purchase Price, designate any Contract or Lease listed on Schedule 2.6(a) for rejection; for the avoidance of doubt, the Sellers will not object to any such designation made by Buyer pursuant to this Section 2.6(b). Except as so designated by Buyer, the Sellers shall not designate any Contract or Lease listed on Schedule 2.6(a) for assumption and assignment or for rejection on or after the date hereof.    The Assumed Contracts as of the date hereof are set forth on Schedule 2.6(b) hereto, which will be supplemented in writing by Buyer as additional Leases and Contracts are designated for assumption and assignment or rejection prior to the Closing as set forth in this Section 2.6(b).

21

(c)    In connection with the assumption by and assignment to Buyer of any Assumed Contracts pursuant to this Section 2.6, (i) the amounts, if any, necessary to cure all defaults, if any, and to pay all actual pecuniary losses, if any, that have resulted from such defaults under the Assumed Contracts (collectively, such amounts, the "Cure Amounts"), in each case as of the Petition Date and to the extent required by Section 365(b)(1)(A) and (B) of the Bankruptcy Code and any Decree of the Bankruptcy Court, shall be paid by Sellers at the Closing, and (ii) Buyer shall provide such adequate assurance of future performance as of the Sale Hearing as the Bankruptcy Court deems necessary to satisfy the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to Assumed Contracts.

(d)    Subject to Buyer's reasonable cooperation therewith, Sellers shall use their respective commercially reasonable efforts to obtain a Decree of the Bankruptcy Court to assign the Assumed Contracts to Buyer on the terms set forth in this Section 2.6. In the event Sellers are unable to assign any such Assumed Contract to Buyer pursuant to a Decree of the Bankruptcy Court, then the Parties shall use their respective commercially reasonable efforts to obtain, and to cooperate (at no material cost or expense to Sellers) in obtaining, all Consents from Governmental Entities and third parties necessary to assume and assign such Assumed Contracts to Buyer, including, in the case of Buyer, paying any applicable Cure Amounts.

(e)    Notwithstanding the foregoing, but subject to Section 5.1, a Contract shall not be an Assumed Contract hereunder and shall not be assigned to, or assumed by, Buyer to the extent that such Contract (i) is rejected by a Seller or terminated by a Seller in accordance with the terms hereof or by the other party thereto, or terminates or expires by its terms, on or prior to the Closing and is not continued or otherwise extended upon assumption, (ii) was not listed on Schedule 2.6(a) and not provided to Buyer by Sellers at least five (5) Business Days prior to the Closing and requires a Consent of any Governmental Entity or other third party (except as permitted by the Bankruptcy Code) in order to permit the sale or transfer to Buyer of Sellers' rights under such Contract, and no such Consent has been obtained prior to the Closing, or (iii) relates solely to Excluded Assets. In addition, a Permit (including any Liquor License) shall not be assigned to, or assumed by, Buyer to the extent that such Permit requires a Consent of any Governmental Entity or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer of Sellers' rights under such Permit, and no such Consent has been obtained prior to the Closing.

(f)    Subject to the terms and conditions herein provided, Seller and Buyer shall use their good faith efforts to take, or cause to be taken, all reasonable action, or do, or cause to be done, all reasonable things, necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement.

**Section 2.7    Closing**. The Closing shall take place remotely by electronic exchange of counterpart signature pages commencing at 10:00 a.m. Eastern Time on the Closing Date upon

22

satisfaction or waiver of all conditions hereunder to the parties' respective obligations to consummate the transactions provided for herein.

**Section 2.8      Deliveries at Closing**.

(a)      At the Closing, Sellers shall deliver to Buyer the following documents and other items, duly executed by Sellers, as applicable:

i.      all Bills of Sale reasonably requested by Buyer;

ii.      all Assignment and Assumption Agreements reasonably requested by Buyer;

iii.      instruments of assignment in form and substance to be agreed to by the Parties in their reasonable discretion for all Registered Intellectual Property transferred or assigned hereby and general assignments of all other Intellectual Property of the Sellers, in each case as reasonably requested by Buyer (collectively, the "Intellectual Property Assignments");

iv.      a non-foreign affidavit from the regarded owner of the Sellers for U.S. federal income Tax purposes, dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the IRC stating that such owner is not a "foreign person" as defined in Section 1445 of the IRC;

v.      the officer's certificates required to be delivered pursuant to Section 7.1(l);

vi.      the Management Agreement duly executed by Sellers;

vii.      such other bills of sale, completed transfer tax returns, assignments of leases, notices to landlords, notices to subtenants, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form and content not inconsistent with the rights and obligations imposed upon Buyer and Sellers pursuant to the other provisions of this Agreement and otherwise reasonably satisfactory to Buyer (in each case signed and acknowledged as appropriate), as Buyer may reasonably request to vest in Buyer, to the extent transferable and assignable, all the right, title and interest of the Sellers in, to or under any or all the Purchased Assets subject only to Permitted Liens to the extent provided in the Sale Order (including, without limitation, releases and terminations of any Liens that are not Permitted Liens);

viii.      originals (or, to the extent originals are not available, copies) of all Assumed Contracts (together with all material amendments, supplements or modifications thereto) to the extent not otherwise already made available to Buyer through the Dataroom;

23

ix.     physical possession, at their respective locations as of the Closing, of all of the Purchased Assets capable of passing by delivery with the intent that title in such Purchased Assets shall pass by and upon delivery;

x.     certificates of title and title transfer documents to all titled motor vehicles included within the Purchased Assets; and

xi.     all other previously undelivered certificates, agreements and other documents, instruments and writings reasonably requested by Buyer to be delivered by Sellers at or prior to the Closing pursuant to this Agreement.

(b)     At the Closing, Buyer shall deliver to Sellers the following documents and other items, duly executed by Buyer, as applicable:

i.     any and all Assignment and Assumption Agreements to which Buyer is party;

ii.     the Purchase Price, in the form of the Credit Bid And Release, in form reasonably satisfactory to Sellers and the Excluded Cash Deficiency Amount, if applicable, such Excluded Cash Deficiency Amount to be wired to Sellers in accordance with such written wiring instructions as Sellers may provide to Buyer at least two (2) Business Days prior to the Closing;

iii.     the officer's certificates required to be delivered pursuant to Section 7.2(g);

iv.     the Management Agreement, duly executed by Buyer; and

v.     all other previously undelivered certificates, agreements and other documents required by this Agreement to be delivered by Buyer at or prior to the Closing in connection with the Contemplated Transactions.

**Section 2.9     Allocation**.   Within ninety (90) calendar days after the Closing Date, Buyer shall in good faith prepare an allocation of the Purchase Price (and all capitalized costs and other amounts treated as purchase price for U.S. federal income Tax purposes) among the Purchased Assets and the Assumed Liabilities in accordance with Section 1060 of the IRC, the Treasury Regulations thereunder (and any similar provision of United States state or local or non-United States Law, as appropriate) (as finally determined, and subject to any further amendment, in each case pursuant to this Section 2.9, the "Allocation"). Sellers shall have thirty (30) calendar days following receipt of the Allocation to review and comment on such the Allocation. If the Sellers disagree with any determinations set forth on the Allocation (the sole permissible basis for which shall be that the Allocation was not prepared in accordance with this Section 2.9), the Sellers shall deliver a written notice to Buyer setting forth its objections. Unless Sellers deliver notice to Buyer within the thirty (30) day review period, Sellers shall be deemed to have accepted the determinations set forth in the Allocation. If the Sellers deliver the notice to Buyer within the thirty (30) day review period, Buyer and the Seller shall, during the thirty (30) days following such delivery or any mutually agreed extension thereof, use their commercially reasonable efforts to reach agreement on the disputed determinations. Buyer and

24

Sellers shall report, act and file Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with the Allocation as determined pursuant to this Section 2.9. Neither Buyer nor Sellers shall take any position (whether in audits, Tax Returns or otherwise) which is inconsistent with the Allocation, unless required by a "determination" within the meaning of Section 1313 of the IRC.

Section 2.10   **Excluded Locations**.   Any of Sellers' restaurant locations with respect to which the associated Leases have not been designated by Buyer as Assumed Contracts in accordance with Section 2.6(a) shall be deemed to have been classified as Excluded Restaurants and Excluded Assets.

**ARTICLE III**
**SELLERS' REPRESENTATIONS AND WARRANTIES**

Except as set forth in the disclosure schedule accompanying this Agreement, as may be updated, amended or supplemented by Sellers in writing from time to time until August 7, 2020 (the "Disclosure Schedule"), Sellers jointly and severally represent and warrant to Buyer as of the date hereof and as of the Closing Date in each case, unless otherwise specified in the representations and warranties below, in which case the representation and warranty is made as of such date, that the statements contained in this Article III are true and correct.

Section 3.1   **Organization of Sellers; Good Standing**.

(a)   Each Seller is duly incorporated or organized, as the case may be, and validly existing and in good standing under the Laws of its state of incorporation or formation. Each Seller is duly qualified or otherwise authorized as a foreign entity to transact business in each jurisdiction listed on Schedule 3.1 of the Disclosure Schedule, which are all of the jurisdictions in which the nature of the Business or the Purchased Assets requires such Seller to so qualify. Sellers have made available to Buyer each Seller's Organizational Documents that set forth the state of incorporation or formation for each Seller. Subject to the requirements of the Bankruptcy Code, each Seller has all necessary power and authority to own, lease and operate its assets, properties and to conduct its business in all jurisdictions in which such Seller conducts business (or conducted business prior to the Business Cessation Event) and in the manner in which its business is currently being conducted (or was conducted prior to the Business Cessation Event) and has historically been conducted.

(b)   None of the Sellers has any Subsidiaries (other than other Sellers, if applicable).

Section 3.2   **Authorization of Transaction**.   Subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing:

(a)   each Seller has all requisite applicable corporate or limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder; the execution, delivery and performance of this Agreement and all Related Agreements to which such Seller is a party have been duly authorized by such Seller

25

and no other corporate or company action, as applicable, on the part of such Seller is necessary to authorize this Agreement or the Related Agreements to which it is party or to consummate the Contemplated Transactions; and

(b)    This Agreement constitutes the valid and legally-binding obligations of Sellers, enforceable against Sellers in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Each Related Agreement to which any Seller is a party, when executed and delivered, will constitute the valid and legally-binding obligations of such Seller, as applicable, enforceable against Sellers, as applicable, in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 3.3**    **Noncontravention; Consents and Approvals**.

(a)    Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the Related Agreements), subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, will (with or without notice or lapse of time or both) (i) conflict in any material respect with or result in a breach of the Organizational Documents of any Seller, (ii) violate any Law or Decree to which any Seller is, or its respective assets or properties are, subject, (iii) conflict with any Assumed Contract or Assumed Permit, or (iv) conflict with, or result in any violation of or constitute a breach or default under, any order of any Governmental Entity applicable to the Sellers or any of the Purchased Assets, and, in the case of clauses (ii), (iii) and (iv) for such conflicts, breaches, violations, defaults, accelerations, rights or failures to give notice, would not, individually or in the aggregate, have a Material Adverse Effect.

(b)    Except as set forth in Schedule 3.3(b) of the Disclosure Schedule, subject to the Sale Order having been entered and still being in effect (and not subject to any stay pending appeal at the time of Closing), no Consent, notice or filing is required to be obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement. After giving effect to the Sale Order and any applicable order of the Bankruptcy Court authorizing the assignment and assumption of the Assumed Contracts, no Consent, notice or filing is required to be obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Person that is not a Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected have a Material Adverse Effect or prevent or materially impair or delay the Sellers' ability to consummate the Contemplated Transactions on a timely basis.

26

Section 3.4    **Compliance with Laws**.    Sellers are in compliance with all Laws applicable to the Business or the Purchased Assets in all material respects. As of the date hereof, Sellers have not received any written notice of violation of any Law in any material respect with respect to any Seller, the Business or the Purchased Assets and, to Sellers' Knowledge, there is no reasonable basis for the issuance of any such notice or the taking of any action for such violation.

Section 3.5    **Title to Purchased Assets**.    Sellers, as of immediately prior to the Closing, have good and valid title to, or, in the case of leased assets, have good and valid leasehold interests in, the Purchased Assets, free and clear of all Liens (except for Permitted Liens), subject to entry of the Sale Order. At the Closing or such time as title is conveyed under Section 2.6, Sellers will convey, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, good and valid title to, or valid leasehold interests in, all of the Purchased Assets, free and clear of all Liens (except for Permitted Liens), to the fullest extent permissible under Section 363(f) of the Bankruptcy Code and subject to the rights of licensees under Section 365(n) of the Bankruptcy Code. The Purchased Assets constitute substantially all of the properties, assets and rights (including Intellectual Property) used by the Sellers to conduct and operate the Business at the Continuing Restaurants in all material respects as conducted and operated by the Sellers prior to the Business Cessation Event. All of the Purchased Assets are in good order and repair (ordinary wear and tear excepted) for assets of comparable age and past use and are capable of being used in the Ordinary Course of Business to operate the Business substantially as conducted and operated by the Sellers prior to the Business Cessation Event. No Person other than Sellers are engaged in the operation of, or hold rights, title and interest in (except for Permitted Liens), the Purchased Assets. None of the personal or movable property included in the Purchased Assets is located other than at the Leased Real Property.

Section 3.6    **Contracts**.    Schedule 3.6 of the Disclosure Schedule sets forth an accurate list, as of the date hereof, of all material executory Contracts, including any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof, to which a Seller is a party with respect to the Business as of the date hereof and Sellers have made available to Buyer true and complete copies of all such Contracts or, to the extent any of such Contracts are oral, Schedule 3.6 of the Disclosure Schedule contains a description of the material terms thereof. Except as set forth in Schedule 3.6 of the Disclosure Schedule, no Seller has assigned, delegated or otherwise transferred to any third party any of its rights or obligations with respect to any Assumed Contract. The Assumed Contracts include all Contracts material to the ownership and/or operation of the Business at the Continuing Restaurants. Sellers have not, and, to Sellers' Knowledge, no other party to any Assumed Contract has, commenced any action against any of the parties to any Assumed Contract or given or received any written notice of any material default or violation under any Assumed Contract that has not been withdrawn or dismissed except to the extent such default or violation will be cured as a result of the payment of the applicable Cure Amounts, assuming entry of the Sale Order. To Sellers' Knowledge, each Assumed Contract is, or will be upon the Closing, valid, binding and in full force and effect in accordance with its terms.

Section 3.7    **Intellectual Property**.

27

(a)     Schedule 3.7 of the Disclosure Schedule sets forth a true and complete list of (i) all Registered Intellectual Property that is owned by any Seller, (ii) all executory Contracts pursuant to which any Seller obtains the right to use any Intellectual Property, and (iii) all material Contracts pursuant to which any Seller grants to any other Person the right to use any Intellectual Property (including all Contracts pursuant to which any Seller grants to any other Person any exclusive rights with respect to any Intellectual Property).  Sellers exclusively own all Intellectual Property included among the Purchased Assets (including all such Registered Intellectual Property) free and clear of all Liens (except for Permitted Liens), and all such Registered Intellectual Property is valid, subsisting and, enforceable, and is not subject to any outstanding Decree adversely affecting Sellers' use thereof or rights thereto.

(b)     To Sellers' Knowledge, and except as set forth on Schedule 3.7 of the Disclosure Schedule, none of the use of the Intellectual Property included in the Purchased Assets, the conduct of the Business as conducted prior to the Business Cessation Event (except with respect solely to the Excluded Restaurants), nor any of the products sold or services provided by Sellers or any of their Affiliates in connection therewith (except with respect solely to the Excluded Restaurants), infringes upon or otherwise violates the Intellectual Property of any other Person.   To Sellers' Knowledge, no third party is infringing any Intellectual Property owned by any Seller and included in the Purchased Assets.

(c)     Sellers have used commercially reasonable efforts to maintain, defend, protect, enforce, and preserve all trade secrets and material confidential information included in the Purchased Assets, including all Recipes, and, to Sellers' Knowledge, no such trade secrets, confidential information, or Recipes have been disclosed or accessed by any other Person other than to Persons under binding obligations of confidentiality and non-use. To Sellers' Knowledge, no such trade secrets, material confidential information, or Recipes have been improperly accessed, disclosed, or used.

**Section 3.8    Litigation**.

(a)     Other than the Chapter 11 Cases, Schedule 3.8(a) of the Disclosure Schedule sets forth, as of the date hereof, all unresolved Litigation brought or threatened in writing by or against any Seller, in each case, which seeks to impose Liability upon any party in an amount greater than $50,000, and to Sellers' Knowledge, there is no other Litigation threatened in writing against any Seller which would affect the ability of any Seller to enter into this Agreement, any Related Agreement, or to consummate the Contemplated Transactions.

(b)     Schedule 3.8(c) of the Disclosure Schedule sets forth sets forth any Decree to which any Seller is subject.

**Section 3.9    Employees and Employment Matters**.

(a)     No Seller is or within the last three (3) years has been a party to or bound by any collective bargaining agreement covering the Current Employees or

28

Former Employees nor has there been in the last three (3) years any strike, walkout, work stoppage, or other material collective dispute affecting any Seller with respect to the Business. No Current Employee is and within the last (3) years no Current Employee or Former Employee has been represented by a union or other collective bargaining representative with respect to his or her employment with any Seller. To Sellers' Knowledge, there is no organizational effort being made or threatened by or on behalf of any labor union with respect to any of the Current Employees, nor has there been in the last three (3) years with respect to any Current Employees or Former Employees. No later than ten (10) Business Days following the date hereof, Sellers shall make available to Buyer a list of all Current Employees and Former Employees who were employed by Sellers as of February 29, 2020 (such Former Employees, "Recent Employees"), including such individual's name; title or position; status (part-time, full-time, exempt, nonexempt, etc.); whether a Current Employee or Recent Employee; whether paid on a salaried, hourly or other basis; current base salary or wage rate; current target bonus; other incentive or non-incentive based compensation; start date; service reference date (if different from the start date); work location; vacation entitlement formula; and an indication of whether or not any Current Employee is on leave of absence or furlough (the "Employee Roster").

(b)     There are no grievances or unfair labor practice complaints pending against any Seller before the National Labor Relations Board or any other Governmental Entity with respect to any Current Employees or Former Employees.

(c)     Sellers are in compliance in all material respects with all applicable Laws relating to employment or labor, including those related to hiring, background checks, wages, pay equity, hours, collective bargaining and labor relations, classification of independent contractors and employees, equal opportunity, document retention, notice, plant closing and mass layoff, health and safety, employment eligibility verification, immigration, child labor, discrimination, harassment, retaliation, accommodations, disability rights or benefits, affirmative action, workers' compensation, unemployment insurance, employment and reemployment rights of members of the uniformed services, secondment, employee leave issues and the payment of social security and other Taxes, and are not liable for any arrears of wages, other compensation or benefits (other than such Liabilities that have been incurred in the Ordinary Course of Business of the Seller and are not past due), or any Taxes or penalties for failure to comply with any of the foregoing, including, without limitation, any of the foregoing arising out of other otherwise in connection with the Business Cessation Event.

(d)     No Current Employee, Former Employee, or other service provider has been improperly excluded from participation in any Employee Benefit Plan (to the extent such individual is or should be eligible under the terms of such Employee Benefit Plan), and none of the Sellers has any direct or indirect liability, whether absolute or contingent, with respect to any misclassification of any service provider as an independent contractor or on any other non-employee basis for such Seller rather than as an employee, with respect to any individual employed, engaged, or leased by

29

the Seller from another employer, or with respect to any misclassification of any employee as exempt versus non-exempt under the Fair Labor Standards Act.

(e)    Except as set forth on <u>Schedule 3.9(e) of the Disclosure Schedule</u>, there is no employment or labor-related claim, complaint, demand for arbitration, or administrative charge pending against any Seller brought by or on behalf of any Current Employee, Former Employee or any Governmental Entity, and to Sellers' Knowledge, no such claim is threatened. Except as disclosed to Buyer confidentially, in the last five (5) years, there have been no allegations of sexual or other unlawful harassment or discrimination made against any Current Employee or Former Employee at the management level or higher.

(f)    All Current Employees are, and Recent Employees were, authorized to work in the United States.

(g)    Except as set forth on <u>Schedule 3.9(g) of the Disclosure Schedule</u>, Sellers have not made application to receive or otherwise sought Relief Proceeds.

**Section 3.10    Employee Benefit Plans**.  <u>Schedule 3.10 of the Disclosure Schedule</u> lists each Employee Benefit Plan that Sellers maintain or to which Sellers contribute or which Sellers have maintained or to which Sellers have contributed in the past twelve (12) months and that provides or provided benefits to any Current Employee or Recent Employee. No event or circumstance exists, or could exist as of the Closing, under which Buyer could incur any Liability with respect to any Employee Benefit Plan.

**Section 3.11    Real Property**.

(a)    Sellers do not own any real property.

(b)    <u>Schedule 3.11(b) of the Disclosure Schedule</u> sets forth the address of each Leased Real Property, and a true and complete list of all Leases (including the date and name of the parties to such Lease document). Sellers have made available to Buyer a true and complete copy of all Leases (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto) for such Leased Real Property, as amended through the date hereof. Except as set forth in <u>Schedule 3.11(b) of the Disclosure Schedule</u>, with respect to each of the Leases: (i) to Sellers' Knowledge and subject to the effect on enforceability of (A) any applicable Law relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfers, or similar Laws relating to or affecting creditors' rights generally and (B) general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law), such Lease is legal, valid, binding, enforceable and in full force and effect in accordance with its terms; (ii) Sellers' possession and quiet enjoyment of the Leased Real Property under such Lease has not been disturbed, and to Sellers' Knowledge, there are no disputes with respect to Sellers' or the applicable guarantor's obligations under such Lease that will not be satisfied by the Sale Order; (iii) to Sellers' Knowledge, no other party to a Lease (including, without limitation, any guarantor) is in material breach or default under such Lease, and

30

no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a material breach or default; (iv) no security deposit or portion thereof deposited with respect such Lease has been applied in respect of a breach or default under such Lease which has not been redeposited in full; (v) the other party to such Lease is not an affiliate of, and otherwise does not have any economic interest in, Sellers; (vi) the Sellers have not subleased, licensed or otherwise granted any Person the right to use or occupy such Leased Real Property or any portion thereof; and (vii) there are no liens or encumbrances (other than Permitted Liens) on the estate or interest created by such Lease.

(c)    Schedule 3.11(c) of the Disclosure Schedule sets forth a description of all material Leasehold Improvements with outstanding commitments in excess of $100,000 for each Leased Real Property.

(d)    The Leased Real Property identified in Schedule 3.11(b) of the Disclosure Schedule and the Leasehold Improvements comprise all of the real property used in or otherwise related to the operation by Sellers prior to the Business Cessation Event of, the Business.

(e)    Sellers have received no written notice of any condemnation, expropriation or other proceeding in eminent domain pending or, to Sellers' Knowledge, which is threatened, affecting any real property underlying the Leased Real Property or any portion thereof or interest therein.

**Section 3.12    Tangible Personal Property.**  Schedule 3.12 of the Disclosure Schedule sets forth all material Personal Property Leases related to the Continuing Restaurants, and, to Sellers' Knowledge, each such material Personal Property Lease is valid and enforceable, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 3.13    Permits.**

(a)    Schedule 3.13(a) of the Disclosure Schedule contains a list of all Permits related to the Continuing Restaurants that Sellers hold as of the date hereof in connection with the operations of the Business. The Permits set forth on Schedule 3.13(a) of the Disclosure Schedule represent all Permits required for the operation of the Continuing Restaurants as operated prior to the Business Cessation Event. Each Seller complies, and has at all times complied, in all material respects with all such Permits, and no Seller has received in the past five years any notice or other communication from any Governmental Entity or any other Person that any Seller is not in compliance in any material respect with any such Permit or of any actual or possible revocation, withdrawal, suspension, cancellation, termination or material modification of any such Permit. As of the date hereof, there is no Litigation pending or, to Sellers' Knowledge, threatened in writing that seeks the revocation, cancellation, suspension, failure to renew or adverse modification of any material Assumed Permits, except where a failure of this representation and warranty to be so true and correct would not be material to the ownership and operation of the Continuing Restaurant or

31

Continuing Restaurants that operate under such Permit.   All required filings with respect to the Assumed Permits have been made and all required applications for renewal thereof have been filed, except where a failure of this representation and warranty to be so true and correct would not be material to the ownership and operation of the Business.

(b)     Schedule 3.13(b) of the Disclosure Schedule sets forth a complete and correct list as of the date of this Agreement of Liquor Licenses related to the Continuing Restaurants.   To Sellers' Knowledge, each of the Sellers is in compliance in all material respects with all applicable state, municipal and other governmental laws, regulations and rules with respect to the sale of liquor and all alcoholic beverages and has the right to sell liquor at retail for consumption within each of the restaurant locations of such Seller where the Leases constitute Assumed Contracts, subject to and in accordance with all applicable provisions of the Liquor Licenses.    To Sellers' Knowledge, except as set forth in Schedule 3.13(b) of the Disclosure Schedule, in the past five years, (i) there has been no Litigation brought or threatened in writing to be brought by or before a Governmental Entity in respect of any such Liquor License related to a Continuing Restaurant or the activities of such Seller in connection with any such Liquor License (or in connection with any other liquor licenses previously held or used by such Seller), (ii) no such Liquor License related to a Continuing Restaurant is subject to any due but unpaid Tax obligation owed to a Governmental Entity, the outstanding nature of which would preclude transfer of such Liquor License from any of the Sellers to Buyer, and (iii) no such Liquor License related to a Continuing Restaurant has been threatened by a Governmental Entity to be revoked, limited or not renewed.

### Section 3.14   Purchased Inventory.

(a)     No Inventory that is Purchased Inventory is damaged in any way or subject to a current or past product recall, except for any such damage or any such recall which would not be material to the Purchased Inventory taken as a whole;

(b)     To Sellers' Knowledge, the Purchased Inventory is in material compliance with United States federal and applicable state guidelines for such products as of the date hereof; and

(c)     To Sellers' Knowledge, the Purchased Inventory is in working condition or in a condition fit for sale and consumption in accordance with all applicable Laws, as the case may be.

### Section 3.15   Environmental Matters.   Except as set forth in Schedule 3.15 of the Disclosure Schedule:

(a)     Each Seller is, and has been during the prior two (2) years, in compliance in all material respects with all applicable Environmental Laws, which compliance has included obtaining and maintaining all permits, licenses and authorizations required under applicable Environmental Laws;

32

(b)    No Seller has received during the prior two (2) years written notice from any Governmental Entity or third party regarding any actual or alleged violation of or Liability under Environmental Laws;

(c)    To Sellers' Knowledge, no Hazardous Substance has been released at any current or former Leased Real Property, or other real property, by Sellers in violation of any Environmental Law; and

(d)    Sellers have made available to Buyer copies of all material environmental audits, assessments and reports in its possession relating any actual or potential Liabilities under Environmental Laws with respect to any current or former Leased Real Property.

**Section 3.16    <u>Financial Statements</u>**.

(a)    The Sellers have made available to Buyer true and correct copes of (i) the unaudited consolidated balance sheet of the Sellers for the fiscal year ended on or about December 31, 2018 and December 31, 2019, and the related consolidated statement of income and cash flows of Sellers for the years then ended, and (ii) the unaudited consolidated balance sheet of the Sellers for the fiscal quarter ended on or about March 31, 2020, and the related consolidated statement of income and cash flows of Sellers for the three months then ended (such unaudited statements, including the related notes and schedules thereto, are referred to herein as the "<u>Financial Statements</u>").    Each of the Financial Statements has been prepared in accordance with GAAP consistently applied and presents fairly in all material respects the consolidated financial position, results of operations and cash flows of Sellers as of the dates and for the periods indicated therein, subject to normal year-end adjustments (which will not be material individually or in the aggregate) and the absence of complete notes in the case of the unaudited statements.    Other than with respect to Excluded Liabilities as to which the Sellers do not provide any representations and warranties, no Seller has any material Liabilities that would be required by GAAP to be reflected on a consolidated balance sheet (or the notes thereto) of the Sellers, except for liabilities and obligations (a) reflected, accrued or reserved against in the Sellers' consolidated balance sheet for the period ended on March 31, 2020 (or the notes thereto) included in the Financial Statements, (b) incurred in the Ordinary Course of Business since March 31, 2020, (c) incurred pursuant to the Contemplated Transactions, or (d) obligations under Assumed Contracts (other than liabilities or obligations related to or arising out of breaches of such Assumed Contracts to the extent arising prior to the Closing Date). Since December 31, 2019, to Sellers' Knowledge, as of the date hereof, no Seller has received any written complaint, allegation, assertion or Claim regarding the accounting or auditing practices, procedures, methodologies or methods of Sellers or their respective internal accounting controls with respect to the Business.

(b)    The Sellers have established and maintained and, for the past five years, have maintained in all material respects, a system of internal accounting controls sufficient to reasonably ensure (i) the reliability of financial reporting and the preparation of the financial statements of the Sellers and (ii) that (A) all transactions are

33

executed in accordance with management's general or specific authorizations; (B) all transactions are recorded when and as necessary to maintain asset accountability and to permit preparation of financial statements in conformity with GAAP applied using the same accounting practices, policies, principles and methodologies, with consistent classifications, judgments and valuation and estimation accrual methodologies, used in the preparation of the Financial Statements; and (C) all accounts, notes and other receivables are recorded accurately, and proper and adequate procedures are implemented to effect the collection thereof on a current and timely basis.

(c)     The Sellers have established and maintained and, for the past five years, have maintained in all material respects, disclosure controls sufficient to reasonably ensure that material information relating to the Sellers (including any deficiencies or weaknesses in the design or operation of the internal controls of the Sellers and any fraud that involves management or other Service Providers of the Sellers is made known to the Sellers' management by others within the Sellers and disclosed to the Sellers' board of directors and outside auditors. The Sellers have provided to the Buyer a summary of any of the foregoing disclosures made to the Sellers' board of directors or outside auditors.

**Section 3.17  Brokers' Fees**.  Except for amounts due to Mastodon Ventures, Inc. ("Mastodon") (which amounts are to be paid by the Sellers under a Credit Bid, but if any overbid is a cash bid in excess of the Credit Bid, such fee shall be paid from the cash sale proceeds (i.e., Mastodon's fee in excess of its minimal fee), no Seller has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the Contemplated Transactions for which Buyer could become liable or obligated to pay.

**Section 3.18  No Other Agreements to Purchase**.  Sellers have not entered into any agreement with any other Person (written or oral) which grants such third party the right or option to purchase or acquire from Sellers any Purchased Asset, other than purchase orders for Inventory accepted by Sellers in the Ordinary Course of Business.

**Section 3.19  Taxes**.

(a)     Each Seller has duly and timely filed all income and other material Tax Returns that it was required to file, and all such filed Tax Returns were true, correct and complete in all material respects. All material Taxes owed by the Sellers and all material Taxes owed with respect to the Purchased Assets (in each case, whether or not shown on any Tax Return) have been paid. In the last three (3) years, no claim has been made in writing by a Governmental Entity in a jurisdiction where the Sellers do not file Tax Returns that the Sellers or the Business is or may be subject to taxation by that jurisdiction. Any deficiencies proposed as a result of any audits of Seller by any Governmental Authority have been fully paid or finally settled, and there are no present disputes as to Taxes payable by Seller.

(b)     There is no audit, dispute, claim or controversy concerning any Tax Liability or Tax Return of Sellers or with respect to the Business in progress or pending by any taxing authority. No Seller has received from any Governmental Authority any

34

(i) written notice indicating an intent to open an audit or other review with respect to Taxes that relate to the Business, (ii) written request for information related to Tax matters that relate to the Business, (iii) written notice of deficiency or proposed adjustment for any amount of Tax that relate to the Business, or (iv) any ruling or binding agreement relating to Taxes that could impact the amount of Taxes due from Buyer or its Affiliates. No Seller has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency that could result in a Lien on the Purchased Assets or the imposition of any liability for Taxes on Buyer, its direct or indirect equityholders, or their Affiliates.

(c)    There are no Liens for Taxes on any of the Purchased Assets, other than Permitted Liens.

(d)    No Seller has any liability for Taxes of another Person under Treasury Regulations Section 1.1502-6, as a transferee or successor, by contract, or otherwise.

(e)    No Seller is party to any Tax sharing, Tax allocation or Tax indemnity agreement, except for customary gross-up or indemnification provisions in commercial agreements entered into in the Ordinary Course of Business, the primary subject matter of which is not related to Taxes, in each case that would be binding on Buyer.

(f)    No Seller has participated in any "reportable transaction" within the meaning of Treasury Regulation section 1.6011-4(b)(1).

(g)    Each Seller has collected or withheld all Taxes required to have been collected or withheld (including from payments made to employees, independent contractors, creditors, stockholders and other Persons) and such collected and withheld Taxes have been duly paid to the proper Governmental Entity, and each of the Seller has complied in all material respects with all Laws relating to withholding, including any reporting and record keeping requirements. The Company has consistently treated any workers that it treats as independent contractors (and any similarly situated workers) as independent contractors for purposes of Section 530 of the Revenue Act of 1978.

(h)    No Seller has requested or received a ruling from any Governmental Authority or signed any binding agreement with any Governmental Authority that might impact the amount of Tax due from Buyer or any of its Affiliates after the Closing Date.

(i)    Each Seller has collected all amounts of sales and use Taxes required to be collected, and has remitted, on a timely basis, such amounts to the appropriate Governmental Entity, or has been furnished properly completed exemption certificates and has, in all material respects, maintained all such records and supporting documents in the manner required by all applicable sales and use Tax statutes and regulations

(j)    None of the Purchased Assets are "Section 197(f)(9) intangibles" (as defined in Treasury Regulations Section 1.197-2(h)(1)(i) and assuming for this purpose that the transition period ends on August 10, 1993) or an interest in an entity or

35

arrangement classified as a partnership for U.S. federal, state or local income Tax purposes.

(k)     No Seller has deferred the inclusion of any amounts in gross income pursuant to Internal Revenue Service Revenue Procedure 2004-34, Treasury Regulations Section 1.451-5, Sections 451(c), 455, 456 or 460 of the Code, as a deposit or pre-paid amount, or any corresponding or similar provision of state or local Law (irrespective of whether or not such deferral is elective).

(l)     None of the Purchased Assets or Assumed Liabilities is a Tax allocation, Tax sharing, Tax distribution, Tax indemnification or Tax gross-up agreement or arrangement.

**Section 3.20  Suppliers**.    Schedule 3.20 of the Disclosure Schedule lists the ten (10) largest suppliers (excluding utilities) (measured by invoiced dollars) of the Continuing Restaurants collectively ("Major Suppliers") for the 12 month periods ended December 31, 2019 and June 30, 2020 and the amount of business done with each Major Supplier in such period. As of the date of this Agreement, to Sellers' Knowledge, (a) there has not been a material dispute with, or actual or potential material and adverse change in the business relationship of, any Seller with any Major Supplier since December 31, 2018, and (b) no Seller is in material breach of or in material default of any agreement with any of its Major Suppliers, and to the Sellers' Knowledge, no Major Supplier is in material breach or in default of any agreements with any Seller. None of the Sellers has received any notice, nor does the Seller or any of its Subsidiaries have any Knowledge, that any Major Supplier intends to terminate or adversely modify the amount, frequency or terms of the business such Major Supplier conducts with the Sellers.

**Section 3.21  Insurance Policies**.    Schedule 3.21 of the Disclosure Schedule contains a true, complete and accurate list of all insurance policies to which any Seller is a party or which provide coverage to or for the benefit of or with respect to any Seller, or any Service Provider in his or her capacity as such (the "Insurance Policies"), indicating in each case the type of coverage, name of the insured, the insurer, the expiration date of each policy and the amount of coverage. True, complete and accurate copies of all such Insurance Policies have been provided or made available to Buyer. Each Insurance Policy is in full force and effect and shall remain in full force and effect in accordance with its terms immediately following the Closing. Each Seller is current in all premiums or other payments due under the Insurance Policies and has otherwise complied in all material respects with all of its obligations under each Insurance Policy. Each Seller has given timely notice to the insurer of all material claims that may be insured thereby under any Insurance Policy.  During the past three years, no Seller has been refused any insurance by, nor has coverage been limited by, any insurance carrier with which any Seller has carried insurance or any other insurance carrier to which any Seller has applied for insurance, and no insurer has issued a reservation of rights or denial of coverage for claims or incidents which could give rise to a claim under any Insurance Policy. No Insurance Policy provides for any retrospective premium adjustment or other experience based liability on the part of any Seller.

**Section 3.22  Related Party Transactions**.    Except as set forth on Schedule 3.22 of the Disclosure Schedule, no Related Party (a) has any direct or indirect interest in any asset used in

36

or otherwise relating to any Seller or the Business, (b) is indebted to any Seller, (c) has entered into, or has had any direct or indirect financial interest in, any Contract, transaction or business dealing involving any Seller, (d) is competing, directly or indirectly, with any Seller, (e) is a member, manager, director, officer or employee of, or consultant to, or owns, directly or indirectly, any interest in, any vendor, supplier or customer of any Seller, or is in any way associated with or involved in the Business (except in his or her official capacity as a director, officer or employee of a Seller, as the case may be), (f) has any interest in or has filed any application with respect to any Intellectual Property, which arises out of or relates to any Seller, or (g) has any claim or right against any Seller (other than rights to receive compensation for, or expense reimbursement in connection with, services performed as an employee or director). Each Seller does not share any facilities or equipment with any Related Party, and each Seller does not purchase or provide assets or services for any business conducted by any Related Party. For the past five years there has not been, and there is not currently, pending, or, to the Knowledge of the Sellers, threatened, any Litigation against any current or former Related Party with respect to which any Seller has an indemnification obligation.

**Section 3.23    Bank Accounts**.    Schedule 3.23 of the Disclosure Schedule is a true, complete and accurate list of each bank or financial institution in which any Seller has an account, safe deposit box or lockbox, or maintains a banking, custodial, trading or similar relationship, the number of each such account or box, and the names of all persons authorized to draw thereon or to having signatory power or access thereto.

**Section 3.24    Trade Names; Business Locations**.    Schedule 3.24 of the Disclosure Schedule sets forth all fictitious or trade names that any Seller has been known as or used and all offices or places of business any Seller has used, in each case, in the past five years. No Seller is the surviving entity of a merger or consolidation.

Notwithstanding anything to the contrary in this Agreement, Buyer acknowledges and agrees that Buyer's sole and exclusive recourse and remedy by virtue of any breach at any time of any of the representations and warranties set forth in this Article III shall be to terminate this Agreement, in which event Buyer and Sellers shall all thereupon conclusively be deemed released and relieved of any further liability or obligation hereunder, except as otherwise set forth in Section 8.3; provided, that this paragraph shall in no way limit or affect the satisfaction of Section 7.1(a) as a condition to Buyer's obligation to consummate the transactions contemplated by this Agreement.

### ARTICLE IV
### BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Sellers as follows as of the date hereof and as of the Closing Date:

**Section 4.1    Organization of Buyer**.    Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite limited liability company power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

37

**Section 4.2    Authorization of Transaction**.

(a)    Buyer has full limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.

(b)    The execution, delivery and performance of this Agreement and all other Related Agreements to which Buyer is a party have been duly authorized by Buyer, and no other limited liability company action on the part of Buyer is necessary to authorize this Agreement or the Related Agreements to which it is a party or to consummate the Contemplated Transactions.

(c)    This Agreement has been duly and validly executed and delivered by Buyer, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which Buyer is a party will have been duly and validly executed and delivered by Buyer.  This Agreement constitutes a valid and legally-binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.  To the extent each Related Agreement constitutes a valid and legally-binding obligation of each Seller party thereto, each Related Agreement to which Buyer is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 4.3    Noncontravention**.    Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the assignments and assumptions referred to in Section 2.6) will (with or without notice or lapse of time or both) (i) conflict with or result in a breach of the certificate of incorporation, operating agreement, or other organizational documents, of Buyer, (ii) subject to any consents required to be obtained from any Governmental Entity, violate any Law or Decree to which Buyer is, or its assets or properties are subject, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (ii) or (iii), for such conflicts, breaches, defaults, accelerations or rights as would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the ability of Buyer to consummate the Contemplated Transactions or the Related Agreements. Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Entity in order for the Parties to consummate the Contemplated Transactions or any of the Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the ability of Buyer to consummate the Contemplated Transactions or the Related Agreements.

DOCS_SF:103743.4 07979/002

Section 4.4    **Litigation**.    There is no Litigation pending or, to Buyer's knowledge, threatened against or affecting Buyer that will adversely affect Buyer's performance under this Agreement or the consummation of the Contemplated Transactions.

Section 4.5    **Adequate Assurances Regarding Executory Contracts**.    Buyer will be capable of satisfying as of the Sale Hearing the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

Section 4.6    **Brokers' Fees**.    Neither Buyer nor any of its Affiliates has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the Contemplated Transactions for which any Seller could become liable or obligated to pay.

Section 4.7    **No Outside Reliance**.    Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, Buyer acknowledges and agrees that the representations and warranties made by the Sellers to Buyer in Article III (as qualified by the Disclosure Schedules and as supplemented by any Schedule Updates and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations") are the sole and exclusive representations, warranties, and statements of any kind made by Sellers to Buyer in connection with the Contemplated Transactions.    Buyer acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations, all of which lapse and cease to be of any further force or effect upon the Closing) including any projections, meetings, calls or correspondence with management of Sellers and their Representatives, or any other Person on behalf of Sellers or any of their respective Affiliates or Representatives and (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, contracts, and prospects of Sellers, or the value, quality, quantity, marketability, transferability or condition of Sellers' assets, are, in each case, specifically disclaimed by Sellers and that Buyer has not relied on any such representations, warranties or statements.    Without limiting the foregoing, Buyer acknowledges that Sellers hereby disclaim any warranty, express or implied, of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets and will accept the Purchased Assets and assume the Assumed Liabilities at the Closing "AS IS," "WHERE IS" and "WITH ALL FAULTS."

## ARTICLE V
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

Section 5.1    **Notices and Consents**.

(a)    To the extent required by the Bankruptcy Code or the Bankruptcy Court, Sellers shall give any notices to third parties, and to the extent the need therefor is not obviated by the entry of the Sale Order, each Seller shall use its commercially

reasonable efforts to obtain any third party Consents or sublicenses; provided, however, that neither Sellers nor Buyer shall be required to incur any Liabilities or provide any financial accommodation, in order to obtain any such third party Consent with respect to the transfer or assignment of any Purchased Asset.

(b)    Sellers and Buyer shall cooperate with one another (i) in promptly determining whether any filings are required to be or should be made or consents, approvals, permits or authorizations are required to be or should be obtained under any applicable Law in connection with this Agreement and the Contemplated Transactions and (ii) in promptly making any such filings, furnishing information required in connection therewith and seeking to obtain timely any such consents, permits, authorizations, approvals or waivers; provided, however, that Sellers' obligations hereunder shall only continue until Sellers cease to be debtors in possession under the Chapter 11 Cases or the Chapter 11 Cases are closed or dismissed.

(c)    To the extent permitted by applicable Law and the terms of the Purchased Assets, in the event any third party Consent has not been obtained by the Closing, at Buyer's written request, the Party contemplated to be transferring such Purchased Asset under this Agreement (the "Transferring Party") shall, at Buyer's cost and expense, hold in trust for Buyer, as applicable, the relevant Purchased Asset until the earlier of such time as (i) the third party Consent is obtained, (ii) the applicable Seller ceases to be a debtor in possession under the Chapter 11 Cases or the Chapter 11 Cases are closed or dismissed or (iii) Buyer elects not to assume such Purchased Asset. During such time period, Buyer shall comply with all applicable covenants and obligations under the Purchased Assets, including the payment of any costs or expenses in connection therewith and the maintenance and continuation thereof. Buyer shall be entitled to receive all of the benefits of the Transferring Party under the Purchased Asset. Buyer shall satisfy all Liabilities with respect to such Purchased Assets until the earlier of such time as (i) the third party Consent is obtained, (ii) the applicable Seller ceases to be a debtor in possession under the Chapter 11 Cases or the Chapter 11 Cases are closed or dismissed or (iii) Buyer elects not to assume such Purchased Asset (provided, with respect to any such Liabilities related to the payment of rent for Leased Real Property, Buyer shall satisfy such Liabilities through the end of the month), and shall indemnify and hold Sellers harmless with respect to any such reasonable out-of-pocket expenses arising in the Ordinary Course of Business with respect to such Purchased Asset during such period.

(d)    Subject to the terms and conditions set forth in this Agreement and applicable Law or as otherwise required in the Chapter 11 Cases, Buyer and Sellers shall (A) promptly notify the other Party of any communication to that Party from any Governmental Entity in respect of any filing, investigation or inquiry concerning this Agreement or the Contemplated Transactions, (B) if practicable, permit the other Party the opportunity to review in advance all the information relating to Sellers and their respective Subsidiaries or Buyer and its Affiliates, as the case may be, that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Entity in connection with the Agreement and the Contemplated Transactions and consider in good faith the other Party's reasonable comments, (C) not

40

participate in any substantive meeting or discussion with any Governmental Entity in respect of any filing, investigation, or inquiry concerning this Agreement and the Contemplated Transactions unless it consults with the other Party in advance, and, to the extent permitted by such Governmental Entity, gives the other Party the opportunity to attend, and (D) furnish the other Party with copies of all substantive correspondence, filings, and written communications between them and their Subsidiaries and Representatives, on the one hand, and any Governmental Entity or its respective staff, on the other hand, with respect to this Agreement and the Contemplated Transactions, provided, however, that any materials or information provided pursuant to any provision of this Section 5.1(d) may be redacted before being provided to the other Party (i) to remove references concerning the valuation of Buyer, Sellers, or any of their Subsidiaries, (ii) financing arrangements, (iii) as necessary to comply with contractual arrangements, and (iv) as necessary to address reasonable privilege or confidentiality issues. Sellers and Buyer may, as each deems advisable and necessary, reasonably designate any commercially or competitively sensitive material provided to the other under this Section 5.1(d) as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel and any retained consultants or experts of the recipient and shall not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Sellers or Buyer, as the case may be). Each of Sellers and Buyer shall promptly notify the other Party if such Party becomes aware that any third party has any objection to the Agreement on antitrust or anti-competitive grounds.

**Section 5.2    Bankruptcy Actions.**

(a)    The Chapter 11 Cases shall be continuing as of the date hereof.

(b)    The Bankruptcy Court shall have entered the Bid Procedures Order by no later than the Bid Procedures Order Deadline.

(c)    The hearing on the Sale Motion shall occur no later than by August 27, 2020, after or during which the Bankruptcy Court shall have entered the Sale Order, in any case by no later than the Sale Order Deadline, that provides the parties, inter alia, consummate the Closing as soon as practicable after the entry of the Sale Order and no later than August 31, 2020, subject to the satisfaction of all conditions to the obligations of Sellers and Buyer as set forth in Article VII (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions).

(d)    Sellers will provide Buyer with a reasonable opportunity to review and comment upon all motions, applications, and supporting papers relating to the Contemplated Transactions prepared by Sellers or any Affiliates (including forms of orders and notices to interested parties) prior to the filing thereof in the Chapter 11 Cases. All motions, applications, and supporting papers prepared by Sellers and relating to the Contemplated Transactions to be filed on behalf of Sellers after the date

41

hereof must be approved in form and substance by Buyer, such approval not unreasonably withheld or delayed.

(e)     Each of Buyer and Sellers shall continue to act in good faith and without any improper conduct, including collusion or fraud of any kind.

(f)     Each of Buyer and Sellers will promptly take such actions as are reasonably requested by the other Party and consistent with their respective rights and obligations hereunder to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by Sellers of their obligations under this Agreement and the Related Agreements and demonstrating that Buyer is a good faith buyer under Section 363(m) of the Bankruptcy Code.

(g)     The Sellers and Buyer agree, and the Sale Order shall reflect the fact that, the provisions of this Agreement are reasonable, were a material inducement to Buyer to enter into this Agreement and, subject to the results of the Auction, are the highest and best offer for the Purchased Assets.

(h)     Sellers shall use commercially reasonable efforts to provide appropriate notice of the hearings on the Sale Motion to all Persons entitled to notice, including, but not limited to, all Persons that have asserted Liens in the Purchased Assets, all parties to the Assumed Contracts and all Taxing authorities in jurisdictions applicable to Sellers and as otherwise required by the Bankruptcy Code and bankruptcy rules.

(i)     Sellers shall serve a notice of the Contemplated Transactions by first class mail on all non-debtor counterparties to all Non-Real Property Contracts and Leases as set forth in the Sale Motion and provide a copy of the same to Buyer.

**Section 5.3     Conduct of Business**.     Until the earlier of the termination of this Agreement and the Closing, and except as expressly contemplated by this Agreement or as set forth on Schedule 5.3 of the Disclosure Schedules, or as appropriate in response to the Business Cessation Event or required under the Bankruptcy Code or other applicable Law and except with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned, or delayed):

i.     Sellers shall use commercially reasonable efforts to maintain, preserve and protect all of the Purchased Assets in the condition in which they existed immediately prior to the Business Cessation Event, except for ordinary wear and tear and casualty and except for replacements, modifications or maintenance in the Ordinary Course of Business and shall maintain insurance coverage with financially responsible insurance companies substantially similar in all material respects to the insurance coverage maintained by the Business and Sellers on the Petition Date; provided, however, during any period when any of its properties and/or Purchased Assets are not being utilized in the Ordinary Course of Business due to the Business Cessation Event (such assets during such period, collectively, "Non-Operating Assets"), Sellers shall be deemed

42

to have satisfied their obligations under this <u>Section 5.3(i)</u> with respect to such Non-Operating Assets by taking reasonable and customary precautions as to the safety and security of the same;

ii.        Sellers shall use commercially reasonable efforts not to take, or agree to or commit to assist any other Person in taking, any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (ii) that would reasonably be expected to impair the ability of Sellers or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation;

iii.       Except as permitted by this Agreement, no Seller shall, directly or indirectly, sell or otherwise transfer or dispose, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer or dispose of any of the Purchased Assets other than in the Ordinary Course of Business;

iv.       No Seller shall, directly or indirectly, permit, offer, agree or commit to permit, any of the Purchased Assets to become subject, directly or indirectly, to any Lien or Claim except for Permitted Liens;

v.        No Seller shall assume, reject or assign any Contract or Lease that may become an Assumed Contract other than through the assumption and assignment of the Assumed Contracts, as contemplated by this Agreement, to Buyer (or, following the termination of this Agreement in accordance with its terms, to a third party in connection with an Alternate Transaction);

vi.       No Seller shall enter into new Contracts or amend or modify Contracts other than extensions, renewals or modifications in the Ordinary Course of Business, and no Seller shall amend, modify, encumber, extend, renew or terminate any Lease, nor enter into any new lease, sublease, or license;

vii.      No Seller shall remove or permit to be removed from any building, facility, or real property any Purchased Asset or any Purchased Inventory (other than the sale of Inventory in the Ordinary Course of Business or any Purchased Assets from an Excluded Restaurant);

viii.     No Seller shall return Inventory with an aggregate value of more than $5,000 to any single vendor unless defective;

ix.       No Seller shall (i) enter into any commitment for any expenditures in excess of $20,000 for any individual commitment and $50,000 for all commitments in the aggregate, or (ii) enter into any commitment with respect to remodeling, except as required by the terms of any Lease for Leased Real Property;

x.        Sellers shall comply in all material respects with all material Laws applicable to them or having jurisdiction over the Business or any Purchased Asset;

43

xi.      No Seller shall, directly or indirectly, cancel, forgive or compromise any material debt or claim or waive or release any material right of any Seller, in each case that constitutes an Purchased Asset;

xii.      Sellers shall use diligent and commercially reasonable efforts to maintain in full force and effect each Assumed Permit and Liquor License held by any Seller as of the date hereof or otherwise obtained by any Seller prior to the Closing, and shall comply with the material terms of each such Permit and Liquor License and no Seller shall permit any such Permit or Liquor License to terminate, expire or lapse other than in the Ordinary Course of Business;

xiii.      Subject to the consequences of the Business Cessation Event, Sellers shall (v) use commercially reasonable efforts to preserve the existing business organization and keep management of the Business intact, (w) use commercially reasonable efforts to keep available the services of the Service Providers, to the extent reasonably feasible, and (x) use commercially reasonable efforts to maintain the existing relations with customers, carriers, suppliers, creditors, business partners, Service Providers, and others having business dealings with the Business, to the extent reasonably feasible;

xiv.      Other than as required by applicable Law, no Seller shall (i) re-hire any Former Employees, Recent Employees or anyone not otherwise a Current Employee as of the date of this Agreement, (ii) grant any loan to or pay any bonus to any employee, (iii) hire or, except as required by a written agreement with such employee existing as of the date hereof, promote or terminate the employment (other than for cause) of any Current Employee, (iv) grant or increase any other severance, change in control, retention, termination or similar compensation or benefits to (or amend any existing severance, change in control, retention, termination or similar compensation, benefits or arrangement with) any Current Employee, (v) recognize any union or other collective employee representative, (vi) except in each case as required by a written agreement with such employee existing as of the date hereof, increase the compensation, bonus or other benefits payable to any employee, (vii) pay to any employee any benefit or amount not required under any Employee Benefit Plan as in effect on the date of this Agreement, (viii) adopt any new Employee Benefit Plan or amend or terminate or increase the benefits under any Employee Benefit Plan, or (ix) take any action to accelerate the vesting of, or payment of, any compensation or benefit under any Employee Benefit Plan;

xv.      Except as required by GAAP, change any accounting policies, procedures, methods or practices (including with respect to reserves, revenue recognition, inventory control, prepayment of expenses, timing for payments of accounts payable and collection of accounts receivable);

xvi.      Sellers shall use commercially reasonable efforts to maintain their business records in accordance with their past practices;

44

xvii.    Sellers shall, at all times, maintain the retention of the current financial advisors and investment banker on terms, scope and conditions identical to the terms scope and conditions  existing on the date of this Agreement; and

xviii.    Except as permitted by this Agreement, no Seller shall authorize any of the foregoing, enter into an agreement to do any of the foregoing, or agree or enter into any Contract to do any of the foregoing.

Nothing contained in this Agreement is intended to give Buyer or its Affiliates, directly or indirectly,  the right to control or direct the business of Sellers prior to the Closing.

Section 5.4    **Notice of Developments**.  From the date hereof until the Closing Date, each of the Sellers (with respect to itself), as the case may be, shall promptly disclose to Buyer, on the one hand, and Buyer shall promptly disclose to Sellers, on the other hand, in writing after attaining knowledge (as applicable to each of Sellers and Buyer) of any real or alleged failure of any of Sellers or Buyer to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; provided, however, that the delivery of any notice pursuant to this Section 5.4 shall not limit or otherwise affect the remedies available to the party receiving such notice under this Agreement if such party objects to the disclosures contained in such notice within five (5) days of receipt of such notice.

Section 5.5    **Access**.

(a)    Upon reasonable advance written request by Buyer, until the earlier of the Closing and the termination of this Agreement, Sellers shall permit Buyer and its Representatives to have reasonable access to, and make (at Buyer's sole cost and expense) reasonable investigation of, during normal business hours, subject to the terms of Leases and in a manner so as not to interfere unreasonably with the normal business operations of Sellers, to all of the books and records, premises, properties, personnel, Records, Contracts, businesses, assets, accountants, auditors, counsel and operations of the Sellers related to the Business; provided, however, that, for avoidance of doubt, (i) the foregoing shall not require any Party to waive, or take any action with the effect of waiving, its attorney-client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable Law, and (ii) nothing herein shall be deemed to condition or otherwise make Buyer's obligations to consummate the Contemplated Transactions contingent upon the results of any investigation or inspection conducted by Buyer or its Representatives pursuant to this Section 5.5.    Sellers shall cause their respective officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Buyer and Buyer's Representatives in commercially reasonable respects (but at no cost or expense to Sellers) in connection with such investigation and examination, and Buyer and its Representatives shall cooperate with Sellers and their respective Representatives and shall use their reasonable efforts to minimize any disruption to the Business. Notwithstanding the foregoing, Buyer shall not have the right to conduct any Phase II environmental or other "invasive" environmental testing without Sellers' written consent (which consent may be conditioned upon, among other reasonable conditions,

45

Buyer's execution and delivery of an access and indemnity agreement in form and content reasonably satisfactory to Sellers).

(b)    As soon as possible after the date of this Agreement, but in any event no later than five (5) calendar days prior to the Closing Date, Sellers shall deliver to Buyer the unaudited consolidated balance sheet of the Sellers for the fiscal quarter ended on or about June 30, 2020, and the related consolidated statement of income and cash flows of Sellers for the three (3) months then ended.

**Section 5.6    Press Releases and Public Announcements**.    After notice to and consultation with Buyer, Sellers shall be entitled to disclose, only to the extent required by applicable Law or by order of the Bankruptcy Court or as appropriate in the conduct of the Chapter 11 Cases, this Agreement and all information provided by Buyer in connection herewith to the Bankruptcy Court, the United States Trustee, the Committee, parties in interest in the Chapter 11 Cases.    Other than statements made in the Bankruptcy Court (or in pleadings filed therein), no Party shall issue (prior to, on or after the Closing) any press release or make any public announcement without the prior written consent of the other Parties, which shall not be unreasonably withheld or delayed.    Notwithstanding anything contained in this Agreement or any contractual confidentiality obligation of Buyer to the contrary, Buyer may disclose the Agreement and all information provided by Sellers in connection herewith (such information, other than this Agreement, the "Seller Confidential Information"): (a) to its Affiliates who are instructed to maintain the confidentiality of the Seller Confidential Information, (b) to the extent required or requested by, or required to be disclosed to, any regulatory or similar authority purporting to have jurisdiction over such Person or its Affiliates and to whom Buyer discloses only so much of the Seller Confidential Information to such authority as so required in Buyer's reasonable discretion, (c) to the extent required by applicable Law or in any legal, judicial, administrative or other compulsory process; provided that Buyer discloses only so much of the Seller Confidential Information in connection with such process as is so required in Buyer's reasonable discretion, (d) to any other party hereto, (e) in connection with the exercise of any remedies under this Agreement or any action or proceeding relating to this Agreement or the enforcement of rights hereunder, (f) with the written consent of Sellers, (g) to the extent such information becomes publicly available other than as a result of a breach of this Agreement or any contractual confidentiality obligation, (h) to governmental regulatory authorities in connection with any regulatory examination of any agent or lender or in accordance with any such agent's or lender's regulatory compliance policy if such agent or such lender deems necessary for the mitigation of claims by those authorities against such agent or such lender or any of its subsidiaries or Affiliates, or (i) for the purposes of establishing a "due diligence" defense.

**Section 5.7    Bulk Transfer Laws**.    Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the Contemplated Transactions, and hereby waives all claims related to the noncompliance therewith.    The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any Liens on the Purchased Assets (other than Permitted Liens) to the extent provided in the Sale Order, including any Liens arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

**Section 5.8    Release of Claims**. Notwithstanding anything contained herein to the contrary, effective as of the Closing, (i) each Seller, on behalf of itself and its Affiliates (individually and collectively, the "Seller Releasing Parties"), fully, irrevocably and unconditionally releases Buyer, the Credit Agreement Secured Parties, and each of their respective Affiliates, each in their capacity as such (individually and collectively, the "Buyer Released Parties"), from any and all actions, causes of action, damages, claims, refunds, choses in action, suits or proceedings, rights of recovery, rights of setoff, rights of recoupment, and demands whatsoever, in law or in equity, known or unknown, matured and unmatured, accrued or contingent or liquidated, regardless of whether such rights are currently exercisable, whether derivative claims asserted or assertable on behalf of any of the Seller Releasing Parties or direct claims or for indemnification or contribution, including but not limited to any Claims under section 506(c) of the Bankruptcy Code, that such Seller Releasing Parties (whether individually or collectively) ever had, now have, or may have against the Buyer Released Parties relating to, or in any manner arising from, in whole or in part, the Sellers, the Debtors, the Chapter 11 Cases, the Credit Agreement Loan Documents, or the negotiation, formulation, or preparation of this Agreement, in each case, in connection with any event, conduct or circumstance occurring on or prior to the Closing; and (ii) the Buyer and the Credit Agreement Secured Parties, on behalf of themselves and their respective Affiliates (individually and collectively, the "Buyer Releasing Parties") fully, irrevocably and unconditionally release each Seller and each of their respective Affiliates (except for Mark A. Sellers, III, who, for the avoidance of doubt, shall not be a Seller Released Party), each in their capacity as such (individually and collectively, the "Seller Released Parties"), from any and all actions, causes of action, damages, claims, refunds, choses in action, suits or proceedings, rights of recovery, rights of setoff, rights of recoupment, and demands whatsoever, in law or in equity, known or unknown, matured and unmatured, accrued or contingent or liquidated, regardless of whether such rights are currently exercisable, whether derivative claims asserted or assertable on behalf of any of the Buyer Releasing Parties or direct claims or for indemnification or contribution, that such Buyer Releasing Parties (whether individually or collectively) ever had, now have, or may have against the Seller Released Parties relating to, or in any manner arising from, in whole or in part, the Sellers, the Debtors, the Chapter 11 Cases, the Credit Agreement Loan Documents, or the negotiation, formulation, or preparation of this Agreement, in each case, in connection with any event, conduct or circumstance occurring on or prior to the Closing; provided, however, that the foregoing provisions shall not operate to waive or release: (i) any deficiency claim against the Sellers in any remaining Credit Agreement Lien Obligations after giving effect to the Credit Bid and Release, (ii) rights to enforce this Agreement and the other agreements or instruments being executed and delivered pursuant to the terms hereof to give effect to the Contemplated Transactions, or (iii) claims against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Sellers.    Notwithstanding anything contained in this Section 5.8 to the contrary, (a) the effectiveness of the release in this Section 5.8 by the Buyer Releasing Parties for the benefit of the direct equityholders of Barfly Ventures, LLC shall be conditioned upon such direct shareholders executing and delivering a release in the form of Exhibit C hereto in favor of the Buyer Released Parties, and (b) in the event that any Seller Released Party asserts any claim or cause of action against a Buyer Released Party that the Seller has released (or purported to release) on behalf of such Seller Released Party pursuant to this Section 5.8, then any release granted by such Buyer Releasing Party to such Seller Released Party pursuant to this Section 5.8 shall be deemed immediately

47