# EXHIBIT 1

**PROPOSED AMENDED SALE ORDER**

DOCS_SF:104202.13

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | Chapter 11 |
| BARFLY VENTURES, LLC, *et al.*,[1] | Case No. 20-01947-jwb |
| Debtors. | Jointly Administered |

## AMENDED ORDER (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF

Upon the motion [Docket No. 127] (the "Motion") of BarFly Ventures, LLC and

its affiliated debtors and debtors-in-possession (collectively, the "Debtors"), for entry of an order

(this "Order") pursuant to sections 105(a), 363, and 365 of Title 11 of the United States Code

(the "Bankruptcy Code") and rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") (i) approving the sale of the Debtors' assets free and clear of

liens, claims, interests and encumbrances, (ii) authorizing assumption and assignment of certain

executory contracts and unexpired leases; and (iii) granting related relief; and the Court having

entered a prior order, dated July 22, 2020 [Docket No. 184] (the "Bid Procedures Order"),

approving bidding procedures for the Debtors' assets (the "Bid Procedures") and granting certain

---

[1] The Debtors and the last four digits of their federal employment identification number are: Barfly Ventures, LLC (8379); 9 Volt, LLC (d/b/a HopCat) (1129); 50 Amp Fuse, LLC (d/b/a Stella's Lounge) (3684); GRBC Holdings, LLC (d/b/a Grand Rapids Brewing Company) (2130); E L Brewpub, LLC (d/b/a HopCat East Lansing) (5334); HopCat-Ann Arbor, LLC (5229); HopCat-Chicago, LLC (7552); HopCat-Concessions, LLC (2597); HopCat-Detroit, LLC (8519); HopCat-GR Beltline, LLC (9149); HopCat-Holland, LLC (7132); HopCat-Indianapolis, LLC (d/b/a HopCat-Broad Ripple) (7970); HopCat-Kalamazoo, LLC (8992); HopCat-Kansas City, LLC (d/b/a HopCat,-KC, LLC and Tikicat) (6242); HopCat-Lexington, LLC (6748); HopCat-Lincoln, LLC (2999); HopCat-Louisville, LLC (0252); HopCat-Madison, LLC (9108); HopCat-Minneapolis, LLC (8622); HopCat-Port St. Lucie, LLC (0616); HopCat-Royal Oak, LLC (1935); HopCat-St. Louis, LLC (6994); Luck of the Irish, LLC (d/b/a The Waldron Public House, LLC and McFadden's Restaurant Saloon) (4255).

related relief; and Project BarFly LLC (together with its permitted successors, designees, and assigns, "Buyer") having submitted a bid, which bid was the Successful Bid for substantially all of the Debtors' assets; and the Court having jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and venue of these chapter 11 cases and the Motion in this district being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b); and the Court having found that proper and adequate notice of the Motion and the relief requested therein has been provided in accordance with the Bankruptcy Rules, and that, except as otherwise ordered herein, no other or further notice is necessary; and any objections (if any) to the Motion having been withdrawn or overruled on the merits other than with respect to (i) the Limited Objection to Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases filed by Gordon Food Service, Inc. ("GFS") [Docket No. 228], and (ii) the Objection to Adequate Assurance of Future Performance Provided by Stalking Horse Bidder filed by GFS [Docket No. 288] (together, the "GFS Objections"); and a hearing on the Motion (the "Sale Hearing") having been held to consider the relief requested in the Motion and to review and consider (i) the Motion and the exhibits thereto, (ii) the Asset Purchase Agreement, dated as of July 9, 2020, by and among the Debtors and Buyer, a copy of which is attached hereto as **Exhibit B** (together with any schedules and exhibits thereto, and as amended, restated, supplemented, or otherwise modified from time to time, the "Purchase Agreement")[2] whereby the Debtors have agreed, among other things, to sell the Purchased Assets (as defined in the Asset Purchase Agreement as modified herein) to Buyer on the terms and conditions set forth in the Purchase Agreement (collectively, the "Sale Transaction"), (iii) the *Response of CIP Administrative, LLC, In Its Capacity as Administrative Agent for the*

---

[2]    Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Purchase Agreement or, if not defined in the Purchase Agreement, the meanings ascribed to them in the Motion.

- 2 -

*Prepetition Lenders, to Objections to Sale Motion* [Docket No. 333], and (iv) the declarations of Robert S. Hersch and Ned Lidvall in support of the Motion, and upon the record of the Sale Hearing and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, their creditors and all other parties-in-interest; and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon the full record of the Sale Hearing and other pleadings and proceedings in these chapter 11 cases, including the Motion; and after due deliberation and sufficient cause appearing therefor,

## THE COURT HEREBY FINDS, DETERMINES, AND CONCLUDES THAT:

A.      Fed. R. Bankr. P. 7052.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to rule 9014 of the Bankruptcy Rules, and shall take immediate effect upon execution hereof.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.  The Court's findings shall also include any oral findings of fact and conclusions of law made by this Court during or at the conclusion of the Sale Hearing.

B.      Jurisdiction and Venue.  The Court has jurisdiction to consider and decide the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      Final Order.    This Order constitutes a final and appealable order as set forth in 28 U.S.C. § 158(a).  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction as contemplated by the Purchase Agreement.  In the

- 3 -

absence of a stay pending appeal, Buyer, being a good faith purchaser under section 363(m) of the Bankruptcy Code and entitled to its protections, may close the sale contemplated by the Purchase Agreement at any time after the entry of this Order and shall not be subject to the stay provided by rules 6004(h) or 6006(d) of the Bankruptcy Rules.

D.      Statutory and Rule Predicates.   The statutory and other legal predicates for the relief sought in the Motion are sections 105(a), 363, and 365 of the Bankruptcy Code and rules 2002, 6004, and 6006 of the Bankruptcy Rules.

E.      Opportunity to Object.   A fair and reasonable opportunity to object or be heard regarding the relief granted by this Order, including but not limited to, the assumption and assignment of the Assumed Contracts and the Cure Costs (each as defined below), has been afforded to all interested persons and entities, including, but not limited to, the Notice Parties (as defined in the Motion).

F.      Sound Business Purpose.   The Debtors have demonstrated that their entry into the Purchase Agreement and related or ancillary agreements thereto or contemplated thereby (collectively, the "Ancillary Agreements") is supported by good, sufficient, and sound business reasons.   A sale of the Purchased Assets and assumption of the Assumed Liabilities will maximize the value of the Debtors' estates, is fair and equitable, and represents a reasonable exercise of the Debtors' sound business judgment.   The Debtors determined that the Purchase Agreement constitutes the highest or otherwise best offer for the Purchased Assets and pursuant to the terms and conditions of the Purchase Agreement, the Debtors have agreed to transfer to Buyer all of the Debtors' right, title, and interest in and to, and Buyer has agreed to assume certain specified Assumed Liabilities that are not Excluded Liabilities related to, the Purchased Assets free and clear of all Liens (as defined below) and, if and to the extent requested by Buyer,

- 4 -

to assume and assign the Assumed Contracts (collectively, the "Assumed Contracts") to Buyer subject to the terms and conditions of the Purchase Agreement and this Order, and such determination is a valid and sound exercise of the Debtors' business judgment.

G. Compliance with Bid Procedures. The Bid Procedures (as approved by the Bid Procedures Order) were substantively and procedurally fair to all parties, were the result of arm's length negotiations, and provided a full, fair, and reasonable opportunity for any party to make an offer to purchase the Purchased Assets. The Debtors, Buyer, and their respective counsel and other advisors have complied with the Bid Procedures Order and the Bid Procedures in all respects except as properly waived by the Debtors in the exercise of their fiduciary duties in accordance with the Bid Procedures. Buyer submitted a Qualified Bid pursuant to the Bid Procedures approved by the Court and was the Successful Bidder for the Purchased Assets in accordance with the Bid Procedures Order and the Bid Procedures.

H. Marketing Process. The Debtors and their advisors thoroughly and fairly marketed the Purchased Assets and conducted the related sale process in good faith and in a fair and open manner, soliciting offers to acquire the Purchased Assets from a wide variety of parties. The sale process and the Bid Procedures were non-collusive, duly noticed, and provided a full, fair, reasonable, and adequate opportunity for any person or entity that expressed an interest in acquiring the Purchased Assets, or who the Debtors believed may have an interest in acquiring, and be permitted and able to acquire, the Purchased Assets, to conduct due diligence, make an offer to purchase the Debtors' assets, including, without limitation, the Purchased Assets, and submit higher and otherwise better offers for the Purchased Assets than Buyer's Successful Bid. The Debtors and Buyer have negotiated and undertaken their roles leading to the Sale Transaction and entry into the Purchase Agreement in a diligent, non-collusive, fair, reasonable,

and good faith manner. The sale process conducted by the Debtors pursuant to the Bid Procedures Order and the Bid Procedures resulted in the highest or otherwise best offer for the Purchased Assets for the Debtors and their estates, was in the best interests of the Debtors, their creditors, and all parties in interest, and any other transaction would not have yielded as favorable a result. There is no legal or equitable reason to delay consummation of the transactions contemplated by the Purchase Agreement, including, without limitation, the Sale Transaction.

I.    No Other Qualified Bids/Cancellation of Auction.  The Debtors did not receive any other Qualified Bids pursuant to the Bid Procedures and, consequently, in accordance with Article III.F of the Bid Procedures, no Auction was held and the Buyer was named the Successful Bidder upon the expiration of the Bid Deadline.

J.    Good Faith.  Buyer is not an "insider" or "affiliate" of any of the Debtors as those terms are defined in section 101 of the Bankruptcy Code.  The Purchase Agreement and the Ancillary Agreements, and each of the transactions contemplated therein, were negotiated, proposed, and entered into by the Debtors and Buyer without collusion or fraud, in good faith, and from arm's-length bargaining positions and are substantively and procedurally fair to all parties.  Neither the Debtors nor Buyer has engaged in any conduct that would cause or permit any part of the Purchase Agreement or the Ancillary Agreements to be avoidable under section 363(n) of the Bankruptcy Code.   Buyer is purchasing the Purchased Assets, in accordance with the Purchase Agreement, in good faith and is a good-faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.  In particular, (i) Buyer recognized that the Debtors were free to deal with any other party interested in purchasing the Purchased Assets; (ii) Buyer in no way induced or caused the

chapter 11 filing by the Debtors; (iii) Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (iv) no common identity of directors, managers, officers, or controlling stockholders exists between Buyer, on the one hand, and any of the Debtors, on the other hand; (v) Buyer complied with the Bid Procedures and all provisions of the Bid Procedures Order; and (vi) all payments to be made, and all other material agreements or arrangements entered into or to be entered into by Buyer in connection with the Sale Transaction, including the Ancillary Agreements, have been disclosed.  The Purchase Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under laws of the United States, any state, territory, or possession, or the District of Columbia.

K.    Fair Consideration/Reasonably Equivalent Value.    The aggregate consideration from Buyer for the Purchased Assets as set forth in the Purchase Agreement: (i) as such consideration relates to the Purchased Assets, constitutes fair consideration and fair value under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and other similar laws of the United States, any state, territory, possession, or the District of Columbia, and any foreign jurisdiction; (ii) is the highest or otherwise best value obtainable for the Purchased Assets; (iii) will provide a greater recovery to creditors than would be provided by any other available alternative; and (iv) as such consideration relates to the Purchased Assets, constitutes reasonably equivalent value (as that term is defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transaction Act, and section 548 of the Bankruptcy Code).  Neither the Debtors nor Buyer entered into or has agreed to enter into the Purchase Agreement or the Ancillary Agreements with any fraudulent or otherwise improper purpose, including, without limitation, the purpose of hindering, delaying, or defrauding any creditors of the Debtors.

L.     <u>No Successor or Other Derivative Liability</u>.  Except as otherwise set forth herein or in the Purchase Agreement, upon Closing, and to the greatest extent permitted by applicable law, Buyer shall not have any liability (including, but not limited to, any successor liability) or other obligation of any of the Debtors arising under or related to the sale and transfer of the Purchased Assets to Buyer or with respect to the Excluded Liabilities, provided that, upon Closing, Buyer shall remain liable for the Assumed Liabilities.  Without limiting the generality of the foregoing, and except as otherwise expressly provided herein or in the Purchase Agreement, Buyer shall not be liable for any claims against the Debtors or any of their predecessors, affiliates employees, agents, or advisors, and Buyer shall have no successor or vicarious liabilities of any kind or character, including, without limitation, under any theory of antitrust, environmental, successor, or transfer liability, labor law, de facto merger, mere continuation, or substantial continuity, whether known or unknown as of Closing, now existing, or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, without limitation, liabilities on account of warranties, intercompany loans, receivables among the Debtors and their affiliates, environmental liabilities, and any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of any of the Purchased Assets prior to the Closing. For the avoidance of doubt, the Debtors are deemed to release and forever discharge Buyer and any of its affiliates, successors, and assigns from any and all claims, causes of action, obligations, liabilities, demands, losses, costs, and expenses of any kind, character, or nature whatsoever, known or unknown, fixed or contingent, relating to the Sale Transaction or operation of the Purchased Assets prior to Closing, except for the Assumed Liabilities.  Buyer is not, and the consummation of the Sale Transaction will not render Buyer, a mere continuation,

- 8 -

and Buyer is not holding itself out as a mere continuation, of any of the Debtors or their respective estates, enterprise, or operations, and there is no continuity or common identity between Buyer and the Debtors.  Accordingly, the Sale Transaction does not amount to a consolidation, merger, or de facto merger of Buyer with or into any of the Debtors or their estates and Buyer is not, and shall not be deemed to be, a successor to any of the Debtors or their estates as a result of the consummation of the Sale Transaction.  Buyer would not have entered into the Purchase Agreement if the transfer of the Purchased Assets were not made free and clear of any successor liability to Buyer.

M.     Sale Notice.  As shown by the certificates of service filed with the Court and the representations or proffers made on the record at the Sale Hearing, (i) the Debtors have provided proper, timely, adequate, and sufficient notice of and sufficient opportunity to object to the Motion and the relief requested therein (including the Debtors' requested findings with respect to successor liability), the bidding process (including, without limitation, the deadline for submitting Qualified Bids), the Sale Hearing, the Sale Transaction, and the proposed entry of this Order in compliance with all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules, (ii) such notice was adequate and sufficient under the circumstances of these chapter 11 cases and complied with the Bid Procedures Order and other orders of the Court, and (iii) no other or further notice is required.

N.     Title to Assets.  The Purchased Assets constitute property of the Debtors' estates and title or rights thereto is currently vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

O.     Satisfaction of Section 363(f) Standards.  The conditions of section 363(f) of the Bankruptcy Code, including 363(f)(2), have been satisfied in full.  Upon entry of this

- 9 -

Order, the Debtors are authorized to transfer all of their right, title, and interest in and to the Purchased Assets free and clear of any and all claims (as such term is defined by section 101(5) of the Bankruptcy Code), liabilities (including any liability that results from, relates to, or arises out of tort or any other product liability claim), interests, and matters of any kind and nature whatsoever, including, without limitation, hypothecations, mortgages, security deeds, deeds of trust, debts, levies, indentures, restrictions (whether on voting, sale, transfer, disposition, or otherwise), leases, licenses, easements, rights of way, encroachments, instruments, preferences, priorities, security agreements, conditional sales agreements, title retention contracts and other title retention agreements and other similar impositions, options, judgments, offsets, rights of recovery, rights of preemption, rights of setoff, profit sharing interest, other third party rights, other impositions, or restrictions on transfer or use of any nature whatsoever, claims for reimbursement, claims for contribution, claims for indemnity, claims for exoneration, products liability claims, alter-ego claims, successor-in-interest claims, successor liability claims, substantial continuation claims, withdrawal liability claims, environmental claims, claims under or relating to any employee benefit plan, ERISA affiliate plan, or ERISA (including any pension or retirement plan) or any claims under state or other laws of similar effect, tax claims (including claims for any and all foreign, federal, state, and local taxes, including, but not limited to, sales, income, use, or any other type of tax), escheatment claims, reclamation claims, obligations, liabilities, demands, and guaranties, and other encumbrances relating to, accruing, or arising any time prior to the Closing Date, duties, responsibilities, obligations, demands, commitments, assessments, costs, expense, losses, expenditures, charges, fees, penalties, fines, contributions, premiums, encumbrances, guaranties, pledges, consensual or nonconsensual liens (including any liens as that term is defined in section 101(37) of the Bankruptcy Code), statutory liens, real or

- 10 -

personal property liens, mechanics' liens, materialman's liens, warehouseman's liens, tax liens, security interests, charges, options (including in favor of third parties), rights, contractual commitments, restrictions, restrictive covenants, covenants not to compete, rights to refunds, escheat obligations, rights of first refusal, rights and restrictions of any kind or nature whatsoever against the Debtors or the Purchased Assets, including, without limitation, any debts arising under or out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands, guaranties, rights, contractual commitments, restrictions, product liability claims, environmental liabilities, employee pension or benefit plan claims, multiemployer benefit plan claims, retiree healthcare or life insurance claims, or claims for taxes of or against the Debtors, and any derivative, vicarious, transferee, or successor liability claims, rights or causes of action (whether in law or in equity, under any law, statute, rule, or regulation of the United States, any state, territory, or possession, or the District of Columbia), whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, secured or unsecured, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, and whether imposed by agreement, understanding, law, equity, or otherwise, including claims otherwise arising under doctrines of successor liability, successor-in-interest liability, continuation liability, or substantial continuation liability, including, without limitation, that the Buyer is in any way a successor, successor-in-interest, continuation, or substantial continuation of the Debtors or their business, arising under or out of, in connection with, or in any way related to the Debtors, the Debtors' interests in the Purchased Assets, the operation of the Debtors' respective businesses at or before the effective time of the Closing pursuant to the

- 11 -

Purchase Agreement, or the transfer of the Debtors' interests in the Purchased Assets to Buyer, and all Excluded Liabilities (collectively, excluding any Assumed Liabilities and Permitted Liens, "Liens"), as provided for in the Purchase Agreement because in each case one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied. Except as otherwise expressly provided in the Purchase Agreement or this Order, such Liens shall attach to the proceeds allocated to the Debtors in the order of their priority, with the same validity, force and effect which they have against the Purchased Assets immediately prior to the Closing, subject to any claims and defenses the Debtors may possess with respect to such Liens. Those holders of Liens against the Purchased Assets who did not object or who withdrew their objections to the Purchase Agreement or the Motion are deemed to be bound by the terms of this Order as the transactions contemplated by the Purchase Agreement pursuant to section 363(f)(2). In addition, one or more of the other subsections of sections 363(f) of the Bankruptcy Code apply and, therefore, holders of Liens with an interest in the Purchased Assets owned by the Debtors are found to be adequately protected by having their Liens that constitute interests in such Purchased Assets attach solely to the proceeds of the Sale Transaction in the same order of priority and with the same extent, validity, force, and effect that such holders had prior to the Sale Transaction and by providing for the distributions provided for herein.  All persons having Liens of any kind or nature whatsoever against the Debtors or the Purchased Assets owned by the Debtors shall be forever barred from pursuing or asserting such Liens against Buyer or any of their respective assets, property, affiliates, successors, assigns, or the Purchased Assets.

P. Buyer would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors and their estates and creditors, if (i) the transfer of the Purchased Assets was not free and clear of all

Liens and other interests, including, without limitation, any rights or Liens based on any successor or transferee liability, as set forth in the Purchase Agreement and this Order, or (ii) the Buyer would, or in the future could, be liable for any such Liens, including, without limitation, any rights or Liens based on any successor or transferee liability.  Buyer will not consummate the Sale Transaction unless this Court expressly orders that none of Buyer, its affiliates, their present or contemplated members or shareholders, or the Purchased Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any Liens and other interests, including rights or claims based on any successor or transferee liability, other than expressly provided herein or in the Purchase Agreement.  The total consideration to be provided under the Purchase Agreement reflects Buyer's reliance on this Order to provide, pursuant to sections 105(a) and 363(f) and (m) of the Bankruptcy Code, that, upon the Closing, Buyer has title to, interest in, and possession of the Purchased Assets free and clear of all Liens.  A sale of the Purchased Assets, other than one free and clear of all Liens, would yield substantially less value for the Debtors' estates.

Q.     Assumption and Assignment of the Assumed Contracts.  The assumption and assignment of the Assumed Contracts are integral to the Purchase Agreement, are in the best interests of the Debtors and their estates, and represent the reasonable exercise of the Debtors' sound business judgment.   Specifically, the assumption and assignment of the Assumed Contracts (i) are necessary to sell the Purchased Assets to Buyer, (ii) allow the Debtors to sell their business to Buyer as a going concern, (iii) allow the Debtors to maximize the value of the Purchased Assets, including the Assumed Contracts, (iv) limit the losses suffered by the counterparties to the Assumed Contracts, and (v) maximize the recoveries to other creditors of

- 13 -

the Debtors by limiting the amount of claims against the Debtors' estates by avoiding the rejection of the Assumed Contracts.

R.     With respect to each of the Assumed Contracts, the Debtors and Buyer have met all requirements of section 365(b) of the Bankruptcy Code, subject only to the GFS Objections to the extent they are not withdrawn or overruled by separate order.  Further, in compliance with the requirements of sections 365(b) and 365(f) of the Bankruptcy Code, Buyer has provided adequate assurance of future performance under the Assumed Contracts to the extent that any such assurance is required and not waived by the counterparties to such Assumed Contracts, subject only to the GFS Objections to the extent they are not withdrawn or overruled by separate order.  Accordingly, the Assumed Contracts may be assumed by the Debtors and assigned to Buyer as provided for in the Purchase Agreement and this Order.

S.     The authority hereunder for the Debtors to assume and assign any Assumed Contract to Buyer includes the authority to assume and assign an Assumed Contract, as amended (including amendments entered into by the Debtors in accordance with paragraph 25 of this Order).

T.     The assignments by the applicable Debtors of each of the Assumed Contracts are made in good faith under sections 363(b) and (m) of the Bankruptcy Code.

U.     <u>Cure Notice; Adequate Assurance of Future Performance</u>.  As shown by the certificates of service filed with the Court, the Debtors have served upon each non-Debtor counterparty to certain executory contracts and unexpired leases (each, a "<u>Counterparty</u>"), prior to the Sale Hearing, a notice, dated July 24, 2020 [Docket No. 198] (the "<u>Notice of Potential Assignment</u>"), (i) that Debtors may wish to assume and assign the contracts or leases identified on the Notice of Potential Assignment (the "<u>Contracts and Leases</u>") to the Buyer pursuant to

- 14 -

section 365 of the Bankruptcy Code and (ii) of the related proposed cure costs due under section 365(b) of the Bankruptcy Code (the "Cure Costs") with respect to the Contracts and Leases.  In accordance with the Bidding Procedures Order, if the Debtors or Buyer identify additional executory contracts or unexpired leases that might be assumed by the Debtors and assigned to the Buyer or that were not set forth in the original Notice of Assumption and Assignment, the Debtors will promptly file with the Court and send a Supplemental Notice of Assumption and Assignment to the applicable Counterparties to such additional executory contracts and unexpired leases.  The service of the Notice of Potential Assignment was good, sufficient, and appropriate under the circumstances of these chapter 11 cases and complied with the Bid Procedures Order and other orders of the Court, and no other or further notice is required with respect to the Cure Costs for the assumption and assignment of the Contracts and Leases, including without limitation Buyer's provision of adequate assurance of future performance.  All Counterparties to the Contracts and Leases have had a reasonable opportunity to object to the Cure Costs listed on the Notice of Potential Assignment in accordance with the Bid Procedures Order and to the assumption and assignment of such Assumed Contract to Buyer in accordance with the Bid Procedures Order.  Accordingly, all Counterparties to Contracts and Leases who did not object or who withdrew their objections to the Cure Costs listed on the Notice of Potential Assignment prior to the Sale Hearing are deemed to have consented to such Cure Costs, and all Counterparties to Assumed Contracts who did not file an objection to the assumption by the Debtors of such Assumed Contracts and the assignment thereof to Buyer prior to the Sale Hearing are deemed to have consented to the assumption of such Assumed Contract and the assignment thereof to Buyer.  For the avoidance of doubt, any assumption and assignment of the Distribution Agreement among GFS and certain of the Debtors dated April 23, 2018 (the "GFS

Distribution Agreement") remains subject to the GFS Objections to the extent they are not withdrawn or overruled by separate order.

V.       All Counterparties to the Assumed Contracts have had a reasonable opportunity to object to Buyer's ability to provide adequate assurance of future performance as contemplated under sections 365(b)(l)(C) and 365(f)(1) of the Bankruptcy Code, in accordance with the Bid Procedures Order.  Accordingly, all Counterparties to Assumed Contracts who did not object or who withdrew their objections to Buyer's ability to provide adequate assurance of future performance under the Assumed Contracts are bound by the terms of this Order as to the assumption of such Assumed Contract and the assignment thereof to Buyer.  The filed objections at [Docket Nos. 216, 217, 220, 223, 225, 227, 259, 268, 290, and 300] relating to the Assumed Contracts were adjourned or resolved as set forth on the record at the Sale Hearing.  For the avoidance of doubt, the GFS Objections [Docket Nos. 228 and 288] remain pending.

W.       Liquor Licenses.  Alcohol sales are currently conducted in connection with the Purchased Assets pursuant to the Liquor Licenses.  The sale of alcohol is an important component of the Debtors' business and the continued sale of alcohol in connection with the Purchased Assets is essential to the Buyer's consummation of the Sale Transaction.  It is in the best interests of the estates and all other parties in interest for such alcohol sales to continue uninterrupted during the transition of ownership from the Debtors to the Buyer after the Closing.

X.       Record Retention.  Pursuant to the terms of and subject to the limitations and conditions in the Purchase Agreement, following the Closing the Debtors, their successors and assigns, and any trustee in bankruptcy will have reasonable access to the Debtors' books and records for any reasonable business purpose or compliance with any obligation, including administration of these chapter 11 cases.  To the extent that the Debtors maintain books and

records electronically, an electronic copy of such books and records shall remain with the Debtors after the Closing.

Y.    Corporate Power and Authority.    The Debtors and their applicable affiliates have (i) full corporate or similar power and authority to execute and deliver the Purchase Agreement, the Ancillary Agreements, and all other documents contemplated thereby, (ii) all corporate or similar authority necessary to consummate the transactions contemplated by the Purchase Agreement and the Ancillary Agreements, and (iii) taken all corporate actions necessary to authorize and approve the Purchase Agreement, the Ancillary Agreements, and the consummation of the transactions contemplated thereby.    No consents or approvals, other than those expressly provided for in the Purchase Agreement, are required for the Debtors to execute the Purchase Agreement or consummate the transactions contemplated thereby.

Z.    Valid and Binding Contract; Validity of Transfer.    The Purchase Agreement is a valid and binding contract between the Debtors and Buyer and shall be enforceable pursuant to its terms.    The Purchase Agreement, the Ancillary Agreements, and the Sale Transaction itself, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors and any chapter 11 trustee appointed in these chapter 11 cases, or in the event these chapter 11 cases are converted to a case under chapter 7 of the Bankruptcy Code, a chapter 7 trustee, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person.    The consummation of the Sale Transaction is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f) of the Bankruptcy Code and all of the applicable requirements of such sections have been complied with in respect of the Sale Transaction.

AA.   No *Sub Rosa* Plan.   The Sale Transaction, the Purchase Agreement, and the other transactions contemplated thereby do not constitute a *sub rosa* chapter 11 plan.  The Sale Transaction neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a liquidating chapter 11 plan for the Debtors.

BB.   Waiver of Bankruptcy Rules 6004(h) and 6006(d).   The Debtors have demonstrated (i) good, sufficient, and sound business purposes and justifications for approving the Purchase Agreement and the Sale Transaction and (ii) compelling circumstances for the immediate approval and consummation of the transactions contemplated by the Purchase Agreement and all other Ancillary Agreements for the Sale Transaction outside of (a) the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code, and (b) a chapter 11 plan, in that, among other things, the immediate consummation of the Sale Transaction to the Buyer and all transactions contemplated thereby are necessary and appropriate to maximize the value of the Debtors' estates.  Accordingly, there is cause to waive the stay contemplated by Bankruptcy Rules 6004 and 6006 with respect to the transactions contemplated by this Order.  To maximize the value of the Purchased Assets and preserve the viability of the Business, it is essential that the Sale Transaction occur within the time constraints set forth in the Purchase Agreement.  Time is of the essence in consummating the Sale Transaction.  Given all of the circumstances of the chapter 11 cases and the adequacy and fair value of the Purchase Price under the Purchase Agreement, the proposed Sale Transaction constitutes a reasonable and sound exercise of the Debtors' business judgment that should be, and hereby is, approved.

CC.   Personally Identifiable Information.   The appointment of a consumer privacy ombudsman pursuant to section 363(b)(1) or section 332 of the Bankruptcy Code is not required with respect to the relief requested in the Motion.

- 18 -

DD.   <u>Legal and Factual Bases</u>.   The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.   Entry of this Order is in the best interests of the Debtors and their estates, creditors, interest holders and all other parties in interest.

**IT IS HEREBY ORDERED THAT:**

1.   To the extent not already approved pursuant to the Bid Procedures Order, the Motion is GRANTED as set forth herein.

2.   <u>Objections</u>.   All objections, reservations of rights regarding, or other responses to the Motion or the relief requested therein, the Purchase Agreement, all other Ancillary Agreements, the Sale Transaction, the entry of this Order, or the relief granted herein, including, without limitation, any objections to Cure Costs or relating to the cure of any defaults under any of the Assumed Contracts or the assumption and assignment of any of the Assumed Contracts to the Buyer by the Debtors, including with respect to Buyer's ability to provide adequate assurance of future performance under the Assumed Contracts, solely as it relates to the relief granted by this Order that have not been adjourned, withdrawn, or resolved are overruled in all respects on the merits with prejudice, except as otherwise set forth herein.   All persons and entities that failed to object timely to the Motion are deemed to have consented to the relief granted herein for all purposes.

3.   <u>Notice</u>.   Notice of the Motion, the Sale Hearing, the Purchase Agreement, the assumption and assignment of the Assumed Contracts, and the relief granted in this Order was fair, sufficient, proper, and equitable under the circumstances, and complied in all respects with sections 102(1), 363, and 365 of the Bankruptcy Code, rules 2002, 6004, and 6006 of the Bankruptcy Rules, the Bid Procedures Order, and other orders of the Court.

- 19 -

4.    Fair Purchase Price.   The consideration to be provided by Buyer under the Purchase Agreement is fair and reasonable and constitutes (a) reasonably equivalent value under the Bankruptcy Code, the Uniform Voidable Transactions Act, and the Uniform Fraudulent Transfer Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act, (c) reasonably equivalent value, fair consideration, and fair value under any other applicable laws of the United States, any state, territory or possession, or the District of Columbia, and (d) valid and valuable consideration for the release of any potential Liens pursuant to this Order, which release shall be deemed to have been given in favor of Buyer by all holders of Liens of any kind whatsoever against all of the Debtors and all of the Purchased Assets, other than as otherwise expressly set forth in this Order.

5.    Approval of the Purchase Agreement.   The Purchase Agreement and the Sale Transaction, including, without limitation, all transactions contemplated therein or in connection therewith (including the Ancillary Agreements) and all of the terms and conditions thereof, are hereby approved in their entirety, subject to the terms and conditions of this Order. The failure specifically to include or make reference to any particular provisions of the Purchase Agreement in this Order shall not impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement, the Sale Transaction, and the transactions contemplated therein or in connection therewith (including the Ancillary Agreements) are authorized and approved in their entirety.

6.    Consummation of Sale Transaction.    Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors are authorized and directed to perform their obligations under and comply with the terms of the Purchase Agreement and the Ancillary Agreements, pursuant to and in accordance with the terms and conditions of the Purchase

Agreement, the Ancillary Agreements, and this Order. The Debtors, as well as their affiliates, officers, employees, and agents, are authorized to execute and deliver, and empowered to perform under, consummate, and implement, the Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement, the Ancillary Agreements, and the Sale Transaction, including the Ancillary Agreements, and to take all further actions and execute such other documents as may be (a) necessary or appropriate to the performance of the obligations contemplated by the Purchase Agreement, including, without limitation, making any regulatory filings necessary or advisable in connection with such transfer, and (b) as may be requested by Buyer to implement the Purchase Agreement and the Sale Transaction, in accordance with the terms thereof, without further order of the Court. The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Purchase Agreement, Ancillary Agreements, or any other Sale Transaction-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Order; provided, however, that the Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

7.     Direction to Government Agencies. To the greatest extent allowable under applicable Law, each and every federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other Governmental Entity is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale Transaction and the other transactions

contemplated by the Purchase Agreement and the Ancillary Agreements and approved by this Order.

        8.    <u>Transfer of Assets Free and Clear and Injunction</u>.  Upon the Closing, pursuant to sections 105(a), 363(b), 365(b), and 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets to Buyer shall (a) constitute a legal, valid, and effective transfer of all of Debtors' right, title, and interest in and to such Purchased Assets subject to and in accordance with the Purchase Agreement, (b) vest Buyer with all of the Debtors' right, title, and interest in and to such Purchased Assets, and (c) be free and clear of all Liens against the Debtors and the Purchased Assets (including Liens of any Governmental Entity), with such Liens attaching to the proceeds allocated to the Debtors in the order of their priority, with the same validity, force, and effect that they had against such Purchased Assets immediately prior to the Closing.  All persons or entities that are presently, or on or after the Closing may be, in possession of some or all of the Purchased Assets, are hereby directed to surrender possession of the Purchased Assets to Buyer or its respective designees on the Closing Date or at such time thereafter as Buyer may request.

        9.    Notwithstanding anything contained herein or in any other document, in accordance with the Purchase Agreement, all fee interests, rights-of-way, easements, real property interests, real rights, licenses, servitudes, permits, privileges, and leases (surface and subsurface) owned or held by the Debtors, or hereinafter acquired by the Debtors prior to the Closing, in each case, in connection with the Purchased Assets, constitute real property or a real property interest, and together with the rights, tenements, appurtenant rights and privileges related thereto (collectively, the "<u>Real Property Interests</u>"), shall, in accordance with the Purchase Agreement, be transferred to Buyer, directly or indirectly, at the Closing notwithstanding any consent rights, anti-assignment provisions, or any other provisions

purporting to prohibit or condition the transfer or assignment of such Real Property Interests contained in such Real Property Interests, or in any other document, and all such rights, provisions, prohibitions, and conditions shall be void and of no force and effect with respect to the Sale Transaction.

10.     To the extent provided for in the Purchase Agreement, any and all of the Debtors' security deposits, or other security held by landlords, lessors, and other counterparties to the Assumed Contracts are being transferred and assigned to, and shall be the property of, the Buyer from and after the Closing, which transfer and assignment of security deposits, other deposits, or security shall satisfy in full the requirements of section 365(l) of the Bankruptcy Code for all contracts, leases, and licenses assumed and assigned pursuant to this Order or the Purchase Agreement.

11.     Subject to the terms, conditions, and provisions of this Order, all persons and entities are hereby forever prohibited and barred from taking any action that would adversely affect or interfere (a) with the ability of the Debtors to sell and transfer the Purchased Assets to Buyer in accordance with the terms of the Purchase Agreement, the Ancillary Agreements, and this Order and (b) with the ability of the Buyer to acquire, take possession of, use, and operate the Purchased Assets in accordance with the terms of the Purchase Agreement, the Ancillary Agreements, and this Order.   Notwithstanding the foregoing, nothing in this Order or the Purchase Agreement shall prohibit any party from seeking to enforce or collect any of the Assumed Liabilities against the Buyer.

12.     Except as otherwise provided in the Purchase Agreement or herein, all Persons (and their respective successors and assigns) including, without limitation, the Debtors, the Debtors' estates, all debt security holders, equity security holders, governmental tax and

regulatory authorities, lenders, customers, vendors, employees, former employees, litigation claimants, trustees, trade creditors, and any other creditors (or agent of any of the foregoing) who may or do hold Liens (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated) against the Debtors or the Purchased Assets owned by the Debtors arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation of the Purchased Assets by the Debtors prior to the Closing, or the Sale Transaction, are hereby forever barred, estopped, and permanently enjoined from asserting or pursuing such Liens against Buyer, its affiliates, successors, assigns, its property, or the Purchased Assets, including, without limitation, taking any of the following actions with respect to any Liens: (a) commencing or continuing in any manner any action, whether at law or in equity, in any judicial, administrative, arbitral, or any other proceeding, against Buyer, its affiliates, successors, assigns, assets (including the Purchased Assets), or properties; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against Buyer, its affiliates, successors, assigns, assets (including the Purchased Assets), or properties; (c) creating, perfecting, or enforcing any Lien against Buyer, its affiliates, any of their respective successors, assigns, assets (including the Purchased Assets), or properties; (d) asserting a Lien as a setoff, right of subrogation, or recoupment of any kind against any obligation due against Buyer, its affiliates, or any of their respective successors or assigns; or (e) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Order or the agreements or actions contemplated or taken in respect thereof.  No such Person shall assert or pursue against Buyer or its affiliates, successors, or assigns any such Lien.

13.     <u>Licenses and Permits; Liquor Licenses</u>.  To the greatest extent allowable under applicable Law, (a) the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, approval, grant, certificate of occupancy, state food service license, local occupational license, certificate of need, authorization, accreditation, operating permit, health inspection permit, registration, plan, or any similar governmental authorization or approval of the Debtors with respect to the Purchased Assets, including the Liquor Licenses (collectively, the "<u>Permits</u>"), (b) all such Permits are deemed to have been, and hereby are, deemed to be transferred to the Buyer as of the Closing Date, and (c) each Governmental Entity that has issued or granted a Permit to, or for the benefit of, the Sellers shall be deemed to have consented to the transfer of such Permit to the Buyer as of the Closing Date.  To the maximum extent provided by section 525 of the Bankruptcy Code, no Governmental Entity may revoke or suspend any Permit sold, transferred, assigned, or conveyed, or deemed to be sold, transferred, assigned, or conveyed, to the Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale Transaction.

14.     To the extent any Permit necessary for the operation of the Business at the Continuing Restaurants is not an assumable and assignable executory contract, the Buyer shall make reasonable efforts to apply for and obtain any such Permit promptly after the Closing Date. To the greatest extent allowable under applicable law, all existing Permits applicable to the Continuing Restaurants, including but not limited to the Liquor Licenses, shall remain in place for the Buyer's benefit until either new Permits are obtained or existing Permits are transferred in accordance with applicable administrative procedures and to the extent any of the Continuing Restaurants are operated under any such Permits after the Closing Date, the Buyer shall fully

- 25 -

indemnify the Debtors, or any successor in interest to the Debtors, including a chapter 11 trustee or chapter 7 trustee, for any and all costs and liabilities arising thereunder without limitation.

15.     With regard to the sale of alcohol at the Continuing Restaurants, pursuant to the Purchase Agreement, the Debtors and all other parties in interest shall cooperate fully with and support the Buyer in executing such applications and furnishing such documents as are necessary for the Buyer to obtain Liquor License Approvals at the Buyer's sole expense.  Except for violations of Law unrelated to the transfer of ownership of the Purchased Assets occurring pursuant to the Purchase Agreement and this Sale Order, and to the greatest extent allowable under applicable law, including, but not limited to, section 525 of the Bankruptcy Code, all law enforcement and regulatory agencies shall not interrupt the Business conducted at the Continuing Restaurants, including the sale of alcohol by the Buyer either on its own behalf, or on behalf of one or more of the Debtors, without first obtaining relief from this Court.  To the greatest extent allowable under applicable law, the Buyer may continue to operate at the Continuing Restaurants under existing Liquor Licenses and other Permits needed to operate at the Continuing Restaurants, with no interruption of the business conducted at the premises, until the Liquor License Approvals have been obtained and other Permits have been transferred or issued to the Buyer; provided, however, to the extent such operation by the Buyer under the existing Liquor Licenses gives rise to any liability against the Debtors the Buyer shall fully indemnify the Debtors, or any successor in interest to the Debtors, including a chapter 11 trustee or chapter 7 trustee,  for any and all costs and liabilities arising therefrom.

16.     Possession of any and all alcohol Inventory shall be surrendered to the Buyer at the earliest of (a) immediately following Closing where allowed by applicable Law; (b) receipt by the Buyer of authorization from the applicable Governmental Entity where

required by applicable Law; or (c) receipt by the Buyer of the applicable Liquor License or Liquor License Approval and the Debtors shall not purchase or sell alcohol Inventory after the Closing for the Buyers or any other party; *provided* that, notwithstanding the foregoing, legal possession of such Inventory shall not be surrendered to the Buyer if doing so would violate applicable law in each applicable jurisdiction..

17.     If, and only if, the real estate lease, dated as of June 10, 2014, between Liberty Maynard, L.L.C. and HopCat Ann Arbor, LLC, is not assumed and assigned to the Buyer or its designee in accordance with the Purchase Agreement on the Closing Date, the Michigan Class C Liquor License associated with such lease shall not be a Purchased Asset under the Purchase Agreement and shall be abandoned to Liberty Maynard, L.L.C. and HopCat Ann Arbor, LLC on the Closing Date.

18.     No Successor or Other Derivative Liability.  Upon the Closing, all Persons are permanently and forever prohibited from asserting against Buyer or the Purchased Assets any Lien arising under any theory of successor or transferee liability, de facto merger, or continuity liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated, or unliquidated.

19.     This Order shall be effective as a determination that, upon the Closing, all Liens as to the Purchased Assets prior to the Closing have been unconditionally released, discharged, and terminated to the fullest extent permitted by applicable Law, and that the conveyances described herein have been effected.  In connection with the Closing, a certified copy of this Order may be filed and/or recorded with the appropriate filing agents, filing officers, administrative agencies or units, governmental departments, secretaries of state, federal, state, and local officials, and all other persons, institutions, agencies, and entities who may be required

- 27 -

by operation of law, the duties of their office, or contract evidencing the release, cancelation, and termination provided herein of any Liens of record on the Purchased Assets prior to the date of this Order.

20.     Following the Closing, no holder of any Lien shall interfere with Buyer's title to or use or enjoyment of the Purchased Assets based on or related to any Lien or based on any actions or omissions by the Debtors, including any actions or omissions the Debtors may take in these chapter 11 cases.

21.     If any Person that has filed statements or other evidence of Liens in respect of the Purchased Assets shall not have delivered to the Debtors before the Closing after due demand therefor, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of such interests that such Person has or may assert with respect to the Purchased Assets, the Debtors or Buyer are authorized to execute and file such statements, instruments, releases, and other documents on behalf of such Person with respect to such Purchased Assets without any further Order of the Court.

22.     Except as expressly set forth in the Purchase Agreement, the Ancillary Agreements or this Order, and except with respect to the Assumed Contracts, Buyer and each of its affiliates, successors, assigns, members, partners, officers, directors, principals, and shareholders shall have no liability whatsoever for any Liens, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, whether liquidated or unliquidated, whether asserted derivatively or vicariously, whether asserted based on Buyer's status as a transferee, successor, or otherwise, of any kind, nature, or character whatsoever,

- 28 -

including Liens based on, relating to, or arising under, without limitation: (a) any employment or labor agreement; (b) any pension, welfare, compensation, or other Employee Benefit Plan, agreements, practices, and programs, including, without limitation, any pension or Employee Benefit Plan of or related to any of the Debtors or any Debtor's affiliates or predecessors or any current or former employees of any of the foregoing; (c) the Debtors' business operations or the cessation thereof; (d) any litigation involving one or more of the Debtors; (e) any employee, workers' compensation, occupational disease or unemployment or temporary disability related law, including, without limitation, any claims, rights, or causes of action that might arise under or pursuant to (i) the Employee Retirement Income Security Act of 1974, as amended, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the Worker Adjustment and Retraining Notification Act of 1988, (vi) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (vii) the Americans with Disabilities Act of 1990, (viii) the Consolidated Omnibus Budget Reconciliation Act of 1985, (ix) state and local discrimination laws, (x) state and local unemployment compensation laws or any other similar state and local laws, (xi) state workers' compensation laws, or (xii) any other state, local, or federal employee benefit laws, regulations, or rules or other state, local, or federal laws, regulations or rules relating to, wages, benefits, employment, or termination of employment with any or all Debtors or any of their predecessors; (f) any antitrust laws; (g) any product liability or similar laws, whether state, federal, or otherwise; (h) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, or similar state statutes; (i) any bulk sales or similar laws; (j) any federal, state, or local tax statutes, rules, regulations, or ordinances, including, without limitation,

the Internal Revenue Code of 1986, as amended; and (k) any common law doctrine of de facto merger, successor, transferee, or vicarious liability, substantial continuity liability, successor-in-interest liability theory, or any other theory of or related to successor liability.

23.     Upon the Closing, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Purchased Assets transferring good and marketable, indefeasible title to and interest in all of the Purchased Assets to Buyer pursuant to the terms of the Purchase Agreement.

24.     Assumption and Assignment of the Assumed Contracts.  Subject to and conditioned upon the Closing, the Debtors are hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to assume and assign the Assumed Contracts to Buyer free and clear of all Liens, and to execute and deliver to Buyer such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts to Buyer as provided in the Purchase Agreement.  In accordance with the Bid Procedures Order and the terms of this Order, following the Closing, Buyer shall be fully and irrevocably vested with all of the Debtors' right, title, and interest in and under the Assumed Contracts, free and clear of any Liens, and each Assumed Contract shall be fully enforceable by Buyer in accordance with its respective terms and conditions, except as limited by this Order.  For the avoidance of doubt, nothing in this paragraph affects Buyer's right to re-designate an Assumed Contract for rejection in accordance with Section 2.6(b) of the Purchase Agreement.

25.     In connection with the assumption and assignment of the Assumed Contracts to Buyer in accordance with the terms of this Order and Section 2.6 of the Purchase Agreement, the Debtors are authorized, upon the written consent of Buyer, to enter into any amendment, modification, or similar agreement with a Counterparty to an Assumed Contract to

modify the terms of such Assumed Contract prior to the effective date of assignment of such Assumed Contract to Buyer.

26.    Adequate Assurance of Future Performance.  All of the requirements of sections 365(b) and 365(f) of the Bankruptcy Code, including without limitation, the demonstration of adequate assurance of future performance, have been satisfied for the assumption by the Debtors, and the assignment by the Debtors to Buyer, solely with respect to the Assumed Contracts, subject only to the GFS Objections to the extent they are not withdrawn or overruled by separate order.  Buyer has satisfied its adequate assurance of future performance requirements with respect to the Assumed Contracts and has demonstrated it is sufficiently capitalized or otherwise able to comply with the necessary obligations under the Assumed Contracts, subject only to the GFS Objections to the extent they are not withdrawn or overruled by separate order.  The GFS Objections are adjourned to October 18, 2020 at 10:00 a.m. (Eastern Time) for further hearing.

27.    Cure Costs.  The Cure Costs set forth on **Exhibit A** annexed hereto (the "Final Cure Schedule") are the sole amounts, if any, necessary under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code, except as otherwise agreed to in writing by the Buyer and the applicable Counterparty with respect to such Cure Cost, to cure all defaults and pay all actual losses under the Assumed Contracts, subject only to the GFS Objections to the extent they are not withdrawn or overruled by separate order and except as set forth on Exhibit A with respect to GFS.  To the extent a Counterparty to an Assumed Contract failed to timely object to a Cure Cost, such Cure Cost has been and shall be deemed to be finally determined as set forth on the Final Cure Schedule, and any such Counterparty shall be barred, and forever prohibited from: (i) challenging, objecting to, or denying the validity and finality of the Cure

Cost as of the Closing Date, and (ii) asserting against the Debtors, their estates, Buyer, and their respective successors and assigns, any pecuniary loss resulting from a default allegedly arising or occurring under the Assumed Contracts before the Closing Date.

28.    <u>Payment of Cure Costs</u>.    Except as otherwise specifically provided for by order of the Court, or as otherwise agreed to in writing between the Debtor and the Counterparty, all defaults or other obligations of the Debtors under the Assumed Contracts arising or accruing prior to the Closing Date or required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assumed Contracts (in each case, without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code), whether monetary or non-monetary, shall be promptly cured pursuant to the terms of the Purchase Agreement and this Order by the Debtors' payment of the applicable Cure Cost in accordance with the Purchase Agreement and as set forth on the Final Cure Schedule.    The failure of the Debtors or Buyer to enforce at any time one or more terms or conditions of any Assumed Contract shall not be a waiver of such terms or conditions, or of the Debtors' and Buyer's rights to enforce every term and condition of such Assumed Contract.

29.    <u>Buyer's Standing; Debtors' Standing</u>.    The Buyer shall have standing to object to the allowance of claims (as such term is defined in section 101(5) of the Bankruptcy Code) asserted against the Debtors or their estates including, without limitation, any unresolved or disputed Assumed Liabilities or otherwise, that constitute obligations assumed by the Buyer pursuant to the terms of the Purchase Agreement.    Nothing in this Order shall divest the Debtors of their standing or duty as debtors-in-possession under the Bankruptcy Code from reconciling

claims asserted against the Debtors or their estates and objecting to any such claims that should be reduced, reclassified, or otherwise disallowed.

30.     *Ipso Facto* Clauses Ineffective.  With respect to the Assumed Contracts, in connection with the Sale Transaction: (a) the Debtors may assume each of the Assumed Contracts in accordance with section 365 of the Bankruptcy Code; (b) the Debtors may assign each Assumed Contract in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Assumed Contract that prohibit or condition the assignment of such Assumed Contract or allow the party to such Assumed Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assumed Contract, constitute unenforceable anti-assignment provisions which are void and of no force and effect; (c) all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of each Assumed Contract have been satisfied; and (d) effective upon the Closing Date or any later applicable effective date with respect to a particular Assumed Contract, the Assumed Contracts shall be transferred and assigned to, and from and following the Closing or such later applicable effective date shall remain in full force and effect for the benefit of, the Buyer, notwithstanding any provision in any Assumed Contract (including those of the type described in sections 365(b)(2) and (e) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Buyer shall be deemed to be substituted for the applicable Debtor as a party to the applicable Assumed Contract and the Debtors shall be relieved from any further liability with respect to the Assumed Contracts after such assumption by the Debtors and assignment to the Buyer, except as otherwise provided in the Purchase Agreement.  To the extent any provision in any Assumed

- 33 -

Contract assumed and assigned pursuant to this Order (x) prohibits, restricts, or conditions, or purports to prohibit, restrict, or condition, such assumption and assignment (including, without limitation, any "change of control" provision), or (y) is modified, breached, or terminated, or deemed modified, breached, or terminated by any of the following: (i) the commencement of the chapter 11 cases, (ii) the insolvency or financial condition of any of the Debtors at any time before the closing of the chapter 11 cases, (iii) the Debtors' assumption and assignment of such Assumed Contract, (iv) a change of control or similar occurrence; or (v) the consummation of the Sale Transaction, then such provision shall be deemed modified in connection with the Sale Transaction so as not to entitle the Counterparty to prohibit, restrict, or condition such assumption and assignment, to modify, terminate, or declare a breach or default under such Assumed Contract, or to exercise any other default-related rights or remedies with respect thereto, including without limitation, any such provision that purports to allow the Counterparty to terminate or recapture such Assumed Contract, impose any penalty, additional payments, damages, or other financial accommodations in favor of the Counterparty thereunder, condition any renewal or extension thereof, impose any rent acceleration or assignment fee, or increase or otherwise impose any other fees or other charges in connection therewith. All such provisions constitute unenforceable anti-assignment provisions that are void and of no force and effect in connection with the Sale pursuant to sections 365(b), 365(e), and 365(f) of the Bankruptcy Code.

31.    Use of PPP Cash. From the date hereof through and including the Closing Date, the Sellers shall use the PPP Cash to (a) pay the Cure Amounts related to any Assumed Contract for Leased Real Property, and, to the extent there is any PPP Cash remaining, (b) use the remaining PPP Cash to pay the payroll (and any Taxes related thereto) of the Transferred Employees until no PPP Cash remains; provided, however, if (x) the Closing Date is after 12:01

a.m. (Eastern Time) on October 19, 2020 and (y) no PPP Cash remains, then the Buyer shall reimburse the Debtors' estates for each dollar of non-PPP Cash used for authorized PPP expenses (*e.g.*, rent, payroll, utilities, etc.) after 12:01 a.m. (Eastern Time) on October 19, 2020. Notwithstanding anything in the Purchase Agreement or this Order to the contrary, and for the avoidance of doubt, to the extent this paragraph 31 conflicts with any other terms of the Purchase Agreement (including but not limited to Sections 2.1(a) 2.3(a), 2.3(d), and 5.9), the terms of this paragraph 31 shall prevail.

32. The Debtors shall use commercially reasonable efforts to provide the Committee and any liquidating or chapter 7 trustee, as applicable, with all documentation necessary to seek forgiveness of any amounts outstanding under any loan received by the Debtors under the Coronavirus Aid, Relief and Economic Security Act's Paycheck Protection Program. The Debtors shall reasonably cooperate with the Committee and any liquidating or chapter 7 trustee, as applicable, in pursuing any application requirements for such forgiveness.

33. <u>Wind-Down Budget</u>.[3]   Upon the entry of an order (a) dismissing these chapter 11 cases or (b) converting these chapter 11 cases to cases under chapter 7, to the extent there are any funds remaining in the Wind-Down Budget, such remaining funds shall be turned over to the Prepetition Secured Lenders. The Wind-Down Budget shall account for the aggregate allowed fees and expenses payable and/or reimbursable by the Debtors to the Committee's professionals, Sugar Felsenthal Grais & Helsinger, LLP, Jaffe Raitt Heuer & Weiss, P.C., and Amherst Partners, in an amount not greater than $299,297.00. The aggregate allowed fees payable and expenses reimbursable by the Debtors to their retained professionals

---

[3]   For the avoidance of doubt, the Wind-Down Budget is predicated on the closing of the Sale Transaction occurring on or before October 19, 2020. The Debtors, the Buyer and the Committee shall work in good faith to prepare a revised Wind-Down Budget in the event that the Sale Transaction fails to close on or before October 19, 2020.

- 35 -

Pachulski Stang Ziehl & Jones LLP, Warner Norcross + Judd LLP, and Rock Creek Advisors, LLC, shall not be greater than 107.5 percent of the sum of total amounts budgeted to such professionals as set forth in the Wind-Down Budget.[4]   Additionally, Buyer shall assume all liabilities related to: (a) any Cure Costs associated with the assumption of the lease agreement between Ionia Ventures, LLC and debtor GRBC Holdings, LLC and (b) any credit card interchange fees and real estate property taxes in excess of the amounts set forth in the Wind-Down Budget.

34.    Good Faith; Statutory Mootness.   Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to, and is hereby granted, the full rights, benefits, privileges, and protections of section 363(m) of the Bankruptcy Code.   The Sale Transaction contemplated by the Purchase Agreement and the Ancillary Agreements is undertaken by Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein shall neither affect the validity of the Sale Transaction (including the assumption and assignment of the Assumed Contracts) nor the transfer of the Purchased Assets to Buyer, free and clear of all Liens pursuant to the Purchase Agreement.   The Debtors and Buyer will be acting in good faith if they proceed to consummate the Sale Transaction at any time after entry of this Order.

35.    No Avoidance of Purchase Agreement.   Neither the Debtors nor the Buyer has engaged in any conduct that would cause or permit the Purchase Agreement to be avoided or

---

[4]      For the avoidance of doubt, the fees payable and expenses reimbursable by the Debtors to Mastodon Ventures, Inc., shall not be subject to such permitted variance but shall, instead, be subject to the amounts approved by the *Order (I) Authorizing the Retention and Employment of Mastodon Ventures, Inc. as Investment Banker to the Debtors, Nunc Pro Tunc to the Petition Date, (II) Waiving the Information Requirements of Local Rule 2016-2(d), and (III) Granting Related Relief* [Docket No. 274], as reflected in the Wind-Down Budget.

costs or damages to be imposed under section 363(n) of the Bankruptcy Code. Accordingly, the Purchase Agreement and the Sale Transaction shall not be avoidable under section 363(n) of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the Purchase Agreement or the Sale Transaction.

36.     Modification of Purchase Agreement. Subject to the terms of the Purchase Agreement and the Ancillary Agreements, as applicable, the Purchase Agreement, the Ancillary Agreements, and any related agreements, documents, or other instruments may be modified, amended, or supplemented through a written document signed by the parties thereto in accordance with the terms thereof and this Order without further order of the Court; provided that; (a) notwithstanding any such modification, amendment, or supplement, the sale of the Purchased Assets to Buyer will still comply with the requirements of section 363 of the Bankruptcy Code; and (b) such modifications, amendment, or supplement is not inconsistent with this Order.

37.     Record Retention. Following the Closing, the Debtors, their successors and assigns, and any trustee in bankruptcy will have access to the Debtors' books and records for the specified purposes set forth in, and subject to the terms and limitations contained in, the Purchase Agreement. To the extent that the Debtors maintain books and records electronically, an electronic copy of such books and records shall remain with the Debtors after the Closing.

38.     Standing. The Purchase Agreement shall be in full force and effect, regardless of any Debtor's lack of good standing in any jurisdiction in which such Debtor is formed or authorized to transact business.

39. <u>Bulk Sales; Taxes</u>.  No bulk sales law, bulk transfer law, or any similar law of any state or other jurisdiction shall apply to the Debtors' conveyance of the Purchased Assets or this Order.

40. <u>Reservation of Rights</u>.  Nothing in this Order shall be deemed to waive, release, extinguish, or estop the Debtors or their estates from asserting or otherwise impair or diminish any right (including any right of recoupment), claim, cause of action, defense, offset, or counterclaim in respect of any asset that is not a Purchased Asset.  All of the provisions of this Order are non-severable and mutually dependent.  To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion in these chapter 11 cases, the terms of this Order shall control.

41. <u>Conflicts</u>.  In the event there is a conflict between this Order and the Purchase Agreement (including any Ancillary Agreements executed in connection therewith), this Order shall control and govern.

42. <u>Waiver of Bankruptcy Rules 6004(h) and 6006(d)</u>.  Notwithstanding the provisions of rules 6004(h) and 6006(d) of the Bankruptcy Rules or any applicable provisions of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Western District of Michigan, this Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen-day stay provided in rules 6004(h) and 6006(d) of the Bankruptcy Rules is hereby expressly waived and shall not apply, and the Debtors and Buyer are authorized and empowered to close the Sale Transaction immediately upon entry of this Order.

- 38 -

43.     Personally Identifiable Information.  After giving due consideration to the facts, circumstances, and conditions of the Purchase Agreement, the Sale Transaction is consistent with the Debtors' privacy policies concerning personally identifiable information and no showing was made that the sale of any personally identifiable information contemplated in the Purchase Agreement, subject to the terms of this Order, would violate applicable non bankruptcy law.

44.     Binding Effect of this Order.  This Order and the Purchase Agreement shall be binding in all respects upon, and shall inure to the benefit of, Buyer, the Debtors' estates, the Debtors, their affiliates, any trustee appointed in the Debtors' chapter 11 cases, all creditors (whether known or unknown) of any Debtor, all holders of interests in the Purchased Assets, all interested parties, and their successors and assigns.  Any trustee appointed for the Debtors under any provision of the Bankruptcy Code, whether the Debtors are proceeding under chapter 7 or chapter 11 of the Bankruptcy Code, shall be authorized to (a) operate the business of the Debtors to the fullest extent necessary to permit compliance with the terms of the Purchase Agreement and the Ancillary Agreements and (b) perform under the Purchase Agreement and the Ancillary Agreements without the need for further order of this Court.

45.     Subsequent Plan Provisions.  Nothing contained in any chapter 11 plan confirmed in the Debtors' chapter 11 cases, any order confirming any such plan, or in any other order in these chapter 11 cases (including any order entered after any conversion of any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code) or any related proceeding subsequent to entry of this Order shall alter, conflict with, or derogate from the provisions of the Purchase Agreement or this Order.

46. _Retention of Jurisdiction_. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the Purchase Agreement (and such other related agreements, documents, or other instruments) and to interpret, implement, and enforce the terms of this Order

47. _Prepetition Secured Lenders' Deficiency Claim_. Notwithstanding anything to the contrary contained in this Order or the Purchase Agreement, effective as of the Closing (but only if the Closing actually occurs), the Prepetition Lenders shall waive, and receive no distribution on account of, any and all unsecured deficiency claims with respect to the Prepetition Obligations.

48. _Additional Cash Consideration for Purchased Assets_. Notwithstanding anything to the contrary contained in this Order or the Purchase Agreement, as additional consideration for the sale and transfer of the Purchased Assets, the Purchase Price shall include $225,000 in cash, payable by the Buyer to the Debtors on the Closing Date (but only if the Closing actually occurs), to be held in escrow until confirmation of a chapter 11 plan or conversion of these cases, and to be used exclusively by any chapter 11 trustee or chapter 7 trustee, acting on behalf of the Debtors' estates, as applicable, at his or her discretion, with any remainder to be distributed to creditors pursuant to the Bankruptcy Code.

49. _Debtors' Claims and Causes of Action_. Notwithstanding anything to the contrary contained in this Order or the Purchase Agreement, all Purchased Actions shall comprise Excluded Assets and shall not comprise Purchased Assets, except for any claims or causes of action against a trade vendor and/or service provider that the Buyer reasonably expects to provide goods and/or services to the Buyer upon and/or after the Closing Date, identified on **Exhibit C** attached hereto (each entity identified therein, an "Ongoing Business Party"), which

- 40 -

claims and causes of action shall remain Purchased Assets under the Purchase Agreement; *provided* that Excluded Assets shall further include any claims and causes of action against a non-Debtor transferee of assets, including but not limited to any Ongoing Business Party, that received such assets from or at the direction of any director or officer (including, but not limited to, Mark Sellers) for the primary benefit of such director or officer individually.

50. Releases. Effective as of the Closing Date (but only if the Closing actually occurs), the Prepetition Secured Lenders, Administrative Agent, Buyer, Debtors, Committee, and members of the Committee (solely in their roles as Committee members and not as individual creditors) and their respective professionals (collectively, the "Release Parties") will be deemed released and discharged by each and all of the other Release Parties and the Debtors' estates from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Release Parties or the Debtors' estates, as applicable, whether known or unknown, foreseen or unforeseen, existing in law, equity, or otherwise, that the Release Parties or the Debtors' estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim against, or interest in, the Debtors or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors' bankruptcy cases, the Debtors' sale of assets to the Buyer in accordance with this Order and the Purchase Agreement, the Bid Procedures, Credit Bid, or any Sale Transaction or any other transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Purchase Agreement, Ancillary Agreements, or this Order, including but not limited to any claims under section 506(c) of the Bankruptcy Code; *provided*

- 41 -

that any right to enforce this Order and any right of estate professionals to seek allowance and payment of professional fees is not so released by this paragraph.

51.     <u>Insurance Claims</u>.  Nothing in the Purchase Agreement or this Order shall be construed to waive, release or otherwise impact any claims that the Buyer may have to pursue or receive the proceeds from claims under the Insurance Policies pursuant to Section 6.7 of the Purchase Agreement (excluding any directors' and officers' liability Insurance Policies). Nothing in the Purchase Agreement or this Order shall be construed to waive, release or otherwise impact any claims that a chapter 11 or chapter 7 trustee may pursue on behalf of the Debtors' estates with respect to the Debtors' directors and officers or their directors and officers Insurance Policies.

52.     <u>U.S. Trustee Fees</u>.  The transfer of the Debtors' assets in connection with the Credit Bid in the amount of $17,500,000.00 shall not be a disbursement for purposes of calculating the United States Trustee's quarterly fees.

## END OF ORDER

*Order prepared and submitted by:*
WARNER NORCROSS + JUDD LLP
Elisabeth M. Von Eitzen (P70183)
1500 Warner Building
150 Ottawa Avenue, NW
Telephone: (616) 752-2418
Facsimile: (616) 222-2418
evoneitzen@wnj.com
Counsel for Debtors

# <u>EXHIBIT A</u>

## Cure Costs

## EXECUTORY CONTRACTS

| Debtor | Counter Party | Contract Description | Agreed Upon Cure for Sale Order |
|---|---|---|---|
| Barfly Ventures, LLC | Accident Fund Insurance Company of Am | Workers Compensation Insurance | $0.00 |
| Barfly Ventures, LLC | Admiral Insurance Company | Excessive Liability Insurance | $0.00 |
| Hopcat Beltline | ArrowWaste Inc. | Trash and recycling services | $0.00 |
| GRBC Holdings, LLC | ArrowWaste Inc. | Trash and recycling services | $0.00 |
| 50 Amp Fuse, LLC | ArrowWaste Inc. | Trash and recycling services | $0.00 |
| Hopcat Grand Rapids | ArrowWaste Inc. | Trash and recycling services | $0.00 |
| Barfly Ventures, LLC | AvidXchange Inc. | Payment network services | $4,979.55 |
| Barfly Ventures, LLC | Blackhawk Network | Gift cards | $0.00 |
| Hopcat Holland | Coverall of Western Michigan | Janitorial services | $0.00 |
| Barfly Ventures, LLC | DoorDash, Inc. | delivery services | $0.00 |
| Hopcat Broad Ripple | DVCLEANINDY, LLC | Cleaning services | $0.00 |
| Barfly Ventures, LLC | ECOLAB | warehousing, housekeeping, laundry, and other cleaning and santizing chemical products | $16,929.29 |
| Barfly Ventures, LLC | eFileCabinet | document management software services | $0.00 |
| Barfly Ventures, LLC | Egencia LLC | Travel services/assisted booking | $0.00 |
| EL Brewpub | Enviro - Master of West Michigan | Janitorial | $0.00 |
| Hopcat Beltline | Enviro - Master of West Michigan | Janitorial | $0.00 |
| Hopcat Kalamazoo | Enviro - Master of West Michigan | Janitorial | $0.00 |
| GRBC Holdings | Enviro - Master of West Michigan | Janitorial | $0.00 |
| Hopcat Grand Rapids | Enviro - Master of West Michigan | Janitorial | $0.00 |
| Stellas | Enviro - Master of West Michigan | Janitorial | $0.00 |

| | | | |
|---|---|---|---|
| Barfly Ventures, LLC<br>50 Amp Fuse, LLC<br>GRBC Holdings, LLC<br>9 Volt, LLC<br>Hopcat Ann Arbor, LLC<br>Hopcat Detroit, LLC<br>EL Brewpub, LLC<br>Hopcat Lexington, LLC<br>Hopcat Indianapolis<br>Hopcat Kansas City<br>Hopcat Lincoln<br>Hopcat Madison | Gordon Food Service | Food distribution | $750,000 ($250,000 at Closing to be paid by Debtor and $500,000 promissory note to be paid by the Buyer and subject to final documentation) |
| Barfly Ventures, LLC | HotSchedules.com, Inc | scheduling software | $16,968.00 |
| Hopcat Lincoln | Huskers IMG Sports Marketing | marketing and sponsorship | $0.00 |
| Barfly Ventures, LLC | Indian Harbor Insurance Company | Umbrella Insurance | $0.00 |
| EL Brewpub LLC | My Green Michigan LLC | Composting services | $0.00 |
| Barfly Ventures, LLC | NCR Corporation | IT software | $0.00 |
| Barfly Ventures, LLC | NCR Corporation | cloud applications | $0.00 |
| Barfly Ventures, LLC | NCR Corporation | CMC software | $0.00 |
| Barfly Ventures, LLC | NCR Corporation | remove loyalty | $0.00 |
| Barfly Ventures, LLC | Nexonia Technologies Inc. | expense management software | $0.00 |
| Barfly Ventures, LLC | OLO | delivery application | $0.00 |
| Barfly Ventures, LLC | Paytronix Systems, Inc. | IT software services | $17,535.93 |
| Barfly Ventures, LLC | Pepsi Beverages Company | Pepsi beverages exclusively | $0.00 |
| GRBC Holdings, LLC | POSitive Solutions Group | phone support and POS hardware maintenance | $5.00 |
| Hopcat Ann Arbor | POSitive Solutions Group | phone support and POS hardware maintenance | $5.00 |
| Hopcat Beltline | POSitive Solutions Group | phone support and POS hardware maintenance | $5.00 |

| | | | |
|---|---|---|---|
| Hopcat Broad Ripple | POSitive Solutions Group | phone support and POS hardware maintenance | $5.00 |
| Hopcat Detroit | POSitive Solutions Group | phone support and POS hardware maintenance | $5.00 |
| EL Brewpub LLC | POSitive Solutions Group | phone support and POS hardware maintenance | $5.00 |
| Hopcat Grand Rapids | POSitive Solutions Group | phone support and POS hardware maintenance | $5.00 |
| Hopcat Kalamazoo | POSitive Solutions Group | phone support and POS hardware maintenance | $5.00 |
| Hopcat Lincoln | POSitive Solutions Group | phone support and POS hardware maintenance | $5.00 |
| 50 Amp Fuse, LLC | POSitive Solutions Group | phone support and POS hardware maintenance | $5.00 |
| Barfly Ventures, LLC | Red Bull North America, Inc. | energy drink distribution and exclusivity | $0.00 |
| Hopcat Detroit | Republic Services | trash and recycling services | $0.00 |
| Barfly Ventures, LLC | Round It Up America, Inc. | charitable donation collections | $0.00 |
| GRBC Holdings | Swept Away | Janitorial | $0.00 |
| Grand Rapids | Swept Away | Janitorial | $0.00 |
| Stellas | Swept Away | Janitorial | $0.00 |
| Hopcat Beltline | Swept Away | Janitorial | $0.00 |
| Barfly Ventures, LLC | TBX | menu design | $0.00 |
| Barfly Ventures, LLC | Untappd | marketing services | $0.00 |
| EL Brewpub LLC | Waste Management of Michigan | Trash and recycling services | $0.00 |
| Barfly Ventures, LLC | Yelp Inc | advertising services | $8.22 |
| Barfly Ventures, LLC | Travelers | General Liability Insurance | $0.00 |
| Barfly Ventures, LLC | Travelers | Automobile Insurance | $0.00 |

**\*\*As noted in the Sale Order, Debtor reserves the right to still reject any executory contract up until the Closing Date**

## ADDITIONAL EXECUTORY CONTRACTS

| Debtor | Counter Party | Contract Description | Cure Amount |
|---|---|---|---|
| BarFly Ventures | 58 Ionia Holdings, LLC | Equipment Lease for equipment located in Detroit restaurant | $4,165.00 |
| BarFly Ventures | Compeat | Back office software provider | $0.00 |
| BarFly Ventures | Wisely | Reservation / Table Mgmt. Software | $0.00 |

## UNEXPIRED REAL PROPERTY LEASES*

| Debtor | Counter Party | Property Address | Cure Amount in Sale Order** | Amendment to Lease |
|---|---|---|---|---|
| GRBC Holdings*** | Ionia Ventures, LLC | 1 Ionia Ave SW, Grand Rapids, MI 49503 | $86,420.96 | Yes |
| Hopcat-Detroit*** | 4265 Woodward Ventures LLC | 4265 Woodward Ave, Detroit, MI 48201 | $23,515.64 | Yes |
| Hopcat-Grand Rapids | Lee Shore-Lemon Wheeler Building | 25 Ionia Ave., Grand Rapids, MI 49503 | $48,764.37 | No |
| Hop Cat-Ann Arbor*** | Liberty Maynard LLC | 311 Maynard, Ann Arbor, MI 48104 | $50,986.80 | Yes |
| Hopcat-E. Lansing/EL Brewpub*** | A&G Partnership | 300 Grove, East Lansing, MI 48823 | $58,301.54 | Yes |
| Hopcat-E. Beltine** | JK East Beltline Real Estate | 2183 E Beltline Ave NE, Grand Rapids MI, 49525 | $61,451.39 | Yes |
| Hopcat-Holland** | Greenen Dekock Properties, LLC | 80 West 8th Street, Holland MI | $23,320.13 | Yes |
| Hopcat-Indianapolis** | 6280 LLC | 6280 N. College Ave. Indianapolis, IN 46220 | $102,312.12 | Yes |
| Hopcat-Kalamazoo | GTW Depot, LLC | 300 E. Water St., Kalamazoo, Michigan, 49007 | $54,894.59 | No |
| Hopcat-Lincoln** | Project Oscar, LLC | 601 P. Street, Lincoln, NE 68508 | $50,733.66 | Yes |
| Stellas's/50 Amp Fuse LLC*** | 50 Commerce Building, LLC | 53 Commerce Ave, SW, Grand Rapids, MI 49503 | $20,000.00 | Yes |

*As noted in the Sale Order, Debtor reserves the right to still reject any Lease up until the Closing Date
**Lease Amendment Signed
***Remains Subject to Execution of Lease Amendment

## NEW REAL PROPERTY LEASE

| Debtor | Counter Party | Property Address | Agreed Upon Cure for Sale Order |
|---|---|---|---|
| BarFly Ventures (Temporary Corporate Office) | 280 Ann LLC | 280 Ann Street NW, Suite 110, Grand Rapids, Michigan 49504 | N/A |
|  |  |  |  |

# EXHIBIT B

**Asset Purchase Agreement**

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**BARFLY VENTURES, LLC,**

**EACH OF THE OTHER SELLERS PARTY HERETO**

**AND**

**PROJECT BARFLY LLC**

**July 9, 2020**

*STRICTLY PRIVATE AND CONFIDENTIAL DRAFT FOR DISCUSSION PURPOSES ONLY. CIRCULATION OF THIS DRAFT SHALL NOT GIVE RISE TO ANY DUTY TO NEGOTIATE OR CREATE OR IMPLY ANY OTHER LEGAL OBLIGATION. NO LEGAL OBLIGATION OF ANY KIND WILL ARISE UNLESS AND UNTIL A DEFINITIVE WRITTEN AGREEMENT IS EXECUTED AND DELIVERED BY ALL PARTIES HERETO.*

# TABLE OF CONTENTS

**Page**

Article I DEFINITIONS ................................................................. 2

Article II PURCHASE AND SALE .................................................15

    Section 2.1    Purchase and Sale of Purchased Assets.................................15
    Section 2.2    Excluded Assets ..............................................................18
    Section 2.3    Assumption of Assumed Liabilities ....................................20
    Section 2.4    Excluded Liabilities ........................................................20
    Section 2.5    Consideration .................................................................21
    Section 2.6    Assumption and Assignment of Contracts.............................21
    Section 2.7    Closing..........................................................................22
    Section 2.8    Deliveries at Closing........................................................23
    Section 2.9    Allocation......................................................................24
    Section 2.10    Excluded Locations .......................................................25

Article III SELLERS' REPRESENTATIONS AND WARRANTIES....................25

    Section 3.1    Organization of Sellers; Good Standing ...............................25
    Section 3.2    Authorization of Transaction.............................................25
    Section 3.3    Noncontravention; Consents and Approvals.........................26
    Section 3.4    Compliance with Laws.....................................................27
    Section 3.5    Title to Purchased Assets ..................................................27
    Section 3.6    Contracts .......................................................................27
    Section 3.7    Intellectual Property.........................................................27
    Section 3.8    Litigation.......................................................................28
    Section 3.9    Employees and Employment Matters...................................28
    Section 3.10    Employee Benefit Plans ..................................................30
    Section 3.11    Real Property.................................................................30
    Section 3.12    Tangible Personal Property ..............................................31
    Section 3.13    Permits........................................................................31
    Section 3.14    Purchased Inventory .......................................................32
    Section 3.15    Environmental Matters.....................................................32
    Section 3.16    Financial Statements........................................................33
    Section 3.17    Brokers' Fees ................................................................34
    Section 3.18    No Other Agreements to Purchase .....................................34
    Section 3.19    Taxes ...........................................................................34
    Section 3.20    Suppliers ......................................................................36
    Section 3.21    Insurance Policies...........................................................36
    Section 3.22    Related Party Transactions ...............................................36
    Section 3.23    Bank Accounts...............................................................37
    Section 3.24    Trade Names; Business Locations ......................................37

Article IV BUYER'S REPRESENTATIONS AND WARRANTIES.................37

    Section 4.1    Organization of Buyer......................................................37

DOCS_SF:103743.4 07979/002

Section 4.2    Authorization of Transaction ...................................................38
Section 4.3    Noncontravention ......................................................................38
Section 4.4    Litigation...................................................................................39
Section 4.5    Adequate Assurances Regarding Executory Contracts...........39
Section 4.6    Brokers' Fees ............................................................................39
Section 4.7    No Outside Reliance ..................................................................39

Article V PRE-CLOSING COVENANTS ........................................................39

Section 5.1    Notices and Consents ................................................................39
Section 5.2    Bankruptcy Actions ..................................................................41
Section 5.3    Conduct of Business ..................................................................42
Section 5.4    Notice of Developments............................................................45
Section 5.5    Access.........................................................................................45
Section 5.6    Press Releases and Public Announcements ..............................46
Section 5.7    Bulk Transfer Laws ..................................................................46
Section 5.8    Release of Claims .....................................................................47
Section 5.9    Buyer Backstop.. .......................................................................48

Article VI OTHER COVENANTS.....................................................................48

Section 6.1    Cooperation...............................................................................48
Section 6.2    Further Assurances ...................................................................49
Section 6.3    Availability of Business Records .............................................49
Section 6.4    Employee Matters .....................................................................49
Section 6.5    Transfer Taxes...........................................................................51
Section 6.6    Wage Reporting.........................................................................51
Section 6.7    Insurance Policies .....................................................................51
Section 6.8    Collection of Accounts Receivable ..........................................51
Section 6.9    Use of Name and Marks............................................................52
Section 6.10   Liquor License Approvals ........................................................52
Section 6.11   Data Privacy Protection............................................................52
Section 6.12   Alternate Transactions ..............................................................53
Section 6.13   Purchased Actions .....................................................................53
Section 6.14   Buyer Designee .........................................................................53

Article VII CONDITIONS TO CLOSING.........................................................53

Section 7.1    Conditions to Buyer's Obligations ..........................................53
Section 7.2    Conditions to Sellers' Obligations ...........................................54
Section 7.3    No Frustration of Closing Conditions ......................................55
Section 7.4    Waiver of Conditions ................................................................55
Section 7.5    Agreement Regarding Schedules and Exhibits Hereto.. ..........56

Article VIII TERMINATION .............................................................................56

Section 8.1    Termination of Agreement .......................................................56
Section 8.2    Procedure upon Termination ....................................................58

Section 8.3    Effect of Termination..................................................................58

Article IX MISCELLANEOUS..................................................................................60

Section 9.1     Remedies.................................................................................60
Section 9.2     Expenses .................................................................................60
Section 9.3     Entire Agreement....................................................................60
Section 9.4     Incorporation of Schedules, Exhibits and Disclosure Schedule ..............60
Section 9.5     Amendments and Waivers......................................................61
Section 9.6     Succession and Assignment....................................................61
Section 9.7     Notices......................................................................................61
Section 9.8     Governing Law; Jurisdiction ..................................................62
Section 9.9     Consent to Service of Process.................................................63
Section 9.10    WAIVERS OF JURY TRIAL ...................................................63
Section 9.11    Severability ..............................................................................63
Section 9.12    No Third Party Beneficiaries ..................................................63
Section 9.13    No Survival of Representations, Warranties and Agreements ...............63
Section 9.14    Non-Recourse...........................................................................64
Section 9.15    Construction ............................................................................64
Section 9.16    Computation of Time ..............................................................64
Section 9.17    Mutual Drafting.......................................................................64
Section 9.18    Disclosure Schedule................................................................64
Section 9.19    Headings; Table of Contents ...................................................65
Section 9.20    Counterparts; Facsimile and Email Signatures ......................65
Section 9.21    Sellers' Rep..............................................................................65
Section 9.22    Time of Essence ......................................................................66
Section 9.23    Risk of Loss.............................................................................66
Section 9.24    Buyer's Removal of Purchased Assets...................................66

DOCS_SF:103743.4 07979/002

EXHIBITS

| | | |
|---|---|---|
| Exhibit A | - | Form of Bill of Sale |
| Exhibit B | - | Form of Assignment and Assumption Agreement |
| Exhibit C | - | Form of Release |

SCHEDULES

| | | |
|---|---|---|
| Schedule 2.1(t) | - | Vehicles |
| Schedule 2.2 | - | Excluded Assets |
| Schedule 2.3(b) | | Accounts Payable |
| Schedule 2.6(a) | - | Contracts and Estimated Cure Amounts |
| Schedule 2.6(b) | - | Assumed Contracts |
| Schedule 3.3(b) | - | Consents and Approvals |
| Schedule 3.6 | - | Contracts |
| Schedule 3.7 | - | Intellectual Property |
| Schedule 3.8 | - | Litigation |
| Schedule 3.9 | - | Employment Matters |
| Schedule 3.10 | - | Employee Benefit Plans |
| Schedule 3.11(b) | - | Leased Real Property |
| Schedule 3.11(c) | - | Leasehold Improvements |
| Schedule 3.12 | - | Personal Property Leases |
| Schedule 3.13(a) | - | Permits |
| Schedule 3.13(b) | - | Liquor Licenses |
| Schedule 3.15 | - | Environmental Matters |
| Schedule 3.21 | - | Major Suppliers |
| Schedule 5.3 | - | Conduct of Business |
| Schedule 7.1 | - | Consents, Assumed Permits, and Liquor Licenses Approvals |

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is entered into as of July 9, 2020, by and among BARFLY VENTURES, LLC ("BarFly Ventures"), individually and as Sellers' Rep; 9 VOLT, LLC; 50 AMP FUSE, LLC; EL BREWPUB, LLC; GRBC HOLDINGS, LLC; HOPCAT-ANN ARBOR, LLC; HOPCAT-CHICAGO, LLC; HOPCAT-CONCESSIONS, LLC; HOPCAT-DETROIT, LLC; HOPCAT-GR BELTLINE, LLC; HOPCAT-HOLLAND, LLC; HOPCAT-INDIANAPOLIS, LLC; HOPCAT-KALAMAZOO, LLC; HOPCAT-KANSAS CITY, LLC; HOPCAT-LEXINGTON, LLC; HOPCAT-LINCOLN, LLC; HOPCAT-LOUISVILLE, LLC; HOPCAT-MADISON, LLC; HOPCAT-MINNEAPOLIS, LLC; HOPCAT-PORT ST. LUCIE, LLC; HOPCAT-ROYAL OAK, LLC; HOPCAT-ST. LOUIS, LLC; and LUCK OF THE IRISH, LLC (each of the foregoing, individually a "Seller" and sometimes collectively, the "Sellers" or, sometimes individually a "Debtor" or collectively, the "Debtors"), and Project BarFly LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"). The Sellers and Buyer are referred to collectively herein as the "Parties." Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Article I.

## RECITALS

WHEREAS, Sellers are in the business of operating restaurants, brewery restaurants and bars in numerous states (collectively, but excluding the Excluded Restaurants and the assets and Liabilities directly related thereto, the "Business");

WHEREAS, on June 3, 2020, Sellers filed voluntary petitions for relief (the "Chapter 11 Cases") pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Michigan (the "Bankruptcy Court");

WHEREAS, upon the filings of such Chapter 11 Cases, Sellers continued in possession of their assets and were authorized under the Bankruptcy Code to continue the operation of their businesses as debtors-in-possession;

WHEREAS, certain of the Sellers entered into a Credit Agreement as borrowers, dated as of August 31, 2015, with the lenders party thereto, as lenders (the "Credit Agreement Lenders"), CIP Administrative, LLC, as administrative agent for the Credit Agreement Lenders (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement" and, together with the other Loan Documents (as therein defined), the "Credit Agreement Loan Documents");

WHEREAS, on or about March 20, 2020, to comply with business closure mandates imposed by governmental authorities as a result of the COVID-19 outbreak, the Sellers ceased operating all of their restaurants and furloughed nearly all of their employees;

WHEREAS, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to acquire and assume from Sellers, pursuant to Sections 363 and 365 of the Bankruptcy Code, the Purchased Assets and the Assumed Liabilities upon the terms and subject to the conditions set forth herein;

WHEREAS, in connection with the Closing, and as a material inducement to Buyer's willingness to enter into this Agreement, Ned Lidvall has executed, or will execute, an employment agreement (in form acceptable to the Buyer) that by its terms is to become effective as of the Closing;

WHEREAS, Sellers intend to seek the entry of the Sale Order by the Bankruptcy Court approving this Agreement and authorizing Sellers to consummate the Contemplated Transactions upon the terms and subject to the conditions set forth herein and in the Sale Order;

WHEREAS, the board of directors or the managing members of each Seller has determined that it is advisable and in the best interests of each such Seller's estate and the beneficiaries of such estates to consummate the Contemplated Transactions provided for herein pursuant to the Sale Order and has approved this Agreement; and

WHEREAS, the Contemplated Transactions are subject to the approval of the Bankruptcy Court, subject to any higher and better offers that may be made for the Purchased Assets prior to or at the Sale Hearing, and will be consummated only pursuant to the Sale Order to be entered by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, the Parties agree as follows:

# ARTICLE I
# DEFINITIONS

"Accounts Receivable" means (a) all accounts, accounts receivable, Credit Card Receivables, contractual rights to payment, notes, notes receivable, negotiable instruments, chattel paper, and vendor and supplier rebates of Sellers in connection with the Business as conducted by the Sellers, and (b) any security interest, claim, remedy or other right related to any of the foregoing.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means, when used with reference to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Alternate Transaction" means a transaction or series of related transactions pursuant to which Sellers sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Sellers or otherwise), all or substantially all of the Purchased Assets (or agrees to do any of the foregoing) in a transaction or series of transactions to a Person or Persons other than Buyer, but

2

does not mean the sale of assets to customers conducted in the Ordinary Course of Business or a piecemeal liquidation of the Purchased Assets through a series of unrelated transactions.

"<u>Assignment and Assumption Agreement</u>" means a duly executed assignment and assumption agreement, substantially in the form attached as <u>Exhibit B</u> hereto.

"<u>Assumed Contracts</u>" has the meaning set forth in <u>Section 2.6(b)</u>.

"<u>Assumed Liabilities</u>" has the meaning set forth in <u>Section 2.3</u>.

"<u>Assumed Permits</u>" means all Permits relating to the Business that are transferable in accordance with their terms and under applicable Law (including, without limitation, those that are transferable without consent of the issuing entity by virtue of the effect of the Sale Order), but excluding all Permits (other than Liquor Licenses) to the extent related exclusively to any Excluded Asset (including any Lease that is not an Assumed Contract).

"<u>Available Cash</u>" is defined in <u>Section 5.9</u>.

"<u>Available Cash Deficiency Amount</u>" is defined in <u>Section 5.9</u>.

"<u>Backstop Amount</u>" is defined in <u>Section 5.9</u>.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals.

"<u>Bid Procedures</u>" means bid procedures acceptable to Buyer, which shall, among other things: (i) schedule an auction for the Business (an "<u>Auction</u>") to be held not later than August 25, 2020; (ii) schedule the hearing to approve the sale of the Business (the "<u>Sale Hearing</u>") to be held not later than August 27, 2020; (iii) require that any sale transaction close not later than August 31, 2020; (iv) require the Sellers to promptly provide a copy of any Qualified Bid to Buyer; (v) provide that, at the Auction, the first bid shall be considered only if it exceeds the amount of the highest Qualified Bid submitted by the Qualified Bidders prior to such auction by a minimum of any Break-up Fee (if Buyer submitted the highest Qualified Bid) <u>plus</u> $100,000 (with $100,000 to be the minimum bid increment for each round of bidding); (vi) authorize the Buyer to bid, at each round of the Auction, the amount of the Break-up Fee; (vii) provide that no bidder(s) (other than, for the avoidance of doubt, the Buyer in those circumstances in which it is entitled to a Break-up Fee hereunder) shall be granted a break-up fee, expense reimbursement, termination payment, or other like compensation at any time during the sale process or the Auction; and (viii) grant Buyer relief from the automatic stay to enable Buyer to exercise rights and receive benefits under this Agreement.

"<u>Bid Procedures Motion</u>" means a motion filed by the Sellers with the Bankruptcy Court requesting the entry of the Bid Procedures Order.

"<u>Bid Procedures Order</u>" means an order of the Bankruptcy Court entered in the Chapter 11 Cases approving the Bid Procedures in form and substance agreeable to Buyer.

"Bid Procedures Order Deadline" means July 17, 2020.

"Bill of Sale" means a duly executed bill of sale, substantially in the form attached as Exhibit A hereto.

"Break-up Fee" means an amount equal to $525,000.

"Business" has the meaning set forth in the recitals.

"Business Cessation Event" means Sellers' cessation of its ongoing business on or about March 20, 2020, as the result of, among other things, the COVID-19 outbreak, and the accompanying furlough of substantially all of Sellers' employees.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks located in New York, New York shall be authorized or required by Law to close.

"Buyer" has the meaning set forth in the preamble.

"Buyer Released Parties" has the meaning set forth in Section 5.9.

"Cash and Cash Equivalents" means, collectively, cash (including Restaurant Petty Cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, government securities and other cash equivalents or similar cash items of Sellers, net of (i) Cure Claims to the extent not assumed by Buyer, if any, (ii) administrative claims incurred through the Closing Date, (iii) the Wind Down Budget, and (iv) uncleared checks issued by Sellers that are not yet reflected in the applicable bank account of Sellers.

"Chapter 11 Cases" has the meaning set forth in the recitals.

"Claim" means a "claim" as defined in Section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing" means the closing of the Contemplated Transactions, which shall be deemed to have occurred at 12:01 p.m. (prevailing Eastern Time) on the Closing Date.

"Closing Date" means the second (2nd) Business Day after the date on which all conditions to the obligations of Sellers and Buyer to consummate the Contemplated Transactions set forth in Article VII (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived by the Party entitled to waive that condition, or at such other time or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto.

"Consent" means any approval, consent, ratification, permission, clearance, designation, qualification, waiver or authorization, or an order of the Bankruptcy Court that deems or renders any of the foregoing unnecessary.

4

"Contemplated Transactions" means the sale by Sellers to Buyer, and the purchase by Buyer from Sellers, of the Purchased Assets and the assumption by Buyer of the Assumed Liabilities.

"Continuing Restaurant" means any of Sellers' restaurant locations with respect to which the associated Leases have been designated by Buyer as Assumed Contracts pursuant to Section 2.6(b).

"Contract" means any written or oral agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, license agreement, contribution agreement, partnership agreement or other arrangement, understanding, permission or commitment that, in each case, is legally-binding.

"COVID-19" means the novel coronavirus disease 2019 caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2).

"Credit Agreement" has the meaning set forth in the recitals, as amended, restated, supplemented or otherwise modified from time to time in accordance with this Agreement.

"Credit Agreement Lenders" means the "Lenders" as such term is defined in the Credit Agreement.

"Credit Agreement Lien Obligations" means all "Obligations" (as defined in the Credit Agreement).

"Credit Agreement Loan Documents" has the meaning set forth in the recitals.

"Credit Agreement Secured Parties" shall mean Congruent Credit Opportunities Fund III, LP; Main Street Capital Corporation; and HMS Income Fund, Inc., and the successors and assignees of such parties.

"Credit Bid" means a bid by Buyer pursuant to Section 363(k) of the Bankruptcy Code equal to a portion of the Credit Agreement Lien Obligations in the initial amount of $17,500,000, and not to exceed $20,000,000.

"Credit Bid And Release" has the meaning set forth in Section 2.5(b).

"Credit Card Liabilities" means all Liabilities and other rights of credit card processors or other Persons to amounts payable by any Seller (whether current or non-current) in connection with any customer purchases from any restaurants operated by Sellers in respect of credit or debit cards to any credit card processors to Sellers.   Credit Card Liabilities are Excluded Liabilities.

"Credit Card Receivables" means all accounts receivable and other rights of Sellers to amounts owed to any Seller (whether current or non-current) in connection with any customer purchases from any restaurants operated by Sellers that are made with credit or debit cards or any

5

other related amounts owing (including deposits or holdbacks to secure chargebacks, offsets or otherwise) from credit card processors to Sellers.

"Cure Amounts" has the meaning set forth in Section 2.6(c).

"Current Employees" means all individuals employed by Sellers as of the day before the Closing Date, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

"Dataroom" has the meaning set forth in Section 4.7.

"Debtor" or "Debtors" has the meaning set forth in the preamble.

"Decree" means any judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order or any other order of any Governmental Entity.

"Disclosure Schedule" has the meaning set forth in Article III.

"Employee Benefit Plan" means (a) any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA, whether or not subject to ERISA), (b) employment, consulting, severance, termination protection, change in control, transaction bonus, retention or similar plan, program, policy, practice agreement or arrangement and (c) any other plan, program, policy, practice, agreement or arrangement providing for benefits or compensation of any kind, including without limitation bonuses, profit-sharing, or other forms of incentive or deferred compensation, vacation or paid time off benefits, insurance, medical, dental, vision, prescription or fringe benefits, life insurance, disability or sick leave benefits or post-employment or retirement benefits, in each case of clause (a), (b) and (c) above, sponsored, maintained, contributed to or required to be contributed to by any Seller or any entity that together with any Seller is, or at any time was, treated as a single employer under Section 414 of the Code or Title IV of ERISA ("ERISA Affiliate") or in which any Seller or any ERISA Affiliate participates or participated, or with respect to which any Seller or any ERISA Affiliate has or may have any liability, contingent or otherwise.

"Employee Roster" has the meaning set forth in Section 3.9(a).

"Environmental Laws" means all applicable Laws concerning pollution or protection of the environment, human health and safety, and natural resources.

"ERISA" means the United States Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" has the meaning set forth in the definition of "Employee Benefit Plan", as amended.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Cash" is defined in Section 2.1(a).

6

"Excluded Employee" has the meaning set forth in Section 6.4(b).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Restaurants" means any of Sellers' restaurant locations with respect to which the associated Leases have not been designated by Buyer as Assumed Contracts pursuant to Section 2.6(b).

"Existing Escrows" has the meaning set forth in Section 2.1(a).

"Expense Reimbursement Amount" means Buyer's and/or its Affiliates, as applicable, reasonable costs and expenses related to pursuing, negotiating, and documenting the Contemplated Transactions.

"Express Representations" has the meaning set forth in Section 4.7.

"Financial Statements" has the meaning set forth in Section 3.16.

"Former Employees" means all individuals who have been employed by the Sellers (or any of their predecessors) who are not Current Employees.

"GAAP" means United States generally accepted accounting principles as in effect from time to time, as consistently applied in accordance with Sellers' historic practices.

"Governmental Entity" means any United States federal, state or local or non-United States governmental or regulatory authority, agency, commission, court, body or other governmental entity.

"Hazardous Substance" means any toxic or hazardous material, substance or waste as to which Liability or standards of conduct may be imposed under any Environmental Laws.

"Intellectual Property" means any and all rights, title and interest in or relating to intellectual property of any type, which may exist or be created under the Laws of any jurisdiction throughout the world, including: (a) patents and patent applications, together with all reissues, continuations, continuations-in-part, divisionals, extensions and reexaminations in connection therewith; (b) trademarks, service marks, brand names, Internet domain names, logos, symbols, trade dress, assumed names, fictitious names, trade names, business names, product names, social media accounts, URLs, and other indicia of origin, all applications and registrations for all of the foregoing, and all goodwill associated therewith and symbolized thereby (the items of this subclause (b) collectively, "Trademarks"); (c) rights associated with works of authorship (including menus), including exclusive exploitation rights, mask work rights, copyrights, database and design rights, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and renewals thereof; (d) rights in electronic data processing systems, information management systems, recordkeeping systems, communications and telecommunications systems, networking systems, account management systems, Internet websites and related content, inventory management systems and other such applications, software, hardware, equipment and services (including all firmware, applications and software installed on such hardware and

7

equipment, and all associated databases, and related documentation); (e) trade secrets and proprietary or confidential information relating to the Business (including recipes, methods, ingredient lists, procedures, food and beverage preparation instructions and publications and guidelines, menu formulation processes, standards, operation manuals, specifications, pictures, drawings, mock-ups, prototypes, processes, ideas, formulae, compositions, know-how, discoveries, inventions, designs, plans, proposals, technical data, financial, business and marketing plans, price lists, and customer and supplier lists and related information); and (f) all other intellectual property rights related to the Business.

"Intellectual Property Assignments" has the meaning set forth in Section 2.9(a).

"Inventory" means all of Sellers' now owned or hereafter (prior to the Closing) acquired inventory and goods, wherever located, including, without limitation, consumable food, alcoholic beverages (whether unopened or opened to the extent permitted by applicable Law), and other beverages and raw materials and work-in-process therefor and all of Sellers' tangible property used in the preparation of, serving, and cleaning up from, food and drinks, including napkins, silverware, plates and dining ware, cups, glassware, mugs, cooking and cleaning utensils, packaging materials, paper products, ingredients, miscellaneous consumables, materials, supplies, inventories and other related items or that are otherwise included in the Purchased Assets and are permitted to be sold and transferred under applicable Law.

"IRC" means the United States Internal Revenue Code of 1986, as amended.

"Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Entity, or court of competent jurisdiction, or other legal requirement or rule of law, including applicable building, zoning, subdivision, health and safety and other land use Laws.

"Leased Real Property" means all (i) leasehold or sub-leasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property which is used in or otherwise related to the Business, including the right to all security deposits, letters of credit and other amounts and instruments deposited by or on behalf of Sellers thereunder, and (ii) any buildings, structures, improvements and fixtures located on any Leased Real Property which are owned by Seller, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the Lease for such Leased Real Property ("Leasehold Improvements").

"Leasehold Improvements" has the meaning set forth in the definition of "Leased Real Property."

"<u>Leases</u>" means all leases, subleases, licenses, concessions and other Contracts, including all amendments, extensions, renewals, guaranties and other agreements with respect thereto, in each case pursuant to which any Seller holds any Leased Real Property.

"<u>Liability</u>" means, as to any Person, any debt, Claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred, or asserted or when the relevant events occurred or circumstances existed.

"<u>Lien</u>" means any lien (as defined in Section 101(37) of the Bankruptcy Code), encumbrance, right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, judgments, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use (whether known or unknown, secured or unsecured or in the nature of setoff or recoupment, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, Law, equity, or otherwise, including claims otherwise arising under doctrines of successor liability).

"<u>Liquor Licenses</u>" means all liquor licenses (including, without limitation, beer and wine licenses) held or used by each Seller in respect of any Purchased Assets, including the Seller in whose name such license is issued, date of issuance and renewal date.

"<u>Liquor License Approvals</u>" means the necessary Consents pertaining to the transfer and/or issuance of any of the Liquor Licenses in respect of any Purchased Assets to Buyer.

"<u>Litigation</u>" means any action, cause of action, suit, claim, investigation, mediation, arbitration, audit, grievance, demand, hearing, proceeding or investigation, whether civil, criminal, administrative or arbitral, whether at law or in equity and whether before any Governmental Entity, arbitrator or mediator.

"<u>Major Suppliers</u>" has the meaning set forth in <u>Section 3.21</u>.

"<u>Management Agreement</u>" means an agreement in the form as shall be reasonably acceptable to Buyer and Sellers, and which provides, among other things, that all costs of operations of the Purchased Assets from and after the Closing Date shall be paid on a current basis by Buyer and the economic benefit of the operations of the Purchased Assets accrues to Buyer.

"<u>Material Adverse Effect</u>" means any change, event, effect, development, condition, circumstance or occurrence (when taken together with all other changes, events, effects, developments, conditions, circumstances or occurrences), that (a) has had, or would reasonably

9

be expected to have, individually or in the aggregate, a material adverse effect on the Purchased Assets (taken as a whole); provided, however, that no change, event, effect, development, condition, circumstance or occurrence related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: (i) any effect resulting from the filing, announcement, or pendency of the Chapter 11 Cases, including (1) any Seller's inability to pay certain prepetition obligations as a result of the commencement of such Chapter 11 Cases, (2) any Decree of the Bankruptcy Court, (3) any action or omission of any Seller taken or not taken in order to avoid violation of any Decree or objections of the Bankruptcy Court, or (4) any other effect, directly or indirectly, related thereto; (ii) acts of war, armed hostilities, sabotage or terrorism, or any escalation or worsening of any such acts of war, armed hostilities, sabotage or terrorism threatened or underway as of the date of this Agreements, except to the extent that such change has a materially disproportionate adverse effect on the Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (iii) changes in conditions in the U.S. or global economy or capital or financial markets generally, including changes in interest or exchange rates, except to the extent that such change has a materially disproportionate adverse effect on Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (iv) resulting from any act of God or other force majeure event (including natural disasters, or any epidemic, pandemic or wide-spread disease outbreak (including the COVID-19 virus outbreak)); (v) changes in Law or in GAAP or interpretations thereof; (vi) any actions taken by Buyer or any of its Affiliates (other than those expressly permitted to be taken hereunder); (vii) inaction by any Seller due to Buyer's refusal to consent to a request for consent by Seller under Section 5.3; (viii) the negotiation, announcement or pendency of this Agreement or the consummation of the sale and assumption contemplated hereby, or the identity, nature or ownership of Buyer; or (ix) the Business Cessation Event; provided, however, notwithstanding anything herein to the contrary, a Decree issued after the date hereof that requires restaurants or bars to close for dine-in business in any jurisdiction where a Continuing Restaurant is located shall constitute a Material Adverse Effect; or (b) would reasonably be expected to prevent, materially delay or materially impair to the ability of any Seller to consummate the Contemplated Transactions or the Related Agreements on the terms set forth herein and therein.

"Non-Real Property Contracts" means the Contracts to which any Seller is a party other than the Leases.

"Offeree" has the meaning set forth in Section 6.4(a).

"Ordinary Course of Business" means the ordinary and usual course of business of Sellers taken as a whole consistent with past custom and practice and taking into account the commencement of the Chapter 11 Cases and the Debtors' current distressed financial condition, excluding from the ordinary and usual course of business, for the avoidance of doubt, any modifications to the previous normal day-to-day operations of Sellers made in response to COVID-19, or any similar or related disease caused by COVID-19, or any mutation or evolution thereof, or any policies, guidelines or Laws enacted, directly or indirectly, in response to the same (including any "shelter-in-place", "stay at home" or similar Decrees and the Cybersecurity and Infrastructure Security Agency Critical Infrastructure Worker Guidance 2.0, as may be amended, supplemented, updated or otherwise modified from time to time).

10

"Organizational Documents" means, with respect to any entity, the certificate of incorporation, articles of incorporation, certificate of formation, articles of organization, by-laws, partnership agreement, limited liability company agreement, formation agreement and other similar organizational documents of such entity (in each case, as amended through the date of this Agreement).

"Outside Date" means August 31, 2020.

"Parties" has the meaning set forth in the preamble.

"Permit" means any and all franchise, approval, permit (including environmental, construction and operation permits), license, order, registration, certificate, variance, Consent, exemption or similar right issued, granted, given or otherwise obtained or required to be obtained, from or by any Governmental Entity, under the authority thereof or pursuant to any applicable Law.

"Permitted Liens" means (a) Liens for Taxes which are (i) being contested in good faith by appropriate proceedings or (ii) not due and payable as of the Closing Date and which shall be prorated or otherwise released at Closing and, in each case of clauses (i) and (ii), for which adequate reserves have been made on the Financial Statements to the extent required by GAAP; (b) mechanics liens and similar liens for labor (excluding Liens arising under ERISA or Code Section 430), materials or supplies provided with respect to real property incurred in the Ordinary Course of Business which are being contested in good faith by appropriate proceedings for which adequate reserves have been made on the Financial Statements to the extent required by GAAP and which shall be prorated or otherwise released at Closing (including, without limitation, by virtue of the effect of the Sale Order); (c) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business, except where any such violation would not, individually or in the aggregate, materially impair the use, operation or transfer of the affected property or the conduct of the Business thereon as it is currently being conducted; (d) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects, in each case that do not or would not materially impair value or the use or occupancy of such real property or materially interfere with the operation of the Business at such real property; (e) with respect to Leasehold Improvements, any reversion or similar rights to the landlord or other third party upon expiration or termination of the applicable Lease; (f) any Liens associated with or arising in connection with any Assumed Liabilities, (g) Liens resulting from Credit Agreement Lenders' and/or Buyer's actions or conduct upon or after the Closing, and (h) Liens that will be released or removed by operation of the Sale Order (including, without limitation, Liens under Credit Agreement Loan Documents).

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

11

"<u>Personal Property Leases</u>" means all leases of personal property relating to personal property used by Sellers or to which any Seller is a party or by which the properties or assets of any Seller are bound, in each case relating to the Business.

"<u>Petition Date</u>" means the date of the filing of the Chapter 11 Cases.

"<u>PII</u>" means "personally identifiable information" within the meaning of Section 101(41A) of the Bankruptcy Code.

"<u>Plan</u>" means a Chapter 11 plan or plans of reorganization or liquidation.

"<u>PPP Cash</u>" means cash received under the Coronavirus Aid, Relief and Economic Security Act's Paycheck Protection Program.

"<u>Purchase Price</u>" has the meaning set forth in <u>Section 2.5(a)</u>.

"<u>Purchased Assets</u>" has the meaning set forth in <u>Section 2.1</u>; <u>provided</u>, <u>however</u>, that, notwithstanding the foregoing or anything contained in this Agreement to the contrary, the Purchased Assets shall not include any Excluded Assets or any asset held by any Seller pursuant to any Lease or Personal Property Lease (a "<u>Possessory Agreement</u>") unless the associated Possessory Agreement is among the Assumed Contracts.

"<u>Purchased Actions</u>" means all causes of action, lawsuits, Claims, rights of recovery and other similar rights of any Seller, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, in equity or otherwise (including any derivative Claims asserted or that may be asserted on behalf of any Seller), (i) arising under Chapter 5 of the Bankruptcy Code, whether relating to the Business and the Purchased Assets or otherwise, or (ii) against any current or former officer or director of any Seller or any shareholder of any Seller or any Affiliate of any Seller.

"<u>Purchased Inventory</u>" means Inventory that is part of the Purchased Assets as set forth in <u>Section 2.1</u>.

"<u>Qualified Bid</u>" means a written proposal provided to the Sellers for the purchase of substantially all of Sellers' assets that:  (a) does not contain any financing or due diligence contingencies; (b) is accompanied by reasonable evidence of committed financing or other ability to perform; (c) is accompanied by a good-faith deposit equal to 10 percent of the consideration proposed by such bidder; and (d) that is timely submitted by the bid deadline set forth in the Bidding Procedures Order. This Agreement shall be deemed a Qualified Bid.

"<u>Qualified Bidder</u>" means an entity that has entered into a confidentiality agreement with Sellers and that Sellers in good faith and in their sole discretion determine (based on the availability of financing and proof of financial ability, experience, and other relevant considerations) is capable of consummating the purchase of the Business, if selected as the successful bidder.  The Buyer shall be deemed to be a Qualified Bidder.

"<u>Recent Employee</u>" has the meaning set forth in <u>Section 3.9(a)</u>.

"<u>Recipes</u>" has the meaning set forth in <u>Section 2.1(x)</u>.

"<u>Records</u>" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Business.

"<u>Registered</u>" means issued by, registered with, renewed by or the subject of a pending application before any Governmental Entity, domain name registrar, or social media site.

"<u>Rejection Damages</u>" means the amount of the distribution that the applicable landlord under any Designated Contract would be entitled to under a Plan that the Bankruptcy Court has confirmed and that has gone effective in the Chapter 11 Cases (with such calculation to be made as if Sellers will not receive any proceeds from Buyer under this Agreement) solely for claims of the applicable landlord for rejection of the applicable Designated Contract of real property that are subject to section 502(b)(6)(A) of the Bankruptcy Code with the amount of such claims to be subject to the limitations in section 502(b)(6)(A) of the Bankruptcy Code even if Sellers do not object to such claims based on any applicable landlord's filed claim exceeding such limitations or the Bankruptcy Court does not adjudicate such claims.

"<u>Related Agreements</u>" means the Management Agreement, Bill of Sale, the Assignment and Assumption Agreement and the Intellectual Property Assignments and any other instruments of transfer and conveyance as may be required under applicable Law to convey valid title of the Purchased Assets to Buyer.

"<u>Related Party</u>" means each officer or director of a Seller, each spouse, sibling, parent, child, grandparent or grandchild of any director or officer of any Seller each trust for the benefit of any of the foregoing, and each Affiliate of any of the foregoing.

"<u>Relief Proceeds</u>" means, all rights of, or on behalf of, any Seller in respect of any current or future disaster relief or other similar assistance program of any Governmental Entity in respect of, or enacted in response to, the COVID-19 pandemic.

"<u>Representative</u>" means a Person's officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents.

"<u>Restaurant Petty Cash</u>" means any petty cash of Sellers on the premises of any Continuing Restaurant or Excluded Restaurant.

"<u>Sale Hearing</u>" means the hearing conducted in the Bankruptcy Court to seek approval of the Sale Motion and the Contemplated Transactions.

"<u>Sale Motion</u>" means a motion filed by the Sellers with the Bankruptcy Court in connection with the Chapter 11 Cases requesting the entry of the Sale Order.

13

"Sale Order" means an order of the Bankruptcy Court entered in the Chapter 11 Cases consistent with the terms of this Agreement approving the Sale Motion and sale to Buyer consistent with the terms of this Agreement in a form agreeable to Buyer.

"Sale Order Deadline" means August 28, 2020.

"Seller" or "Sellers" has the meaning set forth in the preamble.

"Seller Released Parties" has the meaning set forth in Section 5.9.

"Sellers' Knowledge" (or words of similar import) means the actual knowledge of Ned Lidvall and Mark A. Sellers, III, and the knowledge such person would have obtained, as a prudent business person, after making due inquiry with respect to the particular matter in question.

"Sellers' Rep" has the meaning set forth in Section 9.21.

"Service Provider" means each director, officer, employee, manager, independent contractor, consultant, leased employee or other service provider of any Seller.

"Statutory Deadline" means the date that is one hundred twenty (120) days after the date of commencement of the Chapter 11 Cases.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or other persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Tax" or "Taxes" means any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment healthcare, disability, natural resources, entertainment, amusement, registration, real property, personal property, ad valorem, escheat or unclaimed property (whether or not considered a tax under applicable Law), sales, use, liquor, cigarette, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever (however

14

denominated), whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed.

"Tax Return" means any return, declaration, report, claim for refund or information return (including any related or supporting schedules, statements or information and Treasury Form TD F 90-22.1 and FinCEN Form 114) or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Termination Event" has the meaning set forth in Section 8.1.

"Transfer Tax" means any stamp, documentary, registration, transfer, sales, use, added-value or similar Tax (including any penalties and interest thereon but excluding for the avoidance of doubt any income Taxes) imposed under any applicable Law in connection with the Contemplated Transactions.

"Transferred Employees" means all Offerees who accept offers prior to the Closing pursuant to Section 6.4(a).

"Transferring Party" has the meaning set forth in Section 5.1(c).

"Treasury Regulations" means regulations promulgated by the United States Department of Treasury under the IRC.

"Wind-Down Budget" is defined in Section 2.1(a).

## ARTICLE II
## PURCHASE AND SALE

**Section 2.1    Purchase and Sale of Purchased Assets**. Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement (including, without limitation, Section 4.7 below), at the Closing, Buyer shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Buyer, all of the Sellers' right, title and interest in, to and under the Purchased Assets, free and clear of all Liens (other than Permitted Liens and any Liens included in the Assumed Liabilities) to the extent provided in the Sale Order, for the consideration specified in Section 2.5. "Purchased Assets" shall mean all of the direct or indirect right, title and interest of Sellers in, to and under the tangible and intangible assets (including goodwill), properties, rights, going concern value, claims and Contracts used, useful, or held for use in, or related to, the Business (but excluding Excluded Assets) wherever situated and of whatever kind and nature, real or personal, as of the Closing, including:

(a)    all Cash and Cash equivalents of Sellers, including Restaurant Petty Cash, except for (i) PPP Cash, (ii) cash that has otherwise been reserved or designated by Decree of the Bankruptcy Court entered prior to the date hereof for utility deposits (collectively, "Existing Escrows") to the extent actually applied for such designated purpose (it being expressly agreed that notwithstanding anything to the contrary in Section 2.2 below, any cash that reverts to the Sellers from any Existing Escrow shall constitute a Purchased Asset), and (iii) in an aggregate amount needed to fund the

15

wind-down budget set forth on Schedule 2.1(a) (as the same may hereafter be amended from time to time with the prior written consent of Buyer, the "Wind-Down Budget" and, the aggregate amount of such Cash and Cash Equivalents in the foregoing the "Excluded Cash"); provided, that to the extent that Excluded Cash described herein (after taking into account any Backstop Amount (as defined in Section 5.9 below) actually funded to Sellers by Buyer that has not been used or applied for the purposes required by Section 5.9 below prior to (and is not used or applied at) the Closing) is insufficient to fund the entire Wind-Down Budget (the "Excluded Cash Deficiency Amount"), Buyer shall fund the Excluded Cash Deficiency Amount to the Sellers at the Closing in accordance with Sections 2.5, 2.8(b)(ii), and 5.9 (including, for the avoidance of doubt, the limitations set forth therein) hereof;

(b)    all bank accounts of Sellers, other than (i) the PPP Cash account, to the extent such account holds Excluded Cash, or (ii) Existing Escrows (but including any amounts reverting to the Sellers from such Existing Escrows);

(c)    all Accounts Receivable of Sellers as of the Closing;

(d)    all Credit Card Receivables;

(e)    all Inventory of Sellers as of the Closing located at (or in Buyer's reasonable discretion movable and which is actually moved, at Buyer's sole cost and expense at any time prior to August 31, 2020 in accordance with Section 9.24 hereof to) a Continuing Restaurant, including all rights of Sellers to receive such Inventory, supplies and materials which are on order as of the Closing solely in respect of the operation of a Continuing Restaurant, but excluding alcoholic beverage Inventory in jurisdictions where the Law does not permit Buyer to take title to such Inventory until it obtains the requisite Liquor License Approvals or other authorization from the Bankruptcy Court or any other pertinent Governmental Entity; provided, however, Sellers shall promptly transfer, assign, convey and deliver (at Buyer's sole cost and expense) to Buyer such alcoholic beverage Inventories in each instance upon issuance of the relevant Liquor License Approval or other authorization from the Bankruptcy Court or relevant Governmental Entity;

(f)    without duplication of the above, all deposits (including, without limitation, deposits in transit, customer deposits and security deposits for rent, electricity, telephone, utilities or otherwise) and other prepaid charges and expenses of Sellers, including all amounts constituting Existing Escrows to the extent reverting to the Sellers;

(g)    all Assumed Contracts;

(h)    all Intellectual Property owned by Sellers, but as to any Intellectual Property which consists of a Possessory Agreement, only to the extent transfer or assignment of such Intellectual Property is not prohibited by Law;

(i)    all items of machinery, equipment, supplies, furniture, fixtures, leasehold improvements (to the extent of Sellers' rights to any Leasehold

16

Improvements under the Leases that are Assumed Contracts) owned by Sellers as of the Closing and related to (or to the extent movable and actually moved, at Buyer's sole cost and expense at any time prior to August 31, 2020 in accordance with Section 9.24 hereof to) the Continuing Restaurants;

(j)     all Records, including Records related to (i) Taxes paid or payable by any Seller related to the Business or the Purchased Assets (provided that Sellers are entitled to retain copies of all Records and Buyer will make all such Records available to Sellers upon request and at no charge), but excluding any materials exclusively related to any Excluded Assets and (ii) eligibility to receive Relief Proceeds;

(k)     all goodwill associated with the Business or the Purchased Assets, including all goodwill associated with the Intellectual Property owned by Sellers and all rights under any confidentiality agreements executed by any third party for the benefit of any of Sellers to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(l)     all rights of Sellers under non-disclosure or confidentiality, noncompete, or nonsolicitation agreements with Current Employees or Former Employees, directors, consultants, independent contractors and agents of any of Sellers to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(m)     all of the Assumed Permits or, all of the rights and benefits accruing under any Permits that are (i) related to the Continuing Restaurants, or (ii) to the extent related to the Excluded Restaurants, listed on Schedule 7.1, in each case of clauses (i) and (ii), including all Liquor Licenses to the extent transferrable and held by Sellers, other than alcohol permits (including Liquor Licenses) in jurisdictions where the Law does not permit Buyer to take title to such Permits until it obtains the requisite approvals or other authorization from the Bankruptcy Court or any other pertinent Governmental Entity in which case Sellers shall transfer, assign convey and deliver to Buyer such permits in each instance upon issuance of the requisite approvals from the relevant Governmental Entity;

(n)     all Liquor Licenses, to the extent transferable, associated with any Excluded Restaurants not included on Schedule 7.1 pursuant to Section 2.1(m), or which the Sellers presently hold in safe keeping, each at the sole cost and expense of the Buyer;

(o)     the amount of, and all rights to any, insurance proceeds received by any of Sellers after the date hereof in respect of (i) the loss, destruction or condemnation of any Purchased Assets, occurring prior to, on or after the Closing, in each case to the extent relating to loss, destruction or condemnation which has not been repaired or restored prior to the Closing, or (ii) any Assumed Liabilities;

(p)     all other rights, demands, claims, credits, allowances, rebates or other refunds (excluding any vendor or supplier rebates) and rights in respect of promotional allowances or rights of setoff and rights of recoupment of every kind and nature

17

(whether or not known or unknown or contingent or non-contingent), other than against Sellers, arising out of or relating to the Continuing Restaurants as of the Closing, including all deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances and prepayments, in each case to the extent the same relate to Continuing Restaurants;

(q)    all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent), including, without limitation, the Purchased Actions;

(r)    all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to equipment purchased, products sold, or services provided, to Sellers or to the extent affecting any Purchased Assets and/or Assumed Liabilities;

(s)    all cars, trucks, forklifts, other industrial vehicles and other motor vehicles set forth or described on Schedule 2.1(s);

(t)    all of the Sellers' telephone numbers, fax numbers, e-mail addresses, websites, URLs and Internet domain names related to the Continuing Restaurants;

(u)    the right to receive and retain mail relating to, Accounts Receivable payments and other communications of Sellers and the right to bill and receive payment for services performed but unbilled or unpaid as of the Closing;

(v)    all rights arising from (i) any refunds due from federal, state and/or local Governmental Entities with respect to Taxes paid by Sellers or (ii) Relief Proceeds;

(w)    all of Sellers' recipes, methods, procedures, cooking/preparation/mixing publications, guidelines, or standards, knowhow, ingredient lists, menus, price lists, nutritional, health, or dietary information, publications, or disclosures, and promotional or informational materials, in each case whether related to food, beverages (whether alcoholic or non-alcoholic), or otherwise (in each case, written or oral or in any other form whatsoever) (collectively, "Recipes"); and

(x)    all other assets that are related to or used in connection with the Purchased Assets or the Business (but excluding all of the Excluded Assets).

**Section 2.2    Excluded Assets.**    Notwithstanding anything to the contrary in Section 2.1, Buyer expressly understands and agrees that Buyer is not purchasing or acquiring, and Sellers are not selling or assigning, any of the following assets, properties and rights of Sellers (collectively, the "Excluded Assets"):

(a)    (i) the Excluded Cash;

(b)    all alcoholic beverage Inventory of Sellers in jurisdictions where the Law does not permit Buyer to take title to such Inventory until it obtains the requisite Liquor License Approvals or other authorization from the Bankruptcy Court or any other pertinent Governmental Entity; _provided_, _however_, Sellers shall transfer, assign, convey and deliver to Buyer (at Buyer's sole cost and expense) such alcoholic beverage Inventory in each instance upon issuance of the relevant Liquor License Approval or other authorization from the Bankruptcy Court or other relevant Governmental Entity;

(c)    all of Sellers' certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, unit certificates and other documents relating to the organization, maintenance and existence of any Seller as a limited liability company or other entity;

(d)    all equity securities of any Seller or securities convertible into, exchangeable, or exercisable for any such equity securities and all net operating losses of any Seller;

(e)    all Leases (and related Leased Real Property, if any) and Contracts, in each case, other than the Assumed Contracts;

(f)    any loans or notes payable to any Seller or any of its Affiliates from any employee of any Seller or any of its Affiliates;

(g)    any (1) Records containing confidential personal private information including confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the disclosure of such information is prohibited by applicable Law, (2) other Records that Sellers are required by Law to retain and (3) any Records or other documents relating to the Chapter 11 Cases that are protected by the attorney-client or similar privilege; _provided_ that Buyer shall have the right to make copies of any portions of such retained Records (other than the Records referenced in subsection (3)) to the extent that such portions relate to the Business or any Purchased Asset;

(h)    all Permits other than the Assumed Permits;

(i)    all directors' and officers' liability Insurance Policies, including any tail insurance policies, including the rights of the directors and officers thereunder for coverage (_i.e._, advancement of expenses and liability coverage with respect to claims made against such officers and directors);

(j)    all Employee Benefit Plans;

(k)    the Excluded Restaurants and those assets set forth on <u>Schedule 2.2</u>; and

(l)    the rights of Sellers under this Agreement and the Related Agreements and all consideration payable or deliverable to Sellers under this Agreement.

19

**Section 2.3    Assumption of Assumed Liabilities.**  On the terms and subject to the conditions of this Agreement and the Sale Order, at the Closing, Buyer shall assume from Sellers (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers shall irrevocably convey, transfer, and assign to Buyer, the following Liabilities of the Business and only to the extent not paid prior to the Closing and no others (collectively,  the "Assumed Liabilities"):

> (a)    Liabilities (i) for all Cure Amounts to the extent that the Sellers' Cash and Cash Equivalents are not sufficient to pay such amounts, and (ii) under the Assumed Contracts and Assumed Permits arising from and after the Closing Date as well as any Liabilities to the extent arising out of the Purchased Assets or the operation of the Business solely in respect of the Continuing Restaurants, in each case under clause (ii) of this Subpart (a), arising from and after the Closing Date;

> (b)    All Accounts Payable arising from the normal operation of Business that is accrued but not yet due as of the Closing and as set forth on Schedule 2.3(b) (as such Schedule may be updated and amended (i) by Sellers with Buyer's consent (such consent not to be unreasonably withheld) between the date hereof and August 21, 2020, and (ii) as otherwise agreed upon by Sellers and Buyer up to the Closing);

> (c)    all obligations of Sellers to honor gift cards in the Ordinary Course of Business at a Business restaurant (i.e., accepting such gift cards in exchange for goods or services delivered), whether relating to a Continuing Restaurant or an Excluded Restaurant, but excluding any escheatment claims related to such gift card obligations and excluding any claims for cash refunds to the extent not otherwise required by applicable Law in any jurisdiction  in which a Continuing  Restaurant is located; and

> (d)    all accrued payroll, accrued and unused vacation, or other accrued paid time-off, and accrued payroll Taxes, in each case, that is earned or accrued by, but not yet payable, as of the Closing Date (and not paid by Sellers prior thereto) to any Transferred Employee ("Assumed Payroll Obligations");

Notwithstanding the foregoing and except as otherwise provided in Section 5.9 of this Agreement, Assumed Liabilities shall not include (i) any other post-petition Liabilities of the Sellers nor (ii) any liability for Taxes of any kind, except as provided in the last sentence of Section 2.4 below.

**Section 2.4    Excluded Liabilities.**  Notwithstanding anything herein to the contrary, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Sellers, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities (all such Liabilities that Buyer is not assuming being referred to collectively as the "Excluded Liabilities", including without limitation all Liabilities relating to or arising from any Employee Benefit Plan or the employment or termination of any employee of any Seller (other than the Assumed Payroll Obligations.  For the avoidance of doubt, Excluded Liabilities shall include any liability for Taxes of any kind other than any Taxes which are a lien not yet due and payable as of and which are prorated between Sellers and Buyer at the Closing.

20

**Section 2.5    Consideration**.

(a)    In aggregate consideration for the sale and transfer of the Purchased Assets (the "Purchase Price") shall be composed of the following:

i.    the Credit Bid; and

ii.    the assumption by Buyer of the Assumed Liabilities.

(b)    The Purchase Price shall be satisfied at the Closing as to:

i.    the Credit Bid, by causing the Credit Agreement Lenders to acknowledge in writing satisfaction of the portion of the Credit Agreement Lien Obligations covered by the Credit Bid and to release all guarantees of the security interests and liens on the Purchased Assets securing such obligations, all in form and content reasonably satisfactory to Sellers (the "Credit Bid And Release"); and

ii.    the amount of the Assumed Liabilities described in Section 2.3, by assuming such Assumed Liabilities through one or more Assignment and Assumption Agreements.

In addition, at the Closing or as soon as practicable thereafter, Buyer shall pay to the applicable counterparties all Cure Amounts payable in connection with or as a condition to Sellers' assumption and assignment of the Assumed Contracts to the extent Sellers do not have sufficient cash to satisfy all Cure Amounts.

**Section 2.6    Assumption and Assignment of Contracts**.

(a)    Schedule 2.6(a) sets forth a list of all Contracts and Leases to which a Seller is a party (other than such Contracts and Leases that have been rejected by Decree of the Bankruptcy Court or are the subject of a pending motion to reject as of the date of this Agreement), together with estimated Cure Amounts for each Assumed Contract.

(b)    From and after the date hereof until the Closing, Buyer may, in its sole discretion, (i) designate a Contract or Lease listed on Schedule 2.6(a) for assumption and assignment to Buyer, effective on and as of the Closing (such Contracts and Leases, the "Assumed Contracts"), or (ii) without in any manner reducing or otherwise affecting the Purchase Price, designate any Contract or Lease listed on Schedule 2.6(a) for rejection; for the avoidance of doubt, the Sellers will not object to any such designation made by Buyer pursuant to this Section 2.6(b). Except as so designated by Buyer, the Sellers shall not designate any Contract or Lease listed on Schedule 2.6(a) for assumption and assignment or for rejection on or after the date hereof. The Assumed Contracts as of the date hereof are set forth on Schedule 2.6(b) hereto, which will be supplemented in writing by Buyer as additional Leases and Contracts are designated for assumption and assignment or rejection prior to the Closing as set forth in this Section 2.6(b).

(c)      In connection with the assumption by and assignment to Buyer of any Assumed Contracts pursuant to this Section 2.6, (i) the amounts, if any, necessary to cure all defaults, if any, and to pay all actual pecuniary losses, if any, that have resulted from such defaults under the Assumed Contracts (collectively, such amounts, the "Cure Amounts"), in each case as of the Petition Date and to the extent required by Section 365(b)(1)(A) and (B) of the Bankruptcy Code and any Decree of the Bankruptcy Court, shall be paid by Sellers at the Closing, and (ii) Buyer shall provide such adequate assurance of future performance as of the Sale Hearing as the Bankruptcy Court deems necessary to satisfy the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to Assumed Contracts.

(d)      Subject to Buyer's reasonable cooperation therewith, Sellers shall use their respective commercially reasonable efforts to obtain a Decree of the Bankruptcy Court to assign the Assumed Contracts to Buyer on the terms set forth in this Section 2.6. In the event Sellers are unable to assign any such Assumed Contract to Buyer pursuant to a Decree of the Bankruptcy Court, then the Parties shall use their respective commercially reasonable efforts to obtain, and to cooperate (at no material cost or expense to Sellers) in obtaining, all Consents from Governmental Entities and third parties necessary to assume and assign such Assumed Contracts to Buyer, including, in the case of Buyer, paying any applicable Cure Amounts.

(e)      Notwithstanding the foregoing, but subject to Section 5.1, a Contract shall not be an Assumed Contract hereunder and shall not be assigned to, or assumed by, Buyer to the extent that such Contract (i) is rejected by a Seller or terminated by a Seller in accordance with the terms hereof or by the other party thereto, or terminates or expires by its terms, on or prior to the Closing and is not continued or otherwise extended upon assumption, (ii) was not listed on Schedule 2.6(a) and not provided to Buyer by Sellers at least five (5) Business Days prior to the Closing and requires a Consent of any Governmental Entity or other third party (except as permitted by the Bankruptcy Code) in order to permit the sale or transfer to Buyer of Sellers' rights under such Contract, and no such Consent has been obtained prior to the Closing, or (iii) relates solely to Excluded Assets.   In addition, a Permit (including any Liquor License) shall not be assigned to, or assumed by, Buyer to the extent that such Permit requires a Consent of any Governmental Entity or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer of Sellers' rights under such Permit, and no such Consent has been obtained prior to the Closing.

(f)      Subject to the terms and conditions herein provided, Seller and Buyer shall use their good faith efforts to take, or cause to be taken, all reasonable action, or do, or cause to be done, all reasonable things, necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement.

    **Section 2.7    Closing**.  The Closing shall take place remotely by electronic exchange of counterpart signature pages commencing at 10:00 a.m. Eastern Time on the Closing Date upon

22

satisfaction or waiver of all conditions hereunder to the parties' respective obligations to consummate the transactions provided for herein.

**Section 2.8    Deliveries at Closing**.

(a)    At the Closing, Sellers shall deliver to Buyer the following documents and other items, duly executed by Sellers, as applicable:

i.    all Bills of Sale reasonably requested by Buyer;

ii.    all Assignment and Assumption Agreements reasonably requested by Buyer;

iii.    instruments of assignment in form and substance to be agreed to by the Parties in their reasonable discretion for all Registered Intellectual Property transferred or assigned hereby and general assignments of all other Intellectual Property of the Sellers, in each case as reasonably requested by Buyer (collectively, the "Intellectual Property Assignments");

iv.    a non-foreign affidavit from the regarded owner of the Sellers for U.S. federal income Tax purposes, dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the IRC stating that such owner is not a "foreign person" as defined in Section 1445 of the IRC;

v.    the officer's certificates required to be delivered pursuant to Section 7.1(l);

vi.    the Management Agreement duly executed by Sellers;

vii.    such other bills of sale, completed transfer tax returns, assignments of leases, notices to landlords, notices to subtenants, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form and content not inconsistent with the rights and obligations imposed upon Buyer and Sellers pursuant to the other provisions of this Agreement and otherwise reasonably satisfactory to Buyer (in each case signed and acknowledged as appropriate), as Buyer may reasonably request to vest in Buyer, to the extent transferable and assignable, all the right, title and interest of the Sellers in, to or under any or all the Purchased Assets subject only to Permitted Liens to the extent provided in the Sale Order (including, without limitation, releases and terminations of any Liens that are not Permitted Liens);

viii.    originals (or, to the extent originals are not available, copies) of all Assumed Contracts (together with all material amendments, supplements or modifications thereto) to the extent not otherwise already made available to Buyer through the Dataroom;

23

ix.      physical possession, at their respective locations as of the Closing, of all of the Purchased Assets capable of passing by delivery with the intent that title in such Purchased Assets shall pass by and upon delivery;

x.      certificates of title and title transfer documents to all titled motor vehicles included within the Purchased Assets; and

xi.      all other previously undelivered certificates, agreements and other documents, instruments and writings reasonably requested by Buyer to be delivered by Sellers at or prior to the Closing pursuant to this Agreement.

(b)      At the Closing, Buyer shall deliver to Sellers the following documents and other items, duly executed by Buyer, as applicable:

i.      any and all Assignment and Assumption Agreements to which Buyer is party;

ii.      the Purchase Price, in the form of the Credit Bid And Release, in form reasonably satisfactory to Sellers and the Excluded Cash Deficiency Amount, if applicable, such Excluded Cash Deficiency Amount to be wired to Sellers in accordance with such written wiring instructions as Sellers may provide to Buyer at least two (2) Business Days prior to the Closing;

iii.      the officer's certificates required to be delivered pursuant to Section 7.2(g);

iv.      the Management Agreement, duly executed by Buyer; and

v.      all other previously undelivered certificates, agreements and other documents required by this Agreement to be delivered by Buyer at or prior to the Closing in connection with the Contemplated Transactions.

**Section 2.9      Allocation**.    Within ninety (90) calendar days after the Closing Date, Buyer shall in good faith prepare an allocation of the Purchase Price (and all capitalized costs and other amounts treated as purchase price for U.S. federal income Tax purposes) among the Purchased Assets and the Assumed Liabilities in accordance with Section 1060 of the IRC, the Treasury Regulations thereunder (and any similar provision of United States state or local or non-United States Law, as appropriate) (as finally determined, and subject to any further amendment, in each case pursuant to this Section 2.9, the "Allocation").  Sellers shall have thirty (30) calendar days following receipt of the Allocation to review and comment on such the Allocation. If the Sellers disagree with any determinations set forth on the Allocation (the sole permissible basis for which shall be that the Allocation was not prepared in accordance with this Section 2.9), the Sellers shall deliver a written notice to Buyer setting forth its objections. Unless Sellers deliver notice to Buyer within the thirty (30) day review period, Sellers shall be deemed to have accepted the determinations set forth in the Allocation. If the Sellers deliver the notice to Buyer within the thirty (30) day review period, Buyer and the Seller shall, during the thirty (30) days following such delivery or any mutually agreed extension thereof, use their commercially reasonable efforts to reach agreement on the disputed determinations. Buyer and

24

Sellers shall report, act and file Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with the Allocation as determined pursuant to this Section 2.9.  Neither Buyer nor Sellers shall take any position (whether in audits, Tax Returns or otherwise) which is inconsistent with the Allocation, unless required by a "determination" within the meaning of Section 1313 of the IRC.

**Section 2.10  Excluded Locations**.  Any of Sellers' restaurant locations with respect to which the associated Leases have not been designated by Buyer as Assumed Contracts in accordance with Section 2.6(a) shall be deemed to have been classified as Excluded Restaurants and Excluded Assets.

**ARTICLE III**
**SELLERS' REPRESENTATIONS AND WARRANTIES**

Except as set forth in the disclosure schedule accompanying this Agreement, as may be updated, amended or supplemented by Sellers in writing from time to time until August 7, 2020 (the "Disclosure Schedule"), Sellers jointly and severally represent and warrant to Buyer as of the date hereof and as of the Closing Date in each case, unless otherwise specified in the representations and warranties below, in which case the representation and warranty is made as of such date, that the statements contained in this Article III are true and correct.

**Section 3.1  Organization of Sellers; Good Standing**.

(a)  Each Seller is duly incorporated or organized, as the case may be, and validly existing and in good standing under the Laws of its state of incorporation or formation.  Each Seller is duly qualified or otherwise authorized as a foreign entity to transact business in each jurisdiction listed on Schedule 3.1 of the Disclosure Schedule, which are all of the jurisdictions in which the nature of the Business or the Purchased Assets requires such Seller to so qualify. Sellers have made available to Buyer each Seller's Organizational Documents that set forth the state of incorporation or formation for each Seller.  Subject to the requirements of the Bankruptcy Code, each Seller has all necessary power and authority to own, lease and operate its assets, properties and to conduct its business in all jurisdictions in which such Seller conducts business (or conducted business prior to the Business Cessation Event) and in the manner in which its business is currently being conducted (or was conducted prior to the Business Cessation Event) and has historically been conducted.

(b)  None of the Sellers has any Subsidiaries (other than other Sellers, if applicable).

**Section 3.2  Authorization of Transaction**.  Subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing:

(a)  each Seller has all requisite applicable corporate or limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder; the execution, delivery and performance of this Agreement and all Related Agreements to which such Seller is a party have been duly authorized by such Seller

25

and no other corporate or company action, as applicable, on the part of such Seller is necessary to authorize this Agreement or the Related Agreements to which it is party or to consummate the Contemplated Transactions; and

(b)    This Agreement constitutes the valid and legally-binding obligations of Sellers, enforceable against Sellers in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.  Each Related Agreement to which any Seller is a party, when executed and delivered, will constitute the valid and legally-binding obligations of such Seller, as applicable, enforceable against Sellers, as applicable, in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

## Section 3.3    Noncontravention; Consents and Approvals.

(a)    Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the Related Agreements), subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, will (with or without notice or lapse of time or both) (i) conflict in any material respect with or result in a breach of the Organizational Documents of any Seller, (ii) violate any Law or Decree to which any Seller is, or its respective assets or properties are, subject, (iii) conflict with any Assumed Contract or Assumed Permit, or (iv) conflict with, or result in any violation of or constitute a breach or default under, any order of any Governmental Entity applicable to the Sellers or any of the Purchased Assets, and, in the case of clauses (ii), (iii) and (iv) for such conflicts, breaches, violations, defaults, accelerations, rights or failures to give notice, would not, individually or in the aggregate, have a Material Adverse Effect.

(b)    Except as set forth in Schedule 3.3(b) of the Disclosure Schedule, subject to the Sale Order having been entered and still being in effect (and not subject to any stay pending appeal at the time of Closing), no Consent, notice or filing is required to be obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement.  After giving effect to the Sale Order and any applicable order of the Bankruptcy Court authorizing the assignment and assumption of the Assumed Contracts, no Consent, notice or filing is required to be obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Person that is not a Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected have a Material Adverse Effect or prevent or materially impair or delay the Sellers' ability to consummate the Contemplated Transactions on a timely basis.

26

**Section 3.4** **Compliance with Laws**.    Sellers are in compliance with all Laws applicable to the Business or the Purchased Assets in all material respects.  As of the date hereof, Sellers have not received any written notice of violation of any Law in any material respect with respect to any Seller, the Business or the Purchased Assets and, to Sellers' Knowledge, there is no reasonable basis for the issuance of any such notice or the taking of any action for such violation.

**Section 3.5** **Title to Purchased Assets**.    Sellers, as of immediately prior to the Closing, have good and valid title to, or, in the case of leased assets, have good and valid leasehold interests in, the Purchased Assets, free and clear of all Liens (except for Permitted Liens), subject to entry of the Sale Order.  At the Closing or such time as title is conveyed under Section 2.6, Sellers will convey, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, good and valid title to, or valid leasehold interests in, all of the Purchased Assets, free and clear of all Liens (except for Permitted Liens), to the fullest extent permissible under Section 363(f) of the Bankruptcy Code and subject to the rights of licensees under Section 365(n) of the Bankruptcy Code.  The Purchased Assets constitute substantially all of the properties, assets and rights (including Intellectual Property) used by the Sellers to conduct and operate the Business at the Continuing Restaurants in all material respects as conducted and operated by the Sellers prior to the Business Cessation Event.  All of the Purchased Assets are in good order and repair (ordinary wear and tear excepted) for assets of comparable age and past use and are capable of being used in the Ordinary Course of Business to operate the Business substantially as conducted and operated by the Sellers prior to the Business Cessation Event.  No Person other than Sellers are engaged in the operation of, or hold rights, title and interest in (except for Permitted Liens), the Purchased Assets.  None of the personal or movable property included in the Purchased Assets is located other than at the Leased Real Property.

**Section 3.6** **Contracts**.  Schedule 3.6 of the Disclosure Schedule sets forth an accurate list, as of the date hereof, of all material executory Contracts, including any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof, to which a Seller is a party with respect to the Business as of the date hereof and Sellers have made available to Buyer true and complete copies of all such Contracts or, to the extent any of such Contracts are oral, Schedule 3.6 of the Disclosure Schedule contains a description of the material terms thereof.  Except as set forth in Schedule 3.6 of the Disclosure Schedule, no Seller has assigned, delegated or otherwise transferred to any third party any of its rights or obligations with respect to any Assumed Contract.  The Assumed Contracts include all Contracts material to the ownership and/or operation of the Business at the Continuing Restaurants.  Sellers have not, and, to Sellers' Knowledge, no other party to any Assumed Contract has, commenced any action against any of the parties to any Assumed Contract or given or received any written notice of any material default or violation under any Assumed Contract that has not been withdrawn or dismissed except to the extent such default or violation will be cured as a result of the payment of the applicable Cure Amounts, assuming entry of the Sale Order.  To Sellers' Knowledge, each Assumed Contract is, or will be upon the Closing, valid, binding and in full force and effect in accordance with its terms.

**Section 3.7** **Intellectual Property**.

(a)    <u>Schedule 3.7 of the Disclosure Schedule</u> sets forth a true and complete list of (i) all Registered Intellectual Property that is owned by any Seller, (ii) all executory Contracts pursuant to which any Seller obtains the right to use any Intellectual Property, and (iii) all material Contracts pursuant to which any Seller grants to any other Person the right to use any Intellectual Property (including all Contracts pursuant to which any Seller grants to any other Person any exclusive rights with respect to any Intellectual Property).  Sellers exclusively own all Intellectual Property included among the Purchased Assets (including all such Registered Intellectual Property) free and clear of all Liens (except for Permitted Liens), and all such Registered Intellectual Property is valid, subsisting and, enforceable, and is not subject to any outstanding Decree adversely affecting Sellers' use thereof or rights thereto.

(b)    To Sellers' Knowledge, and except as set forth on <u>Schedule 3.7 of the Disclosure Schedule</u>, none of the use of the Intellectual Property included in the Purchased Assets, the conduct of the Business as conducted prior to the Business Cessation Event (except with respect solely to the Excluded Restaurants), nor any of the products sold or services provided by Sellers or any of their Affiliates in connection therewith (except with respect solely to the Excluded Restaurants), infringes upon or otherwise violates the Intellectual Property of any other Person.  To Sellers' Knowledge, no third party is infringing any Intellectual Property owned by any Seller and included in the Purchased Assets.

(c)    Sellers have used commercially reasonable efforts to maintain, defend, protect, enforce, and preserve all trade secrets and material confidential information included in the Purchased Assets, including all Recipes, and, to Sellers' Knowledge, no such trade secrets, confidential information, or Recipes have been disclosed or accessed by any other Person other than to Persons under binding obligations of confidentiality and non-use. To Sellers' Knowledge, no such trade secrets, material confidential information, or Recipes have been improperly accessed, disclosed, or used.

## Section 3.8    <u>Litigation</u>.

(a)    Other than the Chapter 11 Cases, <u>Schedule 3.8(a) of the Disclosure Schedule</u> sets forth, as of the date hereof, all unresolved Litigation brought or threatened in writing by or against any Seller, in each case, which seeks to impose Liability upon any party in an amount greater than $50,000, and to Sellers' Knowledge, there is no other Litigation threatened in writing against any Seller which would affect the ability of any Seller to enter into this Agreement, any Related Agreement, or to consummate the Contemplated Transactions.

(b)    <u>Schedule 3.8(c) of the Disclosure Schedule</u> sets forth sets forth any Decree to which any Seller is subject.

## Section 3.9    <u>Employees and Employment Matters</u>.

(a)    No Seller is or within the last three (3) years has been a party to or bound by any collective bargaining agreement covering the Current Employees or

28

Former Employees nor has there been in the last three (3) years any strike, walkout, work stoppage, or other material collective dispute affecting any Seller with respect to the Business. No Current Employee is and within the last (3) years no Current Employee or Former Employee has been represented by a union or other collective bargaining representative with respect to his or her employment with any Seller. To Sellers' Knowledge, there is no organizational effort being made or threatened by or on behalf of any labor union with respect to any of the Current Employees, nor has there been in the last three (3) years with respect to any Current Employees or Former Employees. No later than ten (10) Business Days following the date hereof, Sellers shall make available to Buyer a list of all Current Employees and Former Employees who were employed by Sellers as of February 29, 2020 (such Former Employees, "Recent Employees"), including such individual's name; title or position; status (part-time, full-time, exempt, nonexempt, etc.); whether a Current Employee or Recent Employee; whether paid on a salaried, hourly or other basis; current base salary or wage rate; current target bonus; other incentive or non-incentive based compensation; start date; service reference date (if different from the start date); work location; vacation entitlement formula; and an indication of whether or not any Current Employee is on leave of absence or furlough (the "Employee Roster").

(b)    There are no grievances or unfair labor practice complaints pending against any Seller before the National Labor Relations Board or any other Governmental Entity with respect to any Current Employees or Former Employees.

(c)    Sellers are in compliance in all material respects with all applicable Laws relating to employment or labor, including those related to hiring, background checks, wages, pay equity, hours, collective bargaining and labor relations, classification of independent contractors and employees, equal opportunity, document retention, notice, plant closing and mass layoff, health and safety, employment eligibility verification, immigration, child labor, discrimination, harassment, retaliation, accommodations, disability rights or benefits, affirmative action, workers' compensation, unemployment insurance, employment and reemployment rights of members of the uniformed services, secondment, employee leave issues and the payment of social security and other Taxes, and are not liable for any arrears of wages, other compensation or benefits (other than such Liabilities that have been incurred in the Ordinary Course of Business of the Seller and are not past due), or any Taxes or penalties for failure to comply with any of the foregoing, including, without limitation, any of the foregoing arising out of other otherwise in connection with the Business Cessation Event.

(d)    No Current Employee, Former Employee, or other service provider has been improperly excluded from participation in any Employee Benefit Plan (to the extent such individual is or should be eligible under the terms of such Employee Benefit Plan), and none of the Sellers has any direct or indirect liability, whether absolute or contingent, with respect to any misclassification of any service provider as an independent contractor or on any other non-employee basis for such Seller rather than as an employee, with respect to any individual employed, engaged, or leased by

29

the Seller from another employer, or with respect to any misclassification of any employee as exempt versus non-exempt under the Fair Labor Standards Act.

(e)      Except as set forth on Schedule 3.9(e) of the Disclosure Schedule, there is no employment or labor-related claim, complaint, demand for arbitration, or administrative charge pending against any Seller brought by or on behalf of any Current Employee, Former Employee or any Governmental Entity, and to Sellers' Knowledge, no such claim is threatened. Except as disclosed to Buyer confidentially, in the last five (5) years, there have been no allegations of sexual or other unlawful harassment or discrimination made against any Current Employee or Former Employee at the management level or higher.

(f)      All Current Employees are, and Recent Employees were, authorized to work in the United States.

(g)      Except as set forth on Schedule 3.9(g) of the Disclosure Schedule, Sellers have not made application to receive or otherwise sought Relief Proceeds.

**Section 3.10    Employee Benefit Plans**.  Schedule 3.10 of the Disclosure Schedule lists each Employee Benefit Plan that Sellers maintain or to which Sellers contribute or which Sellers have maintained or to which Sellers have contributed in the past twelve (12) months and that provides or provided benefits to any Current Employee or Recent Employee.  No event or circumstance exists, or could exist as of the Closing, under which Buyer could incur any Liability with respect to any Employee Benefit Plan.

**Section 3.11    Real Property**.

(a)      Sellers do not own any real property.

(b)      Schedule 3.11(b) of the Disclosure Schedule sets forth the address of each Leased Real Property, and a true and complete list of all Leases (including the date and name of the parties to such Lease document).  Sellers have made available to Buyer a true and complete copy of all Leases (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto) for such Leased Real Property, as amended through the date hereof.  Except as set forth in Schedule 3.11(b) of the Disclosure Schedule, with respect to each of the Leases: (i) to Sellers' Knowledge and subject to the effect on enforceability of (A) any applicable Law relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfers, or similar Laws relating to or affecting creditors' rights generally and (B) general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law), such Lease is legal, valid, binding, enforceable and in full force and effect in accordance with its terms; (ii) Sellers' possession and quiet enjoyment of the Leased Real Property under such Lease has not been disturbed, and to Sellers' Knowledge, there are no disputes with respect to Sellers' or the applicable guarantor's obligations under such Lease that will not be satisfied by the Sale Order; (iii) to Sellers' Knowledge, no other party to a Lease (including, without limitation, any guarantor) is in material breach or default under such Lease, and

30

no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a material breach or default; (iv) no security deposit or portion thereof deposited with respect such Lease has been applied in respect of a breach or default under such Lease which has not been redeposited in full; (v) the other party to such Lease is not an affiliate of, and otherwise does not have any economic interest in, Sellers; (vi) the Sellers have not subleased, licensed or otherwise granted any Person the right to use or occupy such Leased Real Property or any portion thereof; and (vii) there are no liens or encumbrances (other than Permitted Liens) on the estate or interest created by such Lease.

(c)     Schedule 3.11(c) of the Disclosure Schedule sets forth a description of all material Leasehold Improvements with outstanding commitments in excess of $100,000 for each Leased Real Property.

(d)     The Leased Real Property identified in Schedule 3.11(b) of the Disclosure Schedule and the Leasehold Improvements comprise all of the real property used in or otherwise related to the operation by Sellers prior to the Business Cessation Event of, the Business.

(e)     Sellers have received no written notice of any condemnation, expropriation or other proceeding in eminent domain pending or, to Sellers' Knowledge, which is threatened, affecting any real property underlying the Leased Real Property or any portion thereof or interest therein.

**Section 3.12   Tangible Personal Property**.   Schedule 3.12 of the Disclosure Schedule sets forth all material Personal Property Leases related to the Continuing Restaurants, and, to Sellers' Knowledge, each such material Personal Property Lease is valid and enforceable, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 3.13   Permits**.

(a)     Schedule 3.13(a) of the Disclosure Schedule contains a list of all Permits related to the Continuing Restaurants that Sellers hold as of the date hereof in connection with the operations of the Business. The Permits set forth on Schedule 3.13(a) of the Disclosure Schedule represent all Permits required for the operation of the Continuing Restaurants as operated prior to the Business Cessation Event. Each Seller complies, and has at all times complied, in all material respects with all such Permits, and no Seller has received in the past five years any notice or other communication from any Governmental Entity or any other Person that any Seller is not in compliance in any material respect with any such Permit or of any actual or possible revocation, withdrawal, suspension, cancellation, termination or material modification of any such Permit. As of the date hereof, there is no Litigation pending or, to Sellers' Knowledge, threatened in writing that seeks the revocation, cancellation, suspension, failure to renew or adverse modification of any material Assumed Permits, except where a failure of this representation and warranty to be so true and correct would not be material to the ownership and operation of the Continuing Restaurant or

31

Continuing Restaurants that operate under such Permit. All required filings with respect to the Assumed Permits have been made and all required applications for renewal thereof have been filed, except where a failure of this representation and warranty to be so true and correct would not be material to the ownership and operation of the Business.

(b)    Schedule 3.13(b) of the Disclosure Schedule sets forth a complete and correct list as of the date of this Agreement of Liquor Licenses related to the Continuing Restaurants. To Sellers' Knowledge, each of the Sellers is in compliance in all material respects with all applicable state, municipal and other governmental laws, regulations and rules with respect to the sale of liquor and all alcoholic beverages and has the right to sell liquor at retail for consumption within each of the restaurant locations of such Seller where the Leases constitute Assumed Contracts, subject to and in accordance with all applicable provisions of the Liquor Licenses. To Sellers' Knowledge, except as set forth in Schedule 3.13(b) of the Disclosure Schedule, in the past five years, (i) there has been no Litigation brought or threatened in writing to be brought by or before a Governmental Entity in respect of any such Liquor License related to a Continuing Restaurant or the activities of such Seller in connection with any such Liquor License (or in connection with any other liquor licenses previously held or used by such Seller), (ii) no such Liquor License related to a Continuing Restaurant is subject to any due but unpaid Tax obligation owed to a Governmental Entity, the outstanding nature of which would preclude transfer of such Liquor License from any of the Sellers to Buyer, and (iii) no such Liquor License related to a Continuing Restaurant has been threatened by a Governmental Entity to be revoked, limited or not renewed.

**Section 3.14    Purchased Inventory**.

(a)    No Inventory that is Purchased Inventory is damaged in any way or subject to a current or past product recall, except for any such damage or any such recall which would not be material to the Purchased Inventory taken as a whole;

(b)    To Sellers' Knowledge, the Purchased Inventory is in material compliance with United States federal and applicable state guidelines for such products as of the date hereof; and

(c)    To Sellers' Knowledge, the Purchased Inventory is in working condition or in a condition fit for sale and consumption in accordance with all applicable Laws, as the case may be.

**Section 3.15    Environmental Matters**. Except as set forth in Schedule 3.15 of the Disclosure Schedule:

(a)    Each Seller is, and has been during the prior two (2) years, in compliance in all material respects with all applicable Environmental Laws, which compliance has included obtaining and maintaining all permits, licenses and authorizations required under applicable Environmental Laws;

32

(b)    No Seller has received during the prior two (2) years written notice from any Governmental Entity or third party regarding any actual or alleged violation of or Liability under Environmental Laws;

(c)    To Sellers' Knowledge, no Hazardous Substance has been released at any current or former Leased Real Property, or other real property, by Sellers in violation of any Environmental Law; and

(d)    Sellers have made available to Buyer copies of all material environmental audits, assessments and reports in its possession relating any actual or potential Liabilities under Environmental Laws with respect to any current or former Leased Real Property.

**Section 3.16    Financial Statements.**

(a)    The Sellers have made available to Buyer true and correct copes of (i) the unaudited consolidated balance sheet of the Sellers for the fiscal year ended on or about December 31, 2018 and December 31, 2019, and the related consolidated statement of income and cash flows of Sellers for the years then ended, and (ii) the unaudited consolidated balance sheet of the Sellers for the fiscal quarter ended on or about March 31, 2020, and the related consolidated statement of income and cash flows of Sellers for the three months then ended (such unaudited statements, including the related notes and schedules thereto, are referred to herein as the "Financial Statements"). Each of the Financial Statements has been prepared in accordance with GAAP consistently applied and presents fairly in all material respects the consolidated financial position, results of operations and cash flows of Sellers as of the dates and for the periods indicated therein, subject to normal year-end adjustments (which will not be material individually or in the aggregate) and the absence of complete notes in the case of the unaudited statements. Other than with respect to Excluded Liabilities as to which the Sellers do not provide any representations and warranties, no Seller has any material Liabilities that would be required by GAAP to be reflected on a consolidated balance sheet (or the notes thereto) of the Sellers, except for liabilities and obligations (a) reflected, accrued or reserved against in the Sellers' consolidated balance sheet for the period ended on March 31, 2020 (or the notes thereto) included in the Financial Statements, (b) incurred in the Ordinary Course of Business since March 31, 2020, (c) incurred pursuant to the Contemplated Transactions, or (d) obligations under Assumed Contracts (other than liabilities or obligations related to or arising out of breaches of such Assumed Contracts to the extent arising prior to the Closing Date). Since December 31, 2019, to Sellers' Knowledge, as of the date hereof, no Seller has received any written complaint, allegation, assertion or Claim regarding the accounting or auditing practices, procedures, methodologies or methods of Sellers or their respective internal accounting controls with respect to the Business.

(b)    The Sellers have established and maintained and, for the past five years, have maintained in all material respects, a system of internal accounting controls sufficient to reasonably ensure (i) the reliability of financial reporting and the preparation of the financial statements of the Sellers and (ii) that (A) all transactions are

33

executed in accordance with management's general or specific authorizations; (B) all transactions are recorded when and as necessary to maintain asset accountability and to permit preparation of financial statements in conformity with GAAP applied using the same accounting practices, policies, principles and methodologies, with consistent classifications, judgments and valuation and estimation accrual methodologies, used in the preparation of the Financial Statements; and (C) all accounts, notes and other receivables are recorded accurately, and proper and adequate procedures are implemented to effect the collection thereof on a current and timely basis.

(c)     The Sellers have established and maintained and, for the past five years, have maintained in all material respects, disclosure controls sufficient to reasonably ensure that material information relating to the Sellers (including any deficiencies or weaknesses in the design or operation of the internal controls of the Sellers and any fraud that involves management or other Service Providers of the Sellers is made known to the Sellers' management by others within the Sellers and disclosed to the Sellers' board of directors and outside auditors. The Sellers have provided to the Buyer a summary of any of the foregoing disclosures made to the Sellers' board of directors or outside auditors.

Section 3.17  **Brokers' Fees**.  Except for amounts due to Mastodon Ventures, Inc. ("Mastodon") (which amounts are to be paid by the Sellers under a Credit Bid, but if any overbid is a cash bid in excess of the Credit Bid, such fee shall be paid from the cash sale proceeds (i.e., Mastodon's fee in excess of its minimal fee), no Seller has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the Contemplated Transactions for which Buyer could become liable or obligated to pay.

Section 3.18  **No Other Agreements to Purchase**.  Sellers have not entered into any agreement with any other Person (written or oral) which grants such third party the right or option to purchase or acquire from Sellers any Purchased Asset, other than purchase orders for Inventory accepted by Sellers in the Ordinary Course of Business.

Section 3.19  **Taxes**.

(a)     Each Seller has duly and timely filed all income and other material Tax Returns that it was required to file, and all such filed Tax Returns were true, correct and complete in all material respects. All material Taxes owed by the Sellers and all material Taxes owed with respect to the Purchased Assets (in each case, whether or not shown on any Tax Return) have been paid. In the last three (3) years, no claim has been made in writing by a Governmental Entity in a jurisdiction where the Sellers do not file Tax Returns that the Sellers or the Business is or may be subject to taxation by that jurisdiction. Any deficiencies proposed as a result of any audits of Seller by any Governmental Authority have been fully paid or finally settled, and there are no present disputes as to Taxes payable by Seller.

(b)     There is no audit, dispute, claim or controversy concerning any Tax Liability or Tax Return of Sellers or with respect to the Business in progress or pending by any taxing authority. No Seller has received from any Governmental Authority any

34

(i) written notice indicating an intent to open an audit or other review with respect to Taxes that relate to the Business, (ii) written request for information related to Tax matters that relate to the Business, (iii) written notice of deficiency or proposed adjustment for any amount of Tax that relate to the Business, or (iv) any ruling or binding agreement relating to Taxes that could impact the amount of Taxes due from Buyer or its Affiliates. No Seller has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency that could result in a Lien on the Purchased Assets or the imposition of any liability for Taxes on Buyer, its direct or indirect equityholders, or their Affiliates.

(c)      There are no Liens for Taxes on any of the Purchased Assets, other than Permitted Liens.

(d)      No Seller has any liability for Taxes of another Person under Treasury Regulations Section 1.1502-6, as a transferee or successor, by contract, or otherwise.

(e)      No Seller is party to any Tax sharing, Tax allocation or Tax indemnity agreement, except for customary gross-up or indemnification provisions in commercial agreements entered into in the Ordinary Course of Business, the primary subject matter of which is not related to Taxes, in each case that would be binding on Buyer.

(f)      No Seller has participated in any "reportable transaction" within the meaning of Treasury Regulation section 1.6011-4(b)(1).

(g)      Each Seller has collected or withheld all Taxes required to have been collected or withheld (including from payments made to employees, independent contractors, creditors, stockholders and other Persons) and such collected and withheld Taxes have been duly paid to the proper Governmental Entity, and each of the Seller has complied in all material respects with all Laws relating to withholding, including any reporting and record keeping requirements. The Company has consistently treated any workers that it treats as independent contractors (and any similarly situated workers) as independent contractors for purposes of Section 530 of the Revenue Act of 1978.

(h)      No Seller has requested or received a ruling from any Governmental Authority or signed any binding agreement with any Governmental Authority that might impact the amount of Tax due from Buyer or any of its Affiliates after the Closing Date.

(i)      Each Seller has collected all amounts of sales and use Taxes required to be collected, and has remitted, on a timely basis, such amounts to the appropriate Governmental Entity, or has been furnished properly completed exemption certificates and has, in all material respects, maintained all such records and supporting documents in the manner required by all applicable sales and use Tax statutes and regulations

(j)      None of the Purchased Assets are "Section 197(f)(9) intangibles" (as defined in Treasury Regulations Section 1.197-2(h)(1)(i) and assuming for this purpose that the transition period ends on August 10, 1993) or an interest in an entity or

35

arrangement classified as a partnership for U.S. federal, state or local income Tax purposes.

(k)    No Seller has deferred the inclusion of any amounts in gross income pursuant to Internal Revenue Service Revenue Procedure 2004-34, Treasury Regulations Section 1.451-5, Sections 451(c), 455, 456 or 460 of the Code, as a deposit or pre-paid amount, or any corresponding or similar provision of state or local Law (irrespective of whether or not such deferral is elective).

(l)    None of the Purchased Assets or Assumed Liabilities is a Tax allocation, Tax sharing, Tax distribution, Tax indemnification or Tax gross-up agreement or arrangement.

**Section 3.20    Suppliers.**    Schedule 3.20 of the Disclosure Schedule lists the ten (10) largest suppliers (excluding utilities) (measured by invoiced dollars) of the Continuing Restaurants collectively ("Major Suppliers") for the 12 month periods ended December 31, 2019 and June 30, 2020 and the amount of business done with each Major Supplier in such period.  As of the date of this Agreement, to Sellers' Knowledge, (a) there has not been a material dispute with, or actual or potential material and adverse change in the business relationship of, any Seller with any Major Supplier since December 31, 2018, and (b) no Seller is in material breach of or in material default of any agreement with any of its Major Suppliers, and to the Sellers' Knowledge, no Major Supplier is in material breach or in default of any agreements with any Seller.  None of the Sellers has received any notice, nor does the Seller or any of its Subsidiaries have any Knowledge, that any Major Supplier intends to terminate or adversely modify the amount, frequency or terms of the business such Major Supplier conducts with the Sellers.

**Section 3.21    Insurance Policies.**    Schedule 3.21 of the Disclosure Schedule contains a true, complete and accurate list of all insurance policies to which any Seller is a party or which provide coverage to or for the benefit of or with respect to any Seller, or any Service Provider in his or her capacity as such (the "Insurance Policies"), indicating in each case the type of coverage, name of the insured, the insurer, the expiration date of each policy and the amount of coverage.  True, complete and accurate copies of all such Insurance Policies have been provided or made available to Buyer.  Each Insurance Policy is in full force and effect and shall remain in full force and effect in accordance with its terms immediately following the Closing.  Each Seller is current in all premiums or other payments due under the Insurance Policies and has otherwise complied in all material respects with all of its obligations under each Insurance Policy.  Each Seller has given timely notice to the insurer of all material claims that may be insured thereby under any Insurance Policy.  During the past three years, no Seller has been refused any insurance by, nor has coverage been limited by, any insurance carrier with which any Seller has carried insurance or any other insurance carrier to which any Seller has applied for insurance, and no insurer has issued a reservation of rights or denial of coverage for claims or incidents which could give rise to a claim under any Insurance Policy.  No Insurance Policy provides for any retrospective premium adjustment or other experience based liability on the part of any Seller.

**Section 3.22    Related Party Transactions.**    Except as set forth on Schedule 3.22 of the Disclosure Schedule, no Related Party (a) has any direct or indirect interest in any asset used in

36

or otherwise relating to any Seller or the Business, (b) is indebted to any Seller, (c) has entered into, or has had any direct or indirect financial interest in, any Contract, transaction or business dealing involving any Seller, (d) is competing, directly or indirectly, with any Seller, (e) is a member, manager, director, officer or employee of, or consultant to, or owns, directly or indirectly, any interest in, any vendor, supplier or customer of any Seller, or is in any way associated with or involved in the Business (except in his or her official capacity as a director, officer or employee of a Seller, as the case may be), (f) has any interest in or has filed any application with respect to any Intellectual Property, which arises out of or relates to any Seller, or (g) has any claim or right against any Seller (other than rights to receive compensation for, or expense reimbursement in connection with, services performed as an employee or director). Each Seller does not share any facilities or equipment with any Related Party, and each Seller does not purchase or provide assets or services for any business conducted by any Related Party. For the past five years there has not been, and there is not currently, pending, or, to the Knowledge of the Sellers, threatened, any Litigation against any current or former Related Party with respect to which any Seller has an indemnification obligation.

**Section 3.23  Bank Accounts**.   Schedule 3.23 of the Disclosure Schedule is a true, complete and accurate list of each bank or financial institution in which any Seller has an account, safe deposit box or lockbox, or maintains a banking, custodial, trading or similar relationship, the number of each such account or box, and the names of all persons authorized to draw thereon or to having signatory power or access thereto.

**Section 3.24  Trade Names; Business Locations**.   Schedule 3.24 of the Disclosure Schedule sets forth all fictitious or trade names that any Seller has been known as or used and all offices or places of business any Seller has used, in each case, in the past five years.  No Seller is the surviving entity of a merger or consolidation.

Notwithstanding anything to the contrary in this Agreement, Buyer acknowledges and agrees that Buyer's sole and exclusive recourse and remedy by virtue of any breach at any time of any of the representations and warranties set forth in this Article III shall be to terminate this Agreement, in which event Buyer and Sellers shall all thereupon conclusively be deemed released and relieved of any further liability or obligation hereunder, except as otherwise set forth in Section 8.3; provided, that this paragraph shall in no way limit or affect the satisfaction of Section 7.1(a) as a condition to Buyer's obligation to consummate the transactions contemplated by this Agreement.

# ARTICLE IV
# BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Sellers as follows as of the date hereof and as of the Closing Date:

**Section 4.1  Organization of Buyer**.   Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite limited liability company power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

**Section 4.2    Authorization of Transaction**.

        (a)     Buyer has full limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.

        (b)     The execution, delivery and performance of this Agreement and all other Related Agreements to which Buyer is a party have been duly authorized by Buyer, and no other limited liability company action on the part of Buyer is necessary to authorize this Agreement or the Related Agreements to which it is a party or to consummate the Contemplated Transactions.

        (c)     This Agreement has been duly and validly executed and delivered by Buyer, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which Buyer is a party will have been duly and validly executed and delivered by Buyer.  This Agreement constitutes a valid and legally-binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.  To the extent each Related Agreement constitutes a valid and legally-binding obligation of each Seller party thereto, each Related Agreement to which Buyer is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

    **Section 4.3    Noncontravention**.    Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the assignments and assumptions referred to in <u>Section 2.6</u>) will (with or without notice or lapse of time or both) (i) conflict with or result in a breach of the certificate of incorporation, operating agreement, or other organizational documents, of Buyer, (ii) subject to any consents required to be obtained from any Governmental Entity, violate any Law or Decree to which Buyer is, or its assets or properties are subject, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel any Contract to which Buyer is a party or by which it is bound, except, in the case of either <u>clause (ii)</u> or <u>(iii)</u>, for such conflicts, breaches, defaults, accelerations or rights as would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the ability of Buyer to consummate the Contemplated Transactions or the Related Agreements.  Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Entity in order for the Parties to consummate the Contemplated Transactions or any of the Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the ability of Buyer to consummate the Contemplated Transactions or the Related Agreements.

**Section 4.4    Litigation**.    There is no Litigation pending or, to Buyer's knowledge, threatened against or affecting Buyer that will adversely affect Buyer's performance under this Agreement or the consummation of the Contemplated Transactions.

**Section 4.5    Adequate Assurances Regarding Executory Contracts**.    Buyer will be capable of satisfying as of the Sale Hearing the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

**Section 4.6    Brokers' Fees**.    Neither Buyer nor any of its Affiliates has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the Contemplated Transactions for which any Seller could become liable or obligated to pay.

**Section 4.7    No Outside Reliance**.    Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, Buyer acknowledges and agrees that the representations and warranties made by the Sellers to Buyer in Article III (as qualified by the Disclosure Schedules and as supplemented by any Schedule Updates and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations") are the sole and exclusive representations, warranties, and statements of any kind made by Sellers to Buyer in connection with the Contemplated Transactions.    Buyer acknowledges and agrees that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations, all of which lapse and cease to be of any further force or effect upon the Closing) including any projections, meetings, calls or correspondence with management of Sellers and their Representatives, or any other Person on behalf of Sellers or any of their respective Affiliates or Representatives and (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, contracts, and prospects of Sellers, or the value, quality, quantity, marketability, transferability or condition of Sellers' assets, are, in each case, specifically disclaimed by Sellers and that Buyer has not relied on any such representations, warranties or statements.    Without limiting the foregoing, Buyer acknowledges that Sellers hereby disclaim any warranty, express or implied, of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets and will accept the Purchased Assets and assume the Assumed Liabilities at the Closing "AS IS," "WHERE IS" and "WITH ALL FAULTS."

## ARTICLE V
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

**Section 5.1    Notices and Consents**.

(a)    To the extent required by the Bankruptcy Code or the Bankruptcy Court, Sellers shall give any notices to third parties, and to the extent the need therefor is not obviated by the entry of the Sale Order, each Seller shall use its commercially

reasonable efforts to obtain any third party Consents or sublicenses; provided, however, that neither Sellers nor Buyer shall be required to incur any Liabilities or provide any financial accommodation, in order to obtain any such third party Consent with respect to the transfer or assignment of any Purchased Asset.

(b)      Sellers and Buyer shall cooperate with one another (i) in promptly determining whether any filings are required to be or should be made or consents, approvals, permits or authorizations are required to be or should be obtained under any applicable Law in connection with this Agreement and the Contemplated Transactions and (ii) in promptly making any such filings, furnishing information required in connection therewith and seeking to obtain timely any such consents, permits, authorizations, approvals or waivers; provided, however, that Sellers' obligations hereunder shall only continue until Sellers cease to be debtors in possession under the Chapter 11 Cases or the Chapter 11 Cases are closed or dismissed.

(c)      To the extent permitted by applicable Law and the terms of the Purchased Assets, in the event any third party Consent has not been obtained by the Closing, at Buyer's written request, the Party contemplated to be transferring such Purchased Asset under this Agreement (the "Transferring Party") shall, at Buyer's cost and expense, hold in trust for Buyer, as applicable, the relevant Purchased Asset until the earlier of such time as (i) the third party Consent is obtained, (ii) the applicable Seller ceases to be a debtor in possession under the Chapter 11 Cases or the Chapter 11 Cases are closed or dismissed or (iii) Buyer elects not to assume such Purchased Asset. During such time period, Buyer shall comply with all applicable covenants and obligations under the Purchased Assets, including the payment of any costs or expenses in connection therewith and the maintenance and continuation thereof. Buyer shall be entitled to receive all of the benefits of the Transferring Party under the Purchased Asset. Buyer shall satisfy all Liabilities with respect to such Purchased Assets until the earlier of such time as (i) the third party Consent is obtained, (ii) the applicable Seller ceases to be a debtor in possession under the Chapter 11 Cases or the Chapter 11 Cases are closed or dismissed or (iii) Buyer elects not to assume such Purchased Asset (provided, with respect to any such Liabilities related to the payment of rent for Leased Real Property, Buyer shall satisfy such Liabilities through the end of the month), and shall indemnify and hold Sellers harmless with respect to any such reasonable out-of-pocket expenses arising in the Ordinary Course of Business with respect to such Purchased Asset during such period.

(d)      Subject to the terms and conditions set forth in this Agreement and applicable Law or as otherwise required in the Chapter 11 Cases, Buyer and Sellers shall (A) promptly notify the other Party of any communication to that Party from any Governmental Entity in respect of any filing, investigation or inquiry concerning this Agreement or the Contemplated Transactions, (B) if practicable, permit the other Party the opportunity to review in advance all the information relating to Sellers and their respective Subsidiaries or Buyer and its Affiliates, as the case may be, that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Entity in connection with the Agreement and the Contemplated Transactions and consider in good faith the other Party's reasonable comments, (C) not

DOCS_SF:103743.4 07979/002

participate in any substantive meeting or discussion with any Governmental Entity in respect of any filing, investigation, or inquiry concerning this Agreement and the Contemplated Transactions unless it consults with the other Party in advance, and, to the extent permitted by such Governmental Entity, gives the other Party the opportunity to attend, and (D) furnish the other Party with copies of all substantive correspondence, filings, and written communications between them and their Subsidiaries and Representatives, on the one hand, and any Governmental Entity or its respective staff, on the other hand, with respect to this Agreement and the Contemplated Transactions, provided, however, that any materials or information provided pursuant to any provision of this Section 5.1(d) may be redacted before being provided to the other Party (i) to remove references concerning the valuation of Buyer, Sellers, or any of their Subsidiaries, (ii) financing arrangements, (iii) as necessary to comply with contractual arrangements, and (iv) as necessary to address reasonable privilege or confidentiality issues.  Sellers and Buyer may, as each deems advisable and necessary, reasonably designate any commercially or competitively sensitive material provided to the other under this Section 5.1(d) as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel and any retained consultants or experts of the recipient and shall not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Sellers or Buyer, as the case may be).  Each of Sellers and Buyer shall promptly notify the other Party if such Party becomes aware that any third party has any objection to the Agreement on antitrust or anti-competitive grounds.

**Section 5.2    Bankruptcy Actions**.

(a)    The Chapter 11 Cases shall be continuing as of the date hereof.

(b)    The Bankruptcy Court shall have entered the Bid Procedures Order by no later than the Bid Procedures Order Deadline.

(c)    The hearing on the Sale Motion shall occur no later than by August 27, 2020, after or during which the Bankruptcy Court shall have entered the Sale Order, in any case by no later than the Sale Order Deadline, that provides the parties, inter alia, consummate the Closing as soon as practicable after the entry of the Sale Order and no later than August 31, 2020, subject to the satisfaction of all conditions to the obligations of Sellers and Buyer as set forth in Article VII (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions).

(d)    Sellers will provide Buyer with a reasonable opportunity to review and comment upon all motions, applications, and supporting papers relating to the Contemplated Transactions prepared by Sellers or any Affiliates (including forms of orders and notices to interested parties) prior to the filing thereof in the Chapter 11 Cases.  All motions, applications, and supporting papers prepared by Sellers and relating to the Contemplated Transactions to be filed on behalf of Sellers after the date

41

hereof must be approved in form and substance by Buyer, such approval not unreasonably withheld or delayed.

(e)    Each of Buyer and Sellers shall continue to act in good faith and without any improper conduct, including collusion or fraud of any kind.

(f)    Each of Buyer and Sellers will promptly take such actions as are reasonably requested by the other Party and consistent with their respective rights and obligations hereunder to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by Sellers of their obligations under this Agreement and the Related Agreements and demonstrating that Buyer is a good faith buyer under Section 363(m) of the Bankruptcy Code.

(g)    The Sellers and Buyer agree, and the Sale Order shall reflect the fact that, the provisions of this Agreement are reasonable, were a material inducement to Buyer to enter into this Agreement and, subject to the results of the Auction, are the highest and best offer for the Purchased Assets.

(h)    Sellers shall use commercially reasonable efforts to provide appropriate notice of the hearings on the Sale Motion to all Persons entitled to notice, including, but not limited to, all Persons that have asserted Liens in the Purchased Assets, all parties to the Assumed Contracts and all Taxing authorities in jurisdictions applicable to Sellers and as otherwise required by the Bankruptcy Code and bankruptcy rules.

(i)    Sellers shall serve a notice of the Contemplated Transactions by first class mail on all non-debtor counterparties to all Non-Real Property Contracts and Leases as set forth in the Sale Motion and provide a copy of the same to Buyer.

**Section 5.3    Conduct of Business**.    Until the earlier of the termination of this Agreement and the Closing, and except as expressly contemplated by this Agreement or as set forth on Schedule 5.3 of the Disclosure Schedules, or as appropriate in response to the Business Cessation Event or required under the Bankruptcy Code or other applicable Law and except with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned, or delayed):

i.    Sellers shall use commercially reasonable efforts to maintain, preserve and protect all of the Purchased Assets in the condition in which they existed immediately prior to the Business Cessation Event, except for ordinary wear and tear and casualty and except for replacements, modifications or maintenance in the Ordinary Course of Business and shall maintain insurance coverage with financially responsible insurance companies substantially similar in all material respects to the insurance coverage maintained by the Business and Sellers on the Petition Date; provided, however, during any period when any of its properties and/or Purchased Assets are not being utilized in the Ordinary Course of Business due to the Business Cessation Event (such assets during such period, collectively, "Non-Operating Assets"), Sellers shall be deemed

42

to have satisfied their obligations under this <u>Section 5.3(i)</u> with respect to such Non-Operating Assets by taking reasonable and customary precautions as to the safety and security of the same;

        ii.     Sellers shall use commercially reasonable efforts not to take, or agree to or commit to assist any other Person in taking, any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (ii) that would reasonably be expected to impair the ability of Sellers or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation;

        iii.     Except as permitted by this Agreement, no Seller shall, directly or indirectly, sell or otherwise transfer or dispose, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer or dispose of any of the Purchased Assets other than in the Ordinary Course of Business;

        iv.     No Seller shall, directly or indirectly, permit, offer, agree or commit to permit, any of the Purchased Assets to become subject, directly or indirectly, to any Lien or Claim except for Permitted Liens;

        v.     No Seller shall assume, reject or assign any Contract or Lease that may become an Assumed Contract other than through the assumption and assignment of the Assumed Contracts, as contemplated by this Agreement, to Buyer (or, following the termination of this Agreement in accordance with its terms, to a third party in connection with an Alternate Transaction);

        vi.     No Seller shall enter into new Contracts or amend or modify Contracts other than extensions, renewals or modifications in the Ordinary Course of Business, and no Seller shall amend, modify, encumber, extend, renew or terminate any Lease, nor enter into any new lease, sublease, or license;

        vii.     No Seller shall remove or permit to be removed from any building, facility, or real property any Purchased Asset or any Purchased Inventory (other than the sale of Inventory in the Ordinary Course of Business or any Purchased Assets from an Excluded Restaurant);

        viii.     No Seller shall return Inventory with an aggregate value of more than $5,000 to any single vendor unless defective;

        ix.     No Seller shall (i) enter into any commitment for any expenditures in excess of $20,000 for any individual commitment and $50,000 for all commitments in the aggregate, or (ii) enter into any commitment with respect to remodeling, except as required by the terms of any Lease for Leased Real Property;

        x.     Sellers shall comply in all material respects with all material Laws applicable to them or having jurisdiction over the Business or any Purchased Asset;

43

xi.    No Seller shall, directly or indirectly, cancel, forgive or compromise any material debt or claim or waive or release any material right of any Seller, in each case that constitutes an Purchased Asset;

xii.    Sellers shall use diligent and commercially reasonable efforts to maintain in full force and effect each Assumed Permit and Liquor License held by any Seller as of the date hereof or otherwise obtained by any Seller prior to the Closing, and shall comply with the material terms of each such Permit and Liquor License and no Seller shall permit any such Permit or Liquor License to terminate, expire or lapse other than in the Ordinary Course of Business;

xiii.    Subject to the consequences of the Business Cessation Event, Sellers shall (v) use commercially reasonable efforts to preserve the existing business organization and keep management of the Business intact, (w) use commercially reasonable efforts to keep available the services of the Service Providers, to the extent reasonably feasible, and (x) use commercially reasonable efforts to maintain the existing relations with customers, carriers, suppliers, creditors, business partners, Service Providers, and others having business dealings with the Business, to the extent reasonably feasible;

xiv.    Other than as required by applicable Law, no Seller shall (i) re-hire any Former Employees, Recent Employees or anyone not otherwise a Current Employee as of the date of this Agreement, (ii) grant any loan to or pay any bonus to any employee, (iii) hire or, except as required by a written agreement with such employee existing as of the date hereof, promote or terminate the employment (other than for cause) of any Current Employee, (iv) grant or increase any other severance, change in control, retention, termination or similar compensation or benefits to (or amend any existing severance, change in control, retention, termination or similar compensation, benefits or arrangement with) any Current Employee, (v) recognize any union or other collective employee representative, (vi) except in each case as required by a written agreement with such employee existing as of the date hereof, increase the compensation, bonus or other benefits payable to any employee, (vii) pay to any employee any benefit or amount not required under any Employee Benefit Plan as in effect on the date of this Agreement, (viii) adopt any new Employee Benefit Plan or amend or terminate or increase the benefits under any Employee Benefit Plan, or (ix) take any action to accelerate the vesting of, or payment of, any compensation or benefit under any Employee Benefit Plan;

xv.    Except as required by GAAP, change any accounting policies, procedures, methods or practices (including with respect to reserves, revenue recognition, inventory control, prepayment of expenses, timing for payments of accounts payable and collection of accounts receivable);

xvi.    Sellers shall use commercially reasonable efforts to maintain their business records in accordance with their past practices;

44

xvii.    Sellers shall, at all times, maintain the retention of the current financial advisors and investment banker on terms, scope and conditions identical to the terms scope and conditions existing on the date of this Agreement; and

xviii.    Except as permitted by this Agreement, no Seller shall authorize any of the foregoing, enter into an agreement to do any of the foregoing, or agree or enter into any Contract to do any of the foregoing.

Nothing contained in this Agreement is intended to give Buyer or its Affiliates, directly or indirectly, the right to control or direct the business of Sellers prior to the Closing.

Section 5.4    **Notice of Developments**.  From the date hereof until the Closing Date, each of the Sellers (with respect to itself), as the case may be, shall promptly disclose to Buyer, on the one hand, and Buyer shall promptly disclose to Sellers, on the other hand, in writing after attaining knowledge (as applicable to each of Sellers and Buyer) of any real or alleged failure of any of Sellers or Buyer to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; provided, however, that the delivery of any notice pursuant to this Section 5.4 shall not limit or otherwise affect the remedies available to the party receiving such notice under this Agreement if such party objects to the disclosures contained in such notice within five (5) days of receipt of such notice.

Section 5.5    **Access**.

(a)    Upon reasonable advance written request by Buyer, until the earlier of the Closing and the termination of this Agreement, Sellers shall permit Buyer and its Representatives to have reasonable access to, and make (at Buyer's sole cost and expense) reasonable investigation of, during normal business hours, subject to the terms of Leases and in a manner so as not to interfere unreasonably with the normal business operations of Sellers, to all of the books and records, premises, properties, personnel, Records, Contracts, businesses, assets, accountants, auditors, counsel and operations of the Sellers related to the Business; provided, however, that, for avoidance of doubt, (i) the foregoing shall not require any Party to waive, or take any action with the effect of waiving, its attorney-client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable Law, and (ii) nothing herein shall be deemed to condition or otherwise make Buyer's obligations to consummate the Contemplated Transactions contingent upon the results of any investigation or inspection conducted by Buyer or its Representatives pursuant to this Section 5.5.  Sellers shall cause their respective officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Buyer and Buyer's Representatives in commercially reasonable respects (but at no cost or expense to Sellers) in connection with such investigation and examination, and Buyer and its Representatives shall cooperate with Sellers and their respective Representatives and shall use their reasonable efforts to minimize any disruption to the Business. Notwithstanding the foregoing, Buyer shall not have the right to conduct any Phase II environmental or other "invasive" environmental testing without Sellers' written consent (which consent may be conditioned upon, among other reasonable conditions,

45

Buyer's execution and delivery of an access and indemnity agreement in form and content reasonably satisfactory to Sellers).

(b)      As soon as possible after the date of this Agreement, but in any event no later than five (5) calendar days prior to the Closing Date, Sellers shall deliver to Buyer the unaudited consolidated balance sheet of the Sellers for the fiscal quarter ended on or about June 30, 2020, and the related consolidated statement of income and cash flows of Sellers for the three (3) months then ended.

**Section 5.6    Press Releases and Public Announcements**.    After notice to and consultation with Buyer, Sellers shall be entitled to disclose, only to the extent required by applicable Law or by order of the Bankruptcy Court or as appropriate in the conduct of the Chapter 11 Cases, this Agreement and all information provided by Buyer in connection herewith to the Bankruptcy Court, the United States Trustee, the Committee, parties in interest in the Chapter 11 Cases.    Other than statements made in the Bankruptcy Court (or in pleadings filed therein), no Party shall issue (prior to, on or after the Closing) any press release or make any public announcement without the prior written consent of the other Parties, which shall not be unreasonably withheld or delayed.    Notwithstanding anything contained in this Agreement or any contractual confidentiality obligation of Buyer to the contrary, Buyer may disclose the Agreement and all information provided by Sellers in connection herewith (such information, other than this Agreement, the "Seller Confidential Information"): (a) to its Affiliates who are instructed to maintain the confidentiality of the Seller Confidential Information, (b) to the extent required or requested by, or required to be disclosed to, any regulatory or similar authority purporting to have jurisdiction over such Person or its Affiliates and to whom Buyer discloses only so much of the Seller Confidential Information to such authority as so required in Buyer's reasonable discretion, (c) to the extent required by applicable Law or in any legal, judicial, administrative or other compulsory process; provided that Buyer discloses only so much of the Seller Confidential Information in connection with such process as is so required in Buyer's reasonable discretion, (d) to any other party hereto, (e) in connection with the exercise of any remedies under this Agreement or any action or proceeding relating to this Agreement or the enforcement of rights hereunder, (f) with the written consent of Sellers, (g) to the extent such information becomes publicly available other than as a result of a breach of this Agreement or any contractual confidentiality obligation, (h) to governmental regulatory authorities in connection with any regulatory examination of any agent or lender or in accordance with any such agent's or lender's regulatory compliance policy if such agent or such lender deems necessary for the mitigation of claims by those authorities against such agent or such lender or any of its subsidiaries or Affiliates, or (i) for the purposes of establishing a "due diligence" defense.

**Section 5.7    Bulk Transfer Laws**.    Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the Contemplated Transactions, and hereby waives all claims related to the noncompliance therewith.    The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any Liens on the Purchased Assets (other than Permitted Liens) to the extent provided in the Sale Order, including any Liens arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

**Section 5.8    Release of Claims**.  Notwithstanding anything contained herein to the contrary, effective as of the Closing, (i) each Seller, on behalf of itself and its Affiliates (individually and collectively, the "Seller Releasing Parties") , fully, irrevocably and unconditionally releases Buyer, the Credit Agreement Secured Parties, and each of their respective Affiliates, each in their capacity as such (individually and collectively, the "Buyer Released Parties") , from any and all actions, causes of action, damages, claims, refunds, choses in action, suits or proceedings, rights of recovery, rights of setoff, rights of recoupment, and demands whatsoever, in law or in equity, known or unknown, matured and unmatured, accrued or contingent or liquidated, regardless of whether such rights are currently exercisable, whether derivative claims asserted or assertable on behalf of any of the Seller Releasing Parties or direct claims or for indemnification or contribution, including but not limited to any Claims under section 506(c) of the Bankruptcy Code, that such Seller Releasing Parties (whether individually or collectively) ever had, now have, or may have against the Buyer Released Parties relating to, or in any manner arising from, in whole or in part, the Sellers, the Debtors, the Chapter 11 Cases, the Credit Agreement Loan Documents, or the negotiation, formulation, or preparation of this Agreement, in each case, in connection with any event, conduct or circumstance occurring on or prior to the Closing; and (ii) the Buyer and the Credit Agreement Secured Parties, on behalf of themselves and their respective Affiliates (individually and collectively, the "Buyer Releasing Parties") fully, irrevocably and unconditionally release each Seller and each of their respective Affiliates (except for Mark A. Sellers, III, who, for the avoidance of doubt, shall not be a Seller Released Party), each in their capacity as such (individually and collectively, the "Seller Released Parties") , from any and all actions, causes of action, damages, claims, refunds, choses in action, suits or proceedings, rights of recovery, rights of setoff, rights of recoupment, and demands whatsoever, in law or in equity, known or unknown, matured and unmatured, accrued or contingent or liquidated, regardless of whether such rights are currently exercisable, whether derivative claims asserted or assertable on behalf of any of the Buyer Releasing Parties or direct claims or for indemnification or contribution, that such Buyer Releasing Parties (whether individually or collectively) ever had, now have, or may have against the Seller Released Parties relating to, or in any manner arising from, in whole or in part, the Sellers, the Debtors, the Chapter 11 Cases, the Credit Agreement Loan Documents, or the negotiation, formulation, or preparation of this Agreement, in each case, in connection with any event, conduct or circumstance occurring on or prior to the Closing; provided, however, that the foregoing provisions shall not operate to waive or release: (i) any deficiency claim against the Sellers in any remaining Credit Agreement Lien Obligations after giving effect to the Credit Bid and Release, (ii) rights to enforce this Agreement and the other agreements or instruments being executed and delivered pursuant to the terms hereof to give effect to the Contemplated Transactions, or (iii) claims against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Sellers.    Notwithstanding anything contained in this Section 5.8 to the contrary, (a) the effectiveness of the release in this Section 5.8 by the Buyer Releasing Parties for the benefit of the direct equityholders of Barfly Ventures, LLC shall be conditioned upon such direct shareholders executing and delivering a release in the form of Exhibit C hereto in favor of the Buyer Released Parties, and (b) in the event that any Seller Released Party asserts any claim or cause of action against a Buyer Released Party that the Seller has released (or purported to release) on behalf of such Seller Released Party pursuant to this Section 5.8, then any release granted by such Buyer Releasing Party to such Seller Released Party pursuant to this Section 5.8 shall be deemed immediately

revoked, and the grant of such release shall be deemed null and void ab initio, without the need for any further action by the Parties.

**Section 5.9    Buyer Backstop.** To the extent that the performance of Sellers' obligations under this Agreement prior to or at the Closing require the use or payment of money, Sellers shall utilize the from time to time Cash and Cash Equivalents (other than any Excluded Cash) on hand and available for use in the Business ("Available Cash") to perform and satisfy such obligations. If, at any time prior to or at the Closing, there is not sufficient Available Cash for Sellers to perform any such obligations (an "Available Cash Deficiency"), Buyer shall fund to Sellers (within two (2) Business Days following Buyer's receipt from time to time of written notification from Sellers of the amount of such Cash Deficiency and reasonable support therefor (each, a "Shortfall Notice") cash in the amount of the then Available Cash Deficiency (a "Backstop Amount"), which Backstop Amount shall be used by Sellers only to satisfy Sellers' obligations under this Agreement specifically identified in the Shortfall Notice as obligations Sellers had insufficient Available Cash to satisfy; provided, however, and notwithstanding anything to the contrary set forth herein, Buyer's aggregate payments with respect to Backstop Amounts and the Excluded Cash Deficiency Amount shall not exceed $613,708 and Buyer shall have no further obligation for the payment of any Backstop Amounts or the Excluded Cash Deficiency Amount in excess of such aggregate amount, provided further, however, in lieu of funding the Backstop Amount to Sellers, Buyer shall have the right, at Buyer's sole option, to pay the amounts comprising the Backstop Amount directly to the counter-parties and other third parties identified as payees of any portion of the Backstop Amount in the Shortfall Notice. In the event Buyer elects to make payments of the Backstop Amount directly to third parties as contemplated in the immediately preceding sentence, Sellers shall provide such information as Buyer may request in order to do so and otherwise reasonably cooperate with Buyer in making such direct payments. Notwithstanding anything to the contrary in this Agreement, if Buyer fails to fund or pay in full, as applicable, any Backstop Amount required to be funded or paid in full by Buyer in accordance with this Section 5.9, Seller shall be excused from performing Sellers' obligations to which such unpaid or unfunded Backstop Amounts relate and such failure shall be deemed a breach of Buyer's obligations under this Agreement.

# ARTICLE VI
# OTHER COVENANTS

The Parties agree as follows with respect to the period from and after the Closing; provided that (i) Sellers shall not be obligated to incur any costs or expenses, associated with their obligations hereunder during such period, other than such ordinary and necessary professional fees as are required for Sellers to comply with the obligations hereunder and (ii) Sellers' obligations hereunder shall only continue until Sellers are no longer debtors in possession under the Chapter 11 Cases or the Chapter 11 Cases are closed or dismissed:

**Section 6.1    Cooperation.** Each of the Parties shall cooperate with each other, and shall use their commercially reasonable efforts to cause their respective Representatives to cooperate with each other, to provide an orderly transition of the Purchased Assets and Assumed Liabilities from Sellers to Buyer and to minimize the disruption to the Business resulting from the Contemplated Transactions.

48

**Section 6.2**     **Further Assurances**.  In case at any time from and after the Closing any further action is necessary or reasonably required to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the terms and conditions of the Sale Order (and, as to Sellers, taking into account their status as debtors-in-possession), at any Party's request and sole cost and expense, each Party shall take such further action (including the execution and delivery to any other Party of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and information) as another Party may reasonably request (which are consistent with the rights and obligations imposed upon the Parties pursuant to the other provisions hereof) as shall be necessary to transfer, convey and assign to Buyer all of the Purchased Assets, to confirm Buyer's assumption of the Assumed Liabilities and to confirm Sellers' retention of the Excluded Assets and Excluded Liabilities.  Without limiting the generality of this Section 6.2, to the extent that either Buyer or Sellers discovers any additional assets or properties which the parties mutually agree should have been transferred or assigned to Buyer as Purchased Assets but were not so transferred or assigned, Buyer and Sellers shall cooperate and execute and deliver any instruments of transfer or assignment (which are consistent with the rights and obligations imposed upon the Parties pursuant to the other provisions hereof) necessary to transfer and assign such asset or property to Buyer.

**Section 6.3**     **Availability of Business Records**.  From and after the Closing, Buyer shall promptly provide to Sellers and their respective Representatives (after reasonable notice and during normal business hours and without charge to Sellers) access to all Records included in the Purchased Assets for periods prior to the Closing and reasonable access to Transferred Employees to the extent such access is necessary in order for Sellers (as applicable) to comply with applicable Law or any contract to which it is a party, for liquidation, winding up, Tax reporting or other proper purposes and so long as such access is subject to an obligation of confidentiality, and shall preserve such Records until the latest of (i) six (6) years after the Closing Date, (ii) the required retention period for all government contact information, records or documents, (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases or (iv) in the case of Records related to Taxes, the expiration of the statute of limitation applicable to such Taxes.  Such access shall include access to any information in electronic form to the extent reasonably available.  Buyer acknowledges that Sellers have the right to retain originals or copies of all of Records included in the Purchased Assets for periods prior to the Closing.  Prior to destroying any Records included in the Purchased Assets for periods prior to the Closing, Buyer shall notify Sellers thirty (30) days in advance of any such proposed destruction of its intent to destroy such Records, and Buyer shall permit Sellers to retain such Records, at Sellers' cost and expense.  With respect to any Litigation and claims that are Excluded Liabilities, Buyer shall render all reasonable assistance that Sellers may request in defending or prosecuting such Litigation or claim and shall make available to Sellers such personnel as are most knowledgeable about the matter in question, all without charge.

**Section 6.4**     **Employee Matters**.

(a)     No later than ten (10) Business Days prior to Closing Sellers will update the Employee Roster.  At least two (2) Business Days prior to the Closing, Buyer will identify the employees (or corresponding positions) on the Employee Roster to whom Buyer intends make an offer of employment.  Prior to Closing, Buyer may but is under

49

no obligation to offer employment to such identified employees listed on the Employee Roster (an "Offeree") to the extent such identified employee is a Current Employee and remains a Current Employee as of immediately prior to the Closing on such employment terms as Buyer may determine in its sole discretion.

(b)    Each Offeree of Sellers who is not a Transferred Employee shall be referred to herein as an "Excluded Employee."

(c)    Following the date of this Agreement:

i.    Sellers will allow Buyer or any of its Representatives reasonable access upon reasonable advance notice to meet with and interview the individuals listed on the Employee Roster during normal business hours;

ii.    Sellers shall not, nor shall any Seller authorize or direct or give express permission to any Affiliate, officer, director or employee of any Seller or any Affiliate, to (A) interfere with Buyer's or its Representatives' rights under Section 6.4(a) to make offers of employment to any Offeree, or (B) solicit or encourage any Offeree not to accept, or to reject, any such offer of employment;

iii.    Sellers shall provide reasonable cooperation and information to Buyer or the relevant Representative as reasonably requested by Buyer or such Representative with respect to its determination of terms and conditions of employment for any Offeree;

iv.    Sellers shall process the payroll for and pay, or cause to be paid, the base wages, base salary and benefits that are due and payable on or prior to the Closing Date with respect to all Current Employees.  Sellers shall withhold and remit all applicable payroll taxes as required by Law on or prior to the Closing Date with respect to all Current Employees as of such date;

v.    Sellers shall retain and be solely responsible for all Liabilities and obligations arising under or relating to any Employee Benefit Plans or the employment or termination of employment of any employee of any Seller, including without limitation any Current Employee or Former Employee (excluding the Assumed Payroll Obligations).  With respect to all Liabilities arising under or relating to Section 4980B of the Code or Part 6 of Subtitle B of Title I of ERISA ("COBRA"), Sellers and their respective ERISA Affiliates shall retain all Liability to provide continued group health coverage to all M&A qualified beneficiaries (as defined in Treasury Regulation § 54.4980B-9, Q/A(a) who expense a qualifying event (as defined in Treasury Regulation § 54.4980B-9, Q/A-6) as result of transactions contemplated by this Agreement.

(d)    Nothing in this Section 6.4 shall be construed as requiring, and neither Sellers nor any of their Affiliates shall take any affirmative action that would have the effect of requiring Buyer to continue (or prevent the termination of employment of) any specific employee benefit plan or to continue the employment of any specific person following the Closing.  Nothing in this Agreement is intended to establish, create or amend, nor shall anything in this Agreement be construed as establishing, creating or

50

amending, any employee benefit plan, practice or program of Buyer, any of its Affiliates or any of Sellers' Employee Benefit Plans, nor shall anything in this Agreement create or be construed as creating any contract of employment or as conferring upon any Current Employee, Former Employee, Transferred Employee or upon any other person, other than the parties to this Agreement in accordance with its terms, any rights to enforce any provisions of this Agreement under ERISA or otherwise.  No provision of this Agreement shall create any third party beneficiary rights in any Current Employee or Former Employee of any Seller or any other Person (including any beneficiary or dependent thereof) of any nature or kind whatsoever, including without limitation, in respect of continued employment (or resumed employment) for any specified period.

**Section 6.5**    **Transfer Taxes**.  To the extent not exempt under Section 1146 of the Bankruptcy Code and subject to Section 5.9 of this Agreement, Sellers shall pay all Transfer Taxes. Sellers and Buyer shall cooperate to prepare and timely file any Tax Returns required to be filed in connection with Transfer Taxes described in the immediately preceding sentence.

**Section 6.6**    **Wage Reporting**.  Buyer and Sellers agree to utilize, or cause their respective Affiliates to utilize, the alternate procedure set forth in Internal Revenue Service Revenue Procedure 2004-53 with respect to wage reporting.

**Section 6.7**    **Insurance Policies**.  Other than as provided in Section 2.2(k) above, upon Closing, and until Sellers cease to be debtors in possession in the Chapter 11 Cases or the Chapter 11 Cases are closed or dismissed, the Sellers shall use commercially reasonable efforts (but at no material cost or expense to Sellers) to cause the assignment of all rights of the Sellers in and to all insurance coverage provided in relation to Sellers and the Purchased Assets that is maintained by any Seller or its Affiliates (whether such policies are maintained with third party insurers or with such Seller or its Affiliates) to Buyer as soon as reasonably practicable.  To the extent that any current or prior Insurance Policy is not transferable to Buyer at the Closing in accordance with the terms thereof, each Seller, as applicable, shall (so long as Sellers remain debtors in possession in the Chapter 11 Cases and the Chapter 11 Cases have not been closed or dismissed and at no cost or expense to Sellers) hold such Insurance Policy for the benefit of Buyer, shall reasonably cooperate with Buyer (at Buyer's cost and expense) in pursuing any claims thereunder, and shall pay over to Buyer promptly any insurance proceeds paid or recovered thereunder with respect to the Purchased Assets or the Assumed Liabilities.  In the event Buyer determines to purchase replacement coverage with respect to any such Insurance Policy, Sellers shall (so long as Sellers remain debtors in possession in the Chapter 11 Cases and the Chapter 11 Cases have not been closed or dismissed and at no cost or expense to Sellers) reasonably cooperate with Buyer to terminate such Insurance Policy to the extent only applicable to the Purchased Assets, and Sellers shall, at the option of Buyer, promptly pay over to Buyer any refunded or returned insurance premiums received by any Sellers in connection therewith (or, if applicable, Buyer's pro rata portion thereof) or cause such premiums to be applied by the applicable carrier to the replacement coverage arranged by Buyer.

**Section 6.8**    **Collection of Accounts Receivable**.

51

(a)     As of the Closing Date, each Seller hereby (i) authorizes Buyer to open any and all mail addressed to any Seller relating to the Business or the Purchased Assets and delivered to the offices of the Business or otherwise to Buyer if received on or after the Closing Date and (ii) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, made payable or endorsed to any Seller or Sellers' order, for Buyer's own account.

(b)     As of the Closing Date, each Seller agrees that any monies, checks or negotiable instruments received by any Seller after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, shall be held in trust by such Seller for Buyer's benefit and account, and promptly upon receipt by a Seller of any such payment (but in any event within five (5) Business Days of such receipt), such Seller shall pay over to Buyer or its designee the amount of such payments.  In addition, Buyer agrees that, after the Closing, it shall hold and shall promptly transfer and deliver to Sellers, from time to time as and when received by Buyer or its Affiliates, any cash, checks with appropriate endorsements, or other property that Buyer or its Affiliates may receive on or after the Closing which properly belongs to Sellers hereunder, including any Excluded Assets.

(c)     As of the Closing Date, Buyer shall have the sole authority to bill and collect Accounts Receivable that are Purchased Assets and accounts receivable relating to work performed by Buyer after the Closing.

**Section 6.9     Use of Name and Marks**.  Neither Sellers nor any of their Affiliates shall use, license or affirmatively authorize any third party to use, any Trademark which is similar to, confusing with, or which dilutes any Trademark included in the Purchased Assets.

**Section 6.10   Liquor License Approvals**.   Sellers shall reasonably cooperate with Buyer in connection with Buyer's filings with any Governmental Entity or third party with respect to any Liquor Licenses and obtaining any Liquor License Approval, including by entering into the Management Agreement and, if reasonably requested by Buyer, initiating and/or participating, at Buyer's sole cost and expense, in such Litigation reasonably requested by Buyer to obtain such Liquor License Approvals.  For the avoidance of doubt, Sellers shall not bear any of the costs or expenses of Buyers' efforts to obtain Liquor License Approval, except as explicitly provided in the Management Agreement.

**Section 6.11   Data Privacy Protection**.  Buyer acknowledges that the Purchased Assets include PII, along with associated personal information about the Sellers' customers.   In connection with the same, Buyer agrees to: (i) employ appropriate security controls and procedures (technical, operational and managerial) to protect PII and personal information, (ii) abide by all applicable Laws and regulations with respect to PII and (iii) take such further actions with respect to PII as may be agreed in writing between the Parties.  Buyer agrees that it shall, absent a customer's express consent received after adequate notice: (a) abide by the

52

Sellers' privacy policies and privacy-related covenants made in Sellers' terms of service that were in effect as of the Petition Date, (b) respect prior requests of customers to opt out of receipt of marketing messages (to the extent Sellers make Buyer aware of such requests; provided that Buyer shall seek to obtain such information from Sellers), and (c) use personal information only for the purposes of continuing Business operations and continuing to provide similar goods and services to customers, including marketing the products and services related to Purchased Assets. Buyer shall require express consent of a customer for any additional use of PII or personal information or before making material changes to the privacy policies that weaken a customer's consumer protection.  Furthermore, to the extent PII includes any social security numbers, Buyer shall limit such use to tax reporting purposes, and shall purge such information from its databases when such information is no longer required for that purpose.

Section 6.12   **Alternate Transactions**.  Buyer acknowledges that, pursuant to the Bid Procedures Order, and only after entry of the Bid Procedures Order on the Bankruptcy Court's docket, Sellers will solicit bids from other prospective purchasers for the sale of all of the Purchased Assets in accordance with the procedures set forth in the Bid Procedures Order; provided, however, that, following completion of the Auction (if any) until the Closing (in the event that Buyer is selected as the winning bidder), Sellers shall not, directly or indirectly, through any officer, director, employee, agent, professional or advisor, solicit any Alternate Transaction or participate in any negotiations or discussions with respect to any Alternate Transaction, and Sellers shall not, and Sellers shall cause their Affiliates not to, (i) execute an agreement (other than a customary confidentiality agreement) with respect to an Alternate Transaction or (ii) seek or support Bankruptcy Court approval of a motion or Order inconsistent in any material respect with the transactions contemplated by this Agreement.

Section 6.13   **Purchased Actions**.  Buyer covenants and agrees (on behalf of itself and its successors and assigns) not to assert any Purchased Action other than as a defense or counterclaim to any claim alleged or asserted against Buyer or its Affiliates by a Person that is or may be a Purchased Action defendant.

Section 6.14   **Buyer Designee**.  At the Closing, notwithstanding anything to the contrary herein, Buyer may in its sole discretion designate or assign to any of its Affiliates its right, title and interest in any of the Purchased Assets (for the avoidance of doubt, including the Assumed Contracts) pursuant to the terms of this Agreement.  If so instructed by Buyer, Sellers shall sell, transfer, assign, convey and deliver such Purchased Assets directly to such Affiliate in lieu of selling, transferring, assigning, conveying and delivering such Purchased Assets to Buyer.

## ARTICLE VII
## CONDITIONS TO CLOSING

Section 7.1   **Conditions to Buyer's Obligations**.

Subject to Section 7.3, Buyer's obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or written waiver of the following conditions (any or all of which may be waived in writing by the Sellers and Buyer in whole or in part to the extent permitted by applicable Law):

(a)      as of the date hereof and as of the Closing (in each case, except to the extent for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), each representation or warranty contained in Article III shall be true and correct in all respects other than *de minimis* exceptions;

(b)      Sellers shall have performed and complied with their covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Sellers shall have caused the documents and instruments required by Section 2.9(a) to be delivered to Buyer (or tendered subject only to Closing);

(c)      no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)      all Cure Amounts shall have been paid by the Sellers or as otherwise set forth in this Agreement;

(e)      Buyer shall have received all of the Consents from third parties (including any Governmental Entities) and Assumed Permits (including Liquor Licenses Approvals), except to the extent such Assumed Permits (including Liquor Licenses Approvals) are to be transitioned under the Management Agreement (including Liquor Licenses Approvals pursuant to Section 6.10) or the need for such Consents is obviated by the effect of the Sale Order, in each case, as listed on Schedule 7.1 (as the same may be revised, amended or modified by Buyer in its sole discretion up until the Sale Hearing);

(f)      the Bid Procedures Order shall have been entered by the Bankruptcy Court on a final, non-appealable basis;

(g)      the Sale Order shall have been entered by the Bankruptcy Court and shall be in full force and effect and not be subject to a stay pending appeal;

(h)      from the date of this Agreement until the Closing Date, there shall not have occurred and be continuing any Material Adverse Effect;

(i)      Buyer shall have received all of the deliverables pursuant to Section 2.9(a); and

(j)      Sellers shall have delivered a certificate from an authorized officer of Sellers to the effect that each of the conditions specified in Section 7.1(a), Section 7.1(b) and Section 7.1(h) has been satisfied.

**Section 7.2    Conditions to Sellers' Obligations**.    Subject to Section 7.3, Sellers' obligation to consummate the Contemplated Transactions in connection with the Closing are subject to satisfaction or written waiver of the following conditions (any or all of which may be waived in writing by the Sellers and Buyer in whole or in part to the extent permitted by applicable Law):

54

(a)      as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in <u>Section 4.1</u>, <u>Section 4.2</u> or <u>Section 4.3</u> shall be true and correct in all respects other than *de minimis* exceptions, and (ii) each other representation or warranty set forth in <u>Article IV</u> shall be true and correct in all material respects, except where the failure of such representations and warranties referred to in this <u>clause (ii)</u> to be true and correct, individually or in the aggregate with other such failures, would not reasonably be expected to materially prevent, restrict or delay the consummation of the Contemplated Transactions or by any Related Agreement; <u>provided</u>, <u>however</u>, that for purposes of determining the accuracy of representations and warranties referred to in <u>clause (ii)</u> for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)      Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Buyer shall have caused the documents, instruments and payments required by <u>Section 2.9(b)</u> to be delivered to Sellers (or tendered subject only to Closing);

(c)      no Governmental Entity of competent jurisdiction shall have (i) enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)      the Bid Procedures Order shall have been entered by the Bankruptcy Court and shall be in full force and effect and not be subject to a stay pending appeal;

(e)      the Sale Order shall have been entered by the Bankruptcy Court and shall be in full force and effect and not be subject to a stay pending appeal;

(f)      Sellers shall have received all of the deliverables pursuant to <u>Section 2.9(b)</u>; and

(g)      Buyer shall have delivered a certificate from an authorized officer of Buyer to the effect that each of the conditions specified in <u>Section 7.2(a)</u> and <u>Section 7.2(b)</u> has been satisfied.

**Section 7.3    No Frustration of Closing Conditions**.  Neither Buyer nor Sellers may rely on the failure of any condition to its obligation to consummate the Contemplated Transactions set forth in <u>Section 7.1</u> or <u>Section 7.2</u>, as the case may be, to be satisfied if such failure was caused by such Party's failure to use its commercially reasonable efforts with respect to those matters contemplated by the applicable Sections of this Agreement to satisfy the conditions to the consummation of the Contemplated Transactions or other breach of a representation, warranty or covenant hereunder.

**Section 7.4    Waiver of Conditions**.  Upon the occurrence of the Closing, any condition set forth in this <u>Article VII</u> that was not satisfied as of the Closing will be deemed to

55

have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing.

**Section 7.5    Agreement Regarding Schedules and Exhibits Hereto.** Notwithstanding anything to the contrary in this Agreement, the Parties will not append the various schedules and exhibits referred to in this Agreement upon the mutual execution and delivery of this Agreement.  Rather, the Parties will work to mutually agree upon and append all schedules and exhibits hereto by no later than August 7, 2020 (the "Outside Agreement Date"). The Parties shall cooperate reasonably and in good faith to achieve such mutual agreement on or before the Outside Agreement Date.  In the event that the Parties have not mutually agreed upon the form and content of all schedules and exhibits to this Agreement by the Outside Agreement Date, then either Buyer or Sellers shall have the right upon written notice to the other(s) to terminate this Agreement at any time prior to the Parties achieving mutual agreement on the form and content of such schedules and exhibits.  Notwithstanding anything to the contrary herein, upon any such termination, the Parties shall conclusively be deemed released and relieved of any further liability or obligation hereunder, except as otherwise set forth in Section 8.3.  Upon the Parties' mutual agreement upon the form and content of the schedules and exhibits hereto prior to the Outside Agreement Date, such schedules and agreements shall be deemed appended to and included in this Agreement and this Section 7.5 shall lapse and cease to be of any force or effect whatsoever as though it had never been included in this Agreement.

## ARTICLE VIII
## TERMINATION

**Section 8.1    Termination of Agreement**.   This Agreement may be terminated in accordance with this Article VIII and the Contemplated Transactions abandoned at any time prior to the Closing (each a "Termination Event"):

(a)    by the mutual written consent of Buyer, on the one hand, and Sellers, on the other hand;

(b)    by written notice of either Buyer or Sellers, if there shall be any Law that makes consummation of the Contemplated Transactions illegal or otherwise prohibited, or upon the issuance by any Governmental Entity of an Decree restraining, enjoining, or otherwise prohibiting the consummation of the Contemplated Transactions or declaring unlawful the Contemplated Transactions, and such Decree having become final, binding and non-appealable; provided that no termination may be made by a Party under this Section 8.1(b) if the issuance of such Decree was caused by the breach or action or inaction of such Party;

(c)    by written notice of either Buyer or Sellers, if the Closing shall not have occurred on or before the Outside Date;

(d)    by written notice of either Buyer or Sellers, if any of the Chapter 11 Cases is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Sellers is appointed in the Chapter 11 Cases;

56

(e)     by Buyer, if (i) Bid Procedures Order shall not have been entered by the Bankruptcy Court on or before the Bid Procedures Order Deadline or (ii) at any time after entry of the Bid Procedures Order, such Bid Procedures Order is reversed, stayed, vacated or otherwise modified;

(f)     by Buyer, if (i) the Sale Order shall not have been entered by the Bankruptcy Court on or before the Sale Order Deadline or (ii) at any time after entry of the Sale Order, such Sale Order is reversed, stayed, vacated or otherwise modified;

(g)     by Buyer by giving written notice to Sellers at any time prior to Closing (i) in the event Sellers have breached any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in Sections 7.1(a) and 7.1(b) hereof, as the case may be, would not then be satisfied at the time of such breach, Buyer has notified Sellers of the breach, and the breach has continued without cure until the earlier of (i) five (5) days prior to the Outside Date so long as all other conditions of Buyer have been satisfied or (ii) thirty (30) days after the notice of the breach, in each case, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by Buyer;

(h)     by Sellers by giving written notice to Buyer at any time prior to Closing (i) in the event Buyer has breached any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in Sections 7.2(a) and 7.2(b) hereof, as the case may be, would not then be satisfied at the time of such breach, Sellers has notified Buyer of the breach, and the breach has continued without cure until the earlier of (i) five (5) days prior to the Outside Date so long as all other conditions of Sellers have been satisfied or (ii) thirty (30) days after the notice of the breach, in each case, unless such failure shall be due to the failure of Sellers to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by Sellers;

(i)     by written notice from Sellers to Buyer, if all of the conditions set forth in Section 7.1 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Buyer fails to complete the Closing at the time required by Section 2.7(a);

(j)     by Buyer if any secured creditor of any Seller obtains relief from the stay to foreclose on a material portion of the Purchased Assets;

(k)     by Buyer if any Affiliates of the Sellers (other than other debtors in the Chapter 11 Cases on the date hereof) that, directly or indirectly through one or more intermediaries, controls Sellers, files for relief pursuant to the Bankruptcy Code;

(l)      by Buyer if, at any time on or before the August 21, 2020, Buyer becomes aware of any matter as a result of its due diligence investigation (including by way of information delivered or made available by Sellers hereunder or on a Disclosure Schedule or Schedule hereto) that Buyer determines is unacceptable in its sole discretion; or

(m)      by Seller, upon a Decree by the Bankruptcy Court approving an Alternate Transaction.

Notwithstanding anything to the contrary contained herein, (i) in no event may Buyer terminate this Agreement under Section 8.1(f) on account of Buyer's failure to satisfy the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to any proposed Assumed Contract, and (ii) a Party shall not be permitted to terminate this Agreement pursuant to this Article VIII if the applicable Termination Event was caused by the breach of such Party or such Party's gross negligence, willful misconduct, or bad faith.

Section 8.2      **Procedure upon Termination**.      In the event of termination and abandonment by Buyer, on the one hand, or Sellers, on the other hand, or both, pursuant to Section 8.1, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate and the Contemplated Transactions shall be abandoned, without further action by Buyer or Sellers.

Section 8.3      **Effect of Termination**.

(a)      In the event that this Agreement is validly terminated pursuant to a right of termination as provided herein, then each of the Parties shall be relieved of its duties and obligations arising under this Agreement effective as of the date of such termination and such termination shall be without Liability to Buyer or the Sellers; provided, however, that Section 8.1, Section 8.2, this Section 8.3, and Article IX shall survive any such termination and shall be enforceable hereunder.  In no event shall any termination of this Agreement relieve any Party hereto of any Liability for any breach of this Agreement by such Party.

(b)      In consideration of Buyer and its Affiliates having expended considerable time and expense in connection with this Agreement and the negotiation thereof, and the identification and quantification of assets to be included in the Purchased Assets, and to compensate Buyer as a stalking-horse bidder, and regardless of whether or not Buyer makes any matching or competing bids at the Auction, the Sellers shall pay to Buyer the Break-Up Fee, (i) in the event that this Agreement is terminated pursuant to Section 8.1(m) and the Sellers close an Alternate Transaction; and (ii) in the event that this Agreement is otherwise terminated pursuant to Sections 8.1(c) through (g), Section 8.1(j) or Section 8.1(k), and in each case, within twelve (12) months following the termination of this Agreement the Sellers close an Alternate Transaction. Such Break-Up Fee shall be immediately due and payable in full in cash from the proceeds of such Alternate Transaction and after the closing of an Alternate Transaction as set forth in clause (i) and clause (ii) of the immediately preceding sentence. The Break-Up Fee shall, subject to Bankruptcy Court approval, be treated as

58

a superpriority administrative expense in the Chapter 11 Case under Section 503(b)(1)(A) and Section 507(a)(2) of the Bankruptcy Code. The Sellers acknowledge and agree that: (A) the approval of the Break-Up Fee in the circumstances provided in this Section 8.3(b) is an integral part of the transactions contemplated by this Agreement; (B) in the absence of the Sellers' obligation to pay the Break-Up Fee as provided herein, Buyer would not have entered into this Agreement; (C) the entry of Buyer into this Agreement is necessary for preservation of the estates of the Sellers and is beneficial to the Sellers because, in the Sellers' business judgment, it will enhance the Sellers' ability to maximize the value of their assets for the benefit of their creditors and other stakeholders; (D) time is of the essence with respect to the payment of the Break-Up Fee and (E) the Break-Up Fee is reasonable in relation to Buyer's costs and efforts and to the magnitude of the transactions contemplated hereby and Buyer's lost opportunities resulting from the time spent pursuing the transactions contemplated hereby.  For the avoidance of doubt, the Break-Up Fee, if payable pursuant to this Section 8.3(b), shall be in addition to the payment of the Expense Reimbursement Amount, to the extent payable to Buyer pursuant to Section 8.3(c).

(c)    In consideration of Buyer and its Affiliates having expended considerable time and expense in connection with this Agreement and the negotiation thereof, and the identification and quantification of assets to be included in the Purchased Assets, upon any termination of this Agreement, other than any termination pursuant to Section 8.1(a) or by Sellers pursuant to Sections 8.1(h) or (i) (unless, in case of a termination pursuant to Sections 8.1(h) or (i), at the time of any such termination Buyer would have been entitled to terminate this Agreement pursuant to Sections 8.1(c) through (g), Sections 8.1(j) or (k) Sellers shall pay to Buyer in full in cash the Expense Reimbursement Amount within five (5) Business Days after the termination of this Agreement.  Sellers acknowledge and agree that (i) the payment of the Expense Reimbursement Amount is an integral part of the transactions contemplated by this Agreement, (ii) in the absence of the Sellers' obligation to make this payment, Buyer would not have entered into this Agreement, (iii) the delivery of the Expense Reimbursement Amount to Buyer is not a penalty, but rather shall constitute a reasonable amount that will compensate Buyer in the circumstances where Buyer is entitled to the reimbursable expenses for the efforts and resources expended and opportunities forgone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummating of the transactions contemplated thereby, and that, without these agreements, Buyer would not have entered into this Agreement, (iv) time is of the essence with respect to the payment of the Expense Reimbursement Amount and (v) the Expense Reimbursement Amount shall, subject to Bankruptcy Court approval, constitute a superpriority administrative expense of the Sellers' estates under Sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code. For the avoidance of doubt, the Expense Reimbursement Amount, if payable pursuant to this Section 8.3(c), shall be in addition to the Break-Up Fee to the extent payable to Buyer pursuant to Section 8.3(b).

(d)    In the event the Sellers consummate an Alternate Transaction and the Sellers fail to take any action necessary to cause the delivery of the Break-Up Fee and/or the Expense Reimbursement Amount under circumstances where Buyer is

entitled to the Break-Up Fee and/or the Expense Reimbursement Amount and, in order to obtain such Break-Up Fee and/or Expense Reimbursement Amount, Buyer commences a suit which results in a final non-appealable judgment in favor of Buyer, the Sellers shall pay to Buyer, in addition to the Break-Up Fee and/or Expense Reimbursement Amount, an amount in cash equal to the reasonable, documented, out-of-pocket costs and expenses (including reasonable attorneys' fees) incurred by Buyer in connection with such suit.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.1**    **Remedies**.  Except as set forth in Section 8.3, the Parties recognize that if a Party breaches or refuses to perform any of their covenants set forth in this Agreement, monetary damages alone would not be adequate to compensate the non-breaching Party for their injuries.   The non-breaching Party shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of, or to enjoin the violation of, the terms of such covenants.   If any Litigation is brought by the non-breaching Party to enforce such covenants, the breaching Party shall waive the defense that there is an adequate remedy at Law. The Parties agree to waive any requirement for the security or posting of any bond in connection with any Litigation seeking specific performance of, or to enjoin the violation of, such covenants.   The right to equitable relief, including specific performance and injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Agreement. Each of the Sellers and Buyer hereby agrees not to assert that specific performance, injunctive and other equitable remedies are unenforceable, violate public policy, invalid, contrary to Law or inequitable for any reason.   The Parties agree that the only permitted objection that they may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants. The right of specific performance, injunctive and other equitable remedies is an integral part of the transactions contemplated by this Agreement and without that right, neither the Sellers nor the Buyer would have entered into this Agreement.

**Section 9.2**    **Expenses**.   Except as otherwise provided in this Agreement (including Section 8.3), or a Related Agreement, Sellers and Buyer shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement, the Related Agreements and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions.

**Section 9.3**    **Entire Agreement**.  This Agreement (including the schedules and exhibits hereto and other documents specifically referred to herein) and the Related Agreements constitute the entire agreement among the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or among the Parties, written or oral, with respect to the subject matter hereof.

**Section 9.4**    **Incorporation of Schedules, Exhibits and Disclosure Schedule**.  The schedules, appendices and exhibits to this Agreement, the documents and other information

60

made available in the Disclosure Schedule are incorporated herein by reference and made a part hereof.

       **Section 9.5**   **Amendments and Waivers**.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant.  No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this <u>Section 9.5</u> except as expressly provided herein.  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

       **Section 9.6**   **Succession and Assignment**.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  None of the Parties may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of all Parties; <u>provided</u>, <u>however</u>, that Buyer shall be permitted to assign any of its rights hereunder to one or more of its Affiliates, as designated by Buyer in writing to Sellers; <u>provided</u>, <u>however</u>, Buyer shall remain liable for all of its obligations under this Agreement after any such assignment (including, without limitation, its obligation to provide adequate assurance of future performance with respect to all Assumed Contracts); <u>provided</u>, <u>further</u>, that Sellers shall be permitted to assign any of their rights hereunder pursuant to a confirmed chapter 11 plan or pursuant to an order of the Bankruptcy Court.

       **Section 9.7**   **Notices**.  All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient; (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (iii) when sent by email (with written confirmation of transmission); or (iv) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

       If to any Sellers or Sellers' Rep, then to:

                  BarFly Ventures LLC
                  35 Oakes St. SW #400
                  Grand Rapids, Michigan  49503
                  Attention:  Ned Lidvall
                  Email:  NLidvall@barflyventures.com

61

with copies (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
150 California St., 15th Floor
San Francisco, CA 94111
Attention: John W. Lucas
Email: jlucas@pszjlaw.com

If to Buyer, then to:

CIP Administrative, LLC
3131 McKinney Avenue
Dallas, Texas 75204
Attention: Travis Baldwin
Email: tbaldwin@congruentinv.com

with copies (which shall not constitute notice) to:

Paul Hastings LLP
71 S. Wacker Drive, 45th Floor
Chicago, IL 60606
Attention: Matt Murphy
             Amit Mehta
E-mail: mattmurphy@paulhastings.com
             amitmehta@paulhastings.com

Any Party may change the mailing address or email address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this Section 9.7.

Section 9.8    Governing Law; Jurisdiction.  This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of New York, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws.  The Parties agree that any Litigation one Party commences against any other Party pursuant to this Agreement shall be brought exclusively in the Bankruptcy Court and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum; provided that if the Bankruptcy Court is unwilling or unable to hear any such Litigation, then the courts of the State of Michigan, sitting in Grand Rapids, and the federal courts of the United States of America sitting in Grand Rapids, shall have exclusive jurisdiction over such Litigation.

62

**Section 9.9    Consent to Service of Process**. Each of the Parties hereby consents to process being served by any Party, respectively, in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 9.7.

**Section 9.10    WAIVERS OF JURY TRIAL**.    EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE RELATED AGREEMENTS OR THE CONTEMPLATED TRANSACTIONS OR THEREBY.

**Section 9.11    Severability**.    The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement so long as the economic or legal substance of the Contemplated Transactions is not affected in a manner adverse to any Party.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) the Parties shall negotiate in good faith to find a suitable and equitable provision that shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

**Section 9.12    No Third Party Beneficiaries**.  Except as set forth in Section 5.8 hereof, this Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

**Section 9.13    No Survival of Representations, Warranties and Agreements**. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing.  Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for six (6) years following the Closing Date, and nothing in this Section 9.13 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Buyer and Sellers acknowledge and agree, on their own behalf and, with respect to Buyer that the agreements contained in this Section 9.13 (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for six (6) years; and (b) are an integral part of the Contemplated Transactions and that, without the agreements set forth in this Section 9.13, none of the Parties would enter into this Agreement.  For the avoidance of all doubt, nothing herein shall be deemed to require Sellers to perform any obligations under this Agreement beyond the date which is the first to occur of Sellers ceasing to be debtors in possession in the Chapter 11 Cases or the Chapter 11 Cases being closed or dismissed.

63

**Section 9.14   Non-Recourse**.   This Agreement may only be enforced against, and any Litigation based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement.  Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or representative of any party to this Agreement will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Litigation  based upon,  arising out of or related to this Agreement.

**Section 9.15   Construction**.   The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.   The word "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation."  The words "herein," "hereto" and "hereby," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement.  Unless expressly stated in connection therewith or the context otherwise requires, the phrase "relating to the Business" and other words of similar import shall be deemed to mean "relating to the operation of the Business as conducted as of the date hereof."  Except as otherwise provided herein, references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Exhibits, Appendices and the Disclosure Schedule herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Appendices, Exhibits and the Disclosure Schedule of this Agreement.  Any reference herein to any Law (or any provision thereof) shall include such Law (or any provision thereof) and any rule or regulation promulgated thereunder, in each case, including any successor thereto, and as it may be amended, modified or supplemented from time to time.  Any reference herein to "dollars" or "$" means United States dollars.   Where used with respect to information, the phrases "delivered" or "made available" means that the information referred to has been physically or electronically delivered (including the Data Room) no later five (5) calendar days prior to the expiration of the Due Diligence Period.

**Section 9.16   Computation of Time**.   In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

**Section 9.17   Mutual Drafting**.   Each of the Parties has participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**Section 9.18   Disclosure Schedule**.   The Disclosure Schedule has been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement.   The disclosure of any fact or item in any numbered and lettered section of the Disclosure Schedule shall, should the existence of such fact or item be relevant to any other section of the Disclosure Schedule, be deemed to be disclosed with respect to such other section

of the Disclosure Schedule only so long as the relevance of such disclosure to such other section of the Disclosure Schedule is readily apparent. Capitalized terms used in the Disclosure Schedule and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Disclosure Schedule or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business or consistent with past practice, and no party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Disclosure Schedule or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Disclosure Schedule or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business. In addition, matters reflected in the Disclosure Schedule are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedule. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Disclosure Schedule will be deemed to broaden in any way the scope of the parties' representations and warranties. The information contained in this Agreement, in the Disclosure Schedule and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party or any third party of any matter whatsoever, including any violation of Law or breach of contract.

**Section 9.19  Headings; Table of Contents**.  The section headings and the table of contents contained in this Agreement, the Schedules and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 9.20  Counterparts; Facsimile and Email Signatures**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

**Section 9.21  Sellers' Rep**.

(a)     Sellers hereby appoint BarFly Ventures as the representative of Sellers (the "Sellers' Rep") to act in each Seller's name, place and stead, as such Seller's attorney-in- fact, to exercise all of the powers conferred upon it pursuant to this Agreement, for and on behalf of such Seller and without any act of such Seller. BarFly Ventures as Sellers' Rep hereby accepts such appointment. The dissolution, liquidation, insolvency or bankruptcy of any Seller shall not terminate such appointment or the authority and agency of the Sellers' Rep. The power-of-attorney granted in this Section 9.22(a) is coupled with an interest and is irrevocable. Buyer may conclusively rely upon, without independent verification or investigation, all decisions made by Sellers' Rep on behalf of Sellers.

65

(b)    From and after the date hereof, any notice given to the Sellers' Rep shall constitute notice to each and all of the Sellers at the time notice is given to the Sellers' Rep (other than notice for service of process relating to any Litigation before a court or other tribunal of competent jurisdiction, which notice must be given to each Seller individually, as applicable).    Any action taken or foregone by, or notice or instruction received from, the Sellers' Rep shall be deemed to be action or inaction by, or notice or instruction from, each and all Sellers.

(c)    BarFly Ventures shall serve as the Sellers' Rep until its resignation or it is otherwise unable to continue to serve.  Upon the resignation of BarFly Ventures or if it is not able to continue to serve for any reason, Sellers by a majority vote shall select a new Sellers' Rep by written consent signed by such majority.  No resignation or replacement of the Sellers' Rep shall become effective unless and until written notice of the replacement or resignation of such Sellers' Rep shall be provided to Buyer.  Each time a new Sellers' Rep is appointed pursuant to this Agreement, such Person, as a condition precedent to the effectiveness of such appointment, shall accept such position in writing.

**Section 9.22    Time of Essence**.  Time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement.

**Section 9.23    Risk of Loss.**    Notwithstanding anything to the contrary in this Agreement, the risk of loss or damage to the Purchased Assets (wherever located) shall unconditionally shift to the Buyer on the Closing Date.

**Section 9.24    Buyer's Removal of Purchased Assets.** At any time prior to August 31, 2020 (the "Removal Date"), Buyer shall remove, or cause to be removed from the Excluded Restaurants, at Buyer's sole cost and expense, all portions of the Purchased Assets located there. Buyer shall use commercially reasonable efforts to cause such removal to be accomplished in such manner as will minimize any damage to the Excluded Restaurants or any Excluded Assets or other assets of any other party having an interest in any of the Excluded Restaurants and shall cooperate in all reasonable respects (i) with any plans of Sellers to vacate the Excluded Restaurants and Sellers' removal of the Excluded Assets during the Removal Period and (ii) in the coordination of Sellers' and Buyer's activities at the Excluded Restaurants during the period prior to the Removal Date.  Buyer shall, at Buyer's sole cost and expense, promptly (and in no event later than the timeframe allowed for completion of such repairs under the Lease pursuant to which the applicable Seller occupies the relevant Excluded Restaurant) cause any damage to the Excluded Restaurants resulting from Buyer's removal, handling, shipping, disposition or other activities in connection with the Purchased Assets to be fully and completely repaired or restored; provided, however, that Buyer's obligation shall in no event exceed the relevant Seller's obligations under the applicable Leases pursuant to which such Seller occupies and has the right of possession of the Excluded Restaurant.  Buyer shall indemnify, defend and protect and hold Sellers, Sellers' bankruptcy estates, and Sellers' Affiliates harmless of, from and against any and all direct claims, demands, losses, damages, liabilities, obligations, actions, causes of action and costs and expenses (including, without limitation, all court costs and all reasonable attorneys' fees, costs and charges) as Sellers or such other indemnitees may suffer or incur as a result of Buyer's or Buyer's Representatives', employees', agents', contractors',

DOCS_SF:103743.4 07979/002

shippers' removal or handling of the Purchased Assets at or from the Excluded Restaurants.  It is expressly understood that Buyer shall bear any and all costs and expenses of packing, shipping and handling  the Purchased Assets following  their removal from the Excluded Restaurants.

**[SIGNATURE PAGES TO FOLLOW]**

67

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the date first set forth above.

**SELLERS' REP:**

BARFLY VENTURES, LLC

By:

Name: Ned Kidvall

Title: Interim CEO

**SELLERS:**

BARFLY VENTURES, LLC

By: _____
Name: _Ned Lidvall_____
Title: _Interim CEO_____

9 VOLT, LLC

By: _____
Name: _Ned Lidvall_____
Title: _Interim CEO_____

50 AMP FUSE, LLC

By: _____
Name: _Ned Lidvall_____
Title: _Interim CEO_____

EL BREWPUB, LLC

By: _____
Name: _Ned Lidvall_____
Title: _Interim CEO_____

GRBC HOLDINGS, LLC

By: _____
Name: _Ned Lidvall_____
Title: _Interim CEO_____

HOPCAT-ANN ARBOR, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-CHICAGO, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-CONCESSIONS, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-DETROIT LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-GR BELTLINE, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-HOLLAND, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-INDIANAPOLIS, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

*[Signature page to Barfly Asset Purchase Agreement ]*

HOPCAT-KALAMAZOO, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-KANSAS CITY, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-LEXINGTON, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-LINCOLN, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-LOUSVILLE, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-MADISON, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-MINNEAPOLIS, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-PORT- ST. LUCIE, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-ROYAL OAK, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-ST. LOUIS, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

LUCK OF THE IRISH, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

*[Signature page to Barfly Asset Purchase Agreement ]*

**BUYER:**

PROJECT BARFLY LLC

By: _____

Name: Travis Baldwin
Title: President

# EXHIBIT C

## Purchased Actions

## Ongoing Trade Vendors / Service Providers

A & L Janitorial Inc.
ADP CLIENT TRUST
Airgas USA LLC - Rental
Allegra
Alliance Beverage Distributing LLC
Ameren Missouri
Armock Mechanical
Arrowaste Inc.
ASCAP
Becker & Poliakoff, PA
Beer City Glass
BHD0001--BHD, LLC
Borgetto Investments, LLC
Boston Square
Brewers Supply Group
Capitol Beverage Sales
CAVALI1--Cavalier Distributing Inc
Cavalier Distributing Inc
Centerpoint Energy
Certified Refrigeration & Mechanical, LLC
Citizens Energy Group
Comcast
ComEd
Comfort Systems USA Indiana
Consumer's Energy
Corrigan Logistics
Corrine Johnson
Cozzini Bros Inc
Cross Roads Brewing Co
Dan Henry
Daniel L Jacob & Co. Inc
Dawson Rubin
Delta Dental
Dover Grease Traps, Inc.
DTE Energy
Eastown Distributors
EatGR LLC
Eclectic Imprint
ECOLAB
Ecolab Pest Elim Div
Enroll123, LLC
Enviro-Master of West Michigan
Eventbrite, Inc.

### **Ongoing Trade Vendors / Service Providers**

Evergy
Evil Czeck Brewery & Public House
Fabiano Brothers
FedEx
Ferris Coffee & Nut Company, Inc
Field Fire Protection Inc
Final Clean Pro LLC
fintech
First Insurance Funding
Fish Window Cleaning
Glazers Wholesale Company
Gordon Food Service, if and only if the GFS Objections are withdrawn
Grand Rapids Graphix
Great America Financial Services
Great Lakes Beverage Co
Great Lakes West
GREATL1--Great Lakes Wine _ Spirits
Green For Life
GTT Communications
HC Woodward LLC
Henry A. Fox Sales Co.
HNI Risk Advisors
Hoekstra Electrical Services
Holland Board of Public Works
Holland Stitchcraft
Holston Gases
Humidity Controls LLC
Ice Town
ID Watchdog, Inc.
IHS Distributing
Imperial Beverage
INDIAN3--Indiana City Brewing
Infinisource Benefit Services
Insite Business Solutions
James Ferrari and Sons Inc
Jeff Meyer
Johnson Brothers
K&Z Distributing Co.
KegWorks
KM Prost LLC
Knight Investment Group
Lansing Board of Water and Light
Lee Shore Enterprises

**Ongoing Trade Vendors / Service Providers**

Lexington-Fayette Urban County Government
LG&E
Lincoln Electric Systems
Lincoln National Life Insurance Company
M4 C.I.C. LLC
Mervenne Beverage, Inc.
Michigan Dept of Treasury
Monarch Beverage
Mr Handyman Detroit
Mutual of Omaha
My Green Michigan LLC
My Handyman of Ann Arbor
Nantucket Baking Company
National Wine _ Spirits
Nick's Gyro's LLC
NRL Consulting
NuCO2
O & W, Inc
Oath Distributing
OLO
Omega :Yeast Labs
One Way Products
Open Table
Organix Recycling
Patty Matters
Pax Verum Brewing Co.
Phoebe Duvall
Plante & Moran, PLLC
Plaza Storage, LLC
Power Distributing
Premier Beverage CO
Premier-Midwest Beverage Co.
Produce Alliance
Professional Maintenance of Michigan, Inc.
Project 35 LLC
Quail Distributing, Inc.
Quality Brands of Lincoln LLC
R. L. Schrieber
R.E. Golden Produce Co
Rave Associates
Red Tap Solutions
Republic National Dist
Restaurant Technologies, Inc

### Ongoing Trade Vendors / Service Providers

RLM Services LLC
Rotella's Italian Bakery, Inc.
Round It Up America, Inc.
Ryan Leibinger
Saladino Smoke LLC
Scott Cooley
South Broad Ripple Brewing Co
Southern Glaziers of MO
Southern Wine & Spirits
Sparkling Windows Corp.
Spire
Standard Sales Company
Star 2 Star Communications LLC
State Distributing
Sterling/Glaziers Distributing
Susan Kalee
TDS
The Guardian Brewing Co.
Time Warner Cable
Todd Kronebusch
Town Center Inc.
Tri-County Beverage Company
Unemployment Services, Inc.
Unifirst Corporation - Michigan
United Beverage
Valley City Linen
Verdolino & Lowey, P.C.
Verizon Wireless
Vicinity Energy Grand Rapids LLC
VSP Insurance Co.
Waste Management of Michigan
Welders Supply Company
West Side Beer Distributing
WestRock CP LLC
Wirtz Beverage Wisconsin
XCEL Energy
Zink Distributing