revoked, and the grant of such release shall be deemed null and void ab initio, without the need for any further action by the Parties.

Section 5.9    **Buyer Backstop.**  To the extent that the performance of Sellers' obligations under this Agreement prior to or at the Closing require the use or payment of money, Sellers shall utilize the from time to time Cash and Cash Equivalents (other than any Excluded Cash) on hand and available for use in the Business ("Available Cash") to perform and satisfy such obligations. If, at any time prior to or at the Closing, there is not sufficient Available Cash for Sellers to perform any such obligations (an "Available Cash Deficiency"), Buyer shall fund to Sellers (within two (2) Business Days following Buyer's receipt from time to time of written notification from Sellers of the amount of such Cash Deficiency and reasonable support therefor (each, a "Shortfall Notice") cash in the amount of the then Available Cash Deficiency (a "Backstop Amount"), which Backstop Amount shall be used by Sellers only to satisfy Sellers' obligations under this Agreement specifically identified in the Shortfall Notice as obligations Sellers had insufficient Available Cash to satisfy; provided, however, and notwithstanding anything to the contrary set forth herein, Buyer's aggregate payments with respect to Backstop Amounts and the Excluded Cash Deficiency Amount shall not exceed $613,708 and Buyer shall have no further obligation for the payment of any Backstop Amounts or the Excluded Cash Deficiency Amount in excess of such aggregate amount, provided further, however, in lieu of funding the Backstop Amount to Sellers, Buyer shall have the right, at Buyer's sole option, to pay the amounts comprising the Backstop Amount directly to the counter-parties and other third parties identified as payees of any portion of the Backstop Amount in the Shortfall Notice.  In the event Buyer elects to make payments of the Backstop Amount directly to third parties as contemplated in the immediately preceding sentence, Sellers shall provide such information as Buyer may request in order to do so and otherwise reasonably cooperate with Buyer in making such direct payments. Notwithstanding anything to the contrary in this Agreement, if Buyer fails to fund or pay in full, as applicable, any Backstop Amount required to be funded or paid in full by Buyer in accordance with this Section 5.9, Seller shall be excused from performing Sellers' obligations to which such unpaid or unfunded Backstop Amounts relate and such failure shall be deemed a breach of Buyer's obligations under this Agreement.

## ARTICLE VI
## OTHER COVENANTS

The Parties agree as follows with respect to the period from and after the Closing; provided that (i) Sellers shall not be obligated to incur any costs or expenses, associated with their obligations hereunder during such period, other than such ordinary and necessary professional fees as are required for Sellers to comply with the obligations hereunder and (ii) Sellers' obligations hereunder shall only continue until Sellers are no longer debtors in possession under the Chapter 11 Cases or the Chapter 11 Cases are closed or dismissed:

Section 6.1    **Cooperation**.  Each of the Parties shall cooperate with each other, and shall use their commercially reasonable efforts to cause their respective Representatives to cooperate with each other, to provide an orderly transition of the Purchased Assets and Assumed Liabilities from Sellers to Buyer and to minimize the disruption to the Business resulting from the Contemplated Transactions.

Section 6.2    **Further Assurances**.  In case at any time from and after the Closing any further action is necessary or reasonably required to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the terms and conditions of the Sale Order (and, as to Sellers, taking into account their status as debtors-in-possession), at any Party's request and sole cost and expense, each Party shall take such further action (including the execution and delivery to any other Party of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and information) as another Party may reasonably request (which are consistent with the rights and obligations imposed upon the Parties pursuant to the other provisions hereof) as shall be necessary to transfer, convey and assign to Buyer all of the Purchased Assets, to confirm Buyer's assumption of the Assumed Liabilities and to confirm Sellers' retention of the Excluded Assets and Excluded Liabilities.  Without limiting the generality of this Section 6.2, to the extent that either Buyer or Sellers discovers any additional assets or properties which the parties mutually agree should have been transferred or assigned to Buyer as Purchased Assets but were not so transferred or assigned, Buyer and Sellers shall cooperate and execute and deliver any instruments of transfer or assignment (which are consistent with the rights and obligations imposed upon the Parties pursuant to the other provisions hereof) necessary to transfer and assign such asset or property to Buyer.

Section 6.3    **Availability of Business Records**.  From and after the Closing, Buyer shall promptly provide to Sellers and their respective Representatives (after reasonable notice and during normal business hours and without charge to Sellers) access to all Records included in the Purchased Assets for periods prior to the Closing and reasonable access to Transferred Employees to the extent such access is necessary in order for Sellers (as applicable) to comply with applicable Law or any contract to which it is a party, for liquidation, winding up, Tax reporting or other proper purposes and so long as such access is subject to an obligation of confidentiality, and shall preserve such Records until the latest of (i) six (6) years after the Closing Date, (ii) the required retention period for all government contact information, records or documents, (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases or (iv) in the case of Records related to Taxes, the expiration of the statute of limitation applicable to such Taxes.  Such access shall include access to any information in electronic form to the extent reasonably available.  Buyer acknowledges that Sellers have the right to retain originals or copies of all of Records included in the Purchased Assets for periods prior to the Closing.  Prior to destroying any Records included in the Purchased Assets for periods prior to the Closing, Buyer shall notify Sellers thirty (30) days in advance of any such proposed destruction of its intent to destroy such Records, and Buyer shall permit Sellers to retain such Records, at Sellers' cost and expense.  With respect to any Litigation and claims that are Excluded Liabilities, Buyer shall render all reasonable assistance that Sellers may request in defending or prosecuting such Litigation or claim and shall make available to Sellers such personnel as are most knowledgeable about the matter in question, all without charge.

Section 6.4    **Employee Matters**.

(a)    No later than ten (10) Business Days prior to Closing Sellers will update the Employee Roster.  At least two (2) Business Days prior to the Closing, Buyer will identify the employees (or corresponding positions) on the Employee Roster to whom Buyer intends make an offer of employment.  Prior to Closing, Buyer may but is under

49

no obligation to offer employment to such identified employees listed on the Employee Roster (an "Offeree") to the extent such identified employee is a Current Employee and remains a Current Employee as of immediately prior to the Closing on such employment terms as Buyer may determine in its sole discretion.

(b)     Each Offeree of Sellers who is not a Transferred Employee shall be referred to herein as an "Excluded Employee."

(c)     Following the date of this Agreement:

i.     Sellers will allow Buyer or any of its Representatives reasonable access upon reasonable advance notice to meet with and interview the individuals listed on the Employee Roster during normal business hours;

ii.     Sellers shall not, nor shall any Seller authorize or direct or give express permission to any Affiliate, officer, director or employee of any Seller or any Affiliate, to (A) interfere with Buyer's or its Representatives' rights under Section 6.4(a) to make offers of employment to any Offeree, or (B) solicit or encourage any Offeree not to accept, or to reject, any such offer of employment;

iii.     Sellers shall provide reasonable cooperation and information to Buyer or the relevant Representative as reasonably requested by Buyer or such Representative with respect to its determination of terms and conditions of employment for any Offeree;

iv.     Sellers shall process the payroll for and pay, or cause to be paid, the base wages, base salary and benefits that are due and payable on or prior to the Closing Date with respect to all Current Employees.  Sellers shall withhold and remit all applicable payroll taxes as required by Law on or prior to the Closing Date with respect to all Current Employees as of such date;

v.     Sellers shall retain and be solely responsible for all Liabilities and obligations arising under or relating to any Employee Benefit Plans or the employment or termination of employment of any employee of any Seller, including without limitation any Current Employee or Former Employee (excluding the Assumed Payroll Obligations).   With respect to all Liabilities arising under or relating to Section 4980B of the Code or Part 6 of Subtitle B of Title I of ERISA ("COBRA"), Sellers and their respective ERISA Affiliates shall retain all Liability to provide continued group health coverage to all M&A qualified beneficiaries (as defined in Treasury Regulation § 54.4980B-9, Q/A(a) who expense a qualifying event (as defined in Treasury Regulation § 54.4980B-9, Q/A-6) as result of transactions contemplated by this Agreement.

(d)     Nothing in this Section 6.4 shall be construed as requiring, and neither Sellers nor any of their Affiliates shall take any affirmative action that would have the effect of requiring Buyer to continue (or prevent the termination of employment of) any specific employee benefit plan or to continue the employment of any specific person following the Closing.  Nothing in this Agreement is intended to establish, create or amend, nor shall anything in this Agreement be construed as establishing, creating or

50

amending, any employee benefit plan, practice or program of Buyer, any of its Affiliates or any of Sellers' Employee Benefit Plans, nor shall anything in this Agreement create or be construed as creating any contract of employment or as conferring upon any Current Employee, Former Employee, Transferred Employee or upon any other person, other than the parties to this Agreement in accordance with its terms, any rights to enforce any provisions of this Agreement under ERISA or otherwise. No provision of this Agreement shall create any third party beneficiary rights in any Current Employee or Former Employee of any Seller or any other Person (including any beneficiary or dependent thereof) of any nature or kind whatsoever, including without limitation, in respect of continued employment (or resumed employment) for any specified period.

**Section 6.5    Transfer Taxes**.    To the extent not exempt under Section 1146 of the Bankruptcy Code and subject to Section 5.9 of this Agreement, Sellers shall pay all Transfer Taxes. Sellers and Buyer shall cooperate to prepare and timely file any Tax Returns required to be filed in connection with Transfer Taxes described in the immediately preceding sentence.

**Section 6.6    Wage Reporting**.    Buyer and Sellers agree to utilize, or cause their respective Affiliates to utilize, the alternate procedure set forth in Internal Revenue Service Revenue Procedure 2004-53 with respect to wage reporting.

**Section 6.7    Insurance Policies**.    Other than as provided in Section 2.2(k) above, upon Closing, and until Sellers cease to be debtors in possession in the Chapter 11 Cases or the Chapter 11 Cases are closed or dismissed, the Sellers shall use commercially reasonable efforts (but at no material cost or expense to Sellers) to cause the assignment of all rights of the Sellers in and to all insurance coverage provided in relation to Sellers and the Purchased Assets that is maintained by any Seller or its Affiliates (whether such policies are maintained with third party insurers or with such Seller or its Affiliates) to Buyer as soon as reasonably practicable. To the extent that any current or prior Insurance Policy is not transferable to Buyer at the Closing in accordance with the terms thereof, each Seller, as applicable, shall (so long as Sellers remain debtors in possession in the Chapter 11 Cases and the Chapter 11 Cases have not been closed or dismissed and at no cost or expense to Sellers) hold such Insurance Policy for the benefit of Buyer, shall reasonably cooperate with Buyer (at Buyer's cost and expense) in pursuing any claims thereunder, and shall pay over to Buyer promptly any insurance proceeds paid or recovered thereunder with respect to the Purchased Assets or the Assumed Liabilities. In the event Buyer determines to purchase replacement coverage with respect to any such Insurance Policy, Sellers shall (so long as Sellers remain debtors in possession in the Chapter 11 Cases and the Chapter 11 Cases have not been closed or dismissed and at no cost or expense to Sellers) reasonably cooperate with Buyer to terminate such Insurance Policy to the extent only applicable to the Purchased Assets, and Sellers shall, at the option of Buyer, promptly pay over to Buyer any refunded or returned insurance premiums received by any Sellers in connection therewith (or, if applicable, Buyer's pro rata portion thereof) or cause such premiums to be applied by the applicable carrier to the replacement coverage arranged by Buyer.

**Section 6.8    Collection of Accounts Receivable**.

51

(a)    As of the Closing Date, each Seller hereby (i) authorizes Buyer to open any and all mail addressed to any Seller relating to the Business or the Purchased Assets and delivered to the offices of the Business or otherwise to Buyer if received on or after the Closing Date and (ii) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, made payable or endorsed to any Seller or Sellers' order, for Buyer's own account.

(b)    As of the Closing Date, each Seller agrees that any monies, checks or negotiable instruments received by any Seller after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, shall be held in trust by such Seller for Buyer's benefit and account, and promptly upon receipt by a Seller of any such payment (but in any event within five (5) Business Days of such receipt), such Seller shall pay over to Buyer or its designee the amount of such payments.   In addition, Buyer agrees that, after the Closing, it shall hold and shall promptly transfer and deliver to Sellers, from time to time as and when received by Buyer or its Affiliates, any cash, checks with appropriate endorsements, or other property that Buyer or its Affiliates may receive on or after the Closing which properly belongs to Sellers hereunder, including any Excluded Assets.

(c)    As of the Closing Date, Buyer shall have the sole authority to bill and collect Accounts Receivable that are Purchased Assets and accounts receivable relating to work performed by Buyer after the Closing.

**Section 6.9    Use of Name and Marks**.  Neither Sellers nor any of their Affiliates shall use, license or affirmatively authorize any third party to use, any Trademark which is similar to, confusing with, or which dilutes any Trademark included in the Purchased Assets.

**Section 6.10    Liquor License Approvals**.   Sellers shall reasonably cooperate with Buyer in connection with Buyer's filings with any Governmental Entity or third party with respect to any Liquor Licenses and obtaining any Liquor License Approval, including by entering into the Management Agreement and, if reasonably requested by Buyer, initiating and/or participating, at Buyer's sole cost and expense, in such Litigation reasonably requested by Buyer to obtain such Liquor License Approvals.   For the avoidance of doubt, Sellers shall not bear any of the costs or expenses of Buyers' efforts to obtain Liquor License Approval, except as explicitly provided in the Management Agreement.

**Section 6.11    Data Privacy Protection**.  Buyer acknowledges that the Purchased Assets include PII, along with associated personal information about the Sellers' customers.   In connection with the same, Buyer agrees to: (i) employ appropriate security controls and procedures (technical, operational and managerial) to protect PII and personal information, (ii) abide by all applicable Laws and regulations with respect to PII and (iii) take such further actions with respect to PII as may be agreed in writing between the Parties.  Buyer agrees that it shall, absent a customer's express consent received after adequate notice: (a) abide by the

52

Sellers' privacy policies and privacy-related covenants made in Sellers' terms of service that were in effect as of the Petition Date, (b) respect prior requests of customers to opt out of receipt of marketing messages (to the extent Sellers make Buyer aware of such requests; provided that Buyer shall seek to obtain such information from Sellers), and (c) use personal information only for the purposes of continuing Business operations and continuing to provide similar goods and services to customers, including marketing the products and services related to Purchased Assets. Buyer shall require express consent of a customer for any additional use of PII or personal information or before making material changes to the privacy policies that weaken a customer's consumer protection.  Furthermore, to the extent PII includes any social security numbers, Buyer shall limit such use to tax reporting purposes, and shall purge such information from its databases when such information is no longer required for that purpose.

Section 6.12  **Alternate Transactions**.  Buyer acknowledges that, pursuant to the Bid Procedures Order, and only after entry of the Bid Procedures Order on the Bankruptcy Court's docket, Sellers will solicit bids from other prospective purchasers for the sale of all of the Purchased Assets in accordance with the procedures set forth in the Bid Procedures Order; provided, however, that, following completion of the Auction (if any) until the Closing (in the event that Buyer is selected as the winning bidder), Sellers shall not, directly or indirectly, through any officer, director, employee, agent, professional or advisor, solicit any Alternate Transaction or participate in any negotiations or discussions with respect to any Alternate Transaction, and Sellers shall not, and Sellers shall cause their Affiliates not to, (i) execute an agreement (other than a customary confidentiality agreement) with respect to an Alternate Transaction or (ii) seek or support Bankruptcy Court approval of a motion or Order inconsistent in any material respect with the transactions contemplated by this Agreement.

Section 6.13  **Purchased Actions**.  Buyer covenants and agrees (on behalf of itself and its successors and assigns) not to assert any Purchased Action other than as a defense or counterclaim to any claim alleged or asserted against Buyer or its Affiliates by a Person that is or may be a Purchased Action defendant.

Section 6.14  **Buyer Designee**.  At the Closing, notwithstanding anything to the contrary herein, Buyer may in its sole discretion designate or assign to any of its Affiliates its right, title and interest in any of the Purchased Assets (for the avoidance of doubt, including the Assumed Contracts) pursuant to the terms of this Agreement.  If so instructed by Buyer, Sellers shall sell, transfer, assign, convey and deliver such Purchased Assets directly to such Affiliate in lieu of selling, transferring, assigning, conveying and delivering such Purchased Assets to Buyer.

### ARTICLE VII
### CONDITIONS TO CLOSING

Section 7.1  **Conditions to Buyer's Obligations**.

Subject to Section 7.3, Buyer's obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or written waiver of the following conditions (any or all of which may be waived in writing by the Sellers and Buyer in whole or in part to the extent permitted by applicable Law):

53

(a)    as of the date hereof and as of the Closing (in each case, except to the extent for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), each representation or warranty contained in Article III shall be true and correct in all respects other than *de minimis* exceptions;

(b)    Sellers shall have performed and complied with their covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Sellers shall have caused the documents and instruments required by Section 2.9(a) to be delivered to Buyer (or tendered subject only to Closing);

(c)    no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)    all Cure Amounts shall have been paid by the Sellers or as otherwise set forth in this Agreement;

(e)    Buyer shall have received all of the Consents from third parties (including any Governmental Entities) and Assumed Permits (including Liquor Licenses Approvals), except to the extent such Assumed Permits (including Liquor Licenses Approvals) are to be transitioned under the Management Agreement (including Liquor Licenses Approvals pursuant to Section 6.10) or the need for such Consents is obviated by the effect of the Sale Order, in each case, as listed on Schedule 7.1 (as the same may be revised, amended or modified by Buyer in its sole discretion up until the Sale Hearing);

(f)    the Bid Procedures Order shall have been entered by the Bankruptcy Court on a final, non-appealable basis;

(g)    the Sale Order shall have been entered by the Bankruptcy Court and shall be in full force and effect and not be subject to a stay pending appeal;

(h)    from the date of this Agreement until the Closing Date, there shall not have occurred and be continuing any Material Adverse Effect;

(i)    Buyer shall have received all of the deliverables pursuant to Section 2.9(a); and

(j)    Sellers shall have delivered a certificate from an authorized officer of Sellers to the effect that each of the conditions specified in Section 7.1(a), Section 7.1(b) and Section 7.1(h) has been satisfied.

**Section 7.2    Conditions to Sellers' Obligations**.    Subject to Section 7.3, Sellers' obligation to consummate the Contemplated Transactions in connection with the Closing are subject to satisfaction or written waiver of the following conditions (any or all of which may be waived in writing by the Sellers and Buyer in whole or in part to the extent permitted by applicable Law):

54

(a)      as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 4.1, Section 4.2 or Section 4.3 shall be true and correct in all respects other than *de minimis* exceptions, and (ii) each other representation or warranty set forth in Article IV shall be true and correct in all material respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, would not reasonably be expected to materially prevent, restrict or delay the consummation of the Contemplated Transactions or by any Related Agreement; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)      Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Buyer shall have caused the documents, instruments and payments required by Section 2.9(b) to be delivered to Sellers (or tendered subject only to Closing);

(c)      no Governmental Entity of competent jurisdiction shall have (i) enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)      the Bid Procedures Order shall have been entered by the Bankruptcy Court and shall be in full force and effect and not be subject to a stay pending appeal;

(e)      the Sale Order shall have been entered by the Bankruptcy Court and shall be in full force and effect and not be subject to a stay pending appeal;

(f)      Sellers shall have received all of the deliverables pursuant to Section 2.9(b); and

(g)      Buyer shall have delivered a certificate from an authorized officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) has been satisfied.

**Section 7.3      No Frustration of Closing Conditions.** Neither Buyer nor Sellers may rely on the failure of any condition to its obligation to consummate the Contemplated Transactions set forth in Section 7.1 or Section 7.2, as the case may be, to be satisfied if such failure was caused by such Party's failure to use its commercially reasonable efforts with respect to those matters contemplated by the applicable Sections of this Agreement to satisfy the conditions to the consummation of the Contemplated Transactions or other breach of a representation, warranty or covenant hereunder.

**Section 7.4      Waiver of Conditions.** Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to

55

have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing.

Section 7.5    **Agreement Regarding Schedules and Exhibits Hereto.** Notwithstanding anything to the contrary in this Agreement, the Parties will not append the various schedules and exhibits referred to in this Agreement upon the mutual execution and delivery of this Agreement. Rather, the Parties will work to mutually agree upon and append all schedules and exhibits hereto by no later than August 7, 2020 (the "Outside Agreement Date"). The Parties shall cooperate reasonably and in good faith to achieve such mutual agreement on or before the Outside Agreement Date. In the event that the Parties have not mutually agreed upon the form and content of all schedules and exhibits to this Agreement by the Outside Agreement Date, then either Buyer or Sellers shall have the right upon written notice to the other(s) to terminate this Agreement at any time prior to the Parties achieving mutual agreement on the form and content of such schedules and exhibits. Notwithstanding anything to the contrary herein, upon any such termination, the Parties shall conclusively be deemed released and relieved of any further liability or obligation hereunder, except as otherwise set forth in Section 8.3. Upon the Parties' mutual agreement upon the form and content of the schedules and exhibits hereto prior to the Outside Agreement Date, such schedules and agreements shall be deemed appended to and included in this Agreement and this Section 7.5 shall lapse and cease to be of any force or effect whatsoever as though it had never been included in this Agreement.

## ARTICLE VIII
## TERMINATION

Section 8.1    **Termination of Agreement**. This Agreement may be terminated in accordance with this Article VIII and the Contemplated Transactions abandoned at any time prior to the Closing (each a "Termination Event"):

(a)    by the mutual written consent of Buyer, on the one hand, and Sellers, on the other hand;

(b)    by written notice of either Buyer or Sellers, if there shall be any Law that makes consummation of the Contemplated Transactions illegal or otherwise prohibited, or upon the issuance by any Governmental Entity of an Decree restraining, enjoining, or otherwise prohibiting the consummation of the Contemplated Transactions or declaring unlawful the Contemplated Transactions, and such Decree having become final, binding and non-appealable; provided that no termination may be made by a Party under this Section 8.1(b) if the issuance of such Decree was caused by the breach or action or inaction of such Party;

(c)    by written notice of either Buyer or Sellers, if the Closing shall not have occurred on or before the Outside Date;

(d)    by written notice of either Buyer or Sellers, if any of the Chapter 11 Cases is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Sellers is appointed in the Chapter 11 Cases;

56

(e)     by Buyer, if (i) Bid Procedures Order shall not have been entered by the Bankruptcy Court on or before the Bid Procedures Order Deadline or (ii) at any time after entry of the Bid Procedures Order, such Bid Procedures Order is reversed, stayed, vacated or otherwise modified;

(f)     by Buyer, if (i) the Sale Order shall not have been entered by the Bankruptcy Court on or before the Sale Order Deadline or (ii) at any time after entry of the Sale Order, such Sale Order is reversed, stayed, vacated or otherwise modified;

(g)     by Buyer by giving written notice to Sellers at any time prior to Closing (i) in the event Sellers have breached any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in Sections 7.1(a) and 7.1(b) hereof, as the case may be, would not then be satisfied at the time of such breach, Buyer has notified Sellers of the breach, and the breach has continued without cure until the earlier of (i) five (5) days prior to the Outside Date so long as all other conditions of Buyer have been satisfied or (ii) thirty (30) days after the notice of the breach, in each case, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by Buyer;

(h)     by Sellers by giving written notice to Buyer at any time prior to Closing (i) in the event Buyer has breached any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in Sections 7.2(a) and 7.2(b) hereof, as the case may be, would not then be satisfied at the time of such breach, Sellers has notified Buyer of the breach, and the breach has continued without cure until the earlier of (i) five (5) days prior to the Outside Date so long as all other conditions of Sellers have been satisfied or (ii) thirty (30) days after the notice of the breach, in each case, unless such failure shall be due to the failure of Sellers to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by Sellers;

(i)     by written notice from Sellers to Buyer, if all of the conditions set forth in Section 7.1 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Buyer fails to complete the Closing at the time required by Section 2.7(a);

(j)     by Buyer if any secured creditor of any Seller obtains relief from the stay to foreclose on a material portion of the Purchased Assets;

(k)     by Buyer if any Affiliates of the Sellers (other than other debtors in the Chapter 11 Cases on the date hereof) that, directly or indirectly through one or more intermediaries, controls Sellers, files for relief pursuant to the Bankruptcy Code;

57

(l)    by Buyer if, at any time on or before the August 21, 2020, Buyer becomes aware of any matter as a result of its due diligence investigation (including by way of information delivered or made available by Sellers hereunder or on a Disclosure Schedule or Schedule hereto) that Buyer determines is unacceptable in its sole discretion; or

(m)    by Seller, upon a Decree by the Bankruptcy Court approving an Alternate Transaction.

Notwithstanding anything to the contrary contained herein, (i) in no event may Buyer terminate this Agreement under Section 8.1(f) on account of Buyer's failure to satisfy the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to any proposed Assumed Contract, and (ii) a Party shall not be permitted to terminate this Agreement pursuant to this Article VIII if the applicable Termination Event was caused by the breach of such Party or such Party's gross negligence, willful misconduct, or bad faith.

**Section 8.2    Procedure upon Termination**.    In the event of termination and abandonment by Buyer, on the one hand, or Sellers, on the other hand, or both, pursuant to Section 8.1, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate and the Contemplated Transactions shall be abandoned, without further action by Buyer or Sellers.

**Section 8.3    Effect of Termination**.

(a)    In the event that this Agreement is validly terminated pursuant to a right of termination as provided herein, then each of the Parties shall be relieved of its duties and obligations arising under this Agreement effective as of the date of such termination and such termination shall be without Liability to Buyer or the Sellers; provided, however, that Section 8.1, Section 8.2, this Section 8.3, and Article IX shall survive any such termination and shall be enforceable hereunder. In no event shall any termination of this Agreement relieve any Party hereto of any Liability for any breach of this Agreement by such Party.

(b)    In consideration of Buyer and its Affiliates having expended considerable time and expense in connection with this Agreement and the negotiation thereof, and the identification and quantification of assets to be included in the Purchased Assets, and to compensate Buyer as a stalking-horse bidder, and regardless of whether or not Buyer makes any matching or competing bids at the Auction, the Sellers shall pay to Buyer the Break-Up Fee, (i) in the event that this Agreement is terminated pursuant to Section 8.1(m) and the Sellers close an Alternate Transaction; and (ii) in the event that this Agreement is otherwise terminated pursuant to Sections 8.1(c) through (g), Section 8.1(j) or Section 8.1(k), and in each case, within twelve (12) months following the termination of this Agreement the Sellers close an Alternate Transaction. Such Break-Up Fee shall be immediately due and payable in full in cash from the proceeds of such Alternate Transaction and after the closing of an Alternate Transaction as set forth in clause (i) and clause (ii) of the immediately preceding sentence. The Break-Up Fee shall, subject to Bankruptcy Court approval, be treated as

58

a superpriority administrative expense in the Chapter 11 Case under Section 503(b)(1)(A) and Section 507(a)(2) of the Bankruptcy Code. The Sellers acknowledge and agree that: (A) the approval of the Break-Up Fee in the circumstances provided in this Section 8.3(b) is an integral part of the transactions contemplated by this Agreement; (B) in the absence of the Sellers' obligation to pay the Break-Up Fee as provided herein, Buyer would not have entered into this Agreement; (C) the entry of Buyer into this Agreement is necessary for preservation of the estates of the Sellers and is beneficial to the Sellers because, in the Sellers' business judgment, it will enhance the Sellers' ability to maximize the value of their assets for the benefit of their creditors and other stakeholders; (D) time is of the essence with respect to the payment of the Break-Up Fee and (E) the Break-Up Fee is reasonable in relation to Buyer's costs and efforts and to the magnitude of the transactions contemplated hereby and Buyer's lost opportunities resulting from the time spent pursuing the transactions contemplated hereby.  For the avoidance of doubt, the Break-Up Fee, if payable pursuant to this Section 8.3(b), shall be in addition to the payment of the Expense Reimbursement Amount, to the extent payable to Buyer pursuant to Section 8.3(c).

(c)    In consideration of Buyer and its Affiliates having expended considerable time and expense in connection with this Agreement and the negotiation thereof, and the identification and quantification of assets to be included in the Purchased Assets, upon any termination of this Agreement, other than any termination pursuant to Section 8.1(a) or by Sellers pursuant to Sections 8.1(h) or (i) (unless, in case of a termination pursuant to Sections 8.1(h) or (i), at the time of any such termination Buyer would have been entitled to terminate this Agreement pursuant to Sections 8.1(c) through (g), Sections 8.1(j) or (k) Sellers shall pay to Buyer in full in cash the Expense Reimbursement Amount within five (5) Business Days after the termination of this Agreement.  Sellers acknowledge and agree that (i) the payment of the Expense Reimbursement Amount is an integral part of the transactions contemplated by this Agreement, (ii) in the absence of the Sellers' obligation to make this payment, Buyer would not have entered into this Agreement, (iii) the delivery of the Expense Reimbursement Amount to Buyer is not a penalty, but rather shall constitute a reasonable amount that will compensate Buyer in the circumstances where Buyer is entitled to the reimbursable expenses for the efforts and resources expended and opportunities forgone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummating of the transactions contemplated thereby, and that, without these agreements, Buyer would not have entered into this Agreement, (iv) time is of the essence with respect to the payment of the Expense Reimbursement Amount and (v) the Expense Reimbursement Amount shall, subject to Bankruptcy Court approval, constitute a superpriority administrative expense of the Sellers' estates under Sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code. For the avoidance of doubt, the Expense Reimbursement Amount, if payable pursuant to this Section 8.3(c), shall be in addition to the Break-Up Fee to the extent payable to Buyer pursuant to Section 8.3(b).

(d)    In the event the Sellers consummate an Alternate Transaction and the Sellers fail to take any action necessary to cause the delivery of the Break-Up Fee and/or the Expense Reimbursement Amount under circumstances where Buyer is

59

entitled to the Break-Up Fee and/or the Expense Reimbursement Amount and, in order to obtain such Break-Up Fee and/or Expense Reimbursement Amount, Buyer commences a suit which results in a final non-appealable judgment in favor of Buyer, the Sellers shall pay to Buyer, in addition to the Break-Up Fee and/or Expense Reimbursement Amount, an amount in cash equal to the reasonable, documented, out-of-pocket costs and expenses (including reasonable attorneys' fees) incurred by Buyer in connection with such suit.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.1    Remedies**.  Except as set forth in Section 8.3, the Parties recognize that if a Party breaches or refuses to perform any of their covenants set forth in this Agreement, monetary damages alone would not be adequate to compensate the non-breaching Party for their injuries.  The non-breaching Party shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of, or to enjoin the violation of, the terms of such covenants.  If any Litigation is brought by the non-breaching Party to enforce such covenants, the breaching Party shall waive the defense that there is an adequate remedy at Law. The Parties agree to waive any requirement for the security or posting of any bond in connection with any Litigation seeking specific performance of, or to enjoin the violation of, such covenants.  The right to equitable relief, including specific performance and injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Agreement. Each of the Sellers and Buyer hereby agrees not to assert that specific performance, injunctive and other equitable remedies are unenforceable, violate public policy, invalid, contrary to Law or inequitable for any reason.  The Parties agree that the only permitted objection that they may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants. The right of specific performance, injunctive and other equitable remedies is an integral part of the transactions contemplated by this Agreement and without that right, neither the Sellers nor the Buyer would have entered into this Agreement.

**Section 9.2    Expenses**.  Except as otherwise provided in this Agreement (including Section 8.3), or a Related Agreement, Sellers and Buyer shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement, the Related Agreements and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions.

**Section 9.3    Entire Agreement**.  This Agreement (including the schedules and exhibits hereto and other documents specifically referred to herein) and the Related Agreements constitute the entire agreement among the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or among the Parties, written or oral, with respect to the subject matter hereof.

**Section 9.4    Incorporation of Schedules, Exhibits and Disclosure Schedule**.  The schedules, appendices and exhibits to this Agreement, the documents and other information

60

made available in the Disclosure Schedule are incorporated herein by reference and made a part hereof.

**Section 9.5    Amendments and Waivers**.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant.  No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.5 except as expressly provided herein.  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

**Section 9.6    Succession and Assignment**.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  None of the Parties may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of all Parties; provided, however, that Buyer shall be permitted to assign any of its rights hereunder to one or more of its Affiliates, as designated by Buyer in writing to Sellers; provided, however, Buyer shall remain liable for all of its obligations under this Agreement after any such assignment (including, without limitation, its obligation to provide adequate assurance of future performance with respect to all Assumed Contracts); provided, further, that Sellers shall be permitted to assign any of their rights hereunder pursuant to a confirmed chapter 11 plan or pursuant to an order of the Bankruptcy Court.

**Section 9.7    Notices**.    All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient; (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (iii) when sent by email (with written confirmation of transmission); or (iv) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to any Sellers or Sellers' Rep, then to:

> BarFly Ventures LLC
> 35 Oakes St. SW #400
> Grand Rapids, Michigan 49503
> Attention: Ned Lidvall
> Email: NLidvall@barflyventures.com

61

DOCS_SF:103743.4 07979/002

with copies (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
150 California St., 15th Floor
San Francisco, CA 94111
Attention: John W. Lucas
Email: jlucas@pszjlaw.com

If to Buyer, then to:

CIP Administrative, LLC
3131 McKinney Avenue
Dallas, Texas 75204
Attention: Travis Baldwin
Email: tbaldwin@congruentinv.com

with copies (which shall not constitute notice) to:

Paul Hastings LLP
71 S. Wacker Drive, 45th Floor
Chicago, IL 60606
Attention: Matt Murphy
           Amit Mehta
E-mail: mattmurphy@paulhastings.com
        amitmehta@paulhastings.com

Any Party may change the mailing address or email address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this Section 9.7.

**Section 9.8    Governing Law; Jurisdiction**.   This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of New York, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws.  The Parties agree that any Litigation one Party commences against any other Party pursuant to this Agreement shall be brought exclusively in the Bankruptcy Court and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum; provided that if the Bankruptcy Court is unwilling or unable to hear any such Litigation, then the courts of the State of Michigan, sitting in Grand Rapids, and the federal courts of the United States of America sitting in Grand Rapids, shall have exclusive jurisdiction over such Litigation.

DOCS_SF:103743.4 07979/002

**Section 9.9**    **Consent to Service of Process**.  Each of the Parties hereby consents to process being served by any Party, respectively, in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 9.7.

**Section 9.10 WAIVERS OF JURY TRIAL**.    EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE RELATED AGREEMENTS OR THE CONTEMPLATED TRANSACTIONS OR THEREBY.

**Section 9.11**    **Severability**.    The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement so long as the economic or legal substance of the Contemplated Transactions is not affected in a manner adverse to any Party.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) the Parties shall negotiate in good faith to find a suitable and equitable provision that shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

**Section 9.12**    **No Third Party Beneficiaries**.  Except as set forth in Section 5.8 hereof, this Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

**Section 9.13**    **No Survival of Representations, Warranties and Agreements**.  Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing.  Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for six (6) years following the Closing Date, and nothing in this Section 9.13 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Buyer and Sellers acknowledge and agree, on their own behalf and, with respect to Buyer that the agreements contained in this Section 9.13 (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for six (6) years; and (b) are an integral part of the Contemplated Transactions and that, without the agreements set forth in this Section 9.13, none of the Parties would enter into this Agreement.  For the avoidance of all doubt, nothing herein shall be deemed to require Sellers to perform any obligations under this Agreement beyond the date which is the first to occur of Sellers ceasing to be debtors in possession in the Chapter 11 Cases or the Chapter 11 Cases being closed or dismissed.

63

Section 9.14   **Non-Recourse**.  This Agreement may only be enforced against, and any Litigation based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement.  Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or representative of any party to this Agreement will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Litigation based upon, arising out of or related to this Agreement.

Section 9.15   **Construction**.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.  The word "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation." The words "herein," "hereto" and "hereby," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement.  Unless expressly stated in connection therewith or the context otherwise requires, the phrase "relating to the Business" and other words of similar import shall be deemed to mean "relating to the operation of the Business as conducted as of the date hereof." Except as otherwise provided herein, references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Exhibits, Appendices and the Disclosure Schedule herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Appendices, Exhibits and the Disclosure Schedule of this Agreement.  Any reference herein to any Law (or any provision thereof) shall include such Law (or any provision thereof) and any rule or regulation promulgated thereunder, in each case, including any successor thereto, and as it may be amended, modified or supplemented from time to time.  Any reference herein to "dollars" or "$" means United States dollars.  Where used with respect to information, the phrases "delivered" or "made available" means that the information referred to has been physically or electronically delivered (including the Data Room) no later five (5) calendar days prior to the expiration of the Due Diligence Period.

Section 9.16   **Computation of Time**.  In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

Section 9.17   **Mutual Drafting**.  Each of the Parties has participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 9.18   **Disclosure Schedule**.  The Disclosure Schedule has been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement.  The disclosure of any fact or item in any numbered and lettered section of the Disclosure Schedule shall, should the existence of such fact or item be relevant to any other section of the Disclosure Schedule, be deemed to be disclosed with respect to such other section

64

of the Disclosure Schedule only so long as the relevance of such disclosure to such other section of the Disclosure Schedule is readily apparent. Capitalized terms used in the Disclosure Schedule and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Disclosure Schedule or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business or consistent with past practice, and no party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Disclosure Schedule or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Disclosure Schedule or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business. In addition, matters reflected in the Disclosure Schedule are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedule. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Disclosure Schedule will be deemed to broaden in any way the scope of the parties' representations and warranties. The information contained in this Agreement, in the Disclosure Schedule and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party or any third party of any matter whatsoever, including any violation of Law or breach of contract.

Section 9.19 **Headings; Table of Contents**. The section headings and the table of contents contained in this Agreement, the Schedules and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.20 **Counterparts; Facsimile and Email Signatures**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

Section 9.21 **Sellers' Rep**.

(a) Sellers hereby appoint BarFly Ventures as the representative of Sellers (the "Sellers' Rep") to act in each Seller's name, place and stead, as such Seller's attorney-in- fact, to exercise all of the powers conferred upon it pursuant to this Agreement, for and on behalf of such Seller and without any act of such Seller. BarFly Ventures as Sellers' Rep hereby accepts such appointment. The dissolution, liquidation, insolvency or bankruptcy of any Seller shall not terminate such appointment or the authority and agency of the Sellers' Rep. The power-of-attorney granted in this Section 9.22(a) is coupled with an interest and is irrevocable. Buyer may conclusively rely upon, without independent verification or investigation, all decisions made by Sellers' Rep on behalf of Sellers.

65

(b)     From and after the date hereof, any notice given to the Sellers' Rep shall constitute notice to each and all of the Sellers at the time notice is given to the Sellers' Rep (other than notice for service of process relating to any Litigation before a court or other tribunal of competent jurisdiction, which notice must be given to each Seller individually, as applicable).  Any action taken or foregone by, or notice or instruction received from, the Sellers' Rep shall be deemed to be action or inaction by, or notice or instruction from, each and all Sellers.

(c)     BarFly Ventures shall serve as the Sellers' Rep until its resignation or it is otherwise unable to continue to serve.  Upon the resignation of BarFly Ventures or if it is not able to continue to serve for any reason, Sellers by a majority vote shall select a new Sellers' Rep by written consent signed by such majority.  No resignation or replacement of the Sellers' Rep shall become effective unless and until written notice of the replacement or resignation of such Sellers' Rep shall be provided to Buyer.  Each time a new Sellers' Rep is appointed pursuant to this Agreement, such Person, as a condition precedent to the effectiveness of such appointment, shall accept such position in writing.

**Section 9.22    Time of Essence**.  Time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement.

**Section 9.23    Risk of Loss.**    Notwithstanding anything to the contrary in this Agreement, the risk of loss or damage to the Purchased Assets (wherever located) shall unconditionally shift to the Buyer on the Closing Date.

**Section 9.24    Buyer's Removal of Purchased Assets.**  At any time prior to August 31, 2020 (the "Removal Date"), Buyer shall remove, or cause to be removed from the Excluded Restaurants, at Buyer's sole cost and expense, all portions of the Purchased Assets located there.  Buyer shall use commercially reasonable efforts to cause such removal to be accomplished in such manner as will minimize any damage to the Excluded Restaurants or any Excluded Assets or other assets of any other party having an interest in any of the Excluded Restaurants and shall cooperate in all reasonable respects (i) with any plans of Sellers to vacate the Excluded Restaurants and Sellers' removal of the Excluded Assets during the Removal Period and (ii) in the coordination of Sellers' and Buyer's activities at the Excluded Restaurants during the period prior to the Removal Date.  Buyer shall, at Buyer's sole cost and expense, promptly (and in no event later than the timeframe allowed for completion of such repairs under the Lease pursuant to which the applicable Seller occupies the relevant Excluded Restaurant) cause any damage to the Excluded Restaurants resulting from Buyer's removal, handling, shipping, disposition or other activities in connection with the Purchased Assets to be fully and completely repaired or restored; provided, however, that Buyer's obligation shall in no event exceed the relevant Seller's obligations under the applicable Leases pursuant to which such Seller occupies and has the right of possession of the Excluded Restaurant.  Buyer shall indemnify, defend and protect and hold Sellers, Sellers' bankruptcy estates, and Sellers' Affiliates harmless of, from and against any and all direct claims, demands, losses, damages, liabilities, obligations, actions, causes of action and costs and expenses (including, without limitation, all court costs and all reasonable attorneys' fees, costs and charges) as Sellers or such other indemnitees may suffer or incur as a result of Buyer's or Buyer's Representatives', employees', agents', contractors',

66

shippers' removal or handling of the Purchased Assets at or from the Excluded Restaurants. It is expressly understood that Buyer shall bear any and all costs and expenses of packing, shipping and handling the Purchased Assets following their removal from the Excluded Restaurants.

**[SIGNATURE PAGES TO FOLLOW]**

67

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the date first set forth above.

**SELLERS' REP:**

BARFLY VENTURES, LLC

By: _____

Name: Ned Kidvall

Title: Interim CEO

*[Signature page to Barfly Asset Purchase Agreement ]*

**SELLERS:**

BARFLY VENTURES, LLC

By: _____
Name: Ned Lidvall
Title: Interim CEO

9 VOLT, LLC

By: _____
Name: Ned Lidvall
Title: Interim CEO

50 AMP FUSE, LLC

By: _____
Name: Ned Lidvall
Title: Interim CEO

EL BREWPUB, LLC

By: _____
Name: Ned Lidvall
Title: Interim CEO

GRBC HOLDINGS, LLC

By: _____
Name: Ned Lidvall
Title: Interim CEO

*[Signature page to Barfly Asset Purchase Agreement ]*

HOPCAT-ANN ARBOR, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-CHICAGO, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-CONCESSIONS, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-DETROIT LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-GR BELTLINE, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-HOLLAND, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-INDIANAPOLIS, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

*[Signature page to Barfly Asset Purchase Agreement ]*

HOPCAT-KALAMAZOO, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-KANSAS CITY, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-LEXINGTON, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-LINCOLN, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-LOUSVILLE, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-MADISON, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-MINNEAPOLIS, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-PORT- ST. LUCIE, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-ROYAL OAK, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

HOPCAT-ST. LOUIS, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

LUCK OF THE IRISH, LLC

By:
Name: Ned Lidvall
Title: Interim CEO

**BUYER:**

PROJECT BARFLY LLC

By: _____

Name: Travis Baldwin

Title:   President

# EXHIBIT C

**Purchased Actions**

### Ongoing Trade Vendors / Service Providers

A & L Janitorial Inc.
ADP CLIENT TRUST
Airgas USA LLC - Rental
Allegra
Alliance Beverage Distributing LLC
Ameren Missouri
Armock Mechanical
Arrowaste Inc.
ASCAP
Becker & Poliakoff, PA
Beer City Glass
BHD0001--BHD, LLC
Borgetto Investments, LLC
Boston Square
Brewers Supply Group
Capitol Beverage Sales
CAVALI1--Cavalier Distributing Inc
Cavalier Distributing Inc
Centerpoint Energy
Certified Refrigeration & Mechanical, LLC
Citizens Energy Group
Comcast
ComEd
Comfort Systems USA Indiana
Consumer's Energy
Corrigan Logistics
Corrine Johnson
Cozzini Bros Inc
Cross Roads Brewing Co
Dan Henry
Daniel L Jacob & Co. Inc
Dawson Rubin
Delta Dental
Dover Grease Traps, Inc.
DTE Energy
Eastown Distributors
EatGR LLC
Eclectic Imprint
ECOLAB
Ecolab Pest Elim Div
Enroll123, LLC
Enviro-Master of West Michigan
Eventbrite, Inc.

## Ongoing Trade Vendors / Service Providers

Evergy
Evil Czeck Brewery & Public House
Fabiano Brothers
FedEx
Ferris Coffee & Nut Company, Inc
Field Fire Protection Inc
Final Clean Pro LLC
fintech
First Insurance Funding
Fish Window Cleaning
Glazers Wholesale Company
Gordon Food Service, if and only if the GFS Objections are withdrawn
Grand Rapids Graphix
Great America Financial Services
Great Lakes Beverage Co
Great Lakes West
GREATL1--Great Lakes Wine _ Spirits
Green For Life
GTT Communications
HC Woodward LLC
Henry A. Fox Sales Co.
HNI Risk Advisors
Hoekstra Electrical Services
Holland Board of Public Works
Holland Stitchcraft
Holston Gases
Humidity Controls LLC
Ice Town
ID Watchdog, Inc.
IHS Distributing
Imperial Beverage
INDIAN3--Indiana City Brewing
Infinisource Benefit Services
Insite Business Solutions
James Ferrari and Sons Inc
Jeff Meyer
Johnson Brothers
K&Z Distributing Co.
KegWorks
KM Prost LLC
Knight Investment Group
Lansing Board of Water and Light
Lee Shore Enterprises

**Ongoing Trade Vendors / Service Providers**

Lexington-Fayette Urban County Government
LG&E
Lincoln Electric Systems
Lincoln National Life Insurance Company
M4 C.I.C. LLC
Mervenne Beverage, Inc.
Michigan Dept of Treasury
Monarch Beverage
Mr Handyman Detroit
Mutual of Omaha
My Green Michigan LLC
My Handyman of Ann Arbor
Nantucket Baking Company
National Wine _ Spirits
Nick's Gyro's LLC
NRL Consulting
NuCO2
O & W, Inc
Oath Distributing
OLO
Omega :Yeast Labs
One Way Products
Open Table
Organix Recycling
Patty Matters
Pax Verum Brewing Co.
Phoebe Duvall
Plante & Moran, PLLC
Plaza Storage, LLC
Power Distributing
Premier Beverage CO
Premier-Midwest Beverage Co.
Produce Alliance
Professional Maintenance of Michigan, Inc.
Project 35 LLC
Quail Distributing, Inc.
Quality Brands of Lincoln LLC
R. L. Schrieber
R.E. Golden Produce Co
Rave Associates
Red Tap Solutions
Republic National Dist
Restaurant Technologies, Inc

**Ongoing Trade Vendors / Service Providers**

RLM Services LLC
Rotella's Italian Bakery, Inc.
Round It Up America, Inc.
Ryan Leibinger
Saladino Smoke LLC
Scott Cooley
South Broad Ripple Brewing Co
Southern Glaziers of MO
Southern Wine & Spirits
Sparkling Windows Corp.
Spire
Standard Sales Company
Star 2 Star Communications LLC
State Distributing
Sterling/Glaziers Distributing
Susan Kalee
TDS
The Guardian Brewing Co.
Time Warner Cable
Todd Kronebusch
Town Center Inc.
Tri-County Beverage Company
Unemployment Services, Inc.
Unifirst Corporation - Michigan
United Beverage
Valley City Linen
Verdolino & Lowey, P.C.
Verizon Wireless
Vicinity Energy Grand Rapids LLC
VSP Insurance Co.
Waste Management of Michigan
Welders Supply Company
West Side Beer Distributing
WestRock CP LLC
Wirtz Beverage Wisconsin
XCEL Energy
Zink Distributing