## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re | Chapter 11 |
| BARFLY VENTURES, LLC., *et al.*,[1] | Case No. 20-01947-jwb |
| | (Jointly Administered) |
| Debtors. | |

## DECLARATION OF NED LIDVALL IN
## SUPPORT OF SUBSTANTIVE CONSOLIDATION

I, Ned Lidvall, declare and state as follows:

1.     I am the duly appointed independent manager and interim chief executive officer of the above-captioned debtors (each, a "Debtor" and collectively, the "Debtors") and am authorized to submit this declaration in support of the *Joint Motion of the Debtors and the Official Committee of Unsecured Creditors for the Entry of an Order (I) Substantively Consolidating the Debtors' Estates; (II) Authorizing the Wind Down of the Estates; (III) Authorizing the Rejection of Contracts and Leases; and (IV) Authorizing the Debtors to Certify that the Estates May Be Converted to Chapter 7* [Doc. No. 388].

---

[1]   The Debtors, along with the last four digits of each Debtor's federal tax identification number are: Barfly Ventures, LLC, (8379), Barfly Management, LLC (6274), 9 Volt, LLC (d/b/a HopCat)(1129), 50 Amp Fuse, LLC (d/b/a Stella's Lounge)(3684), GRBC Holdings, LLC, (d/b/a Grand Rapids Brewing Company)(2130), E L Brewpub, LLC (d/b/a HopCat East Lansing)(5334), HopCat-Ann Arbor, LLC (5229), HopCat-Chicago LLC (7552), HopCat-Concessions, LLC (2597), HopCat-Detroit, LLC (8519), HopCat- GR Beltline, LLC (9149), HopCat-Holland, LLC (7132), HopCat Indianapolis, LLC (d/b/a HopCat-Broad Ripple)(7970), HopCat-Kalamazoo, LLC (8992), HopCat-Kansas City, LLC (d/b/a HopCat-KC, LLC and TikiCat)(6242), HopCat Lexington, LLC (6748), HopCat-Lincoln, LLC (2999), HopCat-Louisville, LLC (0252), HopCat-Madison, LLC (9108), HopCat-Minneapolis, LLC (8622), HopCat-Port St. Lucie, LLC (0616), HopCat- Royal Oak, LLC (1935), HopCat-St. Louis, LLC (6994), Luck of the Irish, LLC (d/b/a The Waldron Public House LLC and McFadden's Restaurant Saloon) (4255).

2.      In May 2020, I was appointed as an independent manager to the boards of managers of the Debtors and was also appointed as interim chief executive officer of the Debtors. In my capacity as an independent manager and interim chief executive officer, my responsibilities include overseeing the Debtors' operations and their sale efforts.

3.      The Debtors commenced the above-captioned bankruptcy cases on June 3, 2020 (the "Petition Date"). Additional background regarding the Debtors operation is set forth in the *Declaration of Mark A. Sellers, III in Support of First Day Motions* (the "Sellers' Declaration"). [Docket No. 4], which is incorporated herein by reference.

4.      Prior to the Petition Date, the Debtors operated as an integrated unit and the following are examples of the Debtors' corporate interrelatedness prior to the Petition Date:

   a.   **Restaurant Operations** – Each of the Debtors' restaurants was owned by and set up under a stand-alone limited liability company. Each company entered into a stand-alone lease for the premises. All of the revenue derived from the operation of any single restaurant location was consolidated with the cash from the other restaurants into a single concentrated bank account that was owned by Ventures. Ventures used the cash to pay for the expenses arising from the operation of the all the restaurant locations and the Debtors' corporate office. If, for example, the revenue from any single restaurant location was not sufficient to satisfy the operating expenses from that location, Ventures would use the revenue generated from the other locations to satisfy the remaining operating expenses. As the performance of each location fluctuated over time, it would be impractical and extremely cost prohibitive to determine now whether and to what extent any one of the under-performing restaurant locations relied on the cash from one or more of the more profitable locations. Similarly, it would be impractical and extremely cost prohibitive to determine which profitable restaurant locations provided its surplus operating revenue to pay the expenses of under-performing locations. As enterprise grew and added locations, they operated in an integrated manner that relied on consolidating cash and expenses.

   b.   **Cash Management System**[2] – As noted above, the Debtors utilized a single operating account (the "Operating Account"), whereby the

---

[2]   The Debtors' cash management is further detailed in the *Motion for Entry of an Order Authorizing Debtors' (I) Maintenance of Existing Bank Accounts; (II) Continuance of*

individual Debtor sub-accounts maintained by each restaurant were automatically swept daily from the sub-accounts to the Operating Account such that the end of day balance of the sub-accounts was always $0. Likewise, credit card deposits were made by credit card processors directly into the Operating Account.

c. **Common Management and Ownership** – Barfly Ventures, LLC ("Ventures") is owned by approximately 55 individuals and entities. Barfly Management, LLC, owned by Mark Sellers, III ("Sellers"), is the majority member of Ventures.[3] Each of the restaurants (e.g., the other Debtors) are single-member LLCs owned by Ventures. Likewise, the Debtors shared common management and were operated as an integrated business.

d. **Shared Senior Debt** – All but one of the Debtors (HopCat-Concessions, LLC) were co-borrowers under a credit agreement, dated August 31, 2015 with Congruent Credit Opportunities Fund III, LP, Main Street Capital Corporation, and HMC Income Fund (collectively, the "Prepetition Lenders"), and CIP Administrative, LLC as administrative agent. The proceeds of the secured lending facility were used to operate the business as a whole and to make capital improvements as necessary. In the end, the Debtors, as co-borrowers, were jointly and severally liable for all of the debt without regard to how the loan proceeds might been used for the benefit of any of the operating restaurants. The Prepetition Lenders ultimately acquired substantially all of the Debtors' assets through a credit bid of their outstanding debt.

e. **Vendor Relationships** – Certain of the Debtors' vendors, such as Gordon Food Service, the Debtors' primary food vendor, transacted business with Ventures.  *See* Ventures Claim No. 96. The Debtors internally allocated goods and services to individual Debtor restaurants. Even in those instances where the affiliated Debtors (e.g., not Ventures) separately entered into agreements with creditors, Ventures often served as a guarantor. *See* Ventures lease guaranties at Venture Claim Nos. 11, 37, 40, 60, 61, 62 and 103.

f. **Employee Payroll** – Prior to the Petition Date, Ventures applied for and received a Paycheck Protection Program ("PPP") loan in the amount of $6.6 million.  The PPP loan was deposited into a PPP money market

---

*Existing Cash Management System, Bank Accounts, Checks and Related Forms; (III) Limited Waiver of Section 345(b) Deposit and Investment Requirements; and (IV) Granting Related Relief.* [Docket No. 10].

[3]  The Debtors' Corporate Organizational Chart is attached as Exhibit A to Sellers' Declaration. [Docket No. 4].

account and used to pay various obligations, including payroll, for all of the Debtors.[4]

5.     On the Petition Date, Ventures' assets consisted primarily of cash derived from the individual Debtor restaurant bank accounts, the PPP loan proceeds, certain causes of action and certain trademarks and other intangible assets.

6.     Post-petition, the Debtors maintained the same cash management system. The Debtors' cash continued to be swept into the Operating Account on a daily basis, and Ventures continued to incur liabilities from certain vendors, such as Gordon Food Service, for the Debtors' common good. Moreover, post-petition, the PPP loan proceeds, while in Venture's name, were used to pay the Debtors' individual liabilities, including rent, utilities and employee obligations.

7.     The Debtors filed these chapter 11 cases with the goal of pursuing a going concern sale of substantially all of their assets to maximize the value of their assets for the benefit of creditors of their estates. To that end, on July 9, 2020, the Debtors filed the *Motion of Debtors for Entry of an Order (A) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Doc. No. 127] (the "Sale Motion") seeking to sell substantially all of their assets to an affiliate of the Prepetition Lenders (the "Purchaser"). On October 15, 2020, the Bankruptcy Court entered the *Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III)*

---

[4]  *See Debtors' Motion for Entry of an Order Authorizing Debtors'(I) Maintenance of Existing Bank Accounts; (II) Continuance of Existing Cash Management System, Bank Accounts, Checks and Related Forms; (III) Limited Waiver of Section 345(b) Deposit and Investment Requirements; and (IV) Granting Related Relief* [Doc. No. 10] at ¶¶ 14-15.

*Granting Related Relief* [Doc. No. 363] (as subsequently amended, the "Sale Order") approving the Sale Motion.

8.    The Sale Order provided that two primary assets would remain with the Debtors' estates post-closing: (a) $225,000 in cash to be used exclusively by any chapter 11 trustee or chapter 7 trustee, acting on behalf of the Debtors' estates, as applicable, at his or her discretion, with any remainder to be distributed to unsecured creditors pursuant to the Bankruptcy Code; and (b) all causes of action belonging to the Debtors' estates, excluding certain causes of action that were acquired by the Purchaser. *See* Sale Order at ¶¶ 48-49.

9.    While I understand that the Committee's investigation of causes of action belonging to the Debtors' estates is ongoing, I understand that they (or a successor trustee) intend to investigate and, if appropriate, pursue claims involving alleged mismanagement, self-dealing and breach of fiduciary duties by prior management.  I understand that the primary known causes of action relate to the transfer of funds from the Debtors to Sellers and/or his ex-wife in an amount not less than $1.7 million. On information and belief, these payments pertained to Sellers' alimony obligations to his ex-wife and were not obligations of the Debtors. Because these transfers occurred over many years, and because of the nature of the Debtors' cash management system, it would be impossible to trace the origins of the funds transferred from any individual Debtor or to allocate the causes of action (or any proceeds therefrom) amongst the Debtors.

10.    In light of the remaining assets – unallocated cash and causes of action common to all of the Debtors' estates – maintaining the corporate formalities separating the Debtor entities will do considerable harm to the Debtors' creditor body as a whole. As between the

Debtors, ownership of these remaining assets is so scrambled that separating them (if possible) would be prohibitively expensive and hurt all creditors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 22nd day of December 2020.

Ned Lidvall